# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KIRK LAUGHLIN, derivatively on behalf of SYNCHRONOSS TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> STEPHEN G. WALDIS, WILLIAM J. CADOGAN, THOMAS J. HOPKINS, JAMES M. MCCORMICK, DONNIE M. MOORE, ROBERT E. GARCIA, LAWRENCE IRVING, RONALD W. HOVSEPIAN, KAREN L. ROSENBERGER, KRISTIN RINNE, GLENN LURIE, LAURIE HARRIS, FRANK BAKER, ROBERT AQUILINA, MOHAN GYANI, CHARLES E. HOFFMAN, AND JOHN FREDERICK, <br><br> Defendants, <br><br> and <br><br> SYNCHRONOSS TECHNOLOGIES, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No.: 3:20-cv-7150 <br><br><br><br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

By and through his undersigned counsel, Plaintiff Kirk Laughlin ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Synchronoss Technologies, Inc. ("Synchronoss" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties arising from, *inter alia*, the issuance of materially false and misleading statements, the failure to maintain adequate internal controls and make a good faith correction of the problems therewith, and the wrongful refusals of Plaintiff's litigation demands, as well as for unjust enrichment, insider selling, corporate waste, and contribution pursuant to the Securities and Exchange Act of 1934. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Synchronoss and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Individual Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Synchronoss's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action, *In re Synchronoss Technologies, Inc., Securities Litigation*, No. 3:17-cv-02978-FLW-

LHG (D.N.J.) (the "Securities Class Action"), and *In re Synchronoss Technologies, Inc., Securities Litigation*, No. 3:17-cv-07173-FLW-LHG (D.N.J.) (the "Demand Futility Action"); and (e) review of other publicly available information concerning Synchronoss and the Individual Defendants.  Pursuant to Local Rule 10.1(a), the names and addresses of the parties are as follows:

| **Plaintiff** | **Defendants** |
|---|---|
| Kirk Laughlin, derivatively on behalf of Synchronoss Technologies, Inc. c/o Johnson Fistel, LLP 655 W. Broadway, Suite 1400 San Diego, California 92101 | Nominal Defendant: Synchronoss Technologies, Inc. 200 Crossing Blvd., 8th Floor Bridgewater, New Jersey 08807 Defendants: Stephen G. Waldis, William J. Cadogan, Thomas J. Hopkins, James M. McCormick, Donnie M. Moore, Robert E. Garcia, Lawrence Irving, Ronald W. Hovsepian, Karen L. Rosenberger, Kristin Rinne, Glenn Lurie, Laurie Harris, Frank Baker, Robert Aquilina, Mohan Gyani, Charles E. Hoffman, and John Frederick c/o Synchronoss Technologies, Inc. 200 Crossing Blvd., 8th Floor Bridgewater, New Jersey 08807 |

## NATURE AND SUMMARY OF THE ACTION

1.      This derivative action arises from Synchronoss's Board of Directors' ("Board") and the Demand Review Committee's ("Committee") failure to vindicate Synchronoss's rights via wrongfully refusing Plaintiff's August 6, 2018 Demand (the "August 6, 2018 Demand") and Plaintiff's September 5, 2019 Demand (the "September 5, 2019 Demand" and collectively, the "Demands") that demanded the

Individual Defendants investigate and bring an action against certain current and former directors and officers of the Company for their wrongful conduct in making material misstatements and omissions related to (i) the "friends and family" sale of the Activation Business; (ii) a $9.2 million licensing fee and said fee's impact on the Company's Fourth Quarter 2016 financial results; and (iii) the Company's persistent pattern of falsifying revenue metrics so that the Company could meet its financial guidance targets.

2.      Synchronoss, a Delaware corporation, is a mobile technology service company that provides mobility solutions for service providers and enterprises on the cloud platform and software-based applications for connected devices.  During the period of misconduct, Synchronoss was comprised of two business segments: (i) the Activation Business, which provided cellphone providers, mainly AT&T and Verizon, with technology software licenses that enabled their consumers to activate newly purchased cell phones and also provided these phones with data storage and back-up functions (the "Activation Business"); and (ii) emerging after the Activation Business, the Cloud Services Business, which enabled users to store, manage, and process vast amounts of data without having to store said data on local servers or personal computers. (the "Cloud Services Business").

3.      From 2000 to around 2012, the Activation Business accounted for most of Synchronoss's revenues, but around 2013, however, the Company began to brand itself as a "cloud services provider."

4.      Over time, the Cloud Services Business became an important source of revenue for the Company, such that in 2014, the Company changed its executive compensation structure to reflect and correlate with the success of the Cloud Services Business.

5.      After the Company made the foregoing changes to its executive compensation structure, the Cloud Services Business began to experience unprecedented growth. However, time would reveal that this growth was driven by the Individual Defendants' accounting manipulation. Indeed, typically right before the close of a fiscal quarter or year, the Individual Defendants would fabricate contracts with customers and then book the revenues from these contracts as revenue for the corresponding reporting period. One of the most egregious of these instances came in 2016.

6.      In 2016, the revenue growth from the Cloud Services Business began to slow, and given that the Company's share price and the executives' compensation depended on this growth, the Individual Defendants falsified a contract with Verizon. In the third quarter of 2016, Defendant Stephen G. Waldis ("Waldis") announced that the Company "signed a $25 million license deal with Verizon during

the quarter," which Defendant Karen L. Rosenberger ("Rosenberger") would later confirm. The deal was purported to be a "key contributor to [Synchronoss's] cloud performance in the quarter and continued success of the Version relationship…." With this deal, the Company was able to meet its third quarter guidance; however, this was completely false, and the Company (as detailed below) would later be forced to restate its financial statements for the fiscal year of 2016 as well as other years.

7.     Around this same time period, the Company's Activation Business accounted for a significant portion of its revenues and profits and was a key component of Synchronoss's business.    Nevertheless, on November 7, 2016, Synchronoss announced that it was evaluating strategic alternatives for its Activation Business in an attempt to enhance shareholder value.  Unbeknownst to investors, the Company was already in discussions with Intralinks Holdings, Inc. ("Intralinks"), a cloud-computing content manager and service provider, about a potential acquisition.

8.     On December 6, 2016, via an 8-K filed with the SEC, the Individual Defendants caused the Company to announce that it was divesting 70% of the Company's Activation Business ("Activation Divesture" or "Activation Sale") to a company called Sequential Technology Holdings, LLC ("Sequential"). To facilitate the Activation Sale, the Company announced that it formed a new entity

called Sequential Technology, Inc. ("STI") and that the majority of the Activation Business's assets were to be transferred to STI. Thereafter, Synchronoss would sell 70% of the Company's interest in STI to Sequential, retaining a 30% interest, and in exchange, Sequential would provide Synchronoss with a "cash payment of $146 million." With this cash payment, and up to a $900 million credit line from various banks, Synchronoss would then purchase all Intralinks outstanding stock at $13.00 per share or $821 million (the "Intralinks Acquisition"), and Intralinks would become Synchronoss's wholly owned subsidiary. As part of the Intralinks Acquisition, its CEO, Defendant Ronald Hovsepian ("Hovsepian"), would become the Company's CEO on January 18, 2017 and Defendant Waldis would continue to serve as Synchronoss's Chairman of the Board of Directors.

9.       After the deal closed, investors would learn the startling details of the conflicted nature of the Activation Sale via a report published by the Southern Investigative Reporting Foundation, also known as the Foundation of Financial Journalism ("SIRF"), entitled "Synchronoss Technologies: The Friends and Family Plan" (the "SIRF Report") that accused the Company of hiding from investors key aspects of the Activation Sale. The SIRF Report revealed that Sequential was formally known as Omniglobe International ("Omniglobe"), which had been partly owned by Synchronoss insiders, including Waldis, Synchronoss's CEO and Chairman. These insiders attempted to conceal their ownership of Omniglobe by

holding their Omniglobe shares indirectly through an entity called Rumson Hitters LLC ("Rumson Hitters").   In the SIRF Report, an STI chief executive, Jaswinder Matharu, explained that Synchronoss insiders held their Omniglobe shares in Rumson Hitters until "they had to restructure things a little after the [Synchronoss] IPO," and further, the news article continued:  "Pressed on what 'restructure' meant in that context, he said there were 'legal moves' but that the Rumson Hitters entity was 'still owned by friends and family' of Synchronoss."

10.    Furthermore, Synchronoss  later revealed that despite the claim the Company was to receive $146 million in cash for the Activation Sale, Sequential only put down $17.33 million in cash up front, along with $7.7 million in unspecified "contributed assets" and the rest was financed via a $83 million promissory note.  To make matters worse, the $146 million represented the Activation Business's total value and not just the 70% interest sold to Sequential.

11.    When the dust settled, the Company had been stripped of its Activation Business, which was then sold to Defendant Waldis's and other Synchronoss insiders' friends and family for a payment of *only* $17.33 million, while the Company financed the rest.  The Individual Defendants knew the Activation Sale only benefited the friends and family of Waldis and the other Synchronoss insiders.

12.    In addition to the egregious Activation Sale, certain of the Individual Defendants engaged in scheme to artificially inflate its revenue and

earnings target.  Specifically, on December 22, 2016, just days before the end of Synchronoss's fiscal year, the Company allegedly entered into a $9.2 million licensing agreement with Sequential ("Licensing Agreement") for the use of the Company's analytics software, and like the payment for the Activation Sale, Sequential paid for the $9.2 million Licensing Agreement with a promissory note (or similar mechanism), bringing the total amount Sequential owed to Synchronoss to $92.2 million.   Unsurprisingly, the $9.2 million was booked as revenue in Synchronoss's statement of income for Q4 2016, thereby allowing Synchronoss to meet its revenue and earnings targets for its Cloud Services Business.

13.   On February 8, 2017, Synchronoss announced its financial results for Q4 2016 as in line with the Company's prior guidance, including guidance for the Company's "Cloud Services" revenues between $122 million and $125 million. During a conference call with analysts on that same date, Synchronoss executives received multiple questions regarding payments made by Sequential to Synchronoss. Only the ongoing $32 million three-year transition services agreement ("TSA") was discussed, which was part of the Activation Divesture, whereby Synchronoss agreed to provide ongoing support to Sequential related to the Activation Business, including cost of sales, corporate overhead, and stock-based compensation, in exchange for an annual fee of $32 million paid to Synchronoss.  However, neither in the announced financial results, nor on the earnings call was the fact that the

Company entered into the $9.2 million Licensing Agreement, which was the only reason the Company purportedly met its earnings guidance for the Cloud Services Business, disclosed.

14.    On February 27, 2017, the Company filed its Annual Report on Form 10-K with the SEC (the "2016 10-K"), therein disclosing—*for the first time*—that on December 22, 2016, the Company had entered into the Licensing Agreement.

15.    On this news, Synchronoss's share price declined by $1.80 per share, or 5.9%, from $30.49 per share on February 24, 2017 to $28.69 per share on February 27, 2017 (the next trading day). Synchronoss's share price declined an additional 5.61%, to $27.08 per share, on February 28, 2017, as the market continued to process these disclosures. These steep declines in Synchronoss's stock price collectively wiped out over $158 million in Company market capitalization.

16.    On April 27, 2017, Synchronoss announced that then-CEO, Defendant Hovsepian, and then-Chief Financial Officer ("CFO"), Defendant John Frederick ("Frederick"), were leaving the Company, after assuming their positions just three months and two months prior, respectively, following the Intralinks Acquisition. Defendant Waldis would, once again, take over as CEO. Synchronoss also warned investors that revenue for the first quarter of 2017 ("Q1 2017") would not meet expectations, disclosing that it expected "total revenue for the first quarter of 2017 to be $13 million to $14 million less than the Company's

previously announced guidance" and that it expected operating margins of 8% to 10%, which was also less than previously announced guidance.  The Company stated that it was "disappointed with [its] Q1 performance in this first quarter following our acquisition of Intralinks."

17.     On this news, Synchronoss's stock price declined $11.33, or 46.02%, from $24.62 per share on April 26, 2017 to $13.29 per share on April 27, 2017, on unusually heavy trading volume—wiping out approximately *$525 million more* in Company market capitalization.

18.     According to Pacific Square Research's Herb Greenberg ("Greenberg"), Synchronoss spent months "pulling out all stops to mask a double-digit decline in cloud revenue."   Greenberg also explained that Synchronoss's financials did not add up, stating: "[t]his is a company that we believed, since we first started writing about it in January, that there were plenty of moving parts which just seemed off."  Greenberg further stated: "[a]ny time the CEO and CFO, who has been in the post for less than 4 months, walks out the door, that's not a good sign. . . .  If you knew nothing else, that's all you need to know."

19.     Then, on June 13, 2017, Synchronoss announced that it would need to restate its financials for 2015 and 2016, and that such financials should no longer be relied on as a result of revenue recognition errors.

20.   Following this news, the Company's stock price continued its tumble, closing at $11.26 per share on June 14, 2017, a decrease of 7.2% from a price of $12.13 per share the prior trading day, erasing **another $40.34 million** in Company market capitalization.

21.   Then, on October 12, 2017, the Company announced that it would also need to restate its financials for the fiscal year of 2014.

22.   As detailed further below, during the period of misconduct, Synchronoss was forced to issue false and misleading statements concerning (i) the Activation Divesture; (ii) the Licensing Agreement; and (iii) the recognition of the Company's revenues.  Specifically, the Individual Defendants caused the Company to make false and/or misleading statements, and/or failed to disclose that: (i) Synchronoss's Activation Business was sold to an existing vendor, *i.e.*, Sequential (formerly Omniglobe), that had previously been owned by several members of Synchronoss's senior management, including Defendant Waldis; (ii) Synchronoss did not receive a $146 million cash payment for the Activation Sale; (iii) Synchronoss and Sequential entered into a $9.2 million licensing agreement for the sole purpose of artificially inflating Synchronoss's financials; and (iv) the Company regularly recorded false revenues to meet earnings guidance.

23.   As a result of their fraudulent scheme, the Individual Defendants were able to artificially inflate the Company's financials, and its stock price.

24.     Furthermore, certain of the Individual Defendants breached their fiduciary duties by causing the Company to authorize the repurchase of $100 million worth of its common stock—and executing the repurchase of over $40 million worth of its common stock, such that the Company materially overpaid for its own stock—through a share repurchase program, announced on February 4, 2016.  The share repurchase program had the effect of artificially inflating the Company's stock price.

25.     Then, while the Company's stock price was artificially inflated due to the false and misleading statements detailed herein, as well as the share repurchase program, certain Individual Defendants exploited their positions as corporate fiduciaries of Synchronoss and sold their personal stock holdings for ***over $78 million*** in insider profits, based on knowledge of material, adverse, and non-public information regarding the Company's business, operations, and financial prospects.

26.     As is detailed herein, the Board and the Committee have failed to act independently, in good faith, and within the realm of sound business judgment in investigating and denying the Demand.  In light of the Board's unreasonable and wrongful refusals of Plaintiff's Demands to investigate and remediate harms caused to the Company, Plaintiff has filed this action alleging breach of fiduciary duties and unjust enrichment.  Because the Board failed to act independently and in good faith

within the realm of sound business judgment in investigating and refusing the Demands, this derivative action should be permitted to proceed.

## JURISDICTION AND VENUE

27.    The Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over the non-federal claims asserted herein under 28 U.S.C. § 1367(a).  The Court also has jurisdiction over all claims asserted in this matter pursuant to 28 U.S.C. § 1332(a)(2), in that Plaintiff and Defendants are citizens of different states, and the matter in controversy exceeds $75,000, exclusive of interests or costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

28.    Venue is proper in this district under 28 U.S.C. § 1391 because: (a) Synchronoss maintains its principal executive offices in this District; (b) one or more of the Defendants reside(s) in this District; (c) a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts—occurred in this District; and (d) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

29.    In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

### A.    Plaintiff

30.    Plaintiff Kirk Laughlin has been a continuous Synchronoss shareholder since March 9, 2015, and is, currently, and at all relevant times, has been, a holder of Synchronoss common stock.  Plaintiff is a citizen of Connecticut.

### B.    Nominal Defendant

31.    Nominal Defendant Synchronoss is incorporated in Delaware and maintains its principal executive offices at 200 Crossing Blvd., 8th Floor, Bridgewater, New Jersey 08807.  In June 2006, Synchronoss conducted its initial public offering ("IPO") and began trading on the NASDAQ under the symbol "SNCR."  The Company currently has more than 46 million shares outstanding.

### C.    Individual Defendants

32.    Defendant Waldis is the Founder, Executive Chairman, and CEO of Synchronoss, having served as Executive Chairman since January 2017, Chairman of the Board since 2001, CEO from 2000 until January 2017 and again from April 2017 to the present, and President from 2000 until 2011.  Waldis serves as a

member of the Business Development Committee.  During the period of misconduct, Synchronoss was forced to pay Waldis a sum of $26,733,405 in total compensation, and while in possession of material, non-public information, Waldis sold at least 655,657 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $23,033,296.  Waldis is a defendant in the Securities Class Action and the Demand Futility Action.  Waldis is a citizen of New Jersey.

33.     Defendant William J. Cadogan ("Cadogan") has served as a Director of Synchronoss since 2005.  Cadogan serves as Chair of the Compensation Committee and the Nominating/Corporate Governance Committee and is a member of the Business Development Committee.  During the period of misconduct, Synchronoss was forced to pay Cadogan a sum of $1,758,019 in compensation, and while in possession of material, non-public information, Cadogan sold at least 72,500 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $2,478,885.  Cadogan is a named defendant in the Demand Futility Action, and he is a citizen of Florida.

34.     Defendant Thomas J. Hopkins ("Hopkins") has served as a Director of Synchronoss since 2004.  Hopkins serves as Chair of the Business Development Committee, as well as a member of the Audit Committee, the Compensation Committee, and the Nominating/Corporate Governance.  Hopkins is designated by Synchronoss as a Financial Expert.  During the period of misconduct, Synchronoss

was forced to pay Hopkins a sum of $1,769,696 in total compensation, and while in possession of material, non-public information, Hopkins sold at least 72,500 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $2,911,875.  Hopkins is a named defendant in the Demand Futility Action, and he is a citizen of New Jersey.

35.     Defendant James M. McCormick ("McCormick") served as a Director of Synchronoss from 2000 until June 5, 2019.  During his tenure, McCormick served as Chair of the Nominating/Corporate Governance Committee, as well as a member of the Compensation Committee.  During the period of misconduct, Synchronoss was forced to pay McCormick a sum of $1,681,691 in total compensation, and while in possession of material, non-public information, McCormick sold at least 791,016 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $34,033,453.  McCormick is a named defendant in the Demand Futility Action, and he is a citizen of New Jersey.

36.     Defendant Donnie M. Moore ("Moore") served as a Director of Synchronoss from 2007 until June 5, 2019.  During his tenure, Moore served as Chair of the Audit Committee, as well as a member of the Nominating/Corporate Governance Committee.  Moore was designated by Synchronoss as a Financial Expert.  During the period of misconduct, Synchronoss was forced to pay Moore a sum of $1,858,541 in total compensation, and while in possession of material, non-

public information, Moore sold at least 47,500 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $2,062,565.  Moore is a named defendant in the Demand Futility Action, and he is a citizen of Florida.

37.     Defendant Kristin Rinne ("Rinne") has served as a Director since 2018. Rinne is a member of the Audit Committee as well as the Business Development Committee.  Since becoming a Director, the Company has paid Rinne $324,462. Rinne is a citizen of Georgia.

38.     Defendant Glenn Lurie ("Lurie") is the Company's current CEO and President and is a Director.  Lurie has served in these roles since November of 2017. Lurie is also a member of the Business Development Committee.  Prior to joining Synchronoss, Lurie held several senior positions at AT&T Inc., most recently as President and Chief Executive Officer of AT&T's Mobility and Consumer Operations, until his retirement from AT&T in September 2017.  During the period of misconduct, Synchronoss was forced to pay Lurie $25,508,036 in total compensation.  Lurie is a citizen of New Jersey.

39.     Defendant Laurie Harris ("Harris") has served as a Director since August 2019.  Harris is the Chairperson of the Audit Committee and was designated by Synchronoss as a Financial Expert.  In 2019, the Company paid Harris $284,366. Harris is a citizen of New York.

40.     Defendant Frank Baker ("Baker") has served as a Director since February 2018 pursuant to a Series A Preferred Stock transaction with Siris Capital Group, LLC.  Baker is a member of the Business Development Committee and the Nominating/Corporate Governance Committee.  Since becoming a Director, the Company has paid Baker $394,327.  Baker is a citizen of New York.

41.     Defendant Robert Aquilina ("Aquilina") has served as a Director since 2018, and currently, Aquilina is not a member of any committee.  Since becoming a Director, the Company has paid Aquilina $443,305.  Aquilina is a citizen of New Jersey.

42.     Defendant Mohan Gyani ("Gyani") has served as a Director since 2019. Gyani is a member of the Business Development Committee and the Compensation Committee.  In 2019, Gyani the Company paid $228,366.  Gyani is a citizen of California.

43.     Defendant Charles E. Hoffman ("Hoffman") served as a Director of the Company from July 2006 through May 2016.  During the period of misconduct, the Company was forced to pay Hoffman $826,779.00 in total compensation for his service as a Director of the Company.  Moreover, while in possession of material, non-public information, Hoffman sold 100,000 personally held shares of Synchronoss stock at artificially inflated prices for illicit proceeds of $3,785,163.00.

Hoffman is a named defendant in the Securities Class Action, and he is a citizen of Missouri.

44.     Defendant Robert E. Garcia ("Garcia") has served as President of Synchronoss since 2011 and as Chief Operating Officer ("COO") since 2007.  Prior to that, Garcia served in various positions at Synchronoss, including as Executive Vice President of Operations and Service Delivery, and General Manager of Synchronoss's western office since joining Synchronoss in August 2000.  During the period of misconduct, Synchronoss was forced to pay Garcia a sum of $23,022,977 in total compensation, and while in possession of material, non-public information, Garcia sold at least 325,242 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $12,253,070.  Garcia is a citizen of New Jersey.

45.     Defendant Lawrence Irving ("Irving") has served as CFO and Treasurer of Synchronoss since April 2017, having previously occupied the same positions from July 2001 until April 2014.  During the period of misconduct, Synchronoss was forced to pay Irving a sum of $10,933,901 in total compensation.  Irving is a citizen of Pennsylvania.

46.     Defendant Hovsepian served as CEO and Director of Synchronoss from January 2017 until April 2017.  Hovsepian joined Synchronoss after its acquisition of Intralinks, before which time Hovsepian had served as CEO, President, and

Director of Intralinks since December 2011.  Hovsepian, in connection with his resignation, the Company was forced to enter into a separation agreement with the Hovespian, dated April 26, 2017, pursuant to which the Company was forced to agree to a lump sum severance payment equal to $3.2 million.  The Company also was forced to agree to fully vest 18,260 shares of its common stock previously issued to Hovsepian, and was also forced to agree to a consulting arrangement pursuant to which Hovsepian would provide consulting services to the Company for a two-year period beginning May 1, 2017, in return for a consulting fee of $750,00 per year.  Hovsepian is a defendant in the Securities Class Action.  Hovsepian is a citizen of Massachusetts.

47.     Defendant Rosenberger served as Executive Vice President, CFO, and Treasurer of Synchronoss from April 2014 until February 2017.  During the period of misconduct, Synchronoss was forced to pay Rosenberger a sum of $7,711,923 in total compensation, and while in possession of material, non-public information, Rosenberger sold at least 56,142 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $2,205,671.07.   In connection with Rosenberger's resignation, the Company was forced to entered into a separation agreement with her, pursuant to which the Company was forced to agree to provide the following payments to Rosenberger: (i) severance in the amount of $1,203,681, (ii) the gross amount of $21,814, which is intended to cover the

employer portion of any COBRA payments for a period of eighteen months following the Termination Date, (iii) a transition payment of $200,000, and (iv) an amount of $580,000 to provide services on, at least, an as-needed basis with a term of no less than three months.  Rosenberger is a defendant in the Securities Class Action.  Rosenberger is a citizen of Virginia.

48.     Defendant Frederick served as CFO of Synchronoss from February 2017 until April 2017.  In connection with his resignation, the Company was forced to enter into a separation agreement with Frederick, dated April 26, 2017, pursuant to which the Company was forced to agree to a lump sum severance payment equal to $1.2 million.  During the period of misconduct, Synchronoss was forced to pay Frederick a sum of $4,637,885 in total compensation.  Frederick is a defendant in the Securities Class Action.  Frederick is a citizen of Florida.

49.     Defendants Waldis, Cadogan, Hopkins, McCormick, Moore, Garcia, Irving, Hovsepian, Rosenberger, Lurie, Frederick, and Hoffman are, at times, referred to collectively herein as the "Individual Defendants."

50.     Defendants Rinne, Harris, Baker, Aquilina, Gyani, Waldis, Lurie, Cadogan, Hopkins, and Harris are, at times, referred to collectively herein as the "Demand Defendants."

51.     Defendants Waldis, Cadogan, Hopkins, McCormick, Moore, Garcia, Rosenberger, and Hoffman are, at times, referred to collectively herein as the "Insider Selling Defendants."

52.     Defendants Waldis and Rosenberger are, at times, referred to collectively herein as the "Securities Class Action Defendants."

53.     Defendants Waldis, Irving, Garcia, and non-party David Berry ("Berry"), who at one point was Synchronoss' Executive Vice President and Chief Innovation Officer, are, at times, referred to collectively herein as the "Synchronoss Insiders."

## SUBSTANTIVE ALLEGATIONS[1]

### A.     Synchronoss's History, Business, and Operations

54.     In 2000, Defendant Waldis, a former AT&T executive, founded Synchronoss.  In the midst of the Dot-Com bubble, Defendant Waldis knew the potential of the new technological breakthroughs at that time, including cell phones. Accordingly, Defendant Waldis positioned Synchronoss to take advantage of this new market and provide mobile device activation services and consumer support to, namely AT&T, mobile phone providers through the Activation Business.  The Company experienced great success via the Activation Business, and by 2005, the

---

[1] All textual emphases in quoted material in this Complaint are added unless otherwise noted.

Company derived 80% of its revenues from the Activation Business by servicing AT&T consumers.

55.    Given the Company's success, Waldis decided to take the Company public, so on June 15, 2006, Synchronoss held its IPO.

56.    A year later, in 2007, AT&T, the Company's biggest consumer, entered into a 5-year agreement with Apple, where AT&T had the exclusive right to distribute and service the Apple iPhone from 2007-2012.   This proved to be profitable for the Company.

57.    Around 2010, with the AT&T agreement with Apple ending in just two years, the Company entered the cloud storage business, symbolizing the birth of its Cloud Services Business.   Starting with an acquisition of FusionOne in July 2010, Synchronoss was able to get a small foothold in the cloud services market, and shortly thereafter, the Company experienced rapid growth in its Cloud Services Business.   Synchronoss began aggressively acquiring other cloud-based software companies, including Newbay Software in December 2012 and F-Secure's personal cloud business in February 2015, and by 2015, the Cloud Services Business purportedly surpassed the Activation Business's profitably, accounting for a greater portion of the Company's revenues.   The Cloud Service Business was surging.

58.    While the Cloud Service Business was experiencing purported rapid growth, around 2013, the Company began to see its Activation Business become less

profitable, given the fact that the Company exerted vast efforts to push its Cloud Services Business to the forefront, as it wanted to rebrand itself as a leader in the cloud services market.

59.     In accordance with this effort, in 2014, Synchronoss tied management's compensation structure to, among other things, the success of the Cloud Services Business.   Indeed, according to the Company's 2014 Proxy Statement, "cloud revenue was $211,743,000," representing year-over-year growth of approximately 50% in cloud revenue, and further, "[a]s a result of this strong performance, [defendants Waldis, Garcia, Irving, and Rosenberger] received the maximum number of performance-based restricted shares."   Thus, management, specifically, the Company's named executive officers, personally benefitted if the Cloud Service Business flourished, including this business's ability to meet, at least on paper, the Company's revenue guidance and targets.

60.     As so happens, when the Company changed its executive compensation policy to correlate with the success of the Cloud Service Business, in 2014, the Cloud Service Business saw record breaking growth, growing an incomprehensible 115% in the third quarter of 2014 as compared to the prior year.   For the fiscal year 2014, the Cloud Service Business saw a growth rate of 82% compared to 2013.

61.     In 2015, Synchronoss reported 43% growth for the Cloud Service Business as compared to the prior year.   However, in the Company's 2015 10-K, the

Company subsequently disclosed that $20.3 million of fourth quarter revenues were attributable to its joint ventures with Goldman Sachs and Verizon, and thus, organic growth was only around 11%.

62.    Given the reported growth of the Cloud Services Business in prior years, in 2016, it was in the Individual Defendants best interests to continue this pattern at all costs.

63.    In the first quarter of 2016, Synchronoss reported modest growth of 18% year-over-year in the Cloud Services Business, and the Company reported 33%, 34%, and 36% growth in the second, third and fourth quarters, respectively.

64.    However, as detailed below, these figures were artificially inflated due to the Individual Defendants' falsification of revenues, via bogus contracts.

### B.    Synchronoss's Revenue Recognition

65.    At all relevant times, the Company had two business segments: (i) the Activation Business, and (ii) the Cloud Services Business.  The Activation Business comprised of cell phone activation and other related services, while the Cloud Services Business encompassed content management as well as data storage and back-up services.

66.    For both the Cloud Service Business and the Activation Business, Synchronoss classified its revenues into four categories: (i) transaction fees, (ii) subscription fees, (iii) professional services, and (iv) licensing.  Then, when

reporting revenues for these categories, the Company compiled transaction revenues with subscription revenues, and professional services revenues with licensing revenues.

67.     For transaction and subscription revenues, the Company derived these revenues from contracts with customers that have terms extending to up to 60 months, and transaction and subscription revenues account for a large part of revenue than professional services and licensing.

68.     Transaction revenues are principally based on a contractual price per transaction and include a variety of transactions, such as processing orders, setting up and activating accounts, porting telephone numbers, running credit checks, and performing inventory management.  Subscription revenues, by contrast, are based on term contracts and include enterprise portal management services on a subscription basis, maintenance agreements on software licenses, active user fees and software-as-a-service fees, hosting and storage fees, and related maintenance support for those services.

69.     In the Company's annual statements filed on Form 10-K with the SEC for the fiscal years 2014, 2015, and 2016, the Individual Defendants caused the Company to state that it recognizes transaction revenues "based on the total number of transactions processed at the applicable price established in the relevant contract."

70.    As relates to subscription revenues, the Individual Defendants caused the Company to represent in its 2015 and 2016 Form 10-K filings that it recognizes subscription revenues "on a straight-line basis over the life of the contract or on a fixed monthly fee based on a set contracted amount," and in the 2014 Form 10-K filing that it recognizes subscription revenues "on a straight-line basis over the life of the contract."

71.    Professional services include process and workflow consulting services and development services, and in the 2014, 2015, and 2016 Form 10-K filings, the Individual Defendants caused the Company to represent that it accounts separately for professional services revenues derived from transaction or subscription agreements "when the professional services have value to the customer on a standalone basis and there is objective and reliable evidence of fair value of the professional services."    According to Company filings, when accounted for separately, such revenues are revenues recognized "as services are performed and all other elements of revenue recognition have been satisfied."

72.    Licensing includes arrangements with other companies for use of Synchronoss software products or platforms.  In its 2014, 2015, and 2016 Form 10-K filings, the Individual Defendants caused the Company to represent that it recognizes such revenues "when the license is delivered to our customers and all of

the software revenue recognition criteria are met" and that "we follow specific and detailed rules and guidelines related to revenue recognition."

73.    Per Accounting Standards Codification ("ASC") 985-605-25-3, which concerns revenue derived from software licenses, Subpart 3a explains that revenue may only be recognized when "[p]ersuasive evidence of an arrangement exists." Likewise, ASC 985-605-25-17 provides that "revenue shall not be recognized on any element of the arrangement unless persuasive evidence of an arrangement exists." Furthermore, ASC 985-605-25-16 states: "If the vendor has a customary business practice of using written contracts [as Synchronoss did here], evidence of the arrangement is provided only by a contract signed by both parties."

74.    The Individual Defendants knew that in accordance with the ASC, contracts had to be signed in order for revenue to be recognized. For example, in a Master Services Agreement, dated September 1, 2005, filed with the SEC, between Synchronoss and AT&T, it states "This Agreement and any Orders placed hereunder may be amended or modified only by a written document signed by the authorized representative of the Party against whom enforcement is sought." This agreement was signed by Defendant Waldis and, subsequently, publicly discussed by Defendant Rosenberger in depth.

### C.    Synchronoss's Fraudulent Revenue Practices

75.    During the period of misconduct, the Individual Defendants would create false contracts (oftentimes just before the end of the fiscal quarter or year) that were reported as revenues in the Company's financial statements, which would enable Synchronoss to meet its revenue targets or guidance.  As a result, as described below, the Company was forced to restate its financial statements for the fiscal years 2014, 2015, and 2016.

### 1.    The AT&T and Verizon Contracts

76.    For the 2014 fiscal year, alone, Synchronoss had to adjust its revenue downward by one-sixth, an astounding $53.322 million, in the category titled "Evidence of Arrangement and Other Revenue."

77.    According to the 2014 10-K, AT&T and Verizon, collectively, accounted for 73% of Synchronoss's net revenue in 2014.  Given this number, it is undeniable that the adjustment related to contracts between Synchronoss and those two entities and the revenues derived therefrom were not recorded according to GAAP.

78.    Then, in 2015, the Company, via the Individual Defendants, allegedly falsified revenues related to certain AT&T contracts.  According to an article by Telecoms.com, titled "What the hell is going on at Synchronoss?" (the "Telecoms Article"), "[a] former company insider alleges that Synchronoss booked $7 million

in revenue from two AT&T transactions *in late 2015* that never materialized, which in turn allowed the company to show cloud growth in a quarter that would have otherwise been flat."

79.     Furthermore, the Securities Class Action explains that "The only basis for these revenues . . . is an email from an AT&T employee indicating that AT&T would proceed with the underlying purchase transactions."   The Individual Defendants knew that this was not in accordance with GAAP.

80.     Accordingly, in the restatement for the fiscal year 2015, Synchronoss was forced to take a downward adjustment of $12 million in the "Evidence of Arrangement" category, showing the $7 million in revenue derived from AT&T was falsified.

81.     Likewise, in the third quarter of 2016, on an earnings call, Defendant Waldis proclaimed that the Company "signed a $25 million license deal with Verizon during the quarter," which Defendant Rosenberger confirmed.

82.     In a follow-up article published by SIRF, titled "Synchronoss Technologies: You Probably Wouldn't Buy a Car From These Guys" ("SIRF Follow-Up Report"), the report honed in on this deal.  According to the SIRF Follow-Up Report, on the earnings call, "Karen Rosenberger referenced a $25 million licensing fee from Verizon Wireless that materialized *in the last days of*

*the third quarter*," and further, the article noted Defendant Rosenberger's evasiveness on the call and the lack of clarity surround the deal, explaining:

> It was not immediately apparent during the third quarter earnings call with analysts, when Waldis cited a nondisclosure agreement as a reason for not providing much detail about the deal. Nor did it become evident in subsequent company filings. Even analysts at investment management firms that own Synchronoss shares have told the Southern Investigative Reporting Foundation they haven't been given a clear answer.

83.    Notably, the SIRF Follow-Up Report made the connection that "The most obvious benefit of signing that $25 million contract was it allowed Synchronoss' third quarter 2016 revenue and income levels to compare favorably with those of the second quarter of 2016 and the third quarter of 2015, metrics that are important to many brokerage analysts."  Notably, the SIRF Follow-Up Report explained the reason this deal seemed false, and that was despite this $25 million deal, "Synchronoss' gross margins didn't really change. Ordinarily a license payment boosts revenue with a minimal effect on the cost of goods sold. But in the third quarter of 2016 the gross margins declined in comparison with the same period in 2015."  Furthermore, the SIRF Follow-Up Report explained that without this deal, Synchronoss's third quarter "results would have been abysmal."

84.    The SIRF Follow-Up Report was corroborated when the Company was forced to restate its 2016 financials to properly account for the revenues derived from this deal with Verizon.   Specifically, in the restatement, Synchronoss reported

$17.1 million in license revenues for the entire fiscal year of 2016, and license revenues is the category under which the Verizon deal would fall.  Thus, this $25 million deal never existed, or if it did, the deal certainly did not amount to $25 million in revenues for the fiscal year of 2016.

### 2.     The Licensing Agreement

85.    On December 22, 2016, the Company entered into the Licensing Agreement with Sequential in connection with the Activation Sale.

86.    Notably, just a few weeks earlier, on December 6, 2016, during a conference call with investors, the Company had forecasted that it anticipated Cloud Services Business revenue between $122 million and $125 million, but the Individual Defendants failed to mention the Licensing Agreement, without which the Company would not meet its revenue guidance.

87.    Despite this white knight deal entered into just days before the close of the fourth quarter, and which enabled the Company to meet  financial results for said quarter, the Licensing Agreement was not mentioned in the Company's February 8, 2017 earnings conference call with investors relating to said results, even after management received multiple questions regarding payments from Sequential to Synchronoss.  Instead, the Individual Defendants represented the Company's revenue forecast for "Cloud Services" came in "right on target."

88.    In fact, the Individual Defendants would not disclose the Licensing Agreement *until February 27, 2017*, when Synchronoss filed its 2016 10-K, and *for the first time*, the Individual Defendants disclosed that on December 22, 2016, the Company "entered into a non-exclusive perpetual license agreement with [Sequential], in the amount of $9.2 million, which is included in net revenues in the statement of income, for the use of the Company's Analytics software."

89.    In the SIRF Follow-Up Report, the report highlighted the "highly unusual" nature of this agreement, stating:

> While accounting standards afford auditors latitude in determining what can be recognized as revenue, permitting a $9.2 million noncash IOU from Sequential (a newly created company that already had an $83 million debt to Synchronoss) to count as revenue on Dec. 22, just days before the fiscal year's end, is highly unusual. Moreover, the payment is not disclosed anywhere but the 10-K and not even mentioned in a separate Dec. 22 filing discussing the transaction's terms.

90.    The Individual Defendants were required to disclose the $9.2 million Licensing Agreement as well as its impact on the Company's fourth quarter financial results, and in failing to do so, breached their fiduciary duties.

### D.    The Friends and Family Sale

#### 1.    The Activation Divesture

91.    On December 6, 2016, the Individual Defendants disclosed that Synchronoss would divest 70% of its Activation Business to Sequential, and in

return, Sequential would provide a "cash payment of $146 million." Synchronoss retained a 30% ownership interest in the Activation Business, a stake that could be reduced during the course of 2017.

92. Furthermore, the Individual Defendants disclosed that the Company had recently formed STI and would divest the Activation Business in STI. Subsequently, Sequential would acquire the 70% interest in STI from Synchronoss.

93. In connection with the Activation Divesture, the Individual Defendants announced that with proceeds from the sale, along with $900 million in possible financing, the Company would purchase all outstanding shares of Intralinks at $13.00 per share for around $821 million.

94. However, the Individual Defendants failed to mention the true relationship between Sequential and Omniglobe and that this sale presented vast conflicts of interest, as it was a sale to the family and friends of the Synchronoss Insiders.

95. The announcement of the Activation Divesture caused the market severe discomfort and led analysts to investigate the sale. In a research note, published on December 20, 2016, Tom Roderick ("Roderick"), a Stifel Analyst, shed light on the conflicted nature of the sale. Roderick revealed that Sequential was formerly known as Omniglobe International, a business process outsourcing company that works with Synchronoss on its AT&T activation work. Roderick went

on to explain that Omniglobe was also listed as a "related party" in the 2006 Synchronoss IPO prospectus, which included details of an equity interest on the part of Waldis and three other Synchronoss executives. Those investments were made through a holding group called Rumson Hitters, other members of which eventually bought out the Synchronoss executives' stakes in Omniglobe.

96.    All of this, however, was omitted by the Individual Defendants when announcing the Sale.

## 2.    The "Friends and Family"

97.    Long before the Activation Sale, Defendant Waldis knew its beneficiaries. In fact, Defendants Waldis and McCormick have known each other for decades. From 1994 to 2000, these two worked together a company called Vertek Corp. ("Vertek"). Defendants Waldis and McCormick acted as partners, but Defendant McCormick owned 84% of Vertek, while Defendant Waldis owned 16% and would eventually become the COO. Vertek was a successful company, and out of it, Synchronoss was born.

98.    In 2000, Defendant Waldis sold his interest in Vertek and headed-up Synchronoss. During the early years of the Company, as mentioned herein, the Company was only comprised of the Activation Business. As part of facilitating this business, the Company used Omniglobe as a vendor.

99.     When Synchronoss went public in 2006, pursuant the federal securities laws, the Company was required to make certain disclosures.  Among them was the requirement to disclose related party transactions.  Accordingly, in the Company's Form S-1 registration statement filed with the SEC on June 12, 2006 (the "Registration Statement"), under "Related Parties," Synchronoss disclosed Omniglobe was a related party, stating that:

> Omniglobe International, L.L.C., a Delaware limited liability company with operations in India, provides data entry services relating to the Company's exception handling management. The Company pays Omniglobe an hourly rate for each hour worked by each of its data entry agents. For these services, the Company has paid Omniglobe $0, $2,211 and $8,089 in 2003, 2004 and 2005 and $1,532 and $2,136 for the three months ended March 31, 2005 and 2006, respectively. At December 31, 2004, 2005 and at March 31, 2006, amounts due to Omniglobe were $399, $577, and $728, respectively.

100.   Omniglobe was a related party because on March 12, 2004, the Synchronoss Insiders, as well as members of their families and close friends, acquired indirect equity interests in Omniglobe by purchasing an ownership interest in Rumson Hitters, which owned an interest in Omniglobe.

101.   Specifically, Defendant Waldis bought 12.23% of Rumson Hitters for $95,000; Defendant Irving and Berry both purchased 2.58% for $20,000; and Defendant Garcia purchased 1.29% for $10,000.

102.   From March 2004 to June 2006, Omniglobe paid its interest holders, including, Rumson Hitters, a total of $1.3 million in distributions, and in turn,

Rumson Hitters paid to its interest holders, including Defendants Waldis, Irving, Garcia, and non-party Berry, a total of $700,000. Specifically, Rumson Hitters paid $153,655 in distributions to Defendant Waldis and his family members, $32,348 in distributions to Defendant Irving, $32,348 in distributions to Berry and his family members, and $16,174 in distributions to Defendant Garcia.

103.    However, given the inherent conflicts associated with their interests in Rumson Hitters, Defendants Waldis, Irving, Garcia, and non-party Berry purportedly divested their interest in Rumson Hitters once the Synchronoss IPO was complete via a buyout from Rumson Hitters' other interest holders. According to the Registration Statement:

> Upon completion of the Company's initial public offering, Rumson Hitters will repurchase, at the original purchase price, the equity interests in Rumson Hitters held by each of the Company's employees and their family members, such that no employee of the Company or family member of such employee will have any interest in Rumson Hitters or Omniglobe after this offering. Neither the Company nor any of its employees will provide any of the funds to be used by Rumson Hitters in repurchasing such equity interests.

104.    According to the SIRF Report, Omniglobe's President and Chairman, Jaswinder Matharu ("Matharu"), owned a 50 percent stake in Omniglobe, and "the Rumson Hitters hold the other 50 percent." When questioned about the Rumson Hitters ownership structure, Matharu stated "I'm reluctant to speak about [the Rumson Hitters] part of the ownership group because they had to restructure things a little after the [Synchronoss] IPO," and when asked what "restructure" meant in

that context,  Matharu said there were "legal moves" but that the Rumson Hitters entity was "still owned by friends and family" of Synchronoss.  Even more odd, Omniglobe and Rumson Hitters were registered in Delaware on the same day, March 5, 2004.

105.  According to Matharu, per the SIRF Report, "a lawyer named John Methfessel ["Methfessel"] controlled the Rumson Hitter investment and that questions about it should be directed to him," and also, "Methfessel [was] identified as the owner of a legal transcription service that outsourced business to Omniglobe."

106.  Methfessel, along with his wife, Kathleen, were pre-IPO investors in Synchronoss.  Methfessel and Defendant Waldis have a deep relationship, given Methfessel was Defendant Waldis' next-door neighbor for several years in Lebanon, New Jersey and Methfessel sits on the Board of the Waldis Family Foundation. Moreover, according to the SIRF Report, a month before the Activation Sale was announced, in November of 2016, Methfessel formed STI, which the SIRF Report calls a "corporate shell."  The following month, December 2016, Synchronoss would transfer its Activation Business to STI, which would then be acquired by Sequential.

107.  Another man who sits on the Board of the Waldis Family Foundation and has close ties with Defendant Waldis is Tom Miller ("Miller").  Miller and Waldis went to school together at Seton Hall University, and furthermore, as of early 2017, Miller was STI's chief strategy officer.

108.   The Synchronoss Insiders and their family have known each other for years, and as detailed herein, using these relationships, these individuals exploited Synchronoss by stripping it of its still profitable Activation Business and selling it for a cheap upfront cash payment of $17.33 and then forcing the Company to finance the rest. Despite this egregious conduct, the Board has refused Plaintiff's Demands to vindicate Synchronoss's rights related to the Activation Sale.

### E.    The Individual Defendants' Misconduct

109.   On October 31, 2014, the Individual Defendants caused the Company to file with the SEC quarterly report for the third quarter of 2014 on Form 10-Q (the "3Q14 10-Q").   In the 3Q14 10-Q, the Company reported net revenue of $125.175 million and income from operations of $15.618 million.   Synchronoss reported net revenue of $457.314 million and income from operations of $62.298 million for the year-to-date 2014 period.  The 3Q14 10-Q also states: "[O]ur consolidated financial statements . . . have been prepared in accordance with GAAP."

110.   Furthermore, the 3Q14 10-Q stated, in relevant part:

We have implemented new financial systems that will continue in phases over the reminder of the year. In connection with this initiative and the resulting changes in our financial systems, the Company continues to enhance the design and documentations of our internal control processes to ensure that controls over our financial reporting remain effective.

111.   The 3Q14 10-Q also contained certifications from Defendants Waldis and Rosenberger certified that they reviewed the third quarter 2014 Form 10-Q and that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The certifications further stated:

> The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and have: (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; (b) Designed such internal control over financial reporting, or caused such control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

112.   On February 5, 2015, Synchronoss announced its financial results for the fiscal year as the fourth quarter of 2014, via a press release, which stated, in relevant part:

**BRIDGEWATER, NJ – February 5, 2015** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation and software-based activation for mobile carriers, retailers and OEMs around the world, today announced financial results for the fourth quarter and full year 2014.

"The fourth quarter provided a strong finish to 2014, with financial results that exceeded our expectations, and were highlighted by year-over-year Cloud Services revenue growth of 61% and improved Activation Services revenue growth of 16%," said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. "We've had a number of exciting business developments in recent months, including a major expansion of our multi-year agreement with Verizon Wireless and the successful acquisition of F-Secure's cloud assets. We believe that our expanding cloud services customer base, coupled with greater opportunities for subscriber adoption and utilization, provide a long runway for growth in this dynamic market."

On a GAAP basis, Synchronoss reported net revenues of $130.2 million, representing an increase of 34% compared to the fourth quarter of 2013. Gross profit was $77.6 million and income from operations was $20.5 million in the fourth quarter of 2014. Net income was $13.6 million, leading to diluted earnings per share of $0.30, compared to $0.39 for the fourth quarter of 2013.

On a non-GAAP basis, Synchronoss reported net revenues, which adds back the purchase accounting adjustment related to revenues for certain acquisitions, of $130.9 million, an increase of 34% compared to the fourth quarter of 2013. Gross profit for the fourth quarter of 2014 was $79.9 million, representing a gross margin of 61%. Income from operations was $36.2 million in the fourth quarter of 2014, representing a year-over-year increase of 44% and an operating margin of 28%. Net income was $24.2 million in the fourth quarter of 2014, up from $16.4 million in the year ago period. Diluted earnings per share were $0.53

for the fourth quarter of 2014, compared to $0.41 for the fourth quarter of 2013.

*       *       *

**Other Fourth Quarter and Recent Business Highlights:**

- Cloud Services revenue accounted for $63.4 million of non-GAAP revenue, representing approximately 48% of total non-GAAP revenue and growing 61% on a year-over-year basis.

113.   In connection with these financial results, the Company held an earnings call, and on the call, Defendant Rosenberger stated: "Our non-GAAP Cloud Services revenue in the fourth quarter was $63.4 million, which represented 48% of our total revenue and year-over-year growth of 61%."

114.   Then, in the Company's annual report filed on Form 10-K for fiscal year ended December 31, 2014 filed with the SEC on February 25, 2015 ("2014 10-K"), and signed and certified by Individual Defendants Waldis, Rosenberger, Cadogan, Hoffman, Hopkins, McCormick, and Moore as true and accurate, and these Individual Defendants caused the Company to report that Synchronoss recorded net revenue of $457.314 million and income from operations of $62.298 million.

115.   On April 29, 2015, the Individual Defendants caused the Company to announce its first quarter results for the first quarter of 2015 in a press release, which stated:

## SYNCHRONOSS TECHNOLOGIES, INC. ANNOUNCES FIRST QUARTER 2015 FINANCIAL RESULTS

- *Non-GAAP total revenue of $133.1 million increases 35% year-over-year*
- *Cloud Services revenue of $71.3 million increases 63% year-over-year*
- *Activation Services revenue of $61.8 million increases 12% year-over-year*
- *Non-GAAP EPS of $0.49 increases 26% year-over-year*

**BRIDGEWATER, NJ – April 29, 2015** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the mobile innovation leader that provides cloud solutions and software-based activation for mobile carriers, retailers and OEMs around the world, today announced financial results for the first quarter 2015.

"Synchronoss delivered a strong start to 2015, highlighted by first quarter results that were at or above the high end of expectations," said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. "During the quarter, both sides of our business contributed to the strong performance, particularly our Cloud Services, which grew by 63% year-over-year. Mobile Operators around the world are capitalizing on the success of how personal cloud can drive important benefits to their valuable subscribers. We are pleased with our successful formula for helping our customers gain adoption and success with our personal cloud platform."

On a GAAP basis, Synchronoss reported net revenues of $132.9 million, representing an increase of 35% compared to the first quarter of 2014. Gross profit was $79.3 million and income from operations was $18.3 million in the first quarter of 2015. Net income was $10.6 million, leading to diluted earnings per share of $0.23, compared to $0.19 for the first quarter of 2014.

116.   Then, on the earnings call held in connection with foregoing results,

Defendant Rosenberger stated: "Our non-GAAP cloud revenue in the first quarter

was $71.3 million, which represented 54% of our total revenue and year-over-year growth of 63%."

117.   On May 1, 2015, the Individual Defendants caused the Company to file its quarterly report for the first quarter of 2015 on Form 10-Q with the SEC ("1Q15 10-Q"), which was signed by Defendants Rosenberger and Waldis and contained the same certification mentioned above.  In the 1Q15 10-Q, the Company reported net revenue of $132.926 million and income from operations of $18.289 million and stated that "our consolidated financial statements . . . have been prepared in accordance with GAAP."

118.   Furthermore, under the heading "Changes in internal controls over financial reporting," the 1Q15 10-Q stated: "We have implemented new financial systems that will continue in phases over the reminder of the year. In connection with this initiative and the resulting changes in our financial systems, the Company continues to enhance the design and documentations of our internal control processes to ensure that controls over our financial reporting remain effective."

119.   On July 29, 2015, the Individual Defendants caused the Company to report its financial results for the second fiscal quarter of 2015 via a press release, and in the release, Synchronoss reported:

## SYNCHRONOSS TECHNOLOGIES, INC. ANNOUNCES SECOND QUARTER 2015 FINANCIAL RESULTS

- *Non-GAAP total revenue of $137.9 million increases 33% year-over-year*
- *Cloud Services revenue of $71.9 million increases 54% year-over-year*
- *Activation Services revenue of $66.0 million increases 16% year-over-year*
- *Non-GAAP EPS of $0.56 increases 37% year-over-year*

**BRIDGEWATER, NJ –July 29, 2015** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the mobile innovation leader that provides cloud solutions and software-based activation for mobile carriers, retailers and OEMs around the world, today announced financial results for the second quarter 2015.

"Synchronoss reported strong second quarter results that met or exceeded the high end of expectations," said Stephen G. Waldis, Founder, Chairman and Chief Executive Officer of Synchronoss. "Each of our businesses performed well in the quarter and we were pleased to see some of our new wins began to scale and drive volumes, particularly on the cloud side. We are gaining strong traction among international mobile operators who are increasingly realizing the significant value Synchronoss's white-label cloud solution can deliver to their subscribers."

On a GAAP basis, Synchronoss reported net revenues of $137.8 million, representing an increase of 33% compared to the second quarter of 2014. Gross profit was $82.9 million and income from operations was $23.6 million in the second quarter of 2015. Net income was $15.2 million, leading to diluted earnings per share of $0.33, compared to $0.20 for the second quarter of 2014.

120.    In connection with these results, Synchronoss held an earnings call with analysts, and on the call, Defendant Rosenberger stated: "Our non-GAAP cloud services revenue in the second quarter was $71.9 million which represented 52% of our total revenue and year-over-year growth of 54%."

– 46 –

121.   Then, on July 31, 2015, the Individual Defendants caused the Company to file its quarterly report for the second quarter of 2015 on Form 10-Q ("2Q15 10-Q") with the SEC.   In the 2Q15 10-Q, Synchronoss reported net revenue of $137.820 million and income from operations of $23.638 million and stated "our consolidated financial statements . . . have been prepared in accordance with GAAP."

122.   The 2Q15 10-Q contained the above-mentioned signed certifications by Defendants Waldis and Rosenberger.

123.   On October 28, 2015, the Individual Defendants caused Synchronoss to issue a press release (the "October 28 Press Release") announcing the Company's third quarter 2015 ("3Q 2015") financial results.  The press release stated, in relevant part:

> **BRIDGEWATER, N.J.** – Oct. 28, 2015 – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the mobile innovation leader that provides cloud solutions and software-based activation for mobile carriers, retailers and OEMs around the world, today announced financial results for the third quarter 2015.
>
> "During the third quarter, Synchronoss passed the $600 million annualized revenue run rate, and did so while delivering 21% top line growth and a non-GAAP operating margin of 29%," said Stephen G. Waldis, Founder, Chairman and Chief Executive Officer of Synchronoss. "We are excited about the growth opportunities ahead of us. *Adoption of our cloud and activation platforms continues to grow globally,* and we recently introduced powerful new predicative analytic capabilities. *In addition, we have significantly expanded our addressable market with the launch of our enterprise business and the Synchronoss Secure Mobility Suite."*

On a GAAP basis, Synchronoss reported net revenues of $150.9 million, representing an increase of 21% compared to the third quarter of 2014. Gross profit was $87.4 million and income from operations was $22.3 million. Net income was $9.6 million, leading to diluted earnings per share of $0.21, compared to $0.22 for the third quarter of 2014.

On a non-GAAP basis, Synchronoss reported net revenues, which adds back the purchase accounting adjustment related to revenues for certain acquisitions, of $151.3 million, an increase of 21% compared to the third quarter of 2014. Gross profit was $92.1 million, representing a gross margin of 61%. Income from operations was $43.2 million representing a year-over-year increase of 36% and an operating margin of 29%. Net income was $27.1 million, up from $20.0 million in the year ago period. Diluted earnings per share were $0.58, compared to $0.46 for the third quarter of 2014, an increase of 26% compared to the third quarter of 2014.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included in this press release. An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

"We are pleased with our third quarter financial results that were highlighted by ongoing strong margin performance and increased earnings," said Karen L. Rosenberger, Chief Financial Officer and Treasurer. "We are confident that *our strategic customer relationships, combined with our growth investments and expansion into new market opportunities, position us well to scale Synchronoss to the next level and generate greater shareholder value over time*."

**Recent Business Highlights:**

- Announced the launch of our enterprise business, which will offer secure mobility solutions to enterprise clients, initially in the financial services, life sciences and healthcare industries, and will be led by David Schuette, a seasoned enterprise executive.

- Established a new venture to develop advanced mobile solutions by leveraging proprietary secure mobility technology contributed by The Goldman Sachs Group, Inc. (NYSE: GS) that

will address the challenges associated with enterprise mobility applications.

- Verizon reaffirmed its commitment to Synchronoss as a valued strategic partner.

124.    On November 5, 2015, the Individual Defendants caused Synchronoss to file its quarterly report on Form 10-Q for the third quarter of 2016 (the "Q3 2016 10-Q").   The Q3 2016 10-Q was signed by Defendants Waldis and Rosenberger, and reaffirmed the financial results announced in the October 28 Press Release.

125.    On February 3, 2016, the Individual Defendants caused Synchronoss to issue a press release (the "February 3 Press Release") announcing the Company's fourth quarter 2015 ("Q4 2015") and fiscal year 2015 financial results.   The press release stated, in relevant part:

> **BRIDGEWATER, N.J.** – Feb. 3, 2016 – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation and software-based activation for mobile carriers, enterprises, retailers and OEMs around the world, today announced financial results for the fourth quarter and full year 2015.
>
> "The fourth quarter marked a strong end to an exciting year at Synchronoss," said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. ***"Our Cloud Services business continues to perform well, driven by increasing subscriber adoption across our expanding customer base.*** We are also seeing strong, early momentum with our Enterprise Business Unit, including the addition of identity management to the Synchronoss Secure Mobility Suite. Overall, 2015 was a pivotal year for Synchronoss as we executed well against our go-to-market strategy while also expanding our market footprint by introducing several new initiatives. As a result, we believe there is a

long runway of opportunity ahead that will lead us through the next phase of growth."

On a GAAP basis, Synchronoss reported fourth quarter net revenues of $157.2 million, representing an increase of 21% compared to the fourth quarter of 2014. Gross profit was $90.2 million and income from operations was $15.4 million in the fourth quarter of 2015. Net income attributable to Synchronoss was $5.3 million, leading to diluted earnings per share of $0.12, compared to $0.30 for the fourth quarter of 2014.

On a non-GAAP basis, Synchronoss reported fourth quarter net revenues, which adds back the purchase accounting adjustment related to revenues for certain acquisitions, of $157.8 million, an increase of 21% compared to the fourth quarter of 2014. Gross profit for the fourth quarter of 2015 was $98.3 million, representing a gross margin of 62%. Income from operations was $44.3 million in the fourth quarter of 2015, representing a year-over-year increase of 22% and an operating margin of 28%. Net income attributable to Synchronoss was $28.7 million in the fourth quarter of 2015, up from $24.2 million in the year ago period. Diluted earnings per share were $0.61 for the fourth quarter of 2015, compared to $0.53 for the fourth quarter of 2014.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included in this press release. An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

"We are pleased with our financial and operational performance in the fourth quarter and the full year, particularly our ability to generate strong free cash flow," said Karen L. Rosenberger, Chief Financial Officer and Treasurer. "We believe *the investments we have made in our business over the last year position us well to generate significant value for our shareholders*."

**Fourth Quarter and Recent Business Highlights:**

- Cloud Services revenue accounted for $90.9 million of non-GAAP revenue, representing approximately 58% of total non-GAAP revenue and growing 43% on a year-over-year basis.

- Extended our agreement with AT&T through 2018.

- Entered into a venture with Verizon (NYSE: VZ) to establish a next generation platform for multifactor authentication and identity management adding another core component to Synchronoss' Secure Mobility Platform.

- Formed the Board of Advisors for the Enterprise Business Unit (EBU), comprised of current and former representatives from Synchronoss, Goldman Sachs, Verizon, Vodafone and Morgan Stanley. This Board of Advisors will provide insight into the growing enterprise market demand for digital solutions and assist in the development of innovative business opportunities for the EBU.

**Full Year 2015 Financial Results**

- On a GAAP basis: revenues for the full year 2015 were $578.8 million, an increase of 27% compared to $457.3 million in the prior year. Gross profit was $339.8 million, income from operations was $79.6 million and net income attributable to Synchronoss was $40.6 million, leading to full year 2015 diluted earnings per share of $0.89.

- On a Non-GAAP basis: revenues for the full year 2015 were $580.1 million, an increase of 26% compared to $458.6 million in 2014. Gross profit was $356.8 million, representing a gross margin of 62%, and income from operations was $162.6 million, representing an operating margin of 28%. Net income attributable to Synchronoss was $104.1 million for the full year 2015, leading to diluted earnings per share of $2.23, an increase of 25% from $1.79 in the prior year.

126.   On February 4, 2016, the Individual Defendants caused Synchronoss to issue a press release (the "February 4 Press Release") announcing a $100 million share repurchase program fueled by the Company's purportedly "very strong market position and financial profile."  The press release stated, in relevant part:

**BRIDGEWATER, N.J.** – Feb. 4, 2016 – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation and software-based activation for mobile carriers, enterprises, retailers and OEMs around the world, today announced that its Board of Directors has approved a share repurchase program under which the company may repurchase up to $100 million of its outstanding common stock. Synchronoss plans to make such purchases at prevailing prices over the next 12 to 18 months.

"As we begin 2016, we believe that Synchronoss has a very strong market position and financial profile, in addition to a large and expanding addressable market opportunity. *We expect to deliver an attractive combination of solid top line growth, strong profit margins and expanding free cash flow. In addition, we are making important investments in our enterprise business, including our ventures with Goldman Sachs and Verizon, that we believe will enhance our long-term growth and profitability profile*," said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. "In addition to investing in our strategic growth initiatives, we believe our new share repurchase program is an excellent way to leverage our strong balance sheet and cash flow in order to enhance long-term shareholder value."

The company anticipates that the timing and amount of any share repurchases will be determined by Synchronoss' management based on market conditions and in accordance with the requirements of the Securities and Exchange Commission. Once adopted, the repurchase program does not obligate Synchronoss to acquire any particular amount of common stock, and repurchases may be commenced, suspended or discontinued at any time without prior notice.

127.   On February 26, 2016, the Individual Defendants caused Synchronoss to file an annual report on Form 10-K for Q4 2015 and fiscal year 2015 (the "2015 10-K").   The 2015 10-K was signed by Individual Defendants Waldis, Rosenberger, Cadogan, Hopkins, McCormick, and Moore, and reaffirmed the financial results announced in the February 3 Press Release, as well as the details of the stock repurchase program announced in the February 4 Press Release.

128.   On May 5, 2016, the Individual Defendants caused Synchronoss to issue a press release (the "May 5 Press Release") reporting "Strong First Quarter Results" for the first quarter of 2016 ("Q1 2016").   The press release stated, in relevant part:

> **BRIDGEWATER, NJ – May 5,   2016** – Synchronoss   Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation and software-based activation for mobile carriers, enterprises, retailers and OEMs around the world, today announced financial results for the first quarter of 2016.
>
> "We are very proud of the Synchronoss team for starting 2016 with a strong first quarter and healthy momentum heading into the rest of the year," said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. ***"Cloud services were robust this quarter, as increasing subscriber growth on our core customer base is laying the groundwork for incremental cloud opportunities both domestically and internationally over the next 12 to 18 months.*** We have a proven history of executing, launching, and scaling new offerings and leveraging technology opportunities into something that becomes much bigger as we have exhibited to our customers, partners, and investors over the years."
>
> **Financial Highlights for the First Quarter of 2016:**
>
> **Non-GAAP**
>
> - **Total Revenue:** $145.6 million compared to $133.1 million in the first quarter of 2015.
>
> - **Gross profit:** $85.2 million compared to $80.9 million in the first quarter of 2015.
>
> - **Operating Income:** $33.2 million compared to $34.9 million in the first quarter of 2015.
>
> - **Net Income attributable to Synchronoss:** $23.0 million compared to $22.3 million in the first quarter of 2015.

- **Earnings per Diluted Share:** $0.49 compared to $0.49 in the first quarter of 2015.

- **Operating Cash Flow:** $37.1 million compared to $5.4 million in the first quarter of 2015.

## GAAP

- **Total Revenue:** $142.7 million compared to $132.9 million in the first quarter of 2015.

- **Gross profit:** $74.4 million compared to $79.3 million in the first quarter of 2015.

- **Operating Income:** ($4.7 million) compared to $18.3 million in the first quarter of 2015.

- **Net Income attributable to Synchronoss:** ($7.3 million) compared to $10.6 million in the first quarter of 2015.

- **Earnings per Diluted Share:** ($0.17) compared to $0.23 in the first quarter of 2015.

- **Operating Cash Flow:** $37.7 million compared to ($0.1 million) in the first quarter of 2015.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included in this press release. An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

"We are pleased with our strong financial and operational performance to kick off 2016, particularly our ability to generate strong free cash flow," said Karen L. Rosenberger, Chief Financial Officer and Treasurer. "We believe our ability to balance growth and profitability, while investing in our enterprise and international initiatives well positions Synchronoss heading into the rest of 2016."

**First Quarter and Recent Business Highlights:**

- Cloud Services revenue accounted for $84.3 million of non-GAAP revenue, representing approximately 58% of total non-GAAP revenue and growing 18% on a year-over-year basis.

- Expanded our activation business with AT&T through our DIRECTV deal.

- On target with the beta version of our Enterprise solution launched in April with general availability expected in early June.

- Free cash flow of $24 million delivered in the quarter as this continues to be a major focal point of the company.

- Announced $100 million share buyback program with $16.6 million completed in the quarter.

- Completed the acquisition of privately held OpenWave Messaging to enhance our international go-to-market strategy.

129. On May 10, 2016, the Individual Defendants caused Synchronoss to file a quarterly report on Form 10-Q for Q1 2016 (the "Q1 2016 10-Q"). The Q1 2016 10-Q was signed by Defendants Waldis and Rosenberger, and reaffirmed the financial results announced in the May 5 Press Release.

130. During the June 2016 analyst day, Synchronoss identified as its main objective, expanding its enterprise cloud-services business in order to reduce its reliance on the legacy Activation Business. However, unbeknownst to investors, by mid-June 2016, Defendant Waldis was in contact with Hovsepian, the then-President and CEO of Intralinks, about a potential business arrangement between Synchronoss and Intralinks.

131.   On August 3, 2016, the Individual Defendants caused Synchronoss to issue a press release (the "August 3 Press Release") reporting "Strong Second Quarter Results" for the second quarter of 2016 ("Q2 2016").   The press release stated, in relevant part:

> **BRIDGEWATER, NJ – August 3, 2016** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation and software-based activation for mobile carriers, enterprises, retailers and OEMs around the world, today announced financial results for the second quarter of 2016.
>
> "We are very proud of the Synchronoss team for delivering a healthy second quarter with momentum especially around cloud heading into the rest of the year", said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. "Cloud was strong this quarter, as solid subscriber growth in our core customer base is setting the stage for incremental cloud opportunities while investments in the enterprise initiatives are already generating significant customer activity in the field. We are continuing to execute on our long-term strategy which is laying the foundation for the future growth of Synchronoss."
>
> **Financial Highlights for the Second Quarter of 2016:**
>
> - **Total Revenue:** $157.6 million GAAP compared to $137.8 million in the second quarter of 2015.  $161.5 million non-GAAP compared to $137.9 million in the second quarter of 2015.
>
> - **Gross profit:** $86.1 million GAAP compared to $82.9 million in the second quarter of 2015.  $96.9 million non-GAAP compared to $85.4 million in the second quarter of 2015.
>
> - **Operating (Loss) Income:** ($3.5 million) GAAP compared to $23.6 million in the second quarter of 2015.  $37.3 million non-GAAP compared to $40.2 million in the second quarter of 2015.
>
> - **Net (Loss) Income attributable to Synchronoss:** ($4.4 million) GAAP compared to $15.2 million in the second quarter of 2015.

$26.9 million non-GAAP compared to $26.0 million in the second quarter of 2015.

- **Earnings (Loss) per Diluted Share:** $(0.10) GAAP compared to $0.33 in the second quarter of 2015. $0.57 non-GAAP compared to $0.56 in the second quarter of 2015.

- **Operating Cash Flow:** $33.7 million GAAP compared to $62.6 million in the second quarter of 2015. $33.7 million non-GAAP compared to $60.6 million in the second quarter of 2015.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included in this press release. An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

"We are pleased with another quarter that exceeded our expectations, particularly our ability to deliver strong top-line growth," said Karen L. Rosenberger, Chief Financial Officer and Treasurer. "We believe our ability to drive growth, while investing in our enterprise and international initiatives positions Synchronoss well heading into the second half of 2016 and beyond."

**Second Quarter and Recent Business Highlights:**

- Cloud Services revenue accounted for $95.2 million of non-GAAP revenue, representing approximately 59% of total non-GAAP revenue and growing 33% on a year-over-year basis.

- Launched the general availability of our Enterprise Secure Mobility Platform (SMP) in June.

- Free cash flow of $20 million delivered in the quarter generating free cash flow continues to be a major focal point of the Company.

- Share repurchases of $23.4 million completed in the quarter.

- Held our annual analyst day in NYC, outlining the Company's core strategic and growth initiatives.

132.   On August 4, 2016, the Individual Defendants caused Synchronoss to file a quarterly report on Form 10-Q for Q2 2016 (the "Q2 2016 10-Q").   The Q2 2016 10-Q was signed by Defendants Waldis and Rosenberger, and reaffirmed the financial results announced in the August 3 Press Release.

133.   On November 7, 2016, the Individual Defendants caused Synchronoss to issue a press release (the "November 7 Press Release") reporting "Strong Third Quarter Results" for the third quarter of 2016 ("Q3 2016").  The press release stated, in relevant part:

> **BRIDGEWATER, NJ –November 7, 2016** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation and software-based activation for mobile carriers, enterprises, retailers and OEMs around the world, today announced financial results for the third quarter of 2016.
>
> "We are very proud of the Synchronoss team for delivering a strong third quarter with significant momentum around cloud and enterprise heading into year end and 2017," said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. "Cloud was very strong this quarter with both new and existing customers, as solid subscriber growth and expanded cloud initiatives in our core customer base set the stage for the next chapter of growth at Synchronoss."
>
> **Financial Highlights for the third Quarter of 2016:**
>
> - **Total revenue:** $176.4 million GAAP compared to $150.9 million in the third quarter of 2015.  $181.0 million non-GAAP compared to $151.3 million in the third quarter of 2015.
>
> - **Gross profit:** $99.2 million GAAP compared to $87.4 million in the third quarter of 2015.  $109.1 million non-GAAP compared to $92.1 million in the third quarter of 2015.

- **Operating income:** $13.2 million GAAP compared to $22.3 million in the third quarter of 2015. $46.5 million non-GAAP compared to $43.2 million in the third quarter of 2015.

- **Net income attributable to Synchronoss:** $7.7 million GAAP compared to $9.6 million in the third quarter of 2015. $32.5 million non-GAAP compared to $27.1 million in the third quarter of 2015.

- **Earnings per diluted share:** $0.16 GAAP compared to $0.21 in the third quarter of 2015. $0.68 non-GAAP compared to $0.58 in the third quarter of 2015.

- **Operating cash flow:** $(17.7) million GAAP and non-GAAP compared to $14.1 million in the third quarter of 2015.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included in this press release. An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

**Third Quarter and Recent Business Highlights:**

- **Cloud Solution revenue:** $101.9 million of GAAP revenue, representing approximately 58% of total GAAP revenues and growing 34% on a year-over-year basis. $106.4 million of non-GAAP revenue, representing approximately 59% of total non-GAAP revenue and growing 40% year-over-year.

- **Activation Solution revenue:** $74.5 million of GAAP revenue for the third quarter, representing 42% of our total GAAP revenues and remained flat year-over-year. $74.6 million of non-GAAP revenue, representing approximately 41% of our total non-GAAP revenues and was down one percent year-over-year.

- Completed key cloud migrations at international customers such as Softbank, America Movil, and British Telecom as they move towards scaling our Personal Cloud Platform.

- Enterprise Secure Mobility Platform (SMP) had numerous customer wins and competitive displacements during the quarter across the healthcare, legal, and financial verticals.

- Our Verizon UID partnership is helping provide us with access to approximately one-third of the US consumer market and a host of large enterprise customers in this new market.

134.  On November 7, 2016, after the close of the financial markets, the Individual Defendants caused Synchronoss to hold an investor conference call to discuss the Company's Q3 2016 financial results.  During the conference call, Synchronoss announced its decision to "evaluate strategic alternatives" for its Activation Business in an attempt to enhance shareholder value.  To that effect, Defendant Waldis stated:

> Yes, we're obviously in the process of evaluating opportunities in the activation world. Clearly, there are good pockets of strength, certainly in analytics, certainly in some of the new emerging areas, Internet of Things. But there's been obviously areas or facets that have slowed down as you guys have seen in the market today and so when you look and compare that to both our cloud and enterprise business that have both high growth trajectories and margin profile significantly better than the activation business, we want to make sure that as we evaluate the process that we're doing everything we can to ensure we are making the investments in the high-growth, high margin businesses of the future. That's something that will play out over the next quarter or so and as we'd mentioned, we'll certainly keep everybody up to speed.

135.  On November 8, 2016, the Individual Defendants caused Synchronoss to file a quarterly report on Form 10-Q for Q3 2016 (the "Q3 2016 10-Q").  The Q3 2016 10-Q was signed by Defendants Waldis and Rosenberger, and reaffirmed the financial results announced in the November 7 Press Release.

136.  On December 6, 2016, the Individual Defendants caused Synchronoss to issue a press release (the "December 6 Press Release"), titled "Synchronoss

Technologies to Acquire Intralinks Holdings Accelerating Strategic Transformation," announcing the Company's decision to purchase Intralinks for $13.00 per share—$821 million in equity value. Defendant Hovsepian, then serving as CEO, President, and Director of Intralinks, would be named CEO of Synchronoss upon closing of the acquisition. Defendant Waldis was expected to move into the role of active Executive Chairman of the Board.

137. The December 6 Press Release portrayed Intralinks as a highly successful business entity with deep ties in the "financial services world," stating as follows:

> In Intralinks' 20-year history, over 4.1 million business users across the world have used its secure, cloud-based platform, and it counts 99% of Fortune 1000 companies among its customers. To date, Intralinks has supported over $31 trillion in high-stakes transactions, making the company a leader in the enterprise content collaboration market.
>
> "Intralinks has established itself as a household name in the financial services world over the past 20 years, with a keen focus on growing its presence into the next generation secure content collaboration market over the coming years," said Stephen Waldis, Synchronoss' CEO. "This acquisition marks another major step in the transformation of Synchronoss to significantly expand the scale and scope of the company's enterprise initiatives and strong carrier relationships in attacking this multi-billion dollar market opportunity. Ron brings significant leadership experience and a history of successfully integrating companies into a single portfolio. I intend to stay active in the company, driving growth opportunities and continued developments on new product innovation. I am excited to be working closely with Ron to bring Synchronoss into its next chapter of growth."
>
> "Our board of directors unanimously concluded that Synchronoss is the ideal strategic partner for Intralinks and also gives our employees and

customers the opportunity to leverage Synchronoss' deep relationships across the carrier space, cloud expertise, and strong partnerships in the financial services vertical," said Ron Hovsepian, CEO of Intralinks. "Together with Synchronoss, we believe we can deploy enhanced enterprise and mobile solutions to our customers while opening up new enterprise distribution channels across the world."

138.   The December 6 Press Release also disclosed that Synchronoss would divest 70% of its Activation Business to Sequential for a total purchase price of $146 million.  As part of this transaction, Synchronoss retained a 30% ownership interest in the Activation Business, a stake that could be reduced during the course of 2017.

139.   Taking into account the divestiture of the Activation Business and the Intralinks Acquisition, the Individual Defendants caused Synchronoss to provide 2017 revenue guidance of between $810 million and $820 million, with pro forma EPS of between $2.45 and $2.60 for the combined entity, and further advised that the Intralinks deal should provide $40 million of combined synergies within the first year.

140.   On January 5, 2017, the Individual Defendants caused Synchronoss to file a Current Report on Form 8-K/A discussing, ***for the first time***, several financial aspects of the $146 million deal with Sequential.  According to the Form 8-K/A, the divestiture of the Company's Activation Business would initially net Synchronoss only $17 million in cash, and included an $83 million note receivable.  And, as shown in the pro forma financial statements, Synchronoss would continue to bear

costs associated with the Activation Business, including cost of sales, corporate overhead, and stock-based compensation.

141.   On January 5, 2017, the Individual Defendants caused Synchronoss to file another Current Report on Form 8-K, disclosing further details of the Company's arrangement with Sequential.  According to the January 5, 2017 8-K, the transaction was structured as a Joint Venture ("JV"), whereby Synchronoss contributed certain components of its carrier-activation business and retained a 30% ownership stake.  Sequential, which owns the remaining 70% of the JV, agreed to finance "the purchase of these assets through cash, a new term loan, and a sellers note issued by Synchronoss."  In addition, Synchronoss entered into a three-year TSA with Sequential to support various indirect activities stemming from the JV. Pursuant to the terms of the TSA, Synchronoss agreed to receive an annual payment of approximately $32 million.

142.   On January 12, 2017, Sequential announced that it had closed the transaction to acquire a portion of the activation assets of Synchronoss, and that its global headquarters would be in Warren, New Jersey.

143.   On February 8, 2017, after the close of the U.S. securities markets, the Individual Defendants caused Synchronoss to issue a press release announcing the Company's financial results for the fourth quarter of 2016 ("Q4 2016") and fiscal year 2016.  The press release stated, in relevant part:

**BRIDGEWATER, NJ – February 8, 2017** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation for mobile carriers, enterprises, retailers and OEMs around the world, today announced financial results for the fourth quarter of 2016.

*"Synchronoss has transformed its strategy with the Intralinks acquisition and divestiture of its traditional activation business as the company now looks to expand the scale and scope of its enterprise and cloud initiatives to drive the new SNCR 3.0 vision, said Ronald Hovsepian, Chief Executive Officer of Synchronoss."* "The Synchronoss team is laying the foundation for the next chapter of growth," said Ronald Hovsepian, Chief Executive Officer of Synchronoss.

"It has been an exciting time here at Synchronoss over the past few months as we view the acquisition of Intralinks to be a major step forward in our enterprise strategy with Ron leading the team to successfully integrate both companies into a single portfolio", said Founder and Executive Chairman Stephen Waldis. "I look forward to working with Ron during this pivotal time for Synchronoss' employees, customers, and partners around the globe."

**Financial Highlights for the Fourth Quarter of 2016:**

- **Total revenues from continuing operations:** $121.7 million GAAP compared to $121.2 million in the fourth quarter of 2015. $123.9 million non-GAAP compared to $121.8 million in the fourth quarter of 2015. Total combined revenue from continuing and discontinued operations was $145.6 million. Non-GAAP combined total revenue from continuing and discontinued operations was $147.8 million.

- **Gross profit from continuing operations:** $71.5 million GAAP compared to $75.7 million in the fourth quarter of 2015. $78.1 million non-GAAP compared to $83.4 million in the fourth quarter of 2015.

- **Operating (loss) income from continuing operations:** $(30.4) million GAAP compared to $1.5 million in the fourth

quarter of 2015. $13.1 million non-GAAP compared to $29.9 million in the fourth quarter of 2015.

- **Net (loss) income attributable to Synchronoss from continuing operations:** $(22.6) million GAAP compared to $(3.2) million in the fourth quarter of 2015. $11.0 million non-GAAP compared to $20.0 million in the fourth quarter of 2015.

- **Earnings (loss) per diluted share:** $(0.51) GAAP compared to $(0.07) in the fourth quarter of 2015. $0.24 non-GAAP compared to $0.43 in the fourth quarter of 2015.

- **Operating cash flow:** $86.0 million GAAP and non-GAAP compared to $63.2 million GAAP and non-GAAP in the fourth quarter of 2015.

**Financial Highlights for the Full Year 2016:**

- **Total revenues from continuing operations:** $476.7 million GAAP compared to $428.1 million in 2015. $490.2 million non-GAAP compared to $429.4 million in 2015.

- **Gross profit from continuing operations:** $282.5 million GAAP compared to $272.8 million in 2015. $319.2 million non-GAAP compared to $288.0 million in 2015.

- **Operating (loss) income from continuing operations:** $(71.9) million GAAP compared to $15.1 million in 2015. $82.0 million non-GAAP compared to $96.2 million in 2015.

- **Net (loss) income from continuing operations attributable to Synchronoss:** $(55.7) million GAAP compared to $1.3 million in 2015. $59.8 million non-GAAP compared to $63.6 million in 2015.

- **(Loss) earnings per diluted share from continuing operations:** $(1.28) GAAP compared to $0.03 in 2015. $1.28 non-GAAP compared to $1.38 in 2015.

- **Operating cash flow:** $142.5 million GAAP compared to $139.8 million in 2015. $142.5 million non-GAAP compared to $143.4 million in 2015.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included in this press release. An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

**Fourth Quarter and Recent Business Highlights:**

- GAAP Cloud Services revenue from continuing operations accounted for $121.7 million in the fourth quarter. Non-GAAP Cloud Services revenue from continuing operations accounted for $123.9 million in the fourth quarter. This was led by cloud deployments at new and existing customers.

- Completed the acquisition of Intralinks together with the closing of the $1.1 billion credit facility.

- Completed the divestiture of our carrier activation business to Sequential Technology International as well as the sale of our SpeechCycle and Mirapoint Software activation businesses.

- Strong progress at international customers in EMEA and APAC as they move towards scaling our Messaging and Personal Cloud Platforms.

144. Also on February 8, 2017, the Individual Defendants caused Synchronoss to hold its Q4 2016 earnings call with analysts and investors. During the call, Defendant Rosenberger provided financial guidance for Q1 2017, which included comments regarding Intralinks, stating, in relevant part:

Now, let me move to guidance for the first quarter and full year 2017 now, with the Intralinks transaction closed. For 2017 non-GAAP revenues are expected to be in the range of $810 million to $820 million, unchanged from our initial guidance given on December 6 for the combined company. On a normalized basis when adjusting for divestitures and the Intralinks acquisition, this would imply year-over-year growth of between 13% and 15%.

The revenue mix in our guidance is expected to be roughly 65% of revenues derived from our cloud carrier-based business and 35% through our cloud enterprise business, which is primarily a subscription-based model. While we would like investors to use these ranges, the revenue mix and its timing could be impacted by the structure of certain large and complex opportunities. For the first quarter we expect total revenues of between $173 million and $178 million.

Turning to profitability. We currently expect non-GAAP gross margins of between 70% and 71% for the full year 2017. In terms of operating profitability, we are slightly widening the range to between 25% and 27% as we have identified some significant enterprise booking opportunities which may require some upfront investments in the first half of this year.

Including the impact from our $900 million debt raised in January with a better than expected interest rate, we are maintaining our non-GAAP EPS range of between $2.45 and $2.60 per share, assuming a tax rate of 30% on a diluted share count of approximately 50 million shares. Importantly, we also note that we are proceeding on target around realizing the $40 million in annual combined cost synergies first outlined when we discussed the deal.

We expect integration and restructuring charges during the course of the year as we continue to execute on our synergy plan and will update investors on our next conference call. For the first quarter, we anticipate non-GAAP operating margin of between 18% and 20%.

Non-GAAP EPS is expected to be in the range of $0.39 and $0.43 on a diluted share count of approximately 49 million shares, assuming a tax rate of 30%. We expect a restructuring charge of between $5 million and $10 million in the first quarter.

145.  Also during the February 8, 2017 conference call, analysts asked Synchronoss's executives multiple questions about payments Synchronoss expected to receive from Sequential as part of the divestiture.  Defendant Rosenberger explained as follows:

**[Q - Tavis C. McCourt:]** Then just some details on the Sequential sale. Can you give us a sense of the size of the revenues that you will be generating from Sequential for providing them services during the transition period, and maybe the margins on those revenues and the timing of when you would expect them to go away?

**[A - Defendant Rosenberger:]** I can give you some information on that, Tavis. I think as we went through the transaction we had talked about the fact that we were going to provide ongoing services for a three-year term to Sequential Technologies. Obviously contractual, around $30 million in revenue per year over the next three years associated with those services. As far as margins, et cetera, we don't give those details, but it's clearly consistent with our mix of business.

\*       \*       \*

**[Q - Tom Roderick:]** Got it. I think I got it. Then I think this may be related to your commentary on the ongoing piece, but so I understand what that piece is. I know you guys were highlighting in the calculation around the financing documents that service agreement, which probably is what you are referring to with Sequential.

But can you talk a little bit more about what that agreement is, how you are still supporting them as a partner? And will all of that revenue then flow into continuing ops going forward, or is that $32 million annual agreement, is that all just thrown into discontinuing ops so we won't worry about it?

**[A - Defendant Rosenberger:]** That will be part of continuing operations.  And if you want to think about the services that we provide for Sequential, remember the fact that we had software revenues associated with some of that activation business in that analytics area. And that particular IP was obviously kept by Synchronoss and Synchronoss will be providing services around that.

\*       \*       \*

**[Q - Samad Samana:]** I actually wanted to follow up on the $32 million payment.  I am curious, when you gave the original $520 million of cloud revenue guidance for calendar 2017, did that assume the $32 million services agreement?  Or how much of this

analytics revenue that is now being put into cloud was previously in activations?

I guess I'm trying to bridge the map of guidance didn't change but there is this $32 million payment now that you're getting. Help me understand where that was classified before, or where you thought that would be classified into?

**[A - Defendant Rosenberger:]** No, this is new analytics revenue, as we talked about. Clearly the $32 million is part of a TSA arrangement, but it is all around the analytics.

## REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS WERE FALSE AND MISLEADING

146.   The above statements, made, or caused to be made, by the Individual Defendants, were materially false and/or misleading because they misrepresented and failed to disclose material, adverse facts concerning the Company's business, operations, and financial prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants made, or caused to be made, false and/or misleading statements and/or failed to disclose that: (i) the Company was engaged in a regular practice of falsifying contracts with customers and booking these contracts as revenue to meet certain revenue targets; (ii) Synchronoss's Activation Business was sold to an existing vendor, *i.e.*, Sequential, that had previously been owned by several members of Synchronoss's senior management, including Defendant Waldis; (iii) Sequential is owned by Omniglobe, 50% of which is owned by friends and family of Synchronoss; (iv) the Chairman and current owner of Sequential is a related party with multiple

ties to Synchronoss and Defendant Waldis; (v) Synchronoss and Sequential had a prior and existing relationship; (vi) Synchronoss and Sequential entered into a $9.2 million Licensing Agreement for the sole purpose of artificially inflating Synchronoss's financials; (vii) Synchronoss had inadequate corporate accounting and corporate financial reporting resources; (viii) Synchronoss failed to maintain effective internal controls over financial reporting; and (ix) as a result of the foregoing, Synchronoss's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.  As a result of their fraudulent scheme, the Individual Defendants were able to artificially inflate the Company's financials, and its stock price.

## THE TRUTH IS REVEALED AND FALLOUT ENSUES

147.   On February 24, 2017, SIRF issued a report accusing the Company of hiding from investors key aspects of the Sequential and Intralinks deals.  According to the SIRF Report, Sequential is none other than Omniglobe, a business-process outsourcer first disclosed as a Synchronoss related-party in February 2006.  At the time, many of Synchronoss's current and former executives and directors, including Defendant Waldis, held an ownership stake in Omniglobe.  Jaswinder Matharu, who currently holds a 50% stake in Omniglobe, informed SIRF that 50% of Omniglobe is currently "owned by friends and family of Synchronoss."   None of these ownership interests were disclosed to investors.

148.   Following the release of the SIRF Report, Synchronoss's share price declined.

149.   On February 27, 2017, the Company filed the 2016 10-K, which was signed by Individual Defendants Waldis, Rosenberger, Hovsepian, Cadogan, Hopkins, McCormick, and Moore.   Therein, Synchronoss disclosed, ***for the first time***, that on December 22, 2016, it "entered into a non-exclusive perpetual license agreement with [Sequential], in the amount of $9.2 million, which is included in net revenues in the statement of income, for the use of the Company's Analytics software."   Remarkably, the $9.2 million software license from Sequential was not mentioned in the Company's February 8, 2017 earnings conference call with investors, even after management received multiple questions regarding payments from Sequential to Synchronoss.

150.   The $9.2 million licensing fee, executed nine days before the end of the quarter and six days after the Activation Divestiture's close, provided a significant boon to the Company's cloud-segment revenue and profit margin.   Because Synchronoss posted only $11 million in non-GAAP net income for Q4 2016, the licensing fee accounted for a vast majority of profits and earnings per share.

151.   In reaction to this disclosure, Synchronoss's share price declined $1.80 per share, or 5.9%, from $30.49 per share on Friday, February 24, 2017 to $28.69 per share on Monday, February 27, 2017.   Synchronoss's share price

declined an additional 5.61% on February 28, 2017.  The February 27 and 28, 2017 stock price drops wiped out *over $158 million* in Company market capitalization.

152.  On April 27, 2017, Synchronoss announced that then-CEO, Defendant Hovsepian, and then-CFO, Defendant Frederick, were leaving the Company, after assuming their positions just three months and two months prior, respectively, following the Intralinks Acquisition.  Defendant Waldis would once again take over as CEO of the Company.  Synchronoss also warned investors that Q1 2017 revenue would not meet expectations, disclosing that it expected "total revenue for the first quarter of 2017 to be $13 million to $14 million less than the company's previously announced guidance" and that it expected operating margins of 8% to 10%, which was also less than previously-announced guidance.  The Company stated that it was "disappointed with [its] Q1 performance in this first quarter following our acquisition of Intralinks."

153.  On this news, Synchronoss's stock price declined $11.33 per share, or 46.02%, from $24.62 per share on Wednesday, April 26, 2017 to $13.29 per share on Thursday, April 27, 2017—wiping out *approximately $525 million* in Company market capitalization.

154.  Analysts swiftly chastised the Company.  According to Greenberg, Synchronoss spent months "pulling out all stops to mask a double-digit decline in cloud revenue."  Greenberg also noted that Synchronoss's financials do not add up:

"[t]his is a company that we believed, since we first started writing about it in January, that there were plenty of moving parts which just seemed off."  Greenberg further affirmed: "Any time the CEO and CFO, who has been in the post for less than 4 months, walks out the door, that's not a good sign . . . .  If you knew nothing else, that's all you need to know."

155.   Likewise, an analyst report, published on April 27, 2017, by Deutsche Bank, noted that "the stock price being cut nearly in half today is a reaction to how quickly the SNCR story has soured for investors," emphasizing "[t]he relatively short tenure of Ron Hovsepian as CEO, and even shorter one of John Frederick as CFO" that "clearly caught investors by surprise – this after Karen Rosenberger abruptly stepped down as CFO on the last earnings call," as well as the fact that "[i]f the pre-announced first-quarter shortfall in revenue and margins are any guide, the rest of the year could be much more modest relative to early guidance set for both the Enterprise and Cloud segments . . . ."

156.   Then, on June 13, 2017, the Individual Defendants caused Synchronoss to file a Current Report on Form 8-K with the SEC, therein announcing that the Company would need to restate its financial statements for fiscal years 2015 and 2016, and that such financial statements should no longer be relied upon by investors.  To that end, the 8-K stated, in relevant part:

> On June 8, 2017, the Audit Committee of the Board of Directors of Synchronoss Technologies, Inc. (the "Company"), after consultation

with management and discussion with Ernst & Young LLP, the Company's independent registered public accounting firm, concluded that the Company's previously issued financial statements for the fiscal years ended December 31, 2016 and 2015 and the respective quarterly periods (collectively, the "Relevant Periods") should be restated and should no longer be relied upon.

As previously reported by the Company, its new Chief Executive Officer, Stephen Waldis and new Chief Financial Officer, Lawrence Irving, together with its Audit Committee of the Company's Board of Directors and with the assistance of accounting and legal advisors, initiated a thorough review of accounting of certain transactions conducted in the Relevant Periods. As a result of this review, certain errors have been identified in the Relevant Periods concerning revenue recognition in connection with certain licensing transactions. The Company has determined that revenues from each of the applicable transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting. While the Company has not yet completed its accounting review, the Company estimates that the revenue impact will be no more than 10% for each of the fiscal years ended December 31, 2016 and December 31, 2015. In connection with the impact of the above errors, the Company also concluded that certain related expenses recognized in the Relevant Periods will be reversed.

The Company has concluded to restate its financial statements for the Relevant Periods to correct the above identified accounting errors and certain other immaterial prior period errors. The Company does not expect the corrections to have an impact on total cash flows for the Relevant Periods, to result in any customer refunds or to impact the Company's services to its customers.

The Company and its advisors are working expeditiously to complete this review and the Company intends to file its Form 10-Q for the quarter ended March 31, 2017 and restated financial statements for the Relevant Periods as soon as practicable.

The Company has identified a material weakness in internal control over financial reporting relating to its revenue recognition process at December 31, 2016. It is possible the Company may identify additional material weaknesses.

157.   Following this news, the Company's stock price continued its tumble, closing at $11.26 per share on June 14, 2017, a decrease of 7.2% from its price of $12.13 per share the prior trading day, erasing another $40.34 million in Company market capitalization.

158.   Once again, analysts were quick to chastise this critical development. A June 13, 2017 analyst report published by Stephens's Samad Samana noted that "having to restate financials going all the way back to 2015 will only make it harder for SNCR to re-gain credibility with investors since the leadership is largely the same . . . ."

159.   To make matters worse, on October 12, 2017, via an 8-K filed with the SEC, the Company announced that it would need to restate its financial statements for the fiscal year 2014, stating:

> As previously disclosed, Synchronoss Technologies, Inc. (the "Company"), together with the Audit Committee of its Board of Directors and with the assistance of accounting and legal advisors, initiated a thorough review of the accounting for certain transactions conducted in the fiscal years ended December 31, 2016 and 2015. The Company reported on June 13, 2017 that its previously issued financial statements for the fiscal years ended December 31, 2016 and 2015 and the respective quarterly periods should be restated and should no longer be relied upon.

> As part of the Company's ongoing internal accounting review, the Company has now also identified an error concerning the revenue recognition associated with a transaction conducted during 2014. Similar to certain transactions previously identified in 2015 and 2016, it has been determined that revenue from this 2014 transaction should be netted against the consideration transferred in connection with

purchase accounting. The identified transaction has no impact on cash balances and overall net cash flows for the fiscal year ended December 31, 2014.

On October 5, 2017, the Audit Committee of the Board of Directors of the Company, after consultation with management and discussion with Ernst & Young LLP, the Company's independent registered public accounting firm, concluded to restate the Company's previously issued financial statements for the fiscal year ended December 31, 2014 to correct the accounting error and certain other prior period errors. Accordingly, the Company's previously issued financial statements for the fiscal year ended December 31, 2014 and the respective quarterly periods should no longer be relied upon.

The Company has not yet completed its accounting review of transactions conducted during 2014, and it is possible that additional errors might be identified.

The Company and its advisors are working expeditiously to complete this review and the Company intends to file its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017 and June 30, 2017 and restated financial statements for the fiscal years 2014, 2015 and 2016 as soon as practicable.

## LEGAL ACTIONS

160. Given the Individual Defendants' misconduct, including falsifying revenues and concealing material facts related to the Licensing Agreement and the Activation Sale, the Company has been subjected and forced to defend itself and/or pay for the defense of certain of the Individual Defendants in the Securities Class Action, and shareholders apart from Plaintiff have sought to redress the wrongs done to the Company in shareholder litigation.

### 1.    The Securities Class Action

161.   On May 1, 2017 the Securities Class Action was filed.  Securities Class Action, ECF No. 1.  After the Company filed the restatement on July 9, 2018 and motions practice, plaintiff in the Securities Class Action filed a second amended complaint (the "SAC") on August 14, 2019.

162.   The SAC included confidential witnesses accounts from, a total of eight individuals, to bolster the inference of scienter with respect to the underlying claims for violations of federal securities laws.  Securities Class Action, ECF No. 81.  Thereafter, the defendants in the Securities Class Action filed a motion to dismiss the SAC.  Securities Class Action, ECF No. 84.

163.   The Court denied in part defendants' motion to dismiss in the Securities Class Action on May 29, 2020 (*see* ECF No. 91 in the Securities Class Action), finding, in relevant part:

> Considering the above confidential witness information collectively, the Court finds that the SAC sets forth particularized allegations that the Company and, notably, Rosenberger, improperly recognized revenue on contracts before they were signed. These particularized allegations provide, at the very least, strong circumstantial evidence that Rosenberger "knew or, more importantly, should have known that [she] was misrepresenting material facts related to the Company," *see In re Campbell Soup*, 145 F. Supp. 2d at 599, and thus, acted recklessly. What is clear from the information provided by the confidential witnesses is that Rosenberger knew that revenue had been recognized on certain deals, notably the $25 million and $5 million Verizon contracts, before the contracts were signed. Moreover, the SAC demonstrates that Rosenberger was heavily involved in the revenue recognition process. *See, e.g.*, SAC ¶ 395 (setting forth information

from CW3 that Rosenberger "'micromanaged' the accountants"). Moreover, the confidential witnesses all gave similar statements with regard to the Company's practice of requiring a signed contract for revenue to be booked, evidencing that such a practice was in place at the Company. That the confidential witnesses did not specifically allege that Rosenberger knew of that policy does not inhibit an inference of scienter—Rosenberger was the CFO of the Company and, previously the Controller, and actively participated in discussions regarding revenue recognition, and was responsible for approving such decisions. Looking to this evidence as a whole, Plaintiff has sufficiently shown that Rosenberger "knew or, more importantly, should have known that" that revenue was being recognized prematurely. *See Novak*, 216 F.3d at 308. Accordingly, I find that scienter can be inferred from the confidential witness testimony pertaining to the improper recognition of revenue as to Rosenberger.

\*　　\*　　\*

In sum, Plaintiff has adequately demonstrated on this motion (1) the Company had a practice of requiring written signed contracts before revenue was recognized, (2) that the Company recognized certain deals as completed before the contracts were signed, and (3) that Rosenberger was aware that such deals were recognized without a signed contract. This is sufficient to allege violations of the GAAP standard in question and, further, sufficient grounds from which to infer scienter as to Rosenberger.

\*　　\*　　\*

The Court finds that both these theories now support a stronger inference of scienter, as Plaintiff has sufficiently alleged that Rosenberger knew that the Company had improperly recognized certain revenue without obtaining signed contacts. This allegation of knowledge is enough to meet the "more" required for a restatement of financial results "to support a strong inference of scienter." *See In re Bio-Tech Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 588 (D.N.J. 2005) ("Although a restatement of financial results is probative of scienter, more is needed to support a strong inference of scienter."). It is similarly sufficient for the Court to infer scienter from the size of the contracts involved. "[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central

importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653–54 (E.D. Pa. 2015). The confidential witness allegations with respect to revenue recognition demonstrate that Rosenberger knew that the Company had improperly recognized revenue on its two biggest accounts—Verizon and AT&T. That knowledge is sufficient to support an inference of scienter under this theory. . .

Securities Class Action, ECF No. 91.

### 2.   The Demand Futility Action

164.   On December 1, 2017, the operative complaint in the Demand Futility Action ("Futility Complaint") was filed, which alleged Defendants Waldis, McCormick, Moore, Hopkins, and Cadogan breached their fiduciary duties to the Company by, *inter alia*, failing to act in a disinterested and independent manner while approving the Activation Sale, and selling their shares of Synchronoss stock at inflated prices based upon insider information regarding the terms and conditions of the Activation sale and the misstated financial results.  Demand Futility Action, ECF No 13.

165.   Subsequently, on March 11, 2019, Defendants Waldis, McCormick, Moore, Hopkins, and Cadogan filed a motion to dismiss the Futility Complaint. Demand Futility Action, ECF No. 49.

166.   The Court denied in part defendants' motion, stating:

Here, Plaintiff's claim for breach of the duty of disclosure is premised both on material omissions and the dissemination of false

information/misstatements. . .   In that respect, Plaintiff alleges that Defendants deliberately omitted 1) material information that Sequential was the entity formerly known as Omniglobe, and Omniglobe's indirect owners had connections to Waldis, and 2) that the Company's fourth quarter 2016 financial results included $9.2 million from the then-undisclosed licensing agreement, and that it had "reclassified revenue historically derived from Cloud Analytics offering to the Cloud category."

Plaintiff has adequately alleged that the Directors face a substantial risk of liability stemming from their omissions and misleading statements regarding the licensing fee, the terms of the Activation Divestiture, and Sequential's ownership. On February 8, 2018, when Synchronoss announced its financial results for the fourth quarter of 2016, it stated that its revenue forecast for "Cloud Services" came in "right on target" at $121.7 million. Compl. ¶67. In early December, during a conference call with investors, the Company had forecasted that it anticipated Cloud Services revenue between $122 million and $125 million. *Id*. at ¶66-67. At that time, the Company did not mention the licensing agreement, or the fact that the $9.2 million from the licensing agreement was factored into the revenue for the Cloud Services. *Id*. Ostensibly, absent the licensing revenue, the Company would have fallen far short of its initial revenue projection of $122 million to $125 million. The alleged circumstances support a reasonable inference that the Directors omitted the information regarding the licensing agreement, in bad faith in order to mislead the shareholders regarding the Company's financial health.

Furthermore, the Court can reasonably infer that each of the alleged omissions was material, and that the shareholders relied on the omissions, based on the impact of the disclosures on Synchronoss' share price, once the omissions were revealed. *Weiss v. Swanson*, 948 A.2d 433, 443 (Del. Ch. 2008). On February 27, 2017, when the Company disclosed that the $9.2 million from the licensing agreement was factored into the revenue for the Cloud Services during the final quarter of 2016, the Company's share price dropped 6%. Compl. ¶69.

Plaintiff's Complaint also alleges that the Directors disseminated false information regarding the pricing of the Activation sale, by alleging that in their December 6, 2016 Form 8-K, the Company falsely claimed that it had sold a 70% interest in STI to Sequential "in return for a cash

payment of $146 million." However, the Form 10-K filed on December 22, 2016, revealed that the $146 million figure, which was initially announced as the sale price, was the valuation for the entire Activation business, rather than the amount that Synchronoss would receive from the divestiture of 70% of business. Furthermore, the transaction amount was not entirely paid in cash, as initially reported, but rather $17.3 million cash, plus an $83 million note receivable—a substantial deviation from the initial announcement. This type of alleged misstatement arguably constitutes the "knowing dissemination of false information," which amounts to a breach of the Directors' duty of disclosure. Accordingly, the Court finds that demand was excused because Plaintiff has alleged particularized facts suggesting that the Directors were exposed to a substantial risk of liability for breach of the duty of loyalty stemming from the Company's failure to disclose.

## THE INSIDER SELLING DEFENDANTS CAPITALIZED ON THE COMPANY'S ARTIFICIALLY INFLATED STOCK PRICE BY TRADING ON MATERIAL, NON-PUBLIC INFORMATION WHILE THE COMPANY WAS FORCED TO REPURCHASE ITS OWN SHARES

### A. The Share Repurchase Program Constituting Corporate Waste and Breach of Fiduciary Duties

167. While the Company's shares were trading at artificially inflated prices due to the Individual Defendants' aforementioned material misrepresentations and/or omissions, Defendants Waldis, McCormick, Moore, Hopkins, Cadogan, and Hoffman further propped up Synchronoss's stock price by causing the Company to authorize the repurchase of $100 million worth—and execute the repurchase of over $40 million worth—of Synchronoss common stock using Company (*i.e.*, *shareholders'*) funds.

168. Indeed, on February 4, 2016, Synchronoss announced that certain of the Individual Defendants, including Defendants Waldis, McCormick, Moore, Hopkins,

Cadogan, and Hoffman, had authorized the repurchase of $100 million worth of the Company's shares through a repurchase program fueled by the Company's purportedly "very strong market position and financial profile."  According to Defendant Waldis, the Company "expect[s] to deliver an attractive combination of solid top line growth, strong profit margins and expanding free cash flow.  In addition, we are making important investments in our enterprise business, including our ventures with Goldman Sachs and Verizon, that we believe will enhance our long-term growth and profitability profile."

169.  Immediately thereafter, in connection with this authorization, Defendants Waldis, McCormick, Moore, Hopkins, Cadogan, and Hoffman caused Synchronoss to aggressively repurchase its own shares at prices that were artificially inflated based on the Individual Defendants' misrepresentations and omissions alleged herein.  Indeed, between March 1, 2016 and June 30, 2016, the Company was forced to repurchase *over $40 million* worth of its common stock, at an average price of *nearly $32.00* per share.

170.  The following table represents the Company's stock repurchase activity immediately following the repurchase authorization, from March 2016 through June 2016:

|  | **March 2016** | **April 2016** | **May 2016** | **June 2016** | **Total** |
|---|---|---|---|---|---|
| Shares Repurchased | 552,500 | 372,462 | 297,174 | 39,835 | 1,261,971 |
| Average Price per Share | $30.00 | $32.20 | $33.75 | $35.64 | $31.72 |
| Total Aggregate Cost to Company | $16,580,830 | $11,993,461 | $10,030,973 | $1,419,893 | $40,025,157 |

171.   At the time of filing, Synchronoss stock was trading at just $3.02 per share, resulting in an overpayment by Synchronoss of $36,214,005 million dollars, or a drop of 90% in the value of the stock certain of the Individual Defendants forced it to purchase while they were aware of the non-public, adverse, material information detailed above.

172.   Despite Defendants Waldis, McCormick, Moore, Hopkins, Cadogan, and Hoffman's knowledge of the true facts about the Company's business and financial prospects, these Defendants nevertheless authorized and executed the Company's repurchases of its own stock at artificially inflated prices.  These Defendants' decisions were not the product of valid business judgment because the Board knew during the repurchase period that the Company's stock was significantly inflated due to the false and misleading statements and omissions set forth in this Complaint.

173.   The repurchases falsely signaled to the Company's shareholders and the public that the purchase of Synchronoss stock at those prices was the best use of the Company's cash, and that purchases of the stock at the market price at that time represented a good value for the Company.  In truth, the Company's expenditures on its own stock were so profligate as to constitute corporate waste.  The repurchases were not designed to serve a legitimate corporate interest; rather, they were designed to help conceal the true facts concerning the Company's business, operations, and financial prospects through an inflated stock price.

### B.   Insider Sales Based on Material, Non-Public Information: Violating the Insider Selling Defendants' Fiduciary Duty Not to Engage in Insider Trading

174.   Besides concealing key aspects of the Sequential and Intralinks deals and misrepresenting the financial metrics of the Company's revenues, the Company's share repurchases at the behest of Defendants Waldis, McCormick, Moore, Hopkins, Cadogan, and Hoffman were also designed to serve another illicit purpose—namely, to allow certain Defendants to personally profit from their fraud and other fiduciary breaches by selling their holdings of Synchronoss stock at bloated prices based on insider information.

175.   During the same time as, and after, Defendants Waldis, McCormick, Moore, Hopkins, Cadogan, and Hoffman were causing the Company to buy tens of millions of dollars' worth of its own stock at inflated prices, those same Defendants,

and others, were liquidating significant portions of their own personally held Synchronoss stock.

176.   Indeed, between March 2016 and June 2016, while the Company was actively repurchasing its own shares at artificially inflated prices (specifically, the Company was forced to repurchase 1,261,971 of its own shares for a staggering cost of approximately $40,025,157), Defendants Waldis, Rosenberger, and Hoffman liquidated 172,266 shares of personally held Synchronoss stock for illicit insider proceeds of more than *$5.6 million*.

177.   Moreover, during the period of misconduct, through April 27, 2017 (when the truth was fully revealed regarding the Individual Defendants' unlawful conduct), each of the Insider Selling Defendants—including *each* of the Defendants who authorized the Company's share repurchase program—liquidated significant holdings of Synchronoss stock.   Specifically, these Defendants sold more than 2,120,557 shares for proceeds of $78,978,815.

178.   Indeed, these insider sales were specifically timed to coincide with: (a) the Company's stock price trading at artificially inflated prices due to the misrepresentations and omissions alleged herein; *and* (b) the precise time periods that these Defendants caused the Company to repurchase over $40 million worth of its own stock at an average price of $31.72 per share, thereby further inflating the

Company's stock price and allowing the Insider Selling Defendants to receive the highest price possible for their shares.

179.   Aside from their direct knowledge of the misrepresentations and omissions that caused Synchronoss's stock price to be inflated in the first place, the wrongful conduct in causing the repurchases is confirmed by the fact that the share repurchase program was halted *before* the Company's stock price began its sharpest decline from a high of $49.94 on November 29, 2016, to close at $11.09 on October 23, 2017.

180.   In sum, because the Company's share price was artificially inflated due to the Defendants' knowing concealment of Synchronoss's true financial and operational conditions, the facts surrounding the Activation Sale, and the Licensing Agreement, the Company's stock repurchase program, between March 1, 2016 and June 30, 2016, was irrational, served no legitimate purpose, constituted corporate waste, and was premised entirely upon fraud, self-dealing, and other unconscionable conduct.   The repurchase program was directly motivated by the Insider Selling Defendants' desire to dispose of their personal holdings of Synchronoss stock at high prices while they still could, and before the artificial inflation therein was removed by revelation of, *inter alia*, previously concealed, conduct mentioned herein.

181.   Moreover, because of their roles as directors and/or officers of Synchronoss, the Insider Selling Defendants either knew, consciously disregarded,

were reckless and grossly negligent in not knowing, or should have known of material, adverse, non-public information about the business of Synchronoss, including, *inter alia*, that the false and misleading statements and/or omissions alleged herein caused the price of Synchronoss's stock to trade at artificially inflated prices at the same time the Insider Selling Defendants were disposing of millions of dollars' worth of Company stock.

182.   The Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse, non-public information concerning Synchronoss's business, finances, and prospects, but they violated this duty.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.   Fiduciary Duties

183.   By reason of their positions as officers, directors, and/or fiduciaries of Synchronoss, and because of their ability to control the business and corporate affairs of Synchronoss, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Synchronoss in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Synchronoss and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

184.   Each director and officer of the Company owed, and owes, to Synchronoss and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

185.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Synchronoss, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Synchronoss, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.  In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, and financial prospects so that the market price of the Company's stock would be based on truthful and accurate information.

186.   To discharge their duties, the officers and directors of Synchronoss were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Synchronoss were required to, among other things:

(a)     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of their business;

(b)     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c)     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

### B.     Audit Committee Duties

187.   In addition to these duties, the members of the Audit Committee owed specific duties to Synchronoss under the Audit Committee's Charter.  The purpose of the Audit Committee "shall be to oversee the Company's accounting practices, system of internal controls, audit processes, and financial reporting processes."

188.   Specifically, according to Synchronoss's Audit Committee Charter, and as reiterated in the Company's 2016 and 2017 Proxy Statements, the Audit Committee's responsibilities "shall include" the following:

*Processes, Controls and Risk Management*

1.     Reviewing periodically the Company's financial reporting processes and disclosure controls and processes, based on

consultation with the Company's management and independent auditors and counsel;

2.  Reviewing periodically the adequacy and effectiveness of the Company's internal control policies and procedures, including, to the extent applicable, the responsibilities, budget, staffing and effectiveness of the Company's internal audit function, based on consultation with the Company's management and independent auditors;

3.  Reviewing the reports prepared by management, and attested to by the Company's independent auditors, assessing the adequacy and effectiveness of the Company's internal controls and procedures, prior to the inclusion of such reports in the Company's periodic filings as required under the rules of the SEC;

4.  Reviewing and discussing, based on periodic consultations with the Company's management and independent auditors, (i) the guidelines and policies governing the process by which management and other persons responsible for risk management assess and manage the Company's exposure to risks, including risks arising from major legislative and regulatory developments, contingent liabilities, significant business risks and financial disclosure and compliance risks and (ii) the adequacy and effectiveness of the Company's overall risk control environment and the steps taken by the Company's management to monitor and control risk exposure in such environment.

*Independent Auditors*

5.  Appointing, approving the compensation of and overseeing the work of the Company's independent auditors; in this regard, the Committee shall have the sole authority to approve the hiring and firing of the independent auditors and the independent auditors shall report directly to the Committee;

6.  Pre-approving audit and permissible non-audit services provided to the Company by the independent auditors (or subsequently approving non-audit services in those circumstances where a subsequent approval is permissible);

7.      Discussing with the Company's independent auditors their annual audit plan, including the scope of audit activities and all critical accounting policies and practices to be used, and any other matters required to be discussed by Statement on Accounting Standard No. 61, as it may be modified or supplemented;

8.      Reviewing quarterly with management, the Company's independent auditors and, to the extent applicable, the internal auditors (or other persons responsible for the Company's internal audit function):

- The results of the annual audit of the Company and the independent auditors' procedures with respect to interim periods, including any significant findings, comments or recommendations of the independent auditors and, to the extent applicable, internal auditors (or other persons responsible for evaluating the Company's compliance with internal controls) together with management's responses thereto; and

- Any significant changes in the Company's accounting principles or the methods of applying the Company's accounting principles;

9.      Reviewing and discussing reports from the independent auditors on:

- All critical accounting policies and practices used by the Company;

- Alternative accounting treatments within generally accepted accounting principles related to material items that have been discussed with management, including the ramifications of the use of the alternative treatments; and

- Other material written communications between the independent auditors and management;

10.      Reviewing with the Company's independent auditors their judgments as to the quality, not just the acceptability, of the

Company's accounting principles and such matters as are required to be discussed with the Committee under generally accepted auditing standards;

11.   Obtaining and reviewing at least annually a report by the Company's independent auditors describing:

- The independent auditors' internal quality-control procedures; and

- Any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditors, or by any inquiry or investigation by any governmental or professional authority, within the preceding five years, respecting one or more independent audits carried out by the independent auditors, and any steps taken to deal with any such issues;

12.   Obtaining and reviewing at least annually a formal written statement by the Company's independent auditors delineating all relationships between the auditor and the Company, consistent with Independent Standards Board Standard No. 1, as it may be modified or supplemented, and reviewing and discussing with the auditors any disclosed relationships or services that may impact the objectivity and independence of the auditors; in this regard, the Committee shall take appropriate action, if necessary, to ensure the independence of the auditors;

13.   Reviewing periodically with the independent auditors any problems or difficulties encountered by the independent auditors in the course of any audit work, including management's response thereto, any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management;

*SEC Reports and Other Disclosure*

14.   Reviewing with:

- Management and the Company's independent auditors, before release, the audited financial statements and unaudited interim financial statements; and

- • Management and the Company's independent auditors, before release, the Company's earnings announcements or financial releases and Management's Discussion and Analysis (MD&A) in the Company's annual report on Form 10-K and quarterly reports on Form 10-Q;

15. Directing the Company's independent auditors to review, before filing with the SEC, the Company's interim financial statements included in quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

16. Overseeing compliance with the disclosure requirements of the SEC, including disclosure of information regarding auditors' services and audit committee members, member qualifications and activities;

*Other Responsibilities and Authority*

17. Establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

18. Reviewing and approving all related party transactions in accordance with the applicable rules of Nasdaq;

19. Reviewing, approving and monitoring the Company's code of ethics for the Chief Executive Officer and senior financial officers in accordance with the applicable rules of Nasdaq and the SEC;

20. Establishing hiring policies regarding employment of employees, or former employees, of the Company's independent auditors in accordance with the applicable rules of Nasdaq and the SEC;

21. Reviewing the Committee's own charter, structure, processes and membership requirements, at least on an annual basis;

22.     Preparing and periodically updating an annual calendar and checklist for the Committee's responsibilities and authority; and

23.     Performing such other duties as may be requested by the Board.

189.    Additionally, per the Audit Committee Charter, to fulfill its responsibilities:

- The Committee shall prepare all reports required to be included in the Company's filings with the SEC, pursuant to and in accordance with applicable rules of the SEC.

- The Committee also shall report regularly to the full Board, including with respect to any issues that arise with respect to the quality or integrity of the Company's financial statements, the effectiveness of the Company's internal controls or disclosure controls, the performance and independence of the Company's independent auditors, or any other issue that the Committee believes should be brought to the attention of the full Board.

190.    Upon information and belief, the Company maintained an Audit Committee Charter that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**C.     Compensation Committee Duties**

191.    Additionally, the members of the Compensation Committee—to wit, Defendants Cadogan, Hopkins, and McCormick—owed specific duties to Synchronoss under the Compensation Committee Charter to, among other things, "discharge certain responsibilities of the Board relating to executive compensation policies and programs, including developing the Company's general compensation

philosophy, providing oversight of the implementation of the compensation policies and benefit plans, administering the Company's various equity compensation plans and programs including the issuance of equity awards, and to make recommendations to the Board regarding its remaining responsibilities relating to executive compensation."

192.    Specifically, according to Synchronoss's Compensation Committee Charter, and as reiterated in the Company's 2016 and 2017 Proxy Statements, the Compensation Committee's responsibilities "shall include" the following:

1.    Reviewing annually and approving the Company's compensation strategy and philosophy;

2.    Reviewing annually and approving corporate goals and objectives relevant to executive compensation and evaluating performance in light of those goals;

3.    Reviewing and approving the corporate objectives that pertain to the determination of the compensation of the Company's Chief Executive Officer (the "CEO");

4.    Evaluating the CEO's performance;

5.    Determining the CEO's salary and contingent compensation, based on evaluating his or her performance and other relevant criteria as determined by the Committee;

6.    In consultation with the CEO, determining the salaries and contingent compensation of the other individuals who are deemed to be "officers" of the Company under Rule 16a-1(f) of the SEC (the "Executive Officers"), including establishing incentive compensation plans for such individuals, establishing targets and incentive awards under such plans and making any determinations required to be made by the Board or a committee of the Board under such plans;

7.    Making recommendations to the Board regarding compensation for non-employee members of the Board, including, but not limited to the following elements: retainers, meeting and committee fees, committee chair fees, and equity compensation;

8.    Recommending the adoption or amendment of equity and cash incentive plans for Board approval, and recommending amendments to such plans for Board approval (including changes in the number of shares reserved for issuance thereunder);

9.    Administering the Company's equity plans, granting stock option, restricted stock and other equity awards and approving modifications of such awards, provided that the Board may delegate to another committee of the Board, or, if permitted under applicable law, regulations or rules, to Company officers, the concurrent authority to make such awards to individuals other than Executive Officers and Board members on such terms and conditions as the Committee may specify;

10.   Overseeing the administration of other material employee benefit plans of the Company, including the Company's 401(k) plan;

11.   Reviewing and approving policies and procedures relating to the perquisites and expense accounts of the Company's Executive Officers;

12.   When and as required by SEC rules, reviewing and discussing with management the Compensation Discussion & Analysis ("CD&A") required to be included in the Company's proxy statement and annual report on Form 10-K under applicable SEC rules; determining on the basis of such process whether to recommend to the Board that the CD&A be included in such filings; and furnishing an annual report on executive compensation for publication in the Company's proxy statement;

13.   Conducting a review of Executive Officer succession planning, as necessary, reporting its findings and recommendations to the Board, and working with the Board in evaluating potential successors to Executive Officer positions;

14.   Making recommendations to the Board regarding amendments to this Charter;

15.   Oversee the Company's submission to, and consider the results of, stockholder votes of matters relating to compensation, including advisory votes on executive compensation and the frequency of such votes, incentive and other compensation plans, and amendments to such plans; [and]

16.   Overseeing the Company's compliance with SEC rules and regulations and Nasdaq listing standards regarding stockholder approval of certain compensation matters.

193.   Upon information and belief, the Company maintained a Compensation Committee Charter that imposed the same, or substantially and materially the same or similar, duties on the members of the Compensation Committee as those set forth above.

**D.   Duties Pursuant to the Company's Code of Business Conduct**

194.   The Individual Defendants, as officers and/or directors of Synchronoss, were also bound by the Company's Code of Business Conduct (the "Code") which, according to the Code, "sets out basic principles to guide all directors, officers and employees of Synchronoss Technologies, Inc." who "must conduct themselves" in accordance with the Code "and seek to avoid even the appearance of improper behavior."

195.   According to the Code, its purpose is to deter wrongdoing and promote the following:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Full, fair, accurate, timely and understandable disclosure in reports and documents that Synchronoss files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by Synchronoss;

- Compliance with applicable governmental laws, rules and regulations;

- The prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and

- Accountability for adherence to the Code.

196.   With respect to compliance with applicable laws, rules, and regulations, the Code states:

Obeying the law is the foundation on which Synchronoss' ethical standards are built.  You must comply with applicable laws, rules and regulations.  Although you are not expected to know the details of these laws, it is important to know enough to determine when to seek advice from managers or other appropriate personnel.

197.   With respect to conflicts of interest, the Code provides:

A "conflict of interest" exists when a person's private interests interfere or conflict in any way with the interests of Synchronoss.  Examples of when a conflict of interest may arise include, but are not limited to:

- When a director, officer or employee takes actions or has interests that may make it difficult to perform his or her work objectively and effectively.

- When a director, officer or employee, or a member of his or her family, receives improper personal benefits as a result of his or her position with Synchronoss.

- Almost always, when an employee works simultaneously for a competitor or, except on our behalf, a customer or supplier. You are not allowed to work for a competitor in any capacity.

- When a director, officer or employee serves as a director of any company that competes with Synchronoss.

- When a director, officer or employee invests in a customer, supplier, developer or competitor of Synchronoss. In deciding whether to make such an investment, you should consider the size and nature of the investment, your ability to influence decisions of Synchronoss or of the other company, your access to confidential information of Synchronoss or of the other company, and the nature of the relationship between Synchronoss and the other company.

- When a director, officer or employee conducts Synchronoss business with a relative or significant other, or with a business with which a relative or significant other is associated in any significant role. Relatives include spouse, sister, brother, daughter, son, mother, father, grandparents, aunts, uncles, nieces, nephews, cousins, step relationships and in-laws. Significant others include persons living in a spousal or familial fashion (including same sex) with an employee.

198. With respect to public disclosure of information, the Code states:

The federal securities laws require Synchronoss to disclose certain information in various reports that the Company must file with or submit to the SEC. In addition, from time to time, Synchronoss makes other public communications, such as issuing press releases.

Synchronoss expects all directors, officers and employees who are involved in the preparation of SEC reports or other public documents to ensure that the information disclosed in those documents is full, fair, accurate, timely and understandable.

To the extent that you reasonably believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should report those concerns to Synchronoss' Chief Financial Officer or in compliance with Company's Whistleblower policy.

199.   With respect to insider trading, the Code provides:

You are not permitted to use or share confidential information for stock trading purposes or for any other purpose, except the conduct of our business. All non-public information about Synchronoss should be considered confidential information. To use material non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical, but also illegal, and could result in criminal prosecution in addition to the termination of your employment. In order to assist with compliance with laws against insider trading, the Company has adopted an Insider Trading Policy. A copy of this policy, which has been distributed to every employee, is available on the Company's internal website. If you have any questions, please consult Synchronoss' Chief Financial Officer.

200.   With respect to corporate opportunities, the Code states:

You are prohibited from taking for yourself opportunities that are discovered through the use of corporate property, information or position without the informed prior consent of the Board. You may not use corporate property or information obtained through your position with Synchronoss for improper personal gain, and you may not compete with Synchronoss directly or indirectly. Furthermore, you owe a duty to Synchronoss to advance its legitimate interests when such an opportunity arises.

201.   With respect to competition and fair dealing, the Code provides:

Synchronoss seeks to outperform its competition fairly and honestly. Stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited. You should endeavor to respect the rights of and deal fairly with Synchronoss' customers, suppliers, competitors and employees.

202.   With respect to protection and proper use of Synchronoss assets, the Code states:

> You should endeavor to protect Synchronoss' assets and ensure their efficient use. Any suspected incident of fraud or theft should immediately be reported for investigation. Synchronoss equipment should not be used for non-Synchronoss business, though limited incidental personal use is permitted.
>
> Your obligation to protect Synchronoss' assets includes protecting its proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data and reports. Unauthorized use or distribution of such information would violate Synchronoss policy and could also be illegal and result in civil or even criminal penalties.

203.   Upon information and belief, the Company maintained a version of the Code that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

## E.   Control, Access, and Authority

204.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Synchronoss, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Synchronoss.

205.   Because of their advisory, executive, managerial, and directorial positions with Synchronoss, each of the Individual Defendants had access to

adverse, non-public information about the financial condition, operations, and improper representations of Synchronoss.

206.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Synchronoss, and was at all times acting within the course and scope of such agency.

### F.    Reasonable and Prudent Supervision

207.   To discharge their duties, the officers and directors of Synchronoss were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Synchronoss were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide shareholders and analysts as to the true business practices, operations, and financial prospects of the Company at any given

time, including making accurate statements about the Company's business practices, operations, and financial prospects, as well as its internal controls;

(d)     remain informed as to how Synchronoss conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

(e)     refrain from trading on material, adverse, non-public information; and

(f)     ensure that Synchronoss was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

208.   The conduct of the Individual Defendants complained of herein involves knowing and culpable violations of their obligations as officers and/or directors of Synchronoss, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

209.   The Individual Defendants breached their duties of loyalty and good faith by allowing the other Individual Defendants to deceive, or by themselves deceiving, the investing public and artificially inflating and maintaining the market

price of Synchronoss's securities by making untrue statements and omissions about Synchronoss's business and financial prospects, by engaging in and concealing deceitful business practices, by wasting corporate assets through the authorization and execution of the repurchase program, and by engaging in unlawful insider sales.

210. The Individual Defendants also violated, or failed to prevent others from violating, federal securities laws and their fiduciary duties, which have resulted in, and exposed the Company to, the Securities Class Action and the Demand Futility Action  As a result of these and other breaches of fiduciary duties, Synchronoss has expended, and will continue to expend, significant sums of money.

211. Thus, the Individual Defendants, because of their positions of control and authority as officers and/or directors of Synchronoss, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, which resulted in substantial harm to Synchronoss.

212. Specifically, members of the Audit Committee breached their fiduciary duties of good faith and loyalty by, *inter alia*, failing to implement sufficient internal controls and procedures, and/or recklessly and indifferently failing to follow internal controls and procedures to ensure the accuracy of the Company's public statements. Because of this failure, the Company issued false and misleading statements concerning the Company's business practices, operations, and financial prospects.

213.   Specifically, members of the Compensation Committee breached their fiduciary duties of good faith and loyalty by, *inter alia*, recommending and/or approving unjust compensation and incentive packages for the Individual Defendants which disincentivized them from identifying, addressing, and reporting problems to investors as they were encountered, as well as by authorizing excessive payments for the high-level executive departures of Defendants Rosenberger, Frederick, and Hovsepian, who collectively received over $7.9 million in compensation as they departed.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

214.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing.   The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

215.   During all times relevant hereto, the Individual Defendants collectively, and individually, initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively, and individually, took the actions set forth herein.

216.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

217.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

218.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO SYNCHRONOSS

219.   As a result of the Individual Defendants' wrongful conduct, Synchronoss conducted its affairs in evident violation of federal and state laws and

regulations.   In addition, the Company was caused to disseminate false and misleading statements, and to omit material information to make such statements not false and misleading when made.   This misconduct has devastated Synchronoss's credibility.   Further, Synchronoss is the subject of the Securities Class Action. Synchronoss has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

220.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Synchronoss's market capitalization has been substantially damaged, having lost over $2.1 billion in value as a result of the conduct described herein.

221.   Further, as a direct and proximate result of the Individual Defendants' conduct, Synchronoss has expended, and will continue to expend, significant sums of money.   Such expenditures include, without limitation:

(a)   costs incurred in investigating and defending Synchronoss and certain officers in the Securities Class Action, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment;

(b)   costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on Synchronoss's artificially inflated stock price;

(c)     costs associated with high-level executive departures, including the costs associated with the departure of Defendant Rosenberger, the Executive Vice President, CFO, and Treasurer, Defendant Frederick, who assumed Rosenberger's position as CFO upon her departure, and former CEO, Defendant Ronald Hovsepian (who had only been with Synchronoss for three months).  Collectively, these Defendants alone received over $7.9 million in compensation as they departed;

(d)     costs associated with the repurchase of more than $40 million in Company stock at prices that the Individual Defendants knew, or should have known, were artificially inflated due to their false and misleading statements and/or omissions, and which is currently worth just $14.73 million;

(e)     costs incurred from the misappropriation of Company information by the Insider Selling Defendants for the purpose of selling Synchronoss common stock at artificially inflated prices;

(f)     costs incurred in connection with the Company's restatements of its financials;

(g)     damages associated with the Activation Sale; and

(h)     costs incurred from the loss of the Company's customers' confidence in Synchronoss and its products and services.

222.   Moreover, these actions have irreparably damaged Synchronoss's corporate image and goodwill.  For at least the foreseeable future, Synchronoss will

suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Synchronoss's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company has also suffered over $2.1 billion in market capitalization loss as a direct result of the Individual Defendants' wrongdoing alleged herein.

## DERIVATIVE AND DEMAND ALLEGATIONS

223.   Plaintiff brings this action derivatively, and in the right and for the benefit of Synchronoss, to redress injuries suffered, and to be suffered, by Synchronoss as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law.  Synchronoss is named as a nominal defendant solely in a derivative capacity.

224.  Plaintiff will adequately and fairly represent the interests of Synchronoss in enforcing and prosecuting its rights.

225.   Plaintiff is, and has continuously been, a shareholder of Synchronoss at all relevant times hereto.

226.   As detailed below, the Board wrongfully refused Plaintiff's pre-suit Demands, forcing Plaintiff to file this shareholder derivative action, and this Complaint, on behalf of the Company.

227. Given the Board's wrongful, bad faith, and unreasonable refusal of Plaintiff's lawful demand to sufficiently investigate the misconduct, and/or to take sufficient action to remedy the harms caused to the Company, this shareholder derivative actions should be permitted to proceed.

### A.   Plaintiff's Demand Allegations

#### i.   The August 6, 2018 Demand

228. Before filing this derivative action, Plaintiff first served a shareholder litigation demand on the Board of Synchronoss on August 6, 2018, requesting that the Board investigate and take legal action to remedy breaches of fiduciary duties and violations of law by certain current and former directors and executive Officers of the Company for the misconduct detailed herein, who caused the Company to suffer damages, including having to defend itself in the Securities Class Action (previously defined as the "August 6, 2018 Demand").  A true and correct copy of the August 6, 2018 Demand is attached hereto as **Exhibit A.**

#### ii.   Plaintiff's Correspondence Following Up on the August 6, 2018 Demand

229. In response to the August 6, 2018 Demand, corporate counsel to Synchronoss, Mr. Marc Dupre, Esq., of Gunderson Dettmer Stough Villenueve Franklin & Hachigian, LLP, wrote to Plaintiff's counsel on September 13, 2018, confirming the Board's receipt of the August 6, 2018 Demand and advising that the Board "[wa]s reviewing the [August 6, 2018] Demand and w[ould] notify [Plaintiff's

counsel] of its intended course of action when decided" (the "September 13, 2018 Letter").  A true and correct copy of the September 13, 2018 Letter is attached hereto as **Exhibit B.**

230.   Having heard nothing more from the Board for roughly two and a half months after receiving the September 13, 2018 Letter, on November 21, 2018, Plaintiff's counsel wrote to Mr. Dupre to follow up on the status of the Board's investigation of the August 6, 2018 Demand, and to raise issue with the complete lack of substantive information regarding the investigation into the August 6, 2018 Demand received by Plaintiff as of that date (the "November 21, 2018 Letter"). Specifically, Plaintiff requested that Mr. Dupre provide the following basic information: (i) the person(s) charged with reviewing the August 6, 2018 Demand and their position(s) within the Company, or if not affiliated with the Company, their affiliation; (ii) the date on which such person(s) were commissioned to undertake a review of the August 6, 2018 Demand; (iii) how those person(s) were selected and determined to be independent in accordance with Delaware law; (iv) the scope of any such persons' mandate and authority in connection with their review the August 6, 2018 Demand.  Finally, Plaintiff's counsel requested that given the gravity of the allegations in the August 6, 2018 Demand, Mr. Dupre advise as to a timeframe in which the Board expected to complete its investigation.  A true and correct copy of the November 21, 2018 Letter is attached hereto as **Exhibit C.**

231.   Plaintiff's counsel did not hear further from Mr. Dupre in response to the November 21, 2018 Letter.

232.   On January 3, 2019, counsel for the Committee, Mr. Kenneth J. Nachbar, Esq., of Morris, Nichols, Arsht & Tunnell LLP, wrote to Plaintiff's counsel purporting to "respon[d] to [Plaintiff's counsel's] letter dated November 21, 2018 to Marc Dupre, Esq." (the "January 3, 2019 Letter"), but in the January 3, 2019 Letter, Mr. Nachbar wholly failed to address *any* of the concerns raised in Plaintiff's November 21, 2018 Letter, except to state that the Committee "anticipate[s] a response during the first half of 2019."   Indeed, Mr. Nachbar's January 3, 2019 Letter consisted of only one four-sentence-long paragraph advising Plaintiff's counsel that the Board had "appointed a Demand Review Committee" to consider the August 6, 2018 Demand and "to recommend action to the Board" in response thereto, and that the Committee had hired Mr. Nachbar's law firm to assist it in its consideration of the August 6, 2018 Demand.   A true and correct copy of the January 3, 2019 Letter is attached hereto as **Exhibit D.**

233.   Plaintiff's counsel responded on January 15, 2019, reiterating Plaintiff's prior requests for basic information regarding the Committee's investigation of the August 6, 2018 Demand contained in Plaintiff's counsel's November 21, 2018 Letter (the "January 15, 2019 Letter").   A true and correct copy of the January 15, 2019 Letter is attached hereto as **Exhibit E.**

234.   On January 29, 2019, Mr. Nachbar again wrote to Plaintiff's counsel, purporting to respond to Plaintiff's counsel's January 15, 2019 Letter (the "January 29, 2019 Letter").  But again, Mr. Nachbar utterly failed to respond to Plaintiff's requests for basic information regarding the Committee's investigation, except to state, for the first time, that "the Board ha[d] appointed a Special Committee of two directors, who have been determined to be disinterested and independent under applicable Delaware law," without identifying the two directors or the process by which, and on what basis, they were selected and determined to be independent.  A true and correct copy of the January 29, 2019 Letter is attached hereto as **Exhibit F.**[2]

235.  Given that nearly all of Plaintiff's prior inquiries remained unanswered—and indeed, had been wholly ignored by Mr. Nachbar (and Mr. Dupre)—Plaintiff's counsel again wrote to Mr. Nachbar on March 18, 2019, reiterating Plaintiff's inquiries first raised in his November 21, 2018 Letter for a *third* time (the March 18, 2019 Letter").  Also in the March 18, 2019 Letter, Plaintiff's counsel noted that while Plaintiff had issued a litigation demand on the Board, thereby conceding that a majority of the Board could fairly consider a demand, that fact "d[id] not necessarily render the *Committee*," as commissioned,

---

[2] In certain of Mr. Nachbar's correspondence to Plaintiff's counsel, Mr. Nachbar refers to the Committee as a "Special Committee," as is the case with the January 29, 2019 Letter, whereas in other correspondence, such as the letters received by Plaintiff prior to January 29, 2019, Mr. Nachbar refers to what Plaintiff understands to be the same committee as a "Demand Review Committee."

"disinterested and independent," and further noted that the Board's *ex-post* actions taken with respect to the August 6, 2018 Demand—for example, choosing not to empower a committee of fully independent and disinterested directors to review the August 6, 2018 Demand—could justify treating the Board as not independent.  A true and correct copy of the March 18, 2019 Letter is attached hereto as **Exhibit G.** (citing *Thorpe v. CERBCO, Inc.*, 611 A.2d 5, 10 n.5 (Del. Ch. 199) (emphasis added)).

236.   Mr. Nachbar failed to respond to Plaintiff's counsel for another roughly four months.

### iii.      The July 9, 2019 Refusal

237.   Then, on July 9, 2019, Mr. Nachbar wrote to Plaintiff's counsel, summarily stating that the Committee comprised of supposedly independent and disinterested directors, working in conjunction with purportedly independent outside counsel, had completed its investigation of the August 6, 2018 Demand and presented its findings and recommendations to the Board not to pursue claims related to the misconduct alleged in the August 6, 2018 Demand, as such action would purportedly "not be in the best interests of the Company," which recommendation was unanimously adopted by the Board at a meeting held on June 26, 2019 (the "July 9, 2019 Refusal").

238.   Notably, for the *first* time, Mr. Nachbar addressed Plaintiff's prior requests for information regarding the identities of Committee members and their mandate and scope of authority in investigating the August 6, 2018 Demand, stating: (i) the Committee was comprised of purportedly independent and disinterested directors, Cadogan and Rinne; (ii) the "Committee was charged with reviewing, investigating and providing recommendations to the Board about how the Company should proceed with respect to the [August 6, 2018 Demand]"; (iii) the "Committee was given full authority to retain and pay, at the Company's expense, independent legal counsel and other advisors as the Committee deemed necessary."[3]  Nowhere in the July 9, 2019 Refusal (or otherwise), however, did Mr. Nachbar advise as to *how* or on what basis Cadogan and Rinne were selected and determined to be independent in accordance with Delaware law, despite Plaintiff's repeated requests for such information in his prior correspondence.   Rather, Mr. Nachbar merely offered the conclusory statement that both Committee members were "disinterested and independent directors."

---

[3] This is true despite Mr. Nachbar's representation to the contrary in the July 9, 2019 Refusal.   *See* Ex. H (falsely indicating Mr. Nachbar had previously provided such information (when in fact he had not), stating, "*[a]s you know from my previous correspondence dated January 3 and January 29, 2019*, the Board appointed a [Committee] consisting of two disinterested and independent directors, William Cadogan and Kristin Rinne, to consider to the Demand and to recommend action to the Board . . . . ").

239.   The July 9, 2019 Refusal provided that the Committee's investigation included a review of "over 300 public and non-public documents . . . , including board and audit committee minutes and materials, SEC filings, communications with NASDAQ, press releases and investor call transcripts, employment agreements, 10b5-1 plans of officers and directors and information related to the Company's prior investigation and review of the financial errors," and that the Committee "conducted interviews of in-house and outside counsel."

240.   According to the July 9, 2019 Refusal, based on its purportedly "extensive" investigation, the Committee found, *inter alia*: (i) "no member of management was involved in misconduct and that there was no evidence that either management or the directors knew that the Company's financial results were misstated when they had been disclosed"; (ii) "no evidence the officers or directors were aware that the financial results were misstated or were in possession or [*sic*] adverse material non-public information about the Company"; and (iii) the "Board[] lack[ed] knowledge that errors in the Company's financial results had occurred." The July 9, 2019 Refusal also described the August 6, 2018 Demand as "factually inaccurate with respect to the allegations of wrongdoing and lacked merit."

241.   Despite these proclamations, however, the July 9, 2019 Refusal also provided that the Company had taken certain actions "to remediate the prior accounting errors," including "fir[ing] four non-officer employees for actions related

to the accounting errors" and retaining a "*new CEO and CFO, as well as other employees with responsibilities related to revenue recognition*."  Moreover, the July 9, 2019 Refusal provided that based on its investigation, the Committee had "recommended that the Board direct the Compensation Committee to *review the Company's insider trading policies* . . . and make any recommendations to the Board for any revisions that the Compensation Committee deemed appropriate."  A true and correct copy of the July 9, 2019 Refusal is attached hereto as **Exhibit H.**

iv.      Plaintiff's September 5, 2019 Demand

242.  Following the July 9, 2019 Refusal, on August 14, 2019, the lead plaintiff in the Securities Class Action filed a Second Amended Class Action Complaint (the "SAC"), alleging numerous additional violations of law by certain current and/or former directors and executive Officers at Synchronoss.   *See* Securities Class Action, ECF No. 81.

243.   In light of these additional allegations of wrongdoing, on September 5, 2019, Plaintiff's counsel again wrote to Mr. Nachbar to demand that the Committee undertake a review of the new allegations in the SAC, in supplementation of his August 6, 2018 Demand, and to follow up on the Board's July 9, 2019 Refusal (previously defined as the "September 5, 2019 Demand").  Specifically, Plaintiff requested copies of the non-public documents referenced in the July 9, 2019 Refusal as having been considered by the Committee in connection with its review of the

August 6, 2018 Demand, as well as any documents and materials reviewed in connection with the Committee's supplemental investigation of the allegations in the September 5, 2019 Demand, and asked that the Board confirm whether it stood by its July 9, 2019 Refusal following such investigation in light of the new allegations of serious misconduct in the SAC.[4]   A true and correct copy of the September 5, 2019 Demand is attached hereto as **Exhibit I.**

            v.          <u>Plaintiff's Continued Correspondence with the Committee Following Up on the September 5, 2019 Demand</u>

244.   On September 26, 2019, Mr. Nachbar wrote to Plaintiff's counsel, confirming that the Committee received the September 5, 2019 Demand and that the Committee "[wa]s investigating the additional allegations set forth [therein] and in the [SAC] filed in [the Securities Class Action]" (the "September 26, 2019 Letter").

---

[4] Plaintiff's September 5, 2019 Demand does not constitute a second, additional litigation demand, as counsel for the Committee suggests in the May 28, 2020 Refusal, but rather, the September 5, 2019 Demand supplemented and expanded on Plaintiff's August 6, 2018 Demand.  Indeed, as noted in the September 5, 2019 Demand, in Plaintiff's August 6, 2018 Demand, Plaintiff had previously explicitly stated:

> Any complete and thorough investigation of the wrongdoing must include a full investigation of the allegations related to these facts in pending litigation, including, without limitation, the Securities Class Action and any other operative complaint in any other shareholder derivative or securities actions. ***In the event that any amended pleading is filed during the pendency of such actions, any additional allegations must also be thoroughly investigated.***

*See* Ex. A (emphasis in original).  Thus, the Committee was obligated, pursuant to the terms of the August 6, 2018 Demand, to investigate all allegations in the SAC.

In addition, Mr. Nachbar declined outright Plaintiff's request for copies of the documents and materials reviewed in connection with the Committee's consideration of the Demands, summarily stating, without citing to any legal authority whatsoever, that "We do not believe that your request for documents in the penultimate paragraph of your letter is proper, and the request is therefore denied." A true and correct copy of the September 26, 2019 Letter is attached hereto as **Exhibit J.**

245.   Plaintiff's counsel responded on December 3, 2019, requesting a timeframe in which the Committee expected to conclude its investigation of the additional allegations in the SAC and reiterating Plaintiff's requests for documents reviewed in connection with the Committee's investigation of the Demands (the "December 3, 2019 Letter").  A true and correct copy of the December 3, 2019 Letter is attached hereto as **Exhibit K.**

246.   On December 13, 2019, Mr. Nachbar wrote to Plaintiff's counsel, advising that the "Special Committee expects to report to the full Board of Synchronoss, and therefore expects to have a further report to your client, in the first quarter of 2020," and again declining to provide the requested documents and materials because the "Special Committee d[id] not believe that it is legally required to provide" such information to Plaintiff (the "December 13, 2019 Letter").  Again,

Mr. Nachbar failed to provide any legal authority for this contention.  A true and correct copy of the December 13, 2019 Letter is attached hereto as **Exhibit L.**

247.   As the end of the first quarter of 2020 approached, Plaintiff's counsel still had not heard from Mr. Nachbar regarding the status of the Committee's investigation, despite Mr. Nachbar's prior representation in his December 13, 2019 Letter that the Committee "expect[ed] to have a further report to [Plaintiff] in the first quarter of 2020."

248.   Accordingly, on March 26, 2019, Plaintiff's counsel followed up with Mr. Nachbar, requesting that he advise as to whether the Committee still expected to conclude its investigation "in the first quarter of 2020," as previously stated, or if not, requesting that he advise Plaintiff of the revised timeframe in which the Committee expected to conclude its investigation of the September 5, 2019 Demand (the "March 26, 2019 Letter").  Moreover, in the event that the Committee no longer expected to conclude its investigation by the close of the first quarter of 2020, Plaintiff's counsel asked that the Committee enter into an appropriate tolling agreement to preserve Plaintiff's claims on behalf of Synchronoss.  A true and correct copy of the March 26, 2019 Letter is attached hereto as **Exhibit M.**

249.   On April 2, 2020, Mr. Nachbar responded, stating that the Committee "expects to report to the board of Synchronoss later this month" and "expects to make a decision concerning [Plaintiff's] request [that the Committee enter into a

tolling agreement] early next week" (the "April 2, 2020 Letter").  A true and correct copy of the April 2, 2020 Letter is attached hereto as **Exhibit N.**

250.   On April 7, 2020, Mr. Nachbar sent another letter to Plaintiff's counsel, advising that "[t]he Committee has determined not to request [a tolling agreement] at this time, principally because it expects to complete its work by the end of this month, and it is unaware of any statues of limitations that will expire in the next time between today and the anticipated completion date" (the "April 7, 2020 Letter").  A true and correct copy of the April 7, 2020 Letter is attached hereto as **Exhibit O.**

251.   April came and went without Mr. Nachbar advising as to the outcome of the Committee's investigation into the September 5, 2019 Demand, as he had undertaken to do in his April 2, 2020 Letter.

252.   As such, Plaintiff's counsel wrote to Mr. Nachbar on May 15, 2020, inquiring as to the status of the Committee's investigation, and in the event the investigation was still not complete, requesting an explanation of the reason(s) for the delay and a revised timetable in which the Committee expected to complete its investigation (the "May 15, 2020 Letter").  Finally, in light of the fact that Mr. Nachbar had failed to advise as to the outcome of the Committee's investigation by the end of April 2020, Plaintiff reiterated his request for a tolling agreement.  A true and correct copy of the May 15, 2020 Letter is attached hereto as **Exhibit P.**

vi.     The May 28, 2020 Refusal

253.   On May 28, 2020, Mr. Nachbar responded to Plaintiff's counsel, summarily stating that the Committee, consisting of purportedly independent and disinterested directors with the assistance of purportedly independent outside counsel, had "considered the matters raised in the [September 5, 2019 Demand]" and following its investigation, on May 22, 2020, presented its findings and recommendations to the Board that "it would not be in the best interests of the Company and its stockholders to pursue any litigation in response to the [September 5, 2019 Demand]," which the Board adopted at the same meeting (the "May 28, 2020 Refusal"). In addition, the May 28, 2020 Refusal incorporated by reference the July 9, 2019 Refusal in its entirety, serving to confirm the Board's prior refusal of the claims alleged in Plaintiff's August 6, 2018 Demand.

254.   The May 28, 2020 Refusal provided that as part of the Committee's investigation, it reviewed certain additional documents and materials and conducted interviews of certain counsel and employees at Synchronoss.

255.   Based on its purported investigation of the allegations in the SAC, the Committee found, *inter alia*: (i) "no member of management was involved in misconduct or intended to mislead the public and that there was no evidence that either management or the directors knew that the Company's financial results were misstated when they had been disclosed"; (ii) a "lack of any evidence that actual

expenses were manipulated and that the information in the [September 5, 2019 Demand] was either incorrect or contrary to the evidence discovered during the investigation"; and (iii) "no evidence the officers were aware that the financial results were misstated or were in possession of adverse material non-public information about the Company."  Like the July 9, 2019 Refusal, the May 28, 2020 Refusal also stated the September 5, 2019 Demand "was factually inaccurate with respect to allegations of wrongdoing and lacked merit."

256.   While the May 28, 2020 Refusal explicitly claims to have investigated the allegations in the SAC, the *eight (8)* confidential witnesses providing first-hand knowledge in support of those allegations—all of whom are former Synchronoss employees—were *not* even identified, much less interviewed, in connection with the Committee's investigation.  Indeed, apparently recognizing the value of speaking with these confidential witnesses as part of its consideration of the September 5, 2019 Demand, "the Committee requested that plaintiffs' counsel in the Securities Class Action identify the 'confidential witnesses' identified in the SAC so that the Committee could interview those persons, but counsel refused to do so."  Nowhere does the May 28, 2020 Refusal indicate the Committee made any other attempts to identify the confidential witnesses whose allegations form the basis of the SAC, or that they in fact interviewed such persons before refusing the September 5, 2019

Demand and confirming the July 9, 2019 Refusal.  A true and correct copy of the
May 28, 2020 Refusal is attached hereto as **Exhibit Q.**

### B.     The Board Wrongfully Refused Plaintiff's Demands

257.   As detailed further below, the Board and the Committee failed to act
independently, in good faith, and within the realm of sound business judgment in
investigating and denying the Demands.

258.   *First,* the Committee members charged with investigating the Demands
were not in fact disinterested and independent, but rather, were conflicted and
interested directors incapable of impartially reviewing the Demands.

259.   Indeed, Rinne has maintained a *fifteen-year-long* professional
relationship with Lurie, who is identified as a culpable wrongdoer in both Demands.
Specifically, prior to joining Synchronoss's Board, Rinne and Lurie served
concurrently as executives at Cingular Wireless for roughly nine years, as the CTO
of Cingular Wireless from approximately 2005 to 2007, and as the President of
National Distribution, AT&T Mobility/Cingular from approximately 2005 to 2008,
respectively.  Following the merger of Cingular Wireless and AT&T, the pair then
continued to work concurrently with one another for an additional six years prior to
joining Synchronoss's Board.  From approximately 2007 until 2014, Rinne served
as the Senior Vice President at AT&T, while Lurie was then serving as President of
Other Enterprises at AT&T from approximately 2008 to 2014, before assuming the

role of President and CEO of AT&T's Mobility and Consumer Operations in 2014. Thus, Rinne's professional relationship with Lurie dating back roughly *fifteen years* casts significant doubt as to whether Rinne could impartially investigate the Demands which implicate Lurie for significant misconduct.[5]

260.   Cadogen suffers from a similar conflict of interest with Hopkins, who is also implicated in serious misconduct in both Demands.  Specifically, Cadogen and Hopkins have a longstanding personal relationship owing to their shared alma mater, the Wharton School of Business and the University of Pennsylvania, where they each earned their master's in business administration degrees in 1985 and 1987, respectively.

261.   In addition, as discussed *infra*, Cadogan should not have been selected as a Committee member because the Court previously found based on substantially similar allegations in the Demand Futility Action that Cadogan (and other Board members) "*face a substantial risk of liability stemming from [his] omissions and misleading statements regarding the licensing fee, the terms of the Activation Divestiture, and Sequential's ownership*."  Demand Futility Action, ECF No. 63 at

---

[5] In addition to Rinne and defendant Lurie, other Synchronoss Board members previously served at AT&T as high-level employees, including Aquilina and Gyani, who served as Co-President of AT&T Consumer Services and Member of the Chairman's Operating Group for twenty-two years, and President and CEO of AT&T Wireless Mobility Services for three years, respectively.

40.  As such, Cadogan was incapable of impartially considering the Demands and making findings and recommendations with respect to the Demands.

262.  Notably, neither of the Refusals explain how or on what basis Rinne and Cadogen were selected and determined to be disinterested and independent.  Far from it, the Refusals merely offer the conclusory statement that the Committee "consist[ed] of two disinterested and independent directors" without providing any detail regarding, *inter alia*, who was involved in making the determination that Cadogen and Rinne were disinterested and independent, what criteria were used to make that determination, or when that determination was made.  *See* Ex. Q.  This, despite Plaintiff having requested such information on at least **three** separate occasions in written correspondence to counsel for the Committee.  *See* Exs. C, E, G.

263.  **Second**, the Committee's investigation was woefully deficient because it failed to interview relevant persons identified as possessing knowledge of the misconduct in the Demands.  Specifically, despite the fact that both Demands directed the Committee to investigate the newly added allegations in the SAC in the Securities Class Action[6]—including allegations derived from lead plaintiff's

---

[6] While the September 5, 2019 Demand first explicitly referred the Committee to the new allegations in the SAC, the August 6, 2018 Demand also directed the Committee to investigate those allegations, stating:

counsel's interviews of *eight* confidential witnesses in that action, all of whom are former Synchronoss employees with first-hand knowledge of the misconduct detailed in the Demands—the Committee never identified, or even interviewed, any of those witnesses before refusing the Demands.

264.   This failure to seek out and interview relevant persons with knowledge of the challenged misconduct in the Demands is particularly egregious given that on May 29, 2020, when ruling on defendants' motion to dismiss, this Court credited those witnesses' testimony as, in part, the basis for sustaining certain of the claims in the Securities Class Action—the very same claims here.  *See* Securities Class Action, ECF No. 91.

265.   Despite this failure, the May 28, 2020 Refusal does, however, implicitly acknowledge the propriety of interviewing the confidential witnesses in the Securities Class Action as part of a proper and thorough investigation of the Demands: "the Committee requested that plaintiffs' counsel in the Securities Class Action identify the 'confidential witnesses' identified in the SAC so that the

---

Any complete and thorough investigation of the wrongdoing must include a full investigation of the allegations related to these facts in pending litigation, including, without limitation, the Securities Class Action and any other operative complaint in any other shareholder derivative or securities actions.  *In the event that any amended pleading is filed during the pendency of such actions, any additional allegations must also be thoroughly investigated.*

Committee could interview those persons, but counsel refused to do so."  Beyond this feeble attempt to determine confidential witnesses' identifies, however, there is no indication in the May 28, 2020 Refusal (or otherwise) that the Committee undertook any additional steps to identify and interview those persons with crucial, first-hand knowledge of the wrongdoing alleged in the Demands.  Instead, the Committee proceeded without this vital information to recommend refusal of the Demands, which the Board adopted.

266.   Apart from the Committee's failure to identify and interview the eight confidential witnesses whose testimony supports the Securities Class Action claims, the Committee also appears to have inexplicably failed to interview numerous current and former directors expressly identified in the Demands as responsible for the wrongdoing, including, but not limited to, Waldis, Lurie, Hovsepian, Frederick, Garcia, Hopkins, McCormick, and Moore.

267.   Indeed, aside from counsel, the Committee appears to have interviewed only *five* individuals—whereas the Demands identified more than *nineteen* individuals as having information relevant to the misconduct alleged in the Demands (eleven culpable wrongdoers and eight confidential witnesses).  Those persons interviewed include the Company's Corporate Controller, CTO, a former financial analyst at Synchronoss, Irving, and Rosenberger.  And of those five individuals

interviewed, only **three** are identified in the Demands as persons with relevant knowledge of the alleged misconduct.

268.   On their face then, the Refusals conclusively show the Committee failed to interview witnesses with information material to the allegations in the Demands.  The severely limited scope of the Committee's investigation thus strongly suggests that the Refusals were ill-informed and unreasonable and not undertaken in good faith.

269.   **Third,** the Refusals omit key details regarding the Committee's process and reasoning leading to its conclusions that the Demands "lacked merit" and were "factually inaccurate."  For example, while the May 28, 2020 Refusal does identify specific persons interviewed by the Committee (unlike the July 9, 2019 Refusal), it fails to provide any explanation as to *why* those persons (and not others) were selected to be interviewed, such that Plaintiff has no visibility whatsoever into the Committee's inexplicable decision to interview, for example, the Company's Corporate Controller and CTO, but chose **not** to interview, *inter alia*, the eight confidential witnesses from the Securities Class Action and Defendants Waldis, Lurie, Hovsepian, Frederick, Garcia, Hopkins, McCormick, and Moore.

270.   Moreover, the Refusals refer to the Committee as having "presented its findings and recommendations to the Board," but no Committee reports,

presentations, or other materials, including witness interview summaries, have been provided to Plaintiff.

271.   The utter lack of transparency into the Committee's interview process strongly suggests the Committee's investigation, and the Board's Refusals, were not reasonable and not conducted in good faith.

272.   **Fourth**, the Committee's investigation is deficient due to the Committee's failure to review and consider this Court's November 26, 2019 order entered during the pendency of the Committee's investigation and sustaining certain of plaintiff's allegations in the Demand Futility Action—allegations which are also included in Plaintiff's Demands.

273.   Indeed, there is no mention whatsoever of the Court's order sustaining plaintiff's allegations in the Demand Futility Action.  This is particularly concerning given that, when assessing demand futility on a theory of substantial likelihood of liability, the Court found:

> ***Plaintiff has adequately alleged that the Directors face a substantial risk of liability stemming from their omissions and misleading statements regarding the licensing fee, the terms of the Activation Divestiture, and Sequential's ownership***. On February 8, 2018, when Synchronoss announced its financial results for the fourth quarter of 2016, it stated that its revenue forecast for "Cloud Services" came in "right on target" at $121.7 million. In early December, during a conference call with investors, the Company had forecasted that it anticipated Cloud Services revenue between $122 million and $125 million. At that time, the Company did not mention the Licensing Agreement, or the fact that the $9.2 million from the licensing agreement was factored into the revenue for the Cloud Services.

Ostensibly, absent the licensing revenue, the Company would have fallen far short of its initial revenue projection of $122 million to $125 million. *The alleged circumstances support a reasonable inference that the Directors omitted the information regarding the licensing agreement, in bad faith in order to mislead the shareholders regarding the Company's financial health*.

*See* Demand Futility Action, ECF No. 63 at 40 (internal citations omitted).

274.   *Fifth,* Defendants Waldis, Cadogan, and Hopkins are interested directors, and thus improperly participated in the Board's vote to adopt the Committee's findings and recommendations.

275.   Specifically, Defendants Waldis, Cadogan, and Hopkins voted to adopt the Committee's findings and recommendations as to the August 6, 2018 Demand, as reflected in the July 19, 2019 Refusal, which was incorporated into the May 28, 2020 Refusal in full.  Moreover, Defendants Waldis, Cadogan, and Hopkins also separately voted to adopt the Committee's findings and recommendations with respect to the September 5, 2019 Demand, as reflected in the May 28, 2020 Refusal.[7]

276.   As stated above, however, Defendants Waldis, Cadogan, and Hopkins have all been found by the Court to "*face a substantial risk of liability stemming from their omissions and misleading statements regarding the licensing fee, the*

---

[7] Plaintiff bases this allegation on the fact that both Refusals allege that "the Board *unanimously* accepted the Committee's recommendations as in the best interests of the Company and its stockholders," and at the time of both Refusals, July 9, 2019 and May 28, 2020, respectively, defendants Waldis, Cadogan, and Hopkins were all sitting Board members.  *See* Exs. H, Q.

*terms of the Activation Divestiture, and Sequential's ownership*" in the Demand

Futility Action. Demand Futility Action, ECF No. 63 at 40. Moreover, the Court

also found that "*[t]he alleged circumstances support a reasonable inference that*

*[Defendants Waldis, Cadogan, and Hopkins, and other former directors] omitted*

*the information regarding the licensing agreement, in bad faith in order to mislead*

*the shareholders regarding the Company's financial health*." *Id.*

277.  Given the Court's findings that Defendants Waldis, Cadogan, and

Hopkins "face a substantial risk of liability" from the very allegations at the center

of the Demands, Defendants Waldis, Cadogan, and Hopkins are conflicted and

interested in the outcome of the Demands. As such, Defendants Waldis, Cadogan,

and Hopkins were unable to act impartially with respect to the Demands, including

deciding whether to adopt the Committee's findings and recommendations with

respect to the Demands, and should have recused themselves from the Board's vote.

Their failure to do so renders the Refusals wrongful and made in bad faith.

278.  **Sixth,** further eroding the Committee's ability to review the Demands

is the fact that on May 29, 2020, this Court considered additional allegations

substantially similar to Plaintiff's here on defendants' motion to dismiss in the

Securities Class Action, and found such allegations satisfied even the heightened

pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA. Specifically, the Court

found, *inter alia*:

*Considering the above confidential witness information collectively, the Court finds that the SAC sets forth particularized allegations that the Company and, notably, Rosenberger, improperly recognized revenue on contracts before they were signed. These particularized allegations provide, at the very least, strong circumstantial evidence that Rosenberger knew or, more importantly, should have known that [she] was misrepresenting material facts related to the Company, and thus, acted recklessly. What is clear from the information provided by the confidential witnesses is that Rosenberger knew that revenue had been recognized on certain deals, notably the $25 million and $5 million Verizon contracts, before the contracts were signed.* Moreover, the SAC demonstrates that Rosenberger was heavily involved in the revenue recognition process. Moreover, the confidential witnesses all gave similar statements with regard to the Company's practice of requiring a signed contract for revenue to be booked, evidencing that such a practice was in place at the Company. That the confidential witnesses did not specifically allege that Rosenberger knew of that policy does not inhibit an inference of scienter— Rosenberger was the CFO of the Company and, previously the Controller, and actively participated in discussions regarding revenue recognition, and was responsible for approving such decisions. *Looking to this evidence as a whole, Plaintiff has sufficiently shown that Rosenberger knew or, more importantly, should have known that that revenue was being recognized prematurely. Accordingly, I find that scienter can be inferred from the confidential witness testimony pertaining to the improper recognition of revenue as to Rosenberger.*

\*     \*     \*

[W]hen considered in conjunction with the confidential witness testimony recited above, *the Court is satisfied that Plaintiff has demonstrated the "more" required for a GAAP violation to support an inference of scienter. Despite Defendants' assertions to the contrary, the allegations of the SAC suggest that the Company did have a policy of using written contracts and, further, that it required signed contracts for revenue to be recognized. Thus, the provisions of ASC 985-605-25-16 and -17 applied to the Company. These added allegations support a finding of scienter based on the GAAP violation.*

\*     \*     \*

*In sum, Plaintiff has adequately demonstrated on this motion (1) the Company had a practice of requiring written signed contracts before revenue was recognized, (2) that the Company recognized certain deals as completed before the contracts were signed, and (3) that Rosenberger was aware that such deals were recognized without a signed contract. This is sufficient to allege violations of the GAAP standard in question and, further, sufficient grounds from which to infer scienter as to Rosenberger.*

*   *   *

The Court finds that both these theories now support a stronger inference of scienter, as *Plaintiff has sufficiently alleged that Rosenberger knew that the Company had improperly recognized certain revenue without obtaining signed contacts.* This allegation of knowledge is enough to meet the "more" required for a restatement of financial results to support a strong inference of scienter. It is similarly sufficient for the Court to infer scienter from the size of the contracts involved. . . . *The confidential witness allegations with respect to revenue recognition demonstrate that Rosenberger knew that the Company had improperly recognized revenue on its two biggest accounts—Verizon and AT&T. That knowledge is sufficient to support an inference of scienter under this theory.*

*   *   *

*Taken together, the Court finds that Plaintiff's allegations with respect to Rosenberger are as compelling as any opposing inference of nonfraudulent intent. Plaintiff has sufficiently pled that, at a minimum, Rosenberger was aware that certain contracts, most notably the $25 million and $5 million Verizon contracts, were recognized prior to receipt of a signed contract on each deal. Plaintiff has further sufficiently alleged that recognition of those deals was in violation of Company policy, which required a signed contract for deal revenue to be recognized and in violation of GAAP standards. This, taken together with the large magnitude of the Restatement and the size of the contracts at issue, is sufficient to support a substantial inference of scienter as to Rosenberger.*

Securities Class Action, ECF No. 91 at 23-24, 27, 29, 32, 37 (internal quotation marks and citations omitted).

– 134 –

279.   Thus, the very same allegations the Court reviewed and concluded were sufficiently meritorious to withstand dismissal—even under the heightened pleading standards imposed by Rule 9(b) and the PSLRA—the Committee inexplicably reviewed and prejudged as "factually inaccurate" and "lacked merit," casting significant doubt on the reasonableness and good faith review conducted by the Committee and the Board in response to Plaintiff's Demands.

280.   *Seventh*, several of the directors who voted to adopt the Committee's recommendations and refused one or both of Plaintiff's Demands also made, certified, and/or approved the exact false and misleading statements challenged in Plaintiff's Demands, or were otherwise implicated in the wrongdoing detailed therein, including Waldis, Lurie, Cadogen, and Hopkins.  Indeed, by way of example, Waldis, Cadogan, and Hopkins each signed the materially false and misleading 2016 10-K, and Waldis is also alleged to have made numerous false and misleading statements on conference calls with investors.

281.   Additionally, several of the directors participated in unlawful insider trading by selling millions of dollars of Synchronoss stock based on knowledge of material, non-public information, including Waldis, Hopkins, and Cadogen.

282.   *Eighth*, both Refusals fail to weigh the potential recovery from any lawsuit on the Company's behalf in reaching the determination not to pursue claims.

This error is significant, particularly in light of the Court's recent orders sustaining both the Securities Class Action and the Demand Futility Action.

*          *          *

283.   The Board has failed in every respect to properly respond to Plaintiff's Demands.   The Board failed to commission an independent and disinterested Committee to meaningfully investigate the claims alleged in the Demands, failed to engage in a meaningful and transparent investigative process, reached inexplicable conclusions with respect to the merits of the Demands, particularly in light of this Court's orders sustaining substantially similar allegations in the Securities Class Action and the Demand Futility Action, and failed to undertake an appropriate investigation in proportion to the scope of the Demands.   As such, the Board's Refusals of the Demands were improper and directly at odds with the Board's fiduciary duties.

284.   The Board's and the Committee's actions in response to the Demands demonstrate that the Board desired to achieve one predetermined result, a refusal of the Demands.   Specifically, the Board abdicated its obligation to investigate the Demands to two conflicted Committee members the Board knew would recommend refusal.   The conflicted Committee members failed to conduct a bona-fide and independent investigation into the allegations raised in the Demands, disregarded the actual merits of the claims set forth in the Demands, and prejudged the merits of

the claims set forth in the Demands without undertaking a comprehensive and proportionate investigation given the scope of and allegations in the Demands. The entire "investigative" process was procedurally deficient and replete with conflicts of interest. As such, the Board's Refusals are unreasonable and uninformed, and demonstrate the Board's and the Committee's lack of diligence and good faith, and that the Refusals were not a valid exercise of business judgment.

285.  In light of the Board's unreasonable and wrongful Refusals of the Demands—not once, but twice—Plaintiff has filed this action alleging violations of breach of fiduciary duties and unjust enrichment, and this action should be permitted to proceed.

## CAUSES OF ACTION

## COUNT I

**Against the Individual Defendants for Breach of Fiduciary Duties**

286.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

287.  As alleged in detail herein, each of the Individual Defendants owed, and owe, Synchronoss and its shareholders certain fiduciary obligations, including the duties of care, loyalty, good faith, fair dealing, independence, oversight, and supervision. These duties include the duty of full and fair disclosure to shareholders, also known as the duty of candor. To execute this duty, the Individual Defendants

were required to disseminate accurate, truthful, and complete information to shareholders at all times.

288.   In direct violation of these duties, the Individual Defendants each knowingly or recklessly issued, or approved the issuance of, false public statements to shareholders that misrepresented and/or failed to disclose material information concerning the Company's business, operations, and financial prospects, including that: (i) the Company was engaged in a regular practice of falsifying contracts with customers and booking these contracts as revenue to meet certain revenue targets; (ii) Synchronoss's Activation Business was sold to an existing vendor, *i.e.*, Sequential, that had previously been owned by several members of Synchronoss's senior management, including Defendant Waldis; (iii) Sequential is owned by Omniglobe, 50% of which is owned by friends and family of Synchronoss; (iv) the Chairman and current owner of Sequential is a related party with multiple ties to Synchronoss and Defendant Waldis; (v) Synchronoss and Sequential had a prior and existing relationship; (vi) Synchronoss and Sequential entered into a $9.2 million Licensing Agreement for the sole purpose of artificially inflating Synchronoss's financials; (vii) Synchronoss had inadequate corporate accounting and corporate financial reporting resources; (viii) Synchronoss failed to maintain effective internal controls over financial reporting; and (ix) as a result of the foregoing, Synchronoss's public statements were materially false and misleading

and/or lacked a reasonable basis at all relevant times.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the best interests of the Company and its shareholders.

289.   As alleged in detail herein, each of the Individual Defendants also had a duty to exercise good faith to ensure that the Company maintained adequate internal controls.  When put on notice of problems with Synchronoss's business practices and procedures, each Individual Defendant was required to exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

290.   In direct violation of these duties, the Individual Defendants willfully ignored the obvious and pervasive problems with Synchronoss's internal control practices and procedures and failed to make a good faith effort to correct the problems or their recurrence.  As directors and/or officers of Synchronoss, the Individual Defendants were responsible for authorizing and/or failing to monitor the business practices which resulted in violations of the law as alleged herein.  Each of the Individual Defendants had knowledge of, actively participated in, approved of, or acquiesced in the wrongdoings alleged herein.

291.   As alleged in detail herein, each of the Individual Defendants also had a duty to exercise prudent oversight and supervision of Company officers and other

employees to ensure that they conducted Synchronoss's affairs in conformity with all applicable laws and regulations.

292.   In direct violation of these duties, the Individual Defendants turned a blind eye to their duties of oversight and supervision, and willfully or in bad faith allowed Company officers or other employees to conduct the Company's operations in violation of applicable laws and regulations, and in a manner that grievously harmed the best interests of the Company and its shareholders, rather than protecting those interests.

293.   As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Synchronoss has sustained significant damages, not only financially, but also to its reputation, corporate image, goodwill, and ability to continue as a going concern.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

294.   Plaintiff, on behalf of Synchronoss, has no adequate remedy at law.

## COUNT II

### Against the Demand Defendants for Breach of Fiduciary Duties

295.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

296.   The Demand Defendants acted unreasonably and in bad faith by wrongfully refusing the Demands.

297.   As a direct and proximate result of the breaches of duty alleged herein, Synchronoss has sustained, and will continue to sustain, significant damages.

298.   Plaintiff, on behalf of Synchronoss, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Unjust Enrichment**

299.   Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

300.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense, and to the detriment, of Synchronoss.

301.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Synchronoss.

302.   Further, the Insider Selling Defendants sold (or caused to be sold for their benefit) Synchronoss common stock while in possession of material, adverse, non-public information concerning the Company, the concealment of which artificially inflated the price of the Company's stock at the time of their sales.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their misappropriation and exploitation of material, non-public information that belonged to the Company.

303.   Plaintiff, as a shareholder and representative of Synchronoss, seeks restitution from the Individual Defendants, the imposition of a constructive trust over the Individual Defendants' proceeds from their misconduct, and/or an order requiring the Individual Defendants to disgorge all profits, benefits, and other compensation obtained through or as a result of their wrongful conduct and fiduciary breaches.

304.   As a direct and proximate result of these Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

305.   Plaintiff, on behalf of Synchronoss, has no adequate remedy at law.

## COUNT IV

**Against Defendants Waldis, Hoffman, Cadogan, Hopkins, McCormick, Moore, Hovsepian, Rinne, Lurie, Harris, Baker, Aquilina, and Gyani for Corporate Waste**

306.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

307.   As a result of the misconduct described above, Defendants Waldis, Cadogan, Hopkins, McCormick, Moore, Hovsepian, Rinne, Lurie, Harris, Baker, Aquilina, and Gyani have wasted corporate assets by forcing the Company to expend valuable resources in connection with the Securities Class Action, the Company's repurchase program, during which more than $40 million worth of the Company's stock was repurchased at artificially inflated prices, by causing the Company to

expend funds in connection with restating the Company's financials, and by approving wrongful compensation to Defendants, as detailed herein.

308. As a result of the waste of corporate assets, Defendants Waldis, Cadogan, Hopkins, McCormick, Moore, Hovsepian, Rinne, Lurie, Harris, Baker, Aquilina, and Gyani are liable to the Company.

309. Plaintiff, on behalf of Synchronoss, has no adequate remedy at law.

## COUNT V

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Company Information

310. Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

311. At the time the Insider Selling Defendants sold their Synchronoss stock, they were in possession of material, adverse, non-public information concerning the Company, and they sold their stock on the basis of that information.

312. The material, adverse, non-public information at issue—which concerned the Company's financial condition, future business prospects, and the sufficiency of its Company's internal controls and accounting procedures—was a proprietary asset belonging to the Company that must be used to benefit the Company and all its shareholders on equal terms. Instead, the Insider Selling Defendants misappropriated this information entirely for their own benefit.

313. At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's financial condition and future business prospects, specifically related to, among other things, the Company's lack of internal controls.

314. The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duty of loyalty and good faith.

315. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

316. As a direct and proximate result of these Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

317. Plaintiff, on behalf of Synchronoss, has no adequate remedy at law.

## COUNT VI

**Against the Securities Class Action Defendants for Contribution Under Sections 10(B) and 21D of the Securities Exchange Act of 1934**

318. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

319. Defendants Waldis and Rosenberger are named defendants in the Securities Class Action.

320.   This claim is brought derivatively on behalf of the Company against each of the Securities Class Action Defendants for contribution and indemnification.

321.   Synchronoss is named as a defendant in the Securities Class Action filed in this Court, asserting claims under the federal securities laws for, *inter alia*, violations of Sections 10(b) and 20(a) of the Exchange Act.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Defendants as alleged herein.  The Company is entitled to receive contribution from those Defendants in connection with the Securities Class Action against the Company currently pending in this Court.

322.   The Securities Class Action Defendants, as directors and/or officers, and otherwise, had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements about Synchronoss, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements an conduct that violated Sections 10(b) and 20(a) of the Exchange Act, as alleged above.

323.   In addition, the Securities Class Action Defendants are liable under 15 U.S.C. § 78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the

application of any private right of action for contribution asserted pursuant to the Exchange Act.

324.   Accordingly, Synchronoss is entitled to all appropriate contribution or indemnification from the Securities Class Action Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' wrongdoing as alleged herein;

B.   Directing Synchronoss to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Synchronoss and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a provision eliminating the classification of the Board and requiring that all directors elected at or after any annual meeting, be elected on an annual basis;

- a proposal to strengthen the Company's internal reporting and financial-disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Synchronoss's directors, executives, and other employees;

- a provision to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

- a proposal to regulate the Board's future authorizations of stock repurchases;

- a proposal to regulate the Board's future authorizations of severance awards;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the shareholders of Synchronoss to nominate three candidates for election to the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test, and then strengthen, the Company's internal operational control functions.

C.      Awarding to Synchronoss restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by each of them;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  June 11, 2020                    **WHIPPLE AZZARELLO, LLC**

                                         */s/ John A. Azzarello*
                                         JOHN A. AZZARELLO

                                         161 Madison Avenue, Suite 325
                                         Morristown, NJ 07960
                                         Telephone: (973) 267-7300
                                         Facsimile: (973) 267-0031
                                         Email: azzarello@whippleazzarellolaw.com

                                         **JOHNSON FISTEL, LLP**
                                         MICHAEL I. FISTEL, JR.
                                         Murray House
                                         40 Powder Springs Street
                                         Marietta, GA 30064
                                         Telephone: (770) 200-3104
                                         Facsimile: (770) 200-3101
                                         Email: MichaelF@johnsonfistel.com

                                         ***Counsel for Plaintiff***

## **VERIFICATION**

I, Kirk Laughlin, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  6/11/2020

Kirk Laughlin