# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE SYNCHRONOSS TECHNOLOGIES, INC. STOCKHOLDER DERIVATIVE DEMAND REFUSED LITIGATION, | Lead Case No.: 3:20-cv-7150-FLW-LHG (Consolidated with Case No. 3:20-cv-07224) |
| This Document Relates to: All Actions | **VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## **TABLE OF CONTENTS**

NATURE AND SUMMARY OF THE ACTION ....................................................3

JURISDICTION AND VENUE ...........................................................................21

THE PARTIES.....................................................................................................22

    A.    Plaintiffs ..................................................................................22

    B.    Nominal Defendant .................................................................22

    C.    Individual Defendants ............................................................23

SUBSTANTIVE ALLEGATIONS .......................................................................31

    A.    Synchronoss's History, Business, and Operations............................31

    B.    The Company's Cloud Services Business Is Created and Management's Compensation Becomes Tied to the Cloud Services Business's Success.....................................................33

    C.    Synchronoss's Accounting Policies and Revenue Recognition..........35

    D.    Synchronoss's Fraudulent Revenue Practices......................................43

        1.    The AT&T and Verizon "Contracts".........................................43

            i.    The $7 Million AT&T "Contract"...................................44

            ii.    The $25 Million Verizon "Contract"...............................45

            iii.    The $5 Million Verizon "Contract"................................49

            iv.    The SEC Letter .............................................................50

        2.    Synchronoss's Joint Ventures....................................51

        3.    The Licensing Agreement.........................................................52

    E.    The Friends and Family Sale................................................................54

        1.     The Activation Divesture .............................................................54

        2.     The "Friends and Family" ........................................................56

    F.     The Individual Defendants' False and Misleading Statements ...........60

REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS
WERE FALSE AND MISLEADING .....................................................97

THE TRUTH BEGINS TO EMERGE AND FALLOUT ENSUES ......................99

THE SECURITIES CLASS ACTION ..................................................115

THE INSIDER SELLING DEFENDANTS CAPITALIZED ON THE
COMPANY'S ARTIFICIALLY INFLATED STOCK PRICE BY
TRADING ON MATERIAL, NON-PUBLIC INFORMATION WHILE
THE COMPANY WAS FORCED TO REPURCHASE ITS OWN SHARES ....117

    A.     The Share Repurchase Program Constituted Corporate Waste
           and Breach of Fiduciary Duties .............................................117

    B.     Insider Sales Based on Material, Non-Public Information:
           Violating the Insider Selling Defendants' Fiduciary Duty
           Not to Engage in Insider Trading .........................................120

THE INDIVIDUAL DEFENDANTS' DUTIES .....................................134

    A.     Fiduciary Duties .................................................................134

    B.     Audit Committee Duties ......................................................137

    C.     Compensation Committee Duties .........................................143

    D.     Duties Pursuant to the Company's Code of Business Conduct ........145

    E.     Control, Access, and Authority .............................................149

    F.     Reasonable and Prudent Supervision .....................................150

BREACHES OF DUTIES ................................................................151

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ...153

DAMAGES TO SYNCHRONOSS ...........................................................155

DERIVATIVE AND DEMAND ALLEGATIONS ...............................158

    A.    Plaintiff Laughlin's Demand Allegations ...........................159

        1.    The August 6, 2018 Demand ...................................159

        2.    Plaintiff Laughlin's Correspondence Following Up on the August 6, 2018 Demand....................................159

        3.    Plaintiff Laughlin's July 9, 2019 Refusal ...............163

        4.    Plaintiff Laughlin's September 5, 2019 Demand ...................166

        5.    Plaintiff Laughlin's Continued Correspondence with the Committee Following Up on the September 5, 2019 Demand ..................................................................168

        6.    The May 28, 2020 Refusal.......................................171

    B.    Plaintiff Thieffry's Demand Allegations ..........................173

    C.    The Board Wrongfully Refused Plaintiffs' Demands.......................175

CAUSES OF ACTION .......................................................................190

PRAYER FOR RELIEF .....................................................................206

By and through their undersigned counsel, Court-appointed Co-Lead Plaintiffs Kirk Laughlin ("Laughlin") and Patricia Thieffry ("Thieffry" and together with Laughlin, "Plaintiffs")[1] bring this consolidated amended shareholder derivative action on behalf of Nominal Defendant Synchronoss Technologies, Inc. ("Synchronoss" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties arising from, *inter alia*, the issuance of materially false and misleading statements, the failure to maintain adequate internal controls and make a good faith correction of the problems therewith, and the wrongful refusals of Plaintiffs' Demands, as well as for unjust enrichment, insider selling, corporate waste, and contribution pursuant to the Securities and Exchange Act of 1934 ("Exchange Act").[2]  Plaintiffs make these allegations upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Synchronoss and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other

---

[1] On October 20, 2020, the Court appointed Laughlin and Thieffry as Co-Lead Plaintiffs and their counsel, Johnson Fistel, LLP and The Rosen Law Firm, P.A., as Co-Lead Counsel. (ECF No. 13).

[2] Pursuant to the August 27, 2020 Order consolidating Plaintiffs' shareholder derivative actions, Plaintiffs were permitted to file a consolidated complaint by December 4, 2020. (ECF No. 11).

publications disseminated by certain of the Individual Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Synchronoss's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action, *In re Synchronoss Technologies, Inc., Securities Litigation*, No. 3:17-cv-02978-FLW-LHG (D.N.J.) (the "Securities Class Action"); (e) pleadings, papers, and any documents filed with, and publicly available from the action *In Re Synchronoss Technologies, Inc. Derivative Litigation*, 3:17-cv-7173-FLW-LHG (D.N.J.); and (f) review of other publicly available information concerning Synchronoss and the Individual Defendants.  Pursuant to Local Rule 10.1(a), the names and addresses of the parties are as follows:

| **Plaintiffs** | **Defendants** |
|---|---|
| Kirk Laughlin, derivatively on behalf of Synchronoss Technologies, Inc. c/o Johnson Fistel, LLP 655 W. Broadway, Suite 1400 San Diego, California 92101 | Nominal Defendant: Synchronoss Technologies, Inc. 200 Crossing Blvd., 8th Floor Bridgewater, New Jersey 08807 |
| Patricia Thieffry, derivatively on behalf of Synchronoss Technologies, Inc. c/o The Rosen Law Firm, P.A. One Gateway Center, Suite 2600 Newark, New Jersey 07102 | Defendants: Stephen G. Waldis, William J. Cadogan, Thomas J. Hopkins, James M. McCormick, Donnie M. Moore, Robert E. Garcia, Lawrence Irving, Ronald W. Hovsepian, Karen L. Rosenberger, Kristin Rinne, Glenn Lurie, Laurie Harris, Frank Baker, Robert Aquilina, Mohan Gyani, Charles E. Hoffman, John Frederick, and Peter Berger |

– 2 –

c/o Synchronoss Technologies, Inc.
200 Crossing Blvd., 8th Floor
Bridgewater, New Jersey 08807

## NATURE AND SUMMARY OF THE ACTION

1.     This derivative action arises from misconduct by certain officers and directors of Synchronoss's Board of Directors' ("Board") in failing to abide by accounting procedures and improperly recognizing revenue, and from the Board's and the Demand Review Committee's ("Committee") failure to vindicate Synchronoss's rights via wrongfully refusing Plaintiff Laughlin's August 6, 2018 demand (the "August 6, 2018 Demand") and September 5, 2019 demand (the "September 5, 2019 Demand" and collectively, "Plaintiff Laughlin's Demands"), as well as wrongfully refusing Plaintiff Thieffry's August 3, 2018 demand ("Plaintiff Thieffry's Demand" and together with Plaintiff Laughlin's Demands, the "Demands") that demanded the Individual Defendants investigate and bring an action against certain current and former directors and officers of the Company for their wrongful conduct in making material misstatements and omissions related to the Company's business operations, financials, and prospects, including the Company's persistent pattern of falsifying revenue metrics so that the Company could meet its financial guidance targets, which resulted in a restatement of the Company's financials for fiscal years 2014 through 2016.

– 3 –

2.     Synchronoss, a Delaware corporation, is a mobile technology service company that provides mobility solutions for service providers and enterprises on the cloud platform and software-based applications for connected devices.  During the period of misconduct, Synchronoss was comprised of two business segments: (i) the Activation Business, which supplied cellphone providers, mainly AT&T Wireless ("AT&T") and Verizon Wireless ("Verizon"), with technology software licenses that enabled their consumers to activate newly purchased cell phones and also provided these phones with data storage and back-up functions (the "Activation Business"); and (ii) emerging after the Activation Business, the Cloud Services Business, which enabled users to store, manage, and process vast amounts of data without having to store said data on local servers or personal computers (the "Cloud Services Business").

3.     From 2000 to around 2012, the Activation Business accounted for most of Synchronoss's revenues, but around 2013, the Company began branding itself as a "cloud services provider."[3]  In order to support the growth of its Cloud Services Business, the Company changed its executive compensation structure to reflect more the success of the Cloud Services Business, such that a substantial component of

---

[3] Specifically, by 2014, the Activation Business accounted for 54% of revenues, and the Cloud Services Business accounted for 46%; in 2015, the Activation Business accounted for 46% of revenues, and the Cloud Services Business accounted for 54%; and by 2016, only 33% of revenues were derived from the Activation Business, and 67% of revenues were derived from the Cloud Services Business.

executives' compensation would now be derived from the success of the Cloud Services Business.   As a result, Synchronoss management became highly incentivized to ensure that the Company broadcast high revenue growth in its Cloud Services Business.

4.      Predictably, just as the Company made these changes to its executive compensation structure, the Cloud Services Business began to experience unprecedented growth beginning in the third quarter ended September 30, 2014. By 2015, the Company's reported revenue from the Cloud Services Business surpassed that for Activation Services, and it was apparent that the Cloud Services Business would continue to grow rapidly throughout 2016.  Indeed, by 2016, Cloud Services Business revenue accounted for 67% of the Company's total revenue.

5.      Unfortunately for Synchronoss and its shareholders, however, time would reveal that this growth was in fact illusory and driven by the Individual Defendants' accounting manipulations.  Specifically, typically right before the close of a fiscal quarter or year, the Individual Defendants would fabricate contracts with customers and then book the revenues from these contracts as revenue for the corresponding reporting period.  For example, in late 2015, at a time when the Company's Cloud Services Business growth would have otherwise been flat, and given that the Company's share price and the executives' compensation depended on this growth, the Company improperly recorded $7 million in revenue from two

transactions with top customer AT&T, despite the fact that these transactions never in fact materialized.  But improperly recognizing the $7 million in revenue allowed the Company to project continued growth in the Cloud Services Business, falsely meet its guidance in the fourth quarter of 2015, and the Individual Defendants to reap the financial gains therefrom.

6.     Then, in 2016, as revenue growth from the Cloud Services Business continued to slow, the Individual Defendants falsified contracts with another major Synchronoss customer, Verizon.[4]  According to the Second Amended Complaint (the "SAC") filed in the Securities Class Action , a CPA and certified fraud examiner as well as a financial analyst previously employed at Synchronoss, identified therein as Confidential Witness ("CW") 1, detailed based on personal knowledge that the Company improperly and prematurely recognized $5 million in cloud software licensing revenue derived from an agreement with Verizon in the first quarter of 2016.  However, no such agreement was signed in that quarter.  Indeed, that Verizon deal was only in the initial discussion phases in March 2016 and was still unsigned in April 2016, when the first quarter closed.[5]

---

[4] Together, AT&T and Verizon accounted for 73% of Synchronoss's net revenue in fiscal year 2014 according to Synchronoss's public filings.

[5] In the Securities Class Action, the Court credited CW1 (and other confidential witnesses), when combined with substantially similar factual allegations to those alleged herein, with establishing "strong circumstantial evidence that Rosenberger 'knew or, more importantly, should have known that [she] was misrepresenting material facts related to the Company,'" including that "revenue had been

7.      Synchronoss also improperly recorded revenue from another unsigned contract with Verizon later that same year.  In the third quarter of 2016, Defendant Stephen G. Waldis ("Waldis") announced that the Company "signed a $25 million license deal with Verizon during the quarter," which, under the direction of Defendant Karen L. Rosenberger ("Rosenberger"), was improperly and prematurely recognized as lump-sum revenue, as opposed to ratably as required by U.S. Generally Accepted Accounting Principles ("GAAP").  The deal was purported to be a "key contributor to [Synchronoss's] cloud performance in the quarter [and] continued success of the Verizon relationship . . . ."  With this deal, the Company was able to meet its third quarter guidance; however, the Company's seeming success was a mirage, and the Company would later be forced to restate its financial statements for 2016, as well as 2014 and 2015.

8.      It was not long until the SEC took note of the Company's purported agreements with AT&T and Verizon.  On September 2, 2016, the SEC sent the Company a comment letter (the "SEC Letter") questioning Synchronoss's revenues from AT&T and Verizon and asking that Synchronoss "provide a narrative summary of the significant terms of any material agreements with either" company.

---

recognized on certain deals, notably the $25 million and $5 million Verizon contracts, before the contracts were signed."  Securities Class Action, ECF No. 91 at 23 (quoting *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 274, 599 (D.N.J. 2009)).

Synchronoss refused to provide the SEC the requested information, however, stating "it does not believe that any individual contract between it and Verizon is one upon which the Company's business is substantially dependent."  And despite the SEC continuing to probe the Company about its contracts with Verizon, the Company continued to refuse to attach any contracts with Verizon to any of its financial reports—indeed, because there were none.

9.     Around the same time, the Company's Activation Business, although now eclipsed (on paper) by the Cloud Services Business, continued to account for a significant portion of the Company's revenues and profits and remained a key component of Synchronoss's business.   Nevertheless, on November 7, 2016, Synchronoss announced that it was evaluating strategic alternatives for its Activation Business purportedly to enhance shareholder value.  Unbeknownst to investors, the Company was already in discussions with Intralinks Holdings, Inc. ("Intralinks"), a cloud-computing content manager and service provider, about a potential acquisition of the Activation Business.

10.    On December 6, 2016, via a Form 8-K filed with the SEC, the Individual Defendants caused the Company to announce that it was divesting 70% of the Company's Activation Business ("Activation Divesture" or "Activation Sale") to a company by the name of Sequential Technology Holdings, LLC ("Sequential").  To facilitate the Activation Sale, the Company announced that it

formed a new entity called Sequential Technology, Inc. ("STI") and that the majority of the Activation Business's assets were to be transferred to STI. Thereafter, Synchronoss would sell 70% of the Company's interest in STI to Sequential, retaining a 30% interest, and in exchange, Sequential would provide Synchronoss with a "cash payment of $146 million." With this cash payment, and up to a $900 million credit line from various banks, Synchronoss would then purchase all Intralinks outstanding stock at $13.00 per share or $821 million (the "Intralinks Acquisition"), and Intralinks would become Synchronoss's wholly owned subsidiary. As part of the Intralinks Acquisition, Intralinks' CEO, Defendant Ronald Hovsepian ("Hovsepian"), would become Synchronoss's CEO effective January 18, 2017, and Defendant Waldis would continue to serve as Synchronoss's Chairman of the Board.

11.     Investors would soon learn—*after* the deal closed—the startling details of the conflicted nature of the Activation Sale in a report published on February 24, 2017 by the Southern Investigative Reporting Foundation, also known as the Foundation of Financial Journalism ("SIRF"), entitled "Synchronoss Technologies: The Friends and Family Plan" (the "SIRF Report"), that accused the Company of hiding from investors key aspects of the Activation Sale. Among other things, the SIRF Report revealed that Sequential was formally known as Omniglobe

International ("Omniglobe"), which had been partly owned by Synchronoss insiders, including Waldis, Synchronoss's former CEO and current Chairman.

12.     These insiders attempted to conceal their ownership of Omniglobe by holding their Omniglobe shares indirectly through an entity called Rumson Hitters LLC ("Rumson Hitters").   In the SIRF Report, an STI chief executive, Jaswinder Matharu ("Matharu"), explained that Synchronoss insiders held their Omniglobe shares in Rumson Hitters until "they had to restructure things a little after the [Synchronoss] IPO."   Further, the news article stated: "Pressed on what 'restructure' meant in that context, [Matharu] said there were 'legal moves' but that the Rumson Hitters entity was 'still owned by friends and family' of Synchronoss."

13.     In addition the revelations contained in the SIRF Report, Synchronoss itself also later revealed that despite its prior claim that the Company was to receive $146 million in cash for the Activation Sale, Sequential only paid $17.33 million in cash up front, along with $7.7 million in unspecified "contributed assets," and the rest was financed via a $83 million promissory note.   To make matters worse, the $146 million represented the Activation Business's total value, and not just the 70% interest sold to Sequential.   Thus, the Company had been stripped of its Activation Business, which was then sold to Defendant Waldis's and other Synchronoss insiders' friends and family for a payment of *only* $17.33 million, while the Company financed the rest, of which the Individual Defendants were fully aware.

14.    In addition, the Individual Defendants also engaged in a scheme to artificially inflate the Company's revenue and earnings targets by failing to disclose a perpetual license agreement with Sequential, under which Synchronoss booked revenues of $9.2 million in the fourth quarter of 2016.  Specifically, on December 22, 2016, just days before the end of Synchronoss's fiscal year, the Company allegedly entered into a $9.2 million licensing agreement with Sequential ("Licensing Agreement") for the use of the Company's analytics software.  Like the payment for the Activation Sale, Sequential paid for the $9.2 million Licensing Agreement with a promissory note (or similar mechanism), bringing the total amount Sequential owed to Synchronoss to $92.2 million.  Unsurprisingly, the $9.2 million was booked as revenue in Synchronoss's statement of income for Q4 2016, in direct contravention of accounting standards, thereby allowing Synchronoss to meet its revenue and earnings targets for its Cloud Services Business.

15.    On February 8, 2017, Synchronoss announced its financial results for the fourth quarter of 2016 were in line with the Company's prior guidance, including guidance for the Company's "Cloud Services" revenues between $122 million and $125 million.  During a conference call with analysts on the same date, Synchronoss executives received multiple questions regarding payments made by Sequential to Synchronoss.  Only the ongoing $32 million three-year transition services agreement ("TSA") was discussed, which was part of the Activation Divesture, whereby

Synchronoss agreed to provide ongoing support to Sequential related to the Activation Business, including cost of sales, corporate overhead, and stock-based compensation, in exchange for an annual fee of $32 million paid to Synchronoss. However, neither in the announced financial results nor on the earnings call did the Company discuss the fact that it had entered into the $9.2 million Licensing Agreement—the only reason the Company purportedly met its earnings guidance for the Cloud Services Business.

16.    On February 27, 2017, the Company filed its Annual Report on Form 10-K with the SEC for the year ended December 31, 2016 (the "2016 10-K"), disclosing—*for the first time*—that on December 22, 2016, the Company had entered into the Licensing Agreement.  The $9.2 million was recorded as revenue, thereby allowing the Company to meet its revenue and earnings targets.  Further, the Company did not clarify that this $9.2 million was a one-time payment, and not an indication of growth.

17.    On this news, Synchronoss's share price declined by $1.80 per share, or 5.9%, from $30.49 per share on February 24, 2017 to $28.69 per share on February 27, 2017 (the next trading day).  Synchronoss's share price declined an additional 5.61%, to $27.08 per share, on February 28, 2017, as the market continued to process these disclosures.  These steep declines in Synchronoss's stock price collectively wiped out over *$158 million* in Company market capitalization.

18.     On April 27, 2017, Synchronoss announced that the Company's then-CEO, Defendant Hovsepian, and then-Chief Financial Officer ("CFO"), Defendant John Frederick ("Frederick"), were leaving the Company, after assuming their positions just three months and two months prior, respectively, following the Intralinks Acquisition.  Defendant Waldis would, once again, take over as CEO.  Synchronoss also warned investors that revenue for the first quarter of 2017 ("Q1 2017") would not meet expectations, disclosing that it "expect[ed] total revenue for the first quarter of 2017 to be $13 million to $14 million less than the Company's previously announced guidance" and that it expected operating margins of 8% to 10%, which was also less than previously announced guidance.  Defendant Waldis further stated that the Company was "disappointed with [its] Q1 performance in this first quarter following our acquisition of Intralinks."

19.     On this news, Synchronoss's stock price plummeted $11.33 per share, or 46.02%, from $24.62 per share on April 26, 2017 to $13.29 per share on April 27, 2017, on unusually heavy trading volume—wiping out an additional approximately *$525 million* in Company market capitalization.

20.     According to Pacific Square Research's Herb Greenberg ("Greenberg"), Synchronoss spent months "pulling out all stops to mask a double-digit decline in cloud revenue."   Greenberg also explained that Synchronoss's financials did not add up, stating: "[t]his is a company that we believed, since we

– 13 –

first started writing about it in January, that there were plenty of moving parts which just seemed off."  Greenberg further stated: "[a]ny time the CEO and CFO, who has been in the post for less than 4 months, walks out the door, that's not a good sign. . . .  If you knew nothing else, that's all you need to know."

21.     On May 12, 2017, the Company filed a Form 12b-25 with the SEC notifying of its inability timely to file its quarterly report for the quarter ended March 31, 2017 on Form 10-Q.  Due to this news about the late filing of the quarterly report, the Company's stock price fell $1.13 per share, or over 7.23%, to close at $14.49 per share on May 15, 2017.

22.     On May 15, 2017, the Company issued a press release stating that it needed additional time to file its quarterly report with the SEC for the quarter ended March 31, 2017 because, *inter alia*, Defendant Waldis and then newly appointed CFO, Defendant Lawrence Irving ("Irving"), needed time to complete reviews of the accounting of certain transactions conducted in prior financial periods.  Further, after submissions to the Company's independent auditor, the auditor subsequently advised that additional reviews by Defendants Waldis and Irving were needed and the Company was in the process of completing this review.

23.     On this additional news regarding the untimely filing of the quarterly report, Synchronoss's share price fell another $1.23 per share, or over 8.48%, over the next two trading days to close at $13.26 per share on May 17, 2017.

24.     On May 22, 2017, the Company issued a press release that stated that on May 16, 2017, the Company had received notice from the Listing Qualifications Department of the NASDAQ.   The notice stated that the Company was "not in compliance with Nasdaq Listing Rule 5250(c)(1) because the Company has not yet filed its Quarterly Report on Form 10-Q for the period ended March 31, 2017 . . . ."

25.     Due to this news, the Company's stock price fell $0.72 per share, or 5.3%, to close at $12.82 per share on May 22, 2017.

26.     Then, on June 13, 2017, Synchronoss announced that it would need to restate its financials for 2015 and 2016, and that those financials should no longer be relied on as a result of revenue recognition errors.

27.     Following this news, the Company's stock price continued its tumble, closing at $11.26 per share on June 14, 2017, a decrease of 7.2% from a price of $12.13 per share the prior trading day, erasing another ***$40.34 million*** in Company market capitalization.

28.     Then, on October 12, 2017, the Company announced that it would also need to restate its financials for the fiscal year of 2014.  On this news, Synchronoss's stock price fell $0.21 per share, or 1.46%, to close at $14.15 on October 13, 2017. The Company's stock price continued to fall over the next several trading sessions.

29.     Today, the Company's stock has still not recovered, as it continues to trade around a dismal $3.00 per share.

30. As detailed further below, during the period of misconduct, Synchronoss was forced to issue false and misleading statements in Company press releases, quarterly reports filed on Form 10-Q, annual reports filed on Form 10-K, and other public statements concerning: (i) the Activation Divesture; (ii) the Licensing Agreement; and (iii) the recognition of the Company's revenues. Specifically, the Individual Defendants caused the Company to make false and/or misleading statements, and/or failed to disclose that: (i) Synchronoss's Activation Business was sold to an existing vendor, *i.e.*, Sequential (formerly Omniglobe), that had previously been owned by several members of Synchronoss's senior management, including Defendant Waldis and other members of the Company's senior management; (ii) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (iii) Sequential's owner and Chairman is a related party with several ties to Defendant Waldis and the Company; (iv) Synchronoss did not receive a $146 million cash payment for the Activation Sale; (v) Synchronoss and Sequential entered into a $9.2 million licensing agreement for the sole purpose of artificially inflating Synchronoss's financials; (vi) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's Cloud Services Business since 2015; (vii) the newly acquired Intralinks was underperforming; (viii) the Company was facing serious hurdles integrating and capitalizing on its newly acquired companies, and its

integration efforts were underperforming; (ix) as such, the Company's guidance was overstated; (x) the Company improperly recognized revenue, regularly recorded false revenues to meet earnings guidance, and manipulated figures and metrics in its financial statements, and as such, the Company's financial statements were not prepared in accordance with GAAP; (xi) the Company failed to maintain internal controls; and (xii) as a result of the foregoing, the Individual Defendants' statements about Synchronoss's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times, all of which was known to the Individual Defendants and/or recklessly disregarded by them.

31.     As a result of their fraudulent scheme, the Individual Defendants were able to inflate artificially the Company's financials and its stock price.

32.     Furthermore, certain of the Individual Defendants breached their fiduciary duties by causing the Company to authorize the repurchase of $100 million worth of its common stock—and executing the repurchase of over *$40 million* worth of its common stock—through a share repurchase program, announced on February 4, 2016.   As the true value of the Company's common stock was considerably lower, the price per share of the Company's common stock when the truth emerged, the Individual Defendants caused Synchronoss to overpay by millions of dollars for its own stock.  Moreover, the share repurchase program also

had the effect of further artificially inflating the Company's stock price during the relevant time period.

33.     Then, while the Company's stock price was artificially inflated due to the false and misleading statements detailed herein, as well as the share repurchase program, certain Individual Defendants exploited their positions as corporate fiduciaries of Synchronoss and sold their personal stock holdings for **_over $78 million_** in insider profits, based on knowledge of material, adverse, and non-public information regarding the Company's business, operations, and financial prospects.

34.     The Individual Defendants breached their fiduciary duties by permitting, facilitating, and/or causing the Company to make false and misleading statements and/or omissions of material fact, by permitting, facilitating, and/or causing the Company to fail to correct these false and misleading statements and/or omissions of material fact, and by causing Synchronoss to make the repurchases of Company stock at artificially inflated prices while six of the Individual Defendants engaged in lucrative insider sales of Company stock.  The Individual Defendants further breached their fiduciary duties by failing to maintain internal controls, leading to the Company's forthcoming restatements of its financial statements.

35.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and

other misconduct.  The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company and certain current and former executive officers to the Securities Class Action, the need to undertake internal investigations, the need to retain lawyers and accountants in connection therewith, losses due to the Company's overpayment of millions of dollars for the repurchases of its own stock, to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company, and of Individual Defendants who received ill-gotten gains from insider sales netting proceeds of millions of dollars, and losses incurred as a result of entering into related party transactions that were unfair to the Company, loss of valuable cash assets through the Company's inflated stock buy-backs, and costs associated with restating two years of financial statements.  As a further direct and proximate result of the misconduct described herein, Synchronoss has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future, all of which will continue to cost the Company many more millions of dollars going forward.

36.   By virtue of their leadership roles and the fact that these transactions concerned the core operations of the Company, the Individual Defendants at all relevant times knew and/or recklessly disregarded that the true state of Synchronoss's business, operations, and prospects was materially different from what the Company portrayed to the investing public.  Indeed, the Individual

Defendants signed off on those very statements contained in misleading securities filings, press releases, earnings calls, and proxy statements.  In addition, the Individual Defendants failed to correct timely and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, further rendering them personally liable to the Company for breaching their fiduciary duties.

37.    Even had they not participated in the misleading statements, Synchronoss's pervasive wrongdoing in the above described schemes could not have escaped the notice of the Individual Defendants had they been appropriately discharging their fiduciary duties to the Company.  In other words, even if the Individual Defendants had not intentionally and/or recklessly engaged in such wrongful acts, they consciously chose not to implement and maintain policies and procedures adequate and necessary to ensure such wrongful acts did not occur (*i.e.*, adequate internal controls), in further breach of their fiduciary duties.

38.    As is detailed herein, the Board and the Committee have failed to act independently, in good faith, and within the realm of sound business judgment in investigating and denying Plaintiffs' Demands.  In light of the Board's unreasonable and wrongful refusals of Plaintiffs' Demands to investigate and remediate harms caused to the Company, Plaintiffs have filed this action alleging breach of fiduciary duties and unjust enrichment.  Because the Board failed to act independently and in

good faith within the realm of sound business judgment in investigating and refusing the Demands, this derivative action should be permitted to proceed.

## JURISDICTION AND VENUE

39.     The Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over the non-federal claims asserted herein under 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

40.     Venue is proper in this district under 28 U.S.C. § 1391 because: (a) Synchronoss maintains its principal executive offices in this District; (b) one or more of the Defendants reside(s) in this District; (c) a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts—occurred in this District; and (d) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

41.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

– 21 –

## THE PARTIES

### A.    Plaintiffs

42.    Plaintiff Kirk Laughlin has been a continuous Synchronoss shareholder since March 2015, and is, currently, and at all relevant times, has been, a holder of Synchronoss common stock.

43.    Plaintiff Patricia Thieffry has been a continuous Synchronoss shareholder since September 2014, and is, currently, and at all relevant times, has been, a holder of Synchronoss common stock.

### B.    Nominal Defendant

44.    Nominal Defendant Synchronoss is incorporated in Delaware and maintains its principal executive offices at 200 Crossing Blvd., 8th Floor, Bridgewater, New Jersey 08807.  In June 2006, Synchronoss conducted its initial public offering ("IPO") and began trading on the NASDAQ under the symbol "SNCR."  Synchronoss is registered to do business in New Jersey.  Synchronoss's New Jersey Business Entity ID Number, 0100909639, is listed on the website for the New Jersey Division of Revenue & Enterprise Services, and Synchronoss has an active State of New Jersey Business Registration Certificate Number, 1007036.  The Company currently has more than 44 million shares outstanding.

## C.   Individual Defendants

45.    Defendant Waldis is the Founder and Executive Chairman, having served as Executive Chairman since January 2017 and Chairman of the Board since 2001.   Previously, he was the CEO of Synchronoss from 2000 until January 2017 and again from April 2017 to November 2017, and President from 2000 until 2011.  Waldis serves as a member of the Business Development Committee.  Defendant Waldis previously worked at Vertek Corp. ("Vertek"), a privately held firm founded by Defendant James M. McCormick ("McCormick"), from 1994 to 2000.  Working alongside Defendant McCormick, Defendant Waldis eventually became Vertek's Chief Operating Officer, and with their success, Waldis and McCormick spun off part of Vertek to form Synchronoss.  During the period of misconduct, Synchronoss was forced to pay Waldis a sum of $26,733,405 in total compensation, and while in possession of material, non-public information, Waldis sold at least 655,657 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $23,033,296.  Waldis was a defendant in the Securities Class Action.

46.    Defendant William J. Cadogan ("Cadogan") has served as a Director of Synchronoss since 2005.  Cadogan serves as Chair of the Compensation Committee and the Nominating/Corporate Governance Committee and is a member of the Business Development Committee.  During the period of misconduct, Synchronoss

was forced to pay Cadogan a sum of $1,758,019 in compensation, and while in possession of material, non-public information, Cadogan sold at least 72,500 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $2,478,885.

47.     Defendant Thomas J. Hopkins ("Hopkins") has served as a Director of Synchronoss since 2004.  Hopkins serves as Chair of the Business Development Committee, as well as a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.  Hopkins is designated by Synchronoss as a Financial Expert.  During the period of misconduct, Synchronoss was forced to pay Hopkins a sum of $1,769,696 in total compensation, and while in possession of material, non-public information, Hopkins sold at least 72,500 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $2,911,875.

48.     Defendant McCormick served as a Director of Synchronoss from 2000 until June 5, 2019.  During his tenure, McCormick served as Chair of the Nominating and Corporate Governance Committee, as well as a member of the Compensation Committee.  Defendant McCormick also founded Vertek, which served as the corporate groundwork for Synchronoss.  During the period of misconduct, Synchronoss was forced to pay McCormick a sum of $1,681,691 in total compensation, and while in possession of material, non-public information,

– 24 –

McCormick sold at least 791,016 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $34,033,453.

49.    Defendant Donnie M. Moore ("Moore") served as a Director of Synchronoss from 2007 until June 5, 2019.  During his tenure, Moore served as Chair of the Audit Committee, as well as a member of the Nominating/Corporate Governance Committee.  Moore was designated by Synchronoss as a Financial Expert.  During the period of misconduct, Synchronoss was forced to pay Moore a sum of $1,858,541 in total compensation, and while in possession of material, non-public information, Moore sold at least 47,500 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $2,062,565.

50.    Defendant Kristin Rinne ("Rinne") has served as a Director since July 2018.  Rinne is a member of the Audit Committee, as well as the Business Development Committee.  Since becoming a Director, the Company has paid Rinne $324,462.

51.    Defendant Glenn Lurie ("Lurie") was the Company's CEO, President, and a Director from November 2017 to September 2020.  Lurie resigned from these positions following the Board's review of allegations of personal misconduct in violation of the Company's policies.  During his tenure, Lurie was also a member of the Business Development Committee.  Prior to joining Synchronoss, Lurie held

several senior positions at AT&T, most recently as President and Chief Executive Officer of AT&T's Mobility and Consumer Operations, until his retirement from AT&T in September 2017.  During the period of misconduct, Synchronoss paid Lurie $25,508,036 in total compensation.

52.     Defendant Laurie Harris ("Harris") has served as a Director since August 2019.  Harris is the Chair of the Audit Committee and was designated by Synchronoss as a Financial Expert.  In 2019, the Company paid Harris $284,366.

53.     Defendant Frank Baker ("Baker") has served as a Director since February 2018 pursuant to a Series A Preferred Stock transaction with Siris Capital Group, LLC.  Baker is a member of the Business Development Committee and the Nominating and Corporate Governance Committee.  Since becoming a Director, the Company has paid Baker $394,327.

54.     Defendant Robert Aquilina ("Aquilina") has served as a Director since July 2018, and currently, Aquilina is not a member of any committee.   Since becoming a Director, the Company has paid Aquilina $443,305.

55.     Defendant Mohan Gyani ("Gyani") has served as a Director since 2019.  Gyani is a member of the Business Development Committee and the Compensation Committee.  In 2019, the Company paid Gyani $228,366.

56.     Defendant Charles E. Hoffman ("Hoffman") served as a Director of the Company from July 2006 through May 2016.  During his tenure, he also served as

the Chair of the Nominating and Corporate Governance Committee, as well as a member of the Compensation Committee.  During the period of misconduct, the Company was forced to pay Hoffman $826,779.00 in total compensation for his service as a Director of the Company.  Moreover, while in possession of material, non-public information, Hoffman sold 100,000 personally held shares of Synchronoss stock at artificially inflated prices for illicit proceeds of $3,785,163. Hoffman is a named defendant in the Securities Class Action.

57.     Defendant Robert E. Garcia ("Garcia") was the President and Chief Operating Officer ("COO") of Synchronoss from 2017 to November 2017 and the Chief Compliance Officer from November 2017 until October 2018.  Prior to that, Garcia served in various positions at Synchronoss, including as Executive Vice President of Operations and Service Delivery, and General Manager of Synchronoss's western office since joining Synchronoss in August 2000.  During the period of misconduct, Synchronoss was forced to pay Garcia a sum of $23,022,977 in total compensation, and while in possession of material, non-public information, Garcia sold at least 325,242 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $12,253,070.

58.     Defendant Irving was the CFO and Treasurer of Synchronoss from April 2017 to August 2018, when he retired, having previously occupied the same

positions from July 2001 until April 2014.   During the period of misconduct, Synchronoss was forced to pay Irving a sum of $10,933,901 in total compensation.

59.    Defendant Hovsepian served as CEO and a Director of Synchronoss from January 2017 until April 2017.   Hovsepian joined Synchronoss after its acquisition of Intralinks, before which time Hovsepian had served as CEO, President, and Director of Intralinks since December 2011.   In connection with his resignation, the Company was forced to enter into a separation agreement with the Hovsepian, dated April 26, 2017, pursuant to which the Company was forced to agree to a lump sum severance payment equal to $3.2 million.   The Company also was forced to agree to fully vest 18,260 shares of its common stock previously issued to Hovsepian, and was also forced to agree to a consulting arrangement pursuant to which Hovsepian would provide consulting services to the Company for a two-year period beginning May 1, 2017, in return for a consulting fee of $750,00 per year. Hovsepian was a defendant in the Securities Class Action.

60.    Defendant Rosenberger served as Executive Vice President, CFO, and Treasurer of Synchronoss from April 2014 until April 1, 2017.   Her resignation was announced in February 2017.   During the period of misconduct, Synchronoss was forced to pay Rosenberger a sum of $7,711,923 in total compensation, and while in possession of material, non-public information, Rosenberger sold at least 56,142 personally held shares of Synchronoss stock at artificially inflated prices for

proceeds of approximately $2,205,671. In connection with Rosenberger's termination, the Company was forced to enter into a separation agreement with her, pursuant to which the Company was forced to agree to provide the following payments to Rosenberger: (i) severance in the amount of $1,203,681, (ii) the gross amount of $21,814, which is intended to cover the employer portion of any COBRA payments for a period of eighteen months following the Termination Date, (iii) a transition payment of $200,000, and (iv) an amount of $580,000 to provide services on, at least, an as-needed basis with a term of no less than three months. According to the 2017 Proxy Statement (defined below), on March 23, 2016, Defendant Rosenberger beneficially owned over 45 thousand shares of the Company's common stock, which equated to over $1.37 million worth of Synchronoss stock. Rosenberger is a defendant in the Securities Class Action.

61. Defendant Frederick served as CFO of Synchronoss from February 2017 until April 2017. In connection with his resignation, the Company was forced to enter into a separation agreement with Frederick, dated April 26, 2017, pursuant to which the Company was forced to agree to a lump sum severance payment equal to $1.2 million. During the period of misconduct, Synchronoss paid Frederick a sum of $4,637,885 in total compensation. Frederick was a defendant in the Securities Class Action.

62.     Defendant Peter Berger ("Berger") has served as a Director since February 2018. Defendant Berger is a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Berger received $236,670 in compensation from the Company in 2019.

63.     Defendants Waldis, Cadogan, Hopkins, McCormick, Moore, Garcia, Irving, Hovsepian, Rosenberger, Lurie, Frederick, Hoffman, Rinne, Baker, Aquilina, Gyani, Berger, and Harris are, at times, referred to collectively herein as the "Individual Defendants."

64.     Defendants Rinne, Baker, Aquilina, Gyani, Waldis, Lurie, Cadogan, Hopkins, Harris, and Berger are, at times, referred to collectively herein as the "Demand Defendants."

65.     Defendants Waldis, Cadogan, Hopkins, McCormick, Moore, Garcia, Rosenberger, and Hoffman are, at times, referred to collectively herein as the "Insider Selling Defendants."

66.     Defendants Waldis, Irving, Garcia, and non-party David Berry ("Berry"), who at one point was Synchronoss's Executive Vice President and Chief Innovation Officer, are, at times, referred to collectively herein as the "Synchronoss Insiders."

## SUBSTANTIVE ALLEGATIONS[6]

### A.      Synchronoss's History, Business, and Operations

67.      In the early 1990s, Defendant McCormick founded Vertek, a privately held firm.  Beginning in 1994, Defendant Waldis also began working at Vertek, ultimately as the company's COO.  Defendants Waldis and McCormick, acting as partners, structured Vertek such that 84% was owned by McCormick and 16% was owned by Waldis.  Eventually, Waldis and McCormick spun off part of Vertek to form Synchronoss, at which time Waldis left Vertek, divested his Vertek shares, and later founded Synchronoss in 2000.

68.      Waldis, a former AT&T executive, in the midst of the Dot-Com bubble, knew the potential of the new technological breakthroughs at that time, including cell phones.   Accordingly, Defendant Waldis positioned Synchronoss to take advantage of this new market and provide mobile device activation services and consumer support to namely AT&T mobile phone providers through the Activation Business.  The Company experienced great success via the Activation Business, and by 2005, the Company derived 80% of its revenues from the Activation Business by servicing AT&T consumers.

---

[6] All textual emphases in quoted material in this Complaint are added unless otherwise noted.

69.     During this time, Synchronoss was also conducting business with a vendor called Omniglobe International, LLC (previously defined as "Omniglobe"). According to the registration statement on Form S-1 that Synchronoss filed with the SEC on June 12, 2006, and subsequently amended, (the "Registration Statement"), Omniglobe "provides data entry services relating to the Company's exception handling management. The Company paid Omniglobe an hourly rate for each hour worked by each of its data entry agents." Payments from Synchronoss to Omniglobe totaled more than $8 million in 2005 alone.

70.     Before Synchronoss went public in 2006, the Synchronoss Insiders owned a total of 18.68% of Omniglobe. Specifically, Waldis owned the biggest share, at 12.23%, and the other Synchronoss Insiders—Defendants Irving and Garcia, and non-party Berry—held the remaining interests in Omniglobe.

71.     The Synchronoss Insiders, however, did not own shares of Omniglobe directly. Rather, these individual owned "indirect equity interest in Omniglobe." According to the Registration Statement filed, these individual controlled stock in a Delaware limited liability company called Rumson Hitters, which itself owned an interest in Omniglobe.

72.     The Synchronoss Insiders held their Rumson Hitters shares for over two years. The business provided enough cash over that time to generate generous returns. Specifically, Waldis and his family received $154,000 in distributions.

Irving received $32,000 in distributions.  Berry and his family received $32,000 in distributions.  And Garcia received $16,500 in distributions.

73.    One June 15, 2006, Synchronoss held its initial public offering ("IPO"). According to Synchronoss's SEC filings, the Synchronoss Insiders and their families sold their entire interest in Rumson Hitters for the same price they paid on June 20, 2006—a mere five days after the Company's IPO.

74.    Sequential, which later bought much of Synchronoss's Activation business, was formerly known as Omniglobe.  And at the time of the Activision Divestiture to Sequential, Sequential was owned and controlled by the Synchronoss Insiders, the former owners of Omniglobe and Rumson Hitters.

**B.    The Company's Cloud Services Business Is Created and Management's Compensation Becomes Tied to the Cloud Services Business's Success**

75.    In 2007, a year after the Company's IPO, AT&T, the Company's biggest customer, entered into a five-year agreement with Apple, where AT&T had the exclusive right to distribute and service the Apple iPhone from 2007 to 2012. This proved to be profitable for the Company.

76.    Around 2010, with the AT&T agreement with Apple ending in just two years, the Company entered the cloud storage business, symbolizing the birth of its Cloud Services Business.  Starting with an acquisition of FusionOne in July 2010, Synchronoss was able to get a small foothold in the cloud services market, and

shortly thereafter, the Company experienced rapid growth in its Cloud Services Business.  Synchronoss began aggressively acquiring other cloud-based software companies, including Newbay Software in December 2012 and F-Secure's personal cloud business in February 2015, and by 2015, the Cloud Services Business purportedly surpassed the Activation Business's profitability, accounting for a greater portion of the Company's revenues.

77.     The Company sought to rebrand itself as a leader in the cloud services market, and to push its Cloud Services Business to the forefront.  Consistent with this effort, in 2014, Synchronoss tied management's compensation structure to, among other things, the success of the Cloud Services Business.  Indeed, according to the Company's 2014 Proxy Statement, "cloud revenue was $211,743,000," representing year-over-year growth of approximately 50% in cloud revenue, and further, "[a]s a result of this strong performance, [defendants Waldis, Garcia, Irving, and Rosenberger] received the maximum number of performance-based restricted shares."  Thus, management, specifically, the Company's named executive officers, would personally benefit if the Cloud Service Business flourished and met, at least on paper, the Company's revenue guidance and targets.

78.     Contemporaneous with the Company's change to its executive compensation policy to correlate with the success of the Cloud Service Business in 2014, the Cloud Service Business began seeing record breaking growth, growing

an incomprehensible 115% in the third quarter of 2014 as compared to the prior year. For the fiscal year 2014, the Cloud Service Business saw a growth rate of 82% compared to 2013.

79.    In 2015, Synchronoss reported 43% growth for the Cloud Service Business as compared to the prior year.  However, in the Company's 2015 10-K (defined below), the Company subsequently disclosed that $20.3 million of fourth quarter revenues were attributable to its joint ventures with Goldman Sachs and Verizon, and thus, organic growth was only around 11%.

80.    In the first quarter of 2016, Synchronoss reported modest growth of 18% year-over-year in the Cloud Services Business, and the Company reported 33%, 34%, and 36% growth in the second, third, and fourth quarters, respectively.

81.    However, as detailed below, these figures were artificially inflated due to the Individual Defendants' falsification of revenues via bogus contracts.

**C.     Synchronoss's Accounting Policies and Revenue Recognition**

82.    At all relevant times, the Company had two business segments: (i) the Activation Business; and (ii) the Cloud Services Business.  The Activation Business comprised of cell phone activation and other related services, while the Cloud Services Business encompassed content management as well as data storage and back-up services.

83.    For both the Cloud Service Business and the Activation Business, Synchronoss classified its revenues into four categories: (i) transaction fees; (ii) subscription fees; (iii) professional services; and (iv) licensing.  Then, when reporting revenues for these categories, the Company compiled transaction revenues with subscription revenues, and professional services revenues with licensing revenues.

84.    The Company derived transaction and subscription revenues from contracts with customers that have terms extending to up to 60 months.  Transaction and subscription revenues account for a larger part of revenue than professional services and licensing.

85.    Transaction revenues are principally based on a contractual price per transaction and include a variety of transactions, such as processing orders, setting up and activating accounts, porting telephone numbers, running credit checks, and performing inventory management.  Subscription revenues, by contrast, are based on term contracts and include enterprise portal management services on a subscription basis, maintenance agreements on software licenses, active user fees and software-as-a-service fees, hosting and storage fees, and related maintenance support for those services.

86.    In the Company's annual reports filed on Form 10-K with the SEC for the fiscal years 2014, 2015, and 2016, the Individual Defendants caused the

Company to state that it recognizes transaction revenues "based on the total number of transactions processed at the applicable price established in the relevant contract."

87.     For subscription revenues, the Individual Defendants caused the Company to represent in its 2015 and 2016 Form 10-K filings that it recognizes subscription revenues "on a straight-line basis over the life of the contract or on a fixed monthly fee based on a set contracted amount," and in the 2014 Form 10-K filing that it recognizes subscription revenues "on a straight-line basis over the life of the contract."

88.     Professional services include process and workflow consulting services and development services, and in the 2014, 2015, and 2016 Form 10-K filings, the Individual Defendants caused the Company to represent that it accounts separately for professional services revenues derived from transaction or subscription agreements "when the professional services have value to the customer on a standalone basis and there is objective and reliable evidence of fair value of the professional services."   According to Company filings, when accounted for separately, such revenues are revenues recognized "as services are performed and all other elements of revenue recognition have been satisfied."

89.     Licensing includes arrangements with other companies for use of Synchronoss software products or platforms.  In its 2014, 2015, and 2016 Form 10-K filings, the Individual Defendants caused the Company to represent that it

recognizes such revenues "when the license is delivered to our customers and all of the software revenue recognition criteria are met" and that "we follow specific and detailed rules and guidelines related to revenue recognition."

90.  Per Accounting Standards Codification ("ASC") 985-605-25-3, which concerns revenue derived from software licenses, Subpart 3a explains that revenue may only be recognized when "[p]ersuasive evidence of an arrangement exists." Likewise, ASC 985-605-25-17 provides that "revenue shall not be recognized on any element of the arrangement unless persuasive evidence of an arrangement exists." Furthermore, ASC 985-605-25-16 states: "If the vendor has a customary business practice of using written contracts, evidence of the arrangement is provided only by a contract signed by both parties."

91.  Further, Ernst & Young LLP, Synchronoss's auditor, published software revenue recognition guidelines (revised in September 2016) that stated:

> If a vendor's customary practice is to obtain signed contracts to evidence an arrangement, revenue recognition is precluded if a contract signed by both parties is not in hand at the end of an accounting period, even if the contract is executed soon thereafter and management believes that execution of the contract is merely perfunctory. Letters of intent, memoranda of understanding and similar documents are not acceptable evidence of the arrangement.

92.  Synchronoss had a business practice of using written contracts and recognizing revenue on contracts only after they were signed. This is confirmed by the language that Synchronoss used in its annual filings to describe contracts that it

has entered.  For example, Synchronoss's 2016 10-K contained the following statements that reflect the Company's practice of using written contracts:

    a.    "We generate a substantial portion of our revenues on a per-transaction or subscription basis, which is derived from contracts that extend up to 60 months from execution.";

    b.    "In periods of economic slowdown our typical sales cycle lengthens, which means that the average time between our initial contact with a prospective customer and the signing of a sales contract increases."; and

    c.    "Because we recognize revenue for certain of our products and services ratably over the term of our customer agreements, downturns or upturns in the value of signed contracts will not be fully and immediately reflected in our operating results."

93.    In addition, a Master Services Agreement between Synchronoss and AT&T, dated September 1, 2005 and filed with the SEC, states, "This Agreement and any Orders placed hereunder may be amended or modified only by a ***written document signed*** by the authorized representative of the Party against whom enforcement is sought."  This agreement was signed by Defendant Waldis and, subsequently, publicly discussed in depth by Defendant Rosenberger, including at the November 16, 2016 Credit Suisse Technology, Media, and Telecom Conference.

Also at a conference held on December 1, 2016, in which Rosenberger and Waldis participated, Defendant Rosenberger confirmed a contract with Verizon.

94.    Moreover, on the Company's fourth quarter 2014 earnings call, Waldis stated, "in the fourth quarter and the first few weeks of 2015, we've executed on a number of exciting opportunities, including signing a substantial expansion of our contract with Verizon Wireless."   Thus, the Individual Defendants knew that in accordance with the ASC, contracts had to be signed in order for revenue to be recognized, and it was policy to do so.  Further, Synchronoss adopted controls and procedures governing its processes for accounts receivable and revenue recognition. In 2015, these policies were documented in what the Company called the 2015 Revenue Policy.  This policy stated that Synchronoss abided by the Sarbanes-Oxley Act of 2002 ("SOX").  The 2015 Revenue Policy required that contracts were to be signed by both parties prior to recognizing revenue.  The policy explicitly required "[f]or all invoices, the AR Senior Accountant and AR Accountant reconcile the pricing information to the customer contract," demonstrating that "all invoices" are pursuant to contracts.

95.    The 2015 Revenue Policy demonstrated that top management of the Company were involved in the process of contract execution.  The 2015 Revenue Policy stated that "[a] Revenue Recognition memo is written for agreements that generate over 500K USD in revenue for the quarter," and explicitly requires that

such memo "provide[] a summary of the contract terms" and be "reviewed and approved by the upper management of the Finance Department, including the Corporate Controller and the Chief Financial Officer[.]"  Defendant Rosenberger was the CFO, thus she reviewed these agreements.  Further, the 2015 Revenue Policy stated that "[a]n Officer of the Company or a designated individual executes . . . contracts" on behalf of the Company, and representatives of the Finance and Legal departments had "a quarterly meeting to review new contracts that have been executed," during which meeting "upcoming contracts that are soon to be completed" are also reviewed.

96.    Moreover, in 2016, the Company established procedures in the "Transactional Revenue Process" which was also adopted pursuant to SOX and further confirmed that the Company had a customary business practice of using written contracts.  The adoption of this revenue process also confirmed that Waldis and Rosenberger were directly involved in the Company's finalization and execution of customer contracts.   The Transactional Revenue Process described the Company's internal controls and procedures.  The Transactional Revenue Process states that "[r]evenues are based on a contractual price per transaction," making clear that contracts are prerequisite to revenue recognition.  The Transactional Revenue Process continues that "[f]or all transactional revenue recorded greater than $500,000 for any given quarter, AR team prepares a technical memo to consider

revenue recognition criteria in accordance with ASC 605-25, Revenue Recognition – Software."

97.   Synchronoss also maintained an Accounts Receivable-Revenue Recognition Risk Control Matrix for 2016 (the "2016 RCM"), which was an extensive spreadsheet setting forth internal controls relating to Synchronoss's accounting.   The 2016 RCM stated that "[c]ontracts cannot be executed prior to obtaining required approval" and that "[a]pprovals are executed and stored within SpringCM," a contract management software application that the Company used. The 2016 RCM also includes that contracts are "required to go through a formal review process prior to execution," and that SpringCM "requires Legal and Finance approval before releasing the contract to be executed by the CEO or COO"—that is, Defendants Waldis or Garcia (who reported directly to Waldis).

98.   And in the Securities Class Action, several confidential witnesses detailed the existence of the policy of having written contracts, including CW7, a Synchronoss Internal Controls Manager, CW4, a financial analysist, CW5, a director of sales, and CW8, who worked on deals with customers.   Relying on that information to find that Defendant Rosenberger knew, or should have known, that revenue was being recorded improperly, the Court stated, "the confidential witnesses all gave similar statements with regard to the Company's practice of requiring a

– 42 –

signed contract for revenue to be booked, evidencing that such a practice was in place at the Company."  Securities Class Action, ECF No. 91 at 23.

### D.  Synchronoss's Fraudulent Revenue Practices

99.  During the period of misconduct, the Individual Defendants would create false contracts (oftentimes just before the end of the fiscal quarter or year) that were reported as revenues in the Company's financial statements.  These false contracts would enable Synchronoss to meet its revenue targets or guidance.  In addition, despite the requirement to have contracts signed before recognizing revenue, the Company abandoned this practice, in contravention of GAAP, and recorded premature revenue by recognizing certain deals as completed before the contracts were signed.  As a result, as described below, the Company was forced to restate its financial statements for the fiscal years 2014, 2015, and 2016.

### 1.  The AT&T and Verizon "Contracts"

100.  For the 2014 fiscal year, alone, Synchronoss had to adjust its revenue downward by one-sixth, an astounding $53.322 million, in the category titled "Evidence of Arrangement and Other Revenue."

101.  According to the 2014 10-K, AT&T and Verizon, collectively, accounted for 73% of Synchronoss's net revenue in 2014.  In 2015, AT&T and Verizon accounted for 75% of total revenues.  Given this significant percentage, it is undeniable that the revenue adjustment related to contracts between Synchronoss

and those two entities and that the revenues derived therefrom were not recorded according to GAAP.

### i.    The $7 Million AT&T "Contract"

102.   Beginning in at least 2015, the Company, via the Individual Defendants, falsified revenues related to certain AT&T contracts.  According to a November 30, 2017 article by *Telecoms.com*, titled "What the hell is going on at Synchronoss?" (the "Telecoms Article"), "[a] former company insider alleges that Synchronoss booked *$7 million* in revenue from two AT&T transactions in late 2015 that never materialized, which in turn allowed the company to show cloud growth in a quarter that would have otherwise been flat."  This allowed Synchronoss to falsely meet its fourth quarter 2015 guidance.

103.   According to CW2 in the SAC, a manager dedicated to overseeing recognition from revenue, was expressly asked by Company management in February 2016 to find a way to retroactively justify the revenue numbers that had already been reported in 2015.  The SAC further explains that "The only basis for these revenues . . . is an email from an AT&T employee indicating that AT&T would proceed with the underlying purchase transactions."

104.   Also according to the SAC, CW6, a former McKinsey & Company associate assigned to Synchronoss and later a Company employee, even estimated that as much as 50% of deals reported as completion lacked substantiation.  This

included the series of deals with AT&T totaling about $7 million for which no evidence existed that AT&T had agreed to the deals. Similarly, CW6 said purported deals with Sprint in 2016 and 2017 lacked documentation that amounted to between $2 million and $5 million.[7]

105.   Accordingly, in the restatement for the fiscal year 2015, Synchronoss was forced to take a downward adjustment of $12 million in the "Evidence of Arrangement" category, showing the $7 million in revenue derived from AT&T was falsified.

### ii.   The $25 Million Verizon "Contract"

106.   Likewise, the Company also falsified revenues with respect to purported contracts with Verizon. Specifically, on a November 7, 2016 earnings call, Defendant Waldis proclaimed that the Company "signed a $25 million license deal with Verizon during the quarter," which Defendant Rosenberger confirmed. Defendant Rosenberger also stated during the same call that "our cloud business has hit an inflection point, as our previously stated strategic initiatives at Verizon on the Personal Cloud front enabled us to further expand our addressable market at this key customer with a $25 million license deal signed and recognized in the quarter." But

---

[7] Based on details provided by CW2 and CW6, in conjunction with other confidential witnesses, the Court in the Securities Class Action determined that the SAC "sets forth particularized allegations that the Company and, notably, Rosenberger, improperly recognized revenue on contracts before they were signed." Securities Class Action, ECF No. 91 at 23.

the Verizon contract was not signed at the time the Company recorded the revenue in the third quarter of 2016.

107.   Defendant Rosenberger instructed accountants at Synchronoss to book this revenue despite objections from the accounting department.  Indeed, according to a former Company accountant identified in the SAC as CW3, Defendants Waldis and Rosenberger, and other Synchronoss executives, instructed the Company's accounting staff to manipulate the Company's financial results for reporting purposes, including bypassing Synchronoss's revenue recognition procedures and other internal controls for the express purpose of falsely meeting earnings guidance. In particular, the "infamous" $25 million transaction with Verizon was booked as revenue without proper substantiation over the extreme objections of Company accountants and members of the accounting team.  Defendant Rosenberger overruled these objections.  Further, Defendant Rosenberger "never really relinquished her control" over the accounting function and that Rosenberger "micromanaged" the Company's accountants.[8]

108.   Additionally, before serving as Synchronoss's CFO, Rosenberger, a licensed CPA, was the Company's Chief Accounting Officer from January 2012 to

---

[8] Relying, in part, on details provided by CW3, the Court in the Securities Class Action found that the SAC "demonstrates that Rosenberger was heavily involved in the revenue recognition process."  Securities Class Action, ECF No. 91 at 23 (citing CW3 stating that Rosenberger "'micromanaged' the accountants").

April 2014, and before that, she was the Company's controller from December 2000 to January 2014. Rosenberger was responsible for reviewing supporting documentation and determining whether the documentation was sufficient for the Company to recognize the revenue. Thus, the Individual Defendants, in particular Defendant Rosenberger, knew that the Company's recognition of revenues in connection with Verizon (and AT&T) were improper and in violation of GAAP and Company policy.

109.   In a follow-up article published by SIRF on March 27, 2017, entitled, "Synchronoss Technologies: You Probably Wouldn't Buy a Car From These Guys" ("SIRF Follow-Up Report"), the report honed in on the Company's claimed $25 million Verizon deal. According to the SIRF Follow-Up Report, on a Company earnings call, "Karen Rosenberger referenced a $25 million licensing fee from Verizon Wireless that materialized *in the last days of the third quarter*," and further, the article noted Defendant Rosenberger's evasiveness on the call and the lack of clarity surround the deal, explaining:

> It was not immediately apparent during the third quarter earnings call with analysts, when Waldis cited a nondisclosure agreement as a reason for not providing much detail about the deal. Nor did it become evident in subsequent company filings. Even analysts at investment management firms that own Synchronoss shares have told the Southern Investigative Reporting Foundation they haven't been given a clear answer.

110.   Notably, the SIRF Follow-Up Report made the connection that "The most obvious benefit of signing that $25 million contract was it allowed Synchronoss's third quarter 2016 revenue and income levels to compare favorably with those of the second quarter of 2016 and the third quarter of 2015, metrics that are important to many brokerage analysts."   Indeed, the Company reported $101.9 million in Cloud Services revenue and $176.4 million in total revenue that quarter.  Without including the Verizon deal, Cloud Services revenue would actually be $76.9 million, and total revenue would have been $151.4 million.  This would have shown there was no growth in Cloud Services revenue for the third quarter of 2015, the previous year.

111.   Notably, the SIRF Follow-Up Report explained the reason this deal seemed false was that "Synchronoss' gross margins didn't really change.  Ordinarily a license payment boosts revenue with a minimal effect on the cost of goods sold.  But in the third quarter of 2016 the gross margins declined in comparison with the same period in 2015."   Furthermore, the SIRF Follow-Up Report explained that without this deal, Synchronoss's third quarter "results would have been abysmal."

112.   The SIRF Follow-Up Report was corroborated when the Company was forced to restate its 2016 financials to account properly for the revenues derived from this deal with Verizon.  Specifically, in the Restatement, Synchronoss reported $17.1 million in license revenues for the entire fiscal year of 2016, and license

revenues is the category under which the Verizon deal would fall.  Thus, this $25 million deal never existed, or if it did, the deal certainly did not amount to $25 million in revenues for the fiscal year of 2016.

### iii.    The $5 Million Verizon "Contract"

113.   Synchronoss also improperly recorded revenue from another unsigned contract with Verizon.

114.   According to the SAC, a CPA and certified fraud examiner as well as a financial analyst previously employed at Synchronoss, identified as CW1, confirmed that the Company improperly and prematurely recognized $5 million in cloud software licensing revenue derived from an agreement with Verizon in the first quarter of 2016.  No such agreement, however, was signed in that quarter.

115.   The topic of getting another contract signed with Verizon, this one for $5 million, was discussed at weekly meetings within Synchronoss.  At these meetings, Defendant Rosenberger was aware that it had not been signed in the first quarter of 2016.  Moreover, she was very involved in the Company's revenue recognition, as discussed above.

116.  Of course, recognizing this $5 million revenue similarly enabled Synchronoss to report Cloud Services revenues exceeding its first quarter 2016 guidance and bolstered the purported growth of the segment to inflate the Company's stock price.

### iv.     The SEC Letter

117.   On September 2, 2016, the SEC issued the SEC Letter to the Company, questioning the Company's revenues derived from its largest customers.  The SEC Letter requested that Synchronoss publicly disclose its contracts with Verizon as exhibits to future filings.

118.   Synchronoss refused to attach the contracts that the SEC requested. Responding on September 16, 2016 to the SEC, the Company stated that "it does not believe that any individual contract between it and Verizon is one upon which the Company's business is substantially dependent."

119.   On September 22, 2016, the SEC responded, requesting further information of the Company's contracts with Verizon specifically.

120.   The Company responded on October 4, 2016, again declining to attach any of the requested contracts.

121.   The Company's refusal to provide contractual documentation of the AT&T and Verizon deals for which it had been recognizing millions of dollars in revenue spoke volumes to the Individual Defendants' culpability: if the requested contracts had been publicly available, the public would have been made aware that the contracts were not signed when the Company reported revenue, and as a result, the Individual Defendants' fraud would have been exposed.

122.   In connection with the Restatement (defined below) of the Company's financial statements, however, Synchronoss attached a contract between the Company and Verizon to a Form 10-Q for the first quarter of 2018 filed with the SEC on July 2, 2018.  This was an "about face" on the Company's prior position that no individual contract with Verizon was material, such that Synchronoss did not need to attach it to SEC filings, as the SEC had demanded of the Company in 2016.

### 2.   Synchronoss's Joint Ventures

123.   In late 2015, Synchronoss formed two joint ventures to expand its position in the cloud technology market.  Specifically, in November 2015, the Company formed SNCR, LLC, a joint venture with Goldman Sachs, and in December 2015, it formed Zentry, LLC ("Zentry"), a joint venture with Verizon.

124.   SNCR, LLC was formed to develop "advanced mobile solutions leveraging proprietary secure enterprise mobility technology" contributed by Goldman Sachs, SNCR, LLC, as well as Synchronoss's WorkSpace platform. Synchronoss obtained a 67% interest in SNCR, LLC in exchange for a perpetual license for the use of the WorkSpace platform.  Goldman Sachs obtained a put option to sell its share of SNCR, LLC to Synchronoss, and Synchronoss obtained a call option to require Goldman Sachs to sell its share of SNCR, LLC to Synchronoss. Goldman Sachs has a "redeemable non-controlling interest" in SNCR, LLC.  SNCR,

LLC is a variable interest entity ("VIE"), of which Synchronoss is the primary beneficiary.

125.   Zentry was formed to develop and manage a secure mobile user identification and authentication platform.  Synchronoss provided $48 million to obtain a 67% interest in Zentry.  Verizon, the co-venturer in Zentry, obtained a put option to sell its share of Zentry to Synchronoss after December 2018, and Synchronoss obtained a call option to require Verizon to sell its share of Zentry to Synchronoss after December 31, 2018.

126.   On December 31, 2015, Zentry entered into a $23 million perpetual license agreement with a Verizon subsidiary for the use of certain Verizon user authentication software.

127.   In the Company's Restatement of its financials, the Company acknowledged that it treated the $23 million licensing fee as revenue in the fourth quarter of 2015.  Recognition of the licensing fee as standalone revenue, rather than as part of the accounting of the formation of the joint venture, was a blatant violation of GAAP.

### 3.   The Licensing Agreement

128.   On December 22, 2016, the Company entered into the Licensing Agreement with Sequential in connection with the Activation Sale.

129.   Notably, just a few weeks earlier, on December 6, 2016, during a conference call with investors, the Company had forecasted that it anticipated Cloud Services Business revenue between $122 million and $125 million, but the Individual Defendants failed to mention the Licensing Agreement, without which the Company would not meet its revenue guidance.

130.   Despite this white knight deal entered into just days before the close of the fourth quarter, which enabled the Company to meet financial results for the quarter, the Licensing Agreement was not mentioned in the Company's February 8, 2017 earnings conference call with investors relating to said results, even after management received multiple questions regarding payments from Sequential to Synchronoss.   Instead, the Individual Defendants represented the Company's revenue forecast for "Cloud Services" came in "right on target."

131.   In fact, the Individual Defendants would not disclose the Licensing  Agreement until months later, on *February 27, 2017*, when Synchronoss filed its 2016 10-K, and *for the first time*, the Individual Defendants disclosed that on December 22, 2016, the Company "entered into a non-exclusive perpetual license agreement with [Sequential], in the amount of $9.2 million, which is included in net revenues in the statement of income, for the use of the Company's Analytics software."

132.   The SIRF Follow-Up Report highlighted the "highly unusual" nature of this agreement, stating:

> While accounting standards afford auditors latitude in determining what can be recognized as revenue, permitting a $9.2 million noncash IOU from Sequential (a newly created company that already had an $83 million debt to Synchronoss) to count as revenue on Dec. 22, just days before the fiscal year's end, is highly unusual. Moreover, the payment is not disclosed anywhere but the 10-K and not even mentioned in a separate Dec. 22 filing discussing the transaction's terms.

133.   The Individual Defendants were required to disclose the $9.2 million Licensing Agreement, as well as its impact on the Company's fourth quarter financial results, and in failing to do so, breached their fiduciary duties.

E.     **The Friends and Family Sale**

1.     **The Activation Divesture**

134.   On December 6, 2016, the Individual Defendants disclosed that Synchronoss would divest 70% of its Activation Business to Sequential, and in return, Sequential would provide a "cash payment of $146 million."  Synchronoss retained a 30% ownership interest in the Activation Business, a stake that could be reduced during the course of 2017.

135.   Furthermore, the Individual Defendants disclosed that the Company had recently formed STI and would divest the Activation Business in STI. Subsequently, Sequential would acquire the 70% interest in STI from Synchronoss.

136.   In connection with the Activation Divesture, the Individual Defendants announced that with proceeds from the sale, along with $900 million in possible financing, the Company would purchase all outstanding shares of Intralinks at $13.00 per share for around $821 million.

137.   The Individual Defendants, however, failed to mention the true relationship between Sequential and Omniglobe and that this sale presented vast conflicts of interest as it was a sale to the family and friends of the Synchronoss Insiders.

138.   The announcement of the Activation Divesture caused the market severe discomfort and led analysts to investigate the sale.   In a research note published on December 20, 2016, Tom Roderick ("Roderick"), an analyst at Stifel Nicolaus & Company, shed light on the conflicted nature of the sale.   Roderick revealed that Sequential was formerly known as Omniglobe, a business process outsourcing company that works with Synchronoss on its AT&T activation work. Roderick went on to explain that Omniglobe was also listed as a "related party" in the 2006 Synchronoss IPO prospectus, which included details of an equity interest on the part of Waldis and three other Synchronoss executives.   Those investments were made through a holding group called Rumson Hitters, other members of which eventually bought out the Synchronoss Insiders' stakes in Omniglobe.

139.   All of this, however, was omitted by the Individual Defendants when announcing the Activision Sale.

### 2.   The "Friends and Family"

140.   Long before the Activation Sale, Defendant Waldis had a longstanding relationship with those who benefited from the Activation Sale.  In fact, Defendants Waldis and McCormick knew each other for decades as they worked together at Vertek from 1994 to 2000.  Defendants Waldis and McCormick acted as partners, but Defendant McCormick owned 84% of Vertek, while Defendant Waldis owned 16% and would eventually become Vertek's COO.   Vertek was a successful company, and out of it, Synchronoss was born.

141.   In 2000, Defendant Waldis sold his interest in Vertek and headed-up Synchronoss.  During the early years of the Company, as mentioned herein, the Company was only comprised of the Activation Business.  As part of facilitating this business, the Company used Omniglobe as a vendor.

142.   When Synchronoss went public in 2006, the Company was required to make certain disclosures pursuant to the federal securities laws.  Among them was the requirement to disclose related party transactions.   Accordingly, in the Company's Form S-1 registration statement filed with the SEC on June 12, 2006 (the "Registration Statement"), under "Related Parties," Synchronoss disclosed Omniglobe was a related party, stating that:

Omniglobe International, L.L.C., a Delaware limited liability company with operations in India, provides data entry services relating to the Company's exception handling management. The Company pays Omniglobe an hourly rate for each hour worked by each of its data entry agents. For these services, the Company has paid Omniglobe $0, $2,211 and $8,089 in 2003, 2004 and 2005 and $1,532 and $2,136 for the three months ended March 31, 2005 and 2006, respectively. At December 31, 2004, 2005 and at March 31, 2006, amounts due to Omniglobe were $399, $577, and $728, respectively.

143.   Omniglobe was a related party because on March 12, 2004, the Synchronoss Insiders, as well as members of their families and close friends, acquired indirect equity interests in Omniglobe by purchasing an ownership interest in Rumson Hitters, which owned an interest in Omniglobe.

144.   Specifically, Defendant Waldis bought 12.23% of Rumson Hitters for $95,000; Defendant Irving and non-party Berry both purchased 2.58% for $20,000; and Defendant Garcia purchased 1.29% for $10,000.

145.   From March 2004 to June 2006, Omniglobe paid its interest holders, including, Rumson Hitters, a total of $1.3 million in distributions, and in turn, Rumson Hitters paid to its interest holders, including Defendants Waldis, Irving, Garcia, and non-party Berry, a total of $700,000.  Specifically, Rumson Hitters paid $153,655 in distributions to Defendant Waldis and his family members, $32,348 in distributions to Defendant Irving, $32,348 in distributions to Berry and his family members, and $16,174 in distributions to Defendant Garcia.

146.   However, given the inherent conflicts associated with their interests in Rumson Hitters, Defendants Waldis, Irving, Garcia, and non-party Berry purportedly divested their interest in Rumson Hitters once the Synchronoss IPO was complete via a buyout from Rumson Hitters' other interest holders.  According to the Registration Statement:

> Upon completion of the Company's initial public offering, Rumson Hitters will repurchase, at the original purchase price, the equity interests in Rumson Hitters held by each of the Company's employees and their family members, such that no employee of the Company or family member of such employee will have any interest in Rumson Hitters or Omniglobe after this offering. Neither the Company nor any of its employees will provide any of the funds to be used by Rumson Hitters in repurchasing such equity interests.

147.   According to the SIRF Report, Omniglobe's President and Chairman, Matharu, owned a 50 percent stake in Omniglobe, and "the Rumson Hitters hold the other 50 percent."  When questioned about the Rumson Hitters ownership structure, Matharu stated, "I'm reluctant to speak about [the Rumson Hitters] part of the ownership group because they had to restructure things a little after the [Synchronoss] IPO."  When asked what "restructure" meant in that context, Matharu said there were "legal moves" but that the Rumson Hitters entity was "still owned by friends and family" of Synchronoss.  Even more odd, Omniglobe and Rumson Hitters were registered in Delaware on the same day, March 5, 2004.

148.   According to Matharu, per the SIRF Report, "a lawyer named John Methfessel ["Methfessel"] controlled the Rumson Hitter investment and that

questions about it should be directed to him," and also, "Methfessel [was] identified as the owner of a legal transcription service that outsourced business to Omniglobe."

149.   Methfessel, along with his wife, Kathleen, were pre-IPO investors in Synchronoss.   Methfessel and Defendant Waldis have a deep relationship, given Methfessel was Defendant Waldis's next-door neighbor for several years in Lebanon, New Jersey and Methfessel sits on the Board of the Waldis Family Foundation.  Moreover, according to the SIRF Report, in November 2016, a month before the Activation Sale was announced, Methfessel formed STI, which the SIRF Report calls a "corporate shell."   The following month, in December 2016, Synchronoss would transfer its Activation Business to STI, which would then be acquired by Sequential.

150.   Another man who sits on the Board of the Waldis Family Foundation and has close ties with Defendant Waldis is Tom Miller ("Miller").   Specifically, Miller and Waldis went to school together at Seton Hall University, and furthermore, as of early 2017, Miller was STI's chief strategy officer.

151.   The Synchronoss Insiders and their family have known each other for years, and using these relationships, these individuals exploited Synchronoss by stripping it of its still profitable Activation Business and selling it for a cheap upfront cash payment of $17.33 million and then forcing the Company to finance the rest.

Despite this egregious conduct, the Board has refused Plaintiffs' Demands to vindicate Synchronoss's rights related to the Activation Sale.

### F.   The Individual Defendants' False and Misleading Statements

152.   On October 28, 2014, the Company issued a press release announcing its financial results for the third quarter of 2014.  In the press release, Defendant Waldis stated:

> Synchronoss' strong third quarter financial results exceeded our expectations from a revenue and profitability perspective and were highlighted by 115% year-over-year Cloud Services revenue growth.

153.   Defendant Rosenberger was quoted in this press release stating: "[W]e continue to generate both meaningful growth and sustained profitability."

154.   The press release also stated the following as to revenues:

> On a GAAP basis, Synchronoss reported net revenues of $125.2 million, representing an increase of 40% compared to the third quarter of 2013. Gross profit was $74.7 million and income from operations was $15.6 million in the quarter. Net income applicable to common stock was $9.3 million, leading to diluted earnings per share of $0.22, compared to $0.09 for the third quarter of 2013.
>
> *     *     *
>
> Cloud Services non-GAAP revenue was $57.9 million, representing approximately 46% of total revenue.

155.   On the third quarter 2014 earnings call, held on October 28, 2014, Defendant Rosenberger stated: "Our non-GAAP Cloud Services revenue in the third quarter was $57.9 million, representing 46% of our total revenue and year-over-year

growth of 115%." Defendant Waldis stated: "Our strong third quarter results were highlighted by the significant outperformance in our cloud services business, which generated year-over-year revenue growth of 115%."

156. On October 31, 2014, the Individual Defendants caused the Company to file a quarterly report for the third quarter of 2014 on Form 10-Q (the "3Q14 10-Q") with the SEC. In the 3Q14 10-Q, the Company reported net revenue of $125.175 million and income from operations of $15.618 million. Synchronoss reported net revenue of $457.314 million and income from operations of $62.298 million for the year-to-date 2014 period. The 3Q14 10-Q also states: "[O]ur consolidated financial statements . . . have been prepared in accordance with GAAP."

157. Furthermore, the 3Q14 10-Q stated, in relevant part:

We have implemented new financial systems that will continue in phases over the reminder of the year. In connection with this initiative and the resulting changes in our financial systems, the Company continues to enhance the design and documentations of our internal control processes to ensure that controls over our financial reporting remain effective.

158. The 3Q14 10-Q also contained signed SOX certifications by Defendants Waldis and Rosenberger.

159. The 3Q14 10-Q also contained certifications pursuant to SEC Rule 13a-14(a) ("SEC Rule Certifications") from Defendants Waldis and Rosenberger attesting that they reviewed the 3Q14 10-Q and that the 3Q14 10-Q "does not contain

any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications further stated:

> The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and have: (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; (b) Designed such internal control over financial reporting, or caused such control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

160.  On February 5, 2015, Synchronoss issued a press release which announced its financial results for the fourth quarter of 2014 and for the full year 2014.  The press release stated, in relevant part:

> **BRIDGEWATER, NJ – February 5, 2015** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud

innovation and software-based activation for mobile carriers, retailers and OEMs around the world, today announced financial results for the fourth quarter and full year 2014.

"The fourth quarter provided a strong finish to 2014, with financial results that exceeded our expectations, and were highlighted by year-over-year Cloud Services revenue growth of 61% and improved Activation Services revenue growth of 16%," said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. "We've had a number of exciting business developments in recent months, including a major expansion of our multi-year agreement with Verizon Wireless and the successful acquisition of F-Secure's cloud assets. We believe that our expanding cloud services customer base, coupled with greater opportunities for subscriber adoption and utilization, provide a long runway for growth in this dynamic market."

On a GAAP basis, Synchronoss reported net revenues of $130.2 million, representing an increase of 34% compared to the fourth quarter of 2013. Gross profit was $77.6 million and income from operations was $20.5 million in the fourth quarter of 2014. Net income was $13.6 million, leading to diluted earnings per share of $0.30, compared to $0.39 for the fourth quarter of 2013.

On a non-GAAP basis, Synchronoss reported net revenues, which adds back the purchase accounting adjustment related to revenues for certain acquisitions, of $130.9 million, an increase of 34% compared to the fourth quarter of 2013. Gross profit for the fourth quarter of 2014 was $79.9 million, representing a gross margin of 61%. Income from operations was $36.2 million in the fourth quarter of 2014, representing a year-over-year increase of 44% and an operating margin of 28%. Net income was $24.2 million in the fourth quarter of 2014, up from $16.4 million in the year ago period. Diluted earnings per share were $0.53 for the fourth quarter of 2014, compared to $0.41 for the fourth quarter of 2013.

\*       \*       \*

**Other Fourth Quarter and Recent Business Highlights:**

• Cloud Services revenue accounted for $63.4 million of non-GAAP revenue, representing approximately 48% of total non-GAAP revenue and growing 61% on a year-over-year basis.

161. In connection with these financial results, the Company held an earnings call on February 5, 2015. On this call, Defendant Rosenberger stated: "Our non-GAAP Cloud Services revenue in the fourth quarter was $63.4 million, which represented 48% of our total revenue and year-over-year growth of 61%."

162. On February 25, 2015, the Company filed its annual report Form 10-K for fiscal year ended December 31, 2014 with the SEC ("2014 10-K"). The 2014 10-K was signed and certified by Individual Defendants Waldis, Rosenberger, Cadogan, Hoffman, Hopkins, McCormick, and Moore as true and accurate and contained signed SOX certifications by Defendants Waldis and Rosenberger. These Individual Defendants caused the Company to report in the 2014 10-K that Synchronoss recorded net revenue of $457.314 million and income from operations of $62.298 million.

163. The 2014 10-K also stated: "our consolidated financial statements . . . have been prepared in accordance with U.S. GAAP."

164. The 2014 10-K stated the following as to revenue:

Revenue from software license arrangements is recognized when the license is delivered to our customers and all of the software revenue recognition criteria are met. When software arrangements include multiple elements, the arrangement consideration is allocated at the inception to all deliverables using the residual method providing we have vendor specific objective evidence (VSOE) on all undelivered

elements. We determine VSOE for each element based on historical stand-alone sales to third-parties.

\*      \*      \*

[W]e follow specific and detailed rules and guidelines related to revenue recognition.

165.   On April 29, 2015, the Individual Defendants caused the Company to announce its first quarter results for the first quarter of 2015 in a press release, which stated in part:

### SYNCHRONOSS TECHNOLOGIES, INC. ANNOUNCES FIRST QUARTER 2015 FINANCIAL RESULTS

- *Non-GAAP total revenue of $133.1 million increases 35% year-over-year*
- *Cloud Services revenue of $71.3 million increases 63% year-over-year*
- *Activation Services revenue of $61.8 million increases 12% year-over-year*
- *Non-GAAP EPS of $0.49 increases 26% year-over-year*

**BRIDGEWATER, NJ – April 29, 2015** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the mobile innovation leader that provides cloud solutions and software-based activation for mobile carriers, retailers and OEMs around the world, today announced financial results for the first quarter 2015.

"Synchronoss delivered a strong start to 2015, highlighted by first quarter results that were at or above the high end of expectations," said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. "During the quarter, both sides of our business contributed to the strong performance, particularly our Cloud Services, which grew by 63% year-over-year. Mobile Operators around the world are capitalizing on the success of how personal cloud can drive important benefits to their valuable subscribers. We are pleased with our successful formula for helping our customers gain adoption and success with our personal cloud platform."

– 65 –

On a GAAP basis, Synchronoss reported net revenues of $132.9 million, representing an increase of 35% compared to the first quarter of 2014. Gross profit was $79.3 million and income from operations was $18.3 million in the first quarter of 2015. Net income was $10.6 million, leading to diluted earnings per share of $0.23, compared to $0.19 for the first quarter of 2014.

166.   The press release also quoted Defendant Waldis as stating:

During the quarter, both sides of our business contributed to the strong performance, particularly our Cloud Services, which grew by 63% year-over-year. Mobile Operators around the world are capitalizing on the success of how personal cloud can drive important benefits to their valuable subscribers. We are pleased with our successful formula for helping our customers gain adoption and success with our personal cloud platform.

167.   Then, on the earnings call held on April 29, 2015 in connection with the foregoing results, Defendant Rosenberger stated: "Our non-GAAP cloud revenue in the first quarter was $71.3 million, which represented 54% of our total revenue and year-over-year growth of 63%."

168.   On May 1, 2015, the Individual Defendants caused the Company to file its quarterly report for the first quarter of 2015 on Form 10-Q with the SEC ("1Q15 10-Q").   The 1Q15 10-Q was signed by Defendants Rosenberger and Waldis and contained signed SOX certifications and SEC Rule Certifications by Defendants Rosenberger and Waldis.   In the 1Q15 10-Q, the Company reported net revenue of $132.926 million and income from operations of $18.289 million and stated that "our consolidated financial statements . . . have been prepared in accordance with GAAP."

169.   The 1Q15 10-Q incorporated the following by reference:

Revenue from software license arrangements is recognized when the license is delivered to our customers and all of the software revenue recognition criteria are met. When software arrangements include multiple elements, the arrangement consideration is allocated at the inception to all deliverables using the residual method providing we have vendor specific objective evidence (VSOE) on all undelivered elements. We determine VSOE for each element based on historical stand-alone sales to third-parties.

*      *      *

[W]e follow specific and detailed rules and guidelines related to revenue recognition.

170.   Furthermore, under the heading "Changes in internal controls over financial reporting," the 1Q15 10-Q stated:

We have implemented new financial systems that will continue in phases over the reminder of the year. In connection with this initiative and the resulting changes in our financial systems, the Company continues to enhance the design and documentations of our internal control processes to ensure that controls over our financial reporting remain effective.

171.   On July 29, 2015, the Individual Defendants caused the Company to report its financial results for the second fiscal quarter of 2015 via a press release, and in the release, Synchronoss reported:

**SYNCHRONOSS TECHNOLOGIES, INC. ANNOUNCES
SECOND QUARTER 2015 FINANCIAL RESULTS**

- *Non-GAAP total revenue of $137.9 million increases 33% year-over-year*
- *Cloud Services revenue of $71.9 million increases 54% year-over-year*

– 67 –

- *Activation Services revenue of $66.0 million increases 16% year-over-year*
- *Non-GAAP EPS of $0.56 increases 37% year-over-year*

**BRIDGEWATER, NJ –July 29, 2015** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the mobile innovation leader that provides cloud solutions and software-based activation for mobile carriers, retailers and OEMs around the world, today announced financial results for the second quarter 2015.

"Synchronoss reported strong second quarter results that met or exceeded the high end of expectations," said Stephen G. Waldis, Founder, Chairman and Chief Executive Officer of Synchronoss. "Each of our businesses performed well in the quarter and we were pleased to see some of our new wins began to scale and drive volumes, particularly on the cloud side. We are gaining strong traction among international mobile operators who are increasingly realizing the significant value Synchronoss's white-label cloud solution can deliver to their subscribers."

On a GAAP basis, Synchronoss reported net revenues of $137.8 million, representing an increase of 33% compared to the second quarter of 2014. Gross profit was $82.9 million and income from operations was $23.6 million in the second quarter of 2015. Net income was $15.2 million, leading to diluted earnings per share of $0.33, compared to $0.20 for the second quarter of 2014.

172.   In connection with these results, Synchronoss held an earnings call on July 29, 2015 with analysts, and on the call, Defendant Rosenberger stated: "Our non-GAAP cloud services revenue in the second quarter was $71.9 million which represented 52% of our total revenue and year-over-year growth of 54%."

173.   Then, on July 31, 2015, the Individual Defendants caused the Company to file its quarterly report for the second quarter of 2015 on Form 10-Q ("2Q15 10-Q") with the SEC.  The 2Q15 10-Q contained SOX certifications and SEC Rule

Certifications by Defendants Waldis and Rosenberger.   In the 2Q15 10-Q, Synchronoss reported net revenue of $137.820 million and income from operations of $23.638 million and stated, "our consolidated financial statements . . . have been prepared in accordance with GAAP."

174.   On October 28, 2015, the Individual Defendants caused Synchronoss to issue a press release (the "October 28 Press Release") announcing the Company's third quarter 2015 ("3Q 2015") financial results.   The October 28 Press Release stated, in relevant part:

> **BRIDGEWATER, N.J.** – Oct. 28, 2015 – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the mobile innovation leader that provides cloud solutions and software-based activation for mobile carriers, retailers and OEMs around the world, today announced financial results for the third quarter 2015.
>
> "During the third quarter, Synchronoss passed the $600 million annualized revenue run rate, and did so while delivering 21% top line growth and a non-GAAP operating margin of 29%," said Stephen G. Waldis, Founder, Chairman and Chief Executive Officer of Synchronoss. "We are excited about the growth opportunities ahead of us. *Adoption of our cloud and activation platforms continues to grow globally,* and we recently introduced powerful new predicative analytic capabilities. *In addition, we have significantly expanded our addressable market with the launch of our enterprise business and the Synchronoss Secure Mobility Suite."*
>
> On a GAAP basis, Synchronoss reported net revenues of $150.9 million, representing an increase of 21% compared to the third quarter of 2014. Gross profit was $87.4 million and income from operations was $22.3 million. Net income was $9.6 million, leading to diluted earnings per share of $0.21, compared to $0.22 for the third quarter of 2014.

On a non-GAAP basis, Synchronoss reported net revenues, which adds back the purchase accounting adjustment related to revenues for certain acquisitions, of $151.3 million, an increase of 21% compared to the third quarter of 2014. Gross profit was $92.1 million, representing a gross margin of 61%. Income from operations was $43.2 million representing a year-over-year increase of 36% and an operating margin of 29%. Net income was $27.1 million, up from $20.0 million in the year ago period. Diluted earnings per share were $0.58, compared to $0.46 for the third quarter of 2014, an increase of 26% compared to the third quarter of 2014.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included in this press release. An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

"We are pleased with our third quarter financial results that were highlighted by ongoing strong margin performance and increased earnings," said Karen L. Rosenberger, Chief Financial Officer and Treasurer. "We are confident that *our strategic customer relationships, combined with our growth investments and expansion into new market opportunities, position us well to scale Synchronoss to the next level and generate greater shareholder value over time*."

**Recent Business Highlights:**

- Announced the launch of our enterprise business, which will offer secure mobility solutions to enterprise clients, initially in the financial services, life sciences and healthcare industries, and will be led by David Schuette, a seasoned enterprise executive.

- Established a new venture to develop advanced mobile solutions by leveraging proprietary secure mobility technology contributed by The Goldman Sachs Group, Inc. (NYSE: GS) that will address the challenges associated with enterprise mobility applications.

- Verizon reaffirmed its commitment to Synchronoss as a valued strategic partner.

175.   On the Company's October 28, 2015 earnings call, Defendant Rosenberger stated: "Our non-GAAP cloud services revenue was $76.1 million, which represented just over 50% of our total revenue and year-over-year growth of 31%."

176.   On November 5, 2015, the Individual Defendants caused Synchronoss to file its quarterly report on Form 10-Q for the third quarter of 2015 (the "3Q15 10-Q").   The 3Q15 10-Q was signed by Defendants Waldis and Rosenberger, and reaffirmed the financial results announced in the October 28 Press Release.   The 3Q15 10-Q contained SOX certifications and SEC Rule Certifications by Defendants Waldis and Rosenberger.

177.   On February 3, 2016, the Individual Defendants caused Synchronoss to issue a press release (the "February 3 Press Release") announcing the Company's fourth quarter 2015 ("Q4 2015") and fiscal year 2015 financial results.   The press release stated, in relevant part:

> **BRIDGEWATER, N.J.** – Feb. 3, 2016 – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation and software-based activation for mobile carriers, enterprises, retailers and OEMs around the world, today announced financial results for the fourth quarter and full year 2015.
>
> "The fourth quarter marked a strong end to an exciting year at Synchronoss," said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. ***"Our Cloud Services business continues to perform well, driven by increasing subscriber adoption across our expanding customer base.*** We are also seeing strong, early momentum with our Enterprise Business Unit, including the addition of identity

– 71 –

management to the Synchronoss Secure Mobility Suite. Overall, 2015 was a pivotal year for Synchronoss as we executed well against our go-to-market strategy while also expanding our market footprint by introducing several new initiatives. As a result, we believe there is a long runway of opportunity ahead that will lead us through the next phase of growth."

On a GAAP basis, Synchronoss reported fourth quarter net revenues of $157.2 million, representing an increase of 21% compared to the fourth quarter of 2014. Gross profit was $90.2 million and income from operations was $15.4 million in the fourth quarter of 2015. Net income attributable to Synchronoss was $5.3 million, leading to diluted earnings per share of $0.12, compared to $0.30 for the fourth quarter of 2014.

On a non-GAAP basis, Synchronoss reported fourth quarter net revenues, which adds back the purchase accounting adjustment related to revenues for certain acquisitions, of $157.8 million, an increase of 21% compared to the fourth quarter of 2014. Gross profit for the fourth quarter of 2015 was $98.3 million, representing a gross margin of 62%. Income from operations was $44.3 million in the fourth quarter of 2015, representing a year-over-year increase of 22% and an operating margin of 28%. Net income attributable to Synchronoss was $28.7 million in the fourth quarter of 2015, up from $24.2 million in the year ago period. Diluted earnings per share were $0.61 for the fourth quarter of 2015, compared to $0.53 for the fourth quarter of 2014.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included in this press release. An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

"We are pleased with our financial and operational performance in the fourth quarter and the full year, particularly our ability to generate strong free cash flow," said Karen L. Rosenberger, Chief Financial Officer and Treasurer. "We believe *the investments we have made in our business over the last year position us well to generate significant value for our shareholders*."

**Fourth Quarter and Recent Business Highlights:**

– 72 –

- Cloud Services revenue accounted for $90.9 million of non-GAAP revenue, representing approximately 58% of total non-GAAP revenue and growing 43% on a year-over-year basis.

- Extended our agreement with AT&T through 2018.

- Entered into a venture with Verizon (NYSE: VZ) to establish a next generation platform for multifactor authentication and identity management adding another core component to Synchronoss' Secure Mobility Platform.

- Formed the Board of Advisors for the Enterprise Business Unit (EBU), comprised of current and former representatives from Synchronoss, Goldman Sachs, Verizon, Vodafone and Morgan Stanley. This Board of Advisors will provide insight into the growing enterprise market demand for digital solutions and assist in the development of innovative business opportunities for the EBU.

**Full Year 2015 Financial Results**

- On a GAAP basis: revenues for the full year 2015 were $578.8 million, an increase of 27% compared to $457.3 million in the prior year. Gross profit was $339.8 million, income from operations was $79.6 million and net income attributable to Synchronoss was $40.6 million, leading to full year 2015 diluted earnings per share of $0.89.

- On a Non-GAAP basis: revenues for the full year 2015 were $580.1 million, an increase of 26% compared to $458.6 million in 2014. Gross profit was $356.8 million, representing a gross margin of 62%, and income from operations was $162.6 million, representing an operating margin of 28%. Net income attributable to Synchronoss was $104.1 million for the full year 2015, leading to diluted earnings per share of $2.23, an increase of 25% from $1.79 in the prior year.

178.   On an earnings call held the same day, Defendant Rosenberger stated, "Our non-GAAP Cloud Services revenue in the fourth quarter was $90.9 million, which represented 58% of our total revenue and year-over-year growth of 43%."

179.   On February 4, 2016, the Individual Defendants caused Synchronoss to issue a press release (the "February 4 Press Release") announcing a $100 million share repurchase program fueled by the Company's purportedly "very strong market position and financial profile."  The press release stated, in relevant part:

> **BRIDGEWATER, N.J.** – Feb. 4, 2016 – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation and software-based activation for mobile carriers, enterprises, retailers and OEMs around the world, today announced that its Board of Directors has approved a share repurchase program under which the company may repurchase up to $100 million of its outstanding common stock. Synchronoss plans to make such purchases at prevailing prices over the next 12 to 18 months.
>
> "As we begin 2016, we believe that Synchronoss has a very strong market position and financial profile, in addition to a large and expanding addressable market opportunity. *We expect to deliver an attractive combination of solid top line growth, strong profit margins and expanding free cash flow. In addition, we are making important investments in our enterprise business, including our ventures with Goldman Sachs and Verizon, that we believe will enhance our long-term growth and profitability profile*," said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. "In addition to investing in our strategic growth initiatives, we believe our new share repurchase program is an excellent way to leverage our strong balance sheet and cash flow in order to enhance long-term shareholder value."
>
> The company anticipates that the timing and amount of any share repurchases will be determined by Synchronoss' management based on market conditions and in accordance with the requirements of the Securities and Exchange Commission. Once adopted, the repurchase

program does not obligate Synchronoss to acquire any particular amount of common stock, and repurchases may be commenced, suspended or discontinued at any time without prior notice.

180.   On February 26, 2016, the Individual Defendants caused Synchronoss to file an annual report on Form 10-K for the year ended December 31, 2015 (the "2015 10-K").   The 2015 10-K was signed by Individual Defendants Waldis, Rosenberger, Cadogan, Hopkins, McCormick, and Moore, contained signed SOX certifications by Defendants Waldis and Rosenberger, and reaffirmed the financial results announced in the February 3 Press Release, as well as the details of the stock repurchase program announced in the February 4 Press Release.

181.   The 2015 10-K also stated: "our consolidated financial statements . . . have been prepared in accordance with U.S. GAAP."

182.   The 2015 10-K also discussed revenue from software licensing stating in part:

> Revenue from software license arrangements is recognized when the license is delivered to our customers and all of the software revenue recognition criteria are met. When software arrangements include multiple elements, the arrangement consideration is allocated at the inception to all deliverables using the residual method providing we have vendor specific objective evidence (VSOE) on all undelivered elements. We determine VSOE for each element based on historical stand-alone sales to third-parties.

183.   On April 7, 2016, the Company filed a Schedule 14A with the SEC (the "2016 Proxy Statement").   The 2016 Proxy Statement touted the Company's "record financial results" in 2015 and the future prospects of the Company.   However, the

– 75 –

2016 Proxy Statement failed to disclose that: (i) an existing vendor (Sequential) had purchased the Company's activation business, and this existing vendor had been owned by Defendant Waldis and other members of the Company's senior management; (ii) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (iii) Sequential's current owner and Chairman is a related party with several ties to Defendant Waldis and the Company; (iv) there was a prior and existing relationship between Sequential and the Company; (v) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (vi) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (vii) the newly acquired Intralinks was underperforming; (viii) the Company's integration of other acquisitions was underperforming; (ix) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (x) as such, the Company's guidance was overstated; (xi) the Company improperly recognized revenue; (xii) the Company manipulated the figures and metrics in its financial statements; (xiii) the Company's financial statements were not prepared in accordance with GAAP; (xiv) the Company failed to maintain internal controls; and (xv) as a result of the foregoing, Defendants' statements about Synchronoss's

business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

184.   On May 5, 2016, the Individual Defendants caused Synchronoss to issue a press release (the "May 5 Press Release") reporting "Strong First Quarter Results" for the first quarter of 2016 ("Q1 2016").  The May 5 Press Release stated, in relevant part:

> **BRIDGEWATER, NJ – May 5, 2016** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation and software-based activation for mobile carriers, enterprises, retailers and OEMs around the world, today announced financial results for the first quarter of 2016.
>
> "We are very proud of the Synchronoss team for starting 2016 with a strong first quarter and healthy momentum heading into the rest of the year," said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. ***"Cloud services were robust this quarter, as increasing subscriber growth on our core customer base is laying the groundwork for incremental cloud opportunities both domestically and internationally over the next 12 to 18 months.*** We have a proven history of executing, launching, and scaling new offerings and leveraging technology opportunities into something that becomes much bigger as we have exhibited to our customers, partners, and investors over the years."
>
> **Financial Highlights for the First Quarter of 2016:**
>
> **Non-GAAP**
>
> - **Total Revenue:** $145.6 million compared to $133.1 million in the first quarter of 2015.
>
> - **Gross profit:** $85.2 million compared to $80.9 million in the first quarter of 2015.

- **Operating Income:** $33.2 million compared to $34.9 million in the first quarter of 2015.

- **Net Income attributable to Synchronoss:** $23.0 million compared to $22.3 million in the first quarter of 2015.

- **Earnings per Diluted Share:** $0.49 compared to $0.49 in the first quarter of 2015.

- **Operating Cash Flow:** $37.1 million compared to $5.4 million in the first quarter of 2015.

**GAAP**

- **Total Revenue:** $142.7 million compared to $132.9 million in the first quarter of 2015.

- **Gross profit:** $74.4 million compared to $79.3 million in the first quarter of 2015.

- **Operating Income:** ($4.7 million) compared to $18.3 million in the first quarter of 2015.

- **Net Income attributable to Synchronoss:** ($7.3 million) compared to $10.6 million in the first quarter of 2015.

- **Earnings per Diluted Share:** ($0.17) compared to $0.23 in the first quarter of 2015.

- **Operating Cash Flow:** $37.7 million compared to ($0.1 million) in the first quarter of 2015.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included in this press release. An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

"We are pleased with our strong financial and operational performance to kick off 2016, particularly our ability to generate strong free cash flow," said Karen L. Rosenberger, Chief Financial Officer and Treasurer. "We believe our ability to balance growth and profitability,

while investing in our enterprise and international initiatives well positions Synchronoss heading into the rest of 2016."

**First Quarter and Recent Business Highlights:**

• Cloud Services revenue accounted for $84.3 million of non-GAAP revenue, representing approximately 58% of total non-GAAP revenue and growing 18% on a year-over-year basis.

• Expanded our activation business with AT&T through our DIRECTV deal.

• On target with the beta version of our Enterprise solution launched in April with general availability expected in early June.

• Free cash flow of $24 million delivered in the quarter as this continues to be a major focal point of the company.

• Announced $100 million share buyback program with $16.6 million completed in the quarter.

• Completed the acquisition of privately held OpenWave Messaging to enhance our international go-to-market strategy.

185. On the Company's May 5, 2016 earnings call, Defendant Rosenberger stated: "Our cloud services revenue in the first quarter was $84.3 million, which represented 58% of our total revenue and grew 18% year-over-year, exceeding both Street and internal expectations."

186. On May 10, 2016, the Individual Defendants caused Synchronoss to file a quarterly report on Form 10-Q for the first quarter of 2016 (the "1Q16 10-Q"). The 1Q16 10-Q was signed by Defendants Waldis and Rosenberger, and reaffirmed the financial results announced in the May 5 Press Release. The 1Q16 10-Q also

contained signed SOX certifications and SEC Rule Certifications by Defendants Waldis and Rosenberger.

187.   During the June 2016 analyst day, Synchronoss identified as its main objective, expanding its enterprise cloud-services business in order to reduce its reliance on the legacy Activation Business.  However, unbeknownst to investors, by mid-June 2016, Defendant Waldis was in contact with Hovsepian, the then-President and CEO of Intralinks, about a potential business arrangement between Synchronoss and Intralinks.

188.   On August 3, 2016, the Individual Defendants caused Synchronoss to issue a press release (the "August 3 Press Release") reporting "Strong Second Quarter Results" for the second quarter of 2016 ("Q2 2016").  The August 3 Press Release stated, in relevant part:

> **BRIDGEWATER, NJ – August 3, 2016** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation and software-based activation for mobile carriers, enterprises, retailers and OEMs around the world, today announced financial results for the second quarter of 2016.
>
> "We are very proud of the Synchronoss team for delivering a healthy second quarter with momentum especially around cloud heading into the rest of the year", said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. "Cloud was strong this quarter, as solid subscriber growth in our core customer base is setting the stage for incremental cloud opportunities while investments in the enterprise initiatives are already generating significant customer activity in the field. We are continuing to execute on our long-term strategy which is laying the foundation for the future growth of Synchronoss."

**Financial Highlights for the Second Quarter of 2016:**

- **Total Revenue:** $157.6 million GAAP compared to $137.8 million in the second quarter of 2015. $161.5 million non-GAAP compared to $137.9 million in the second quarter of 2015.

- **Gross profit:** $86.1 million GAAP compared to $82.9 million in the second quarter of 2015. $96.9 million non-GAAP compared to $85.4 million in the second quarter of 2015.

- **Operating (Loss) Income:** ($3.5 million) GAAP compared to $23.6 million in the second quarter of 2015. $37.3 million non-GAAP compared to $40.2 million in the second quarter of 2015.

- **Net (Loss) Income attributable to Synchronoss:** ($4.4 million) GAAP compared to $15.2 million in the second quarter of 2015. $26.9 million non-GAAP compared to $26.0 million in the second quarter of 2015.

- **Earnings (Loss) per Diluted Share:** $(0.10) GAAP compared to $0.33 in the second quarter of 2015. $0.57 non-GAAP compared to $0.56 in the second quarter of 2015.

- **Operating Cash Flow:** $33.7 million GAAP compared to $62.6 million in the second quarter of 2015. $33.7 million non-GAAP compared to $60.6 million in the second quarter of 2015.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included in this press release. An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

"We are pleased with another quarter that exceeded our expectations, particularly our ability to deliver strong top-line growth," said Karen L. Rosenberger, Chief Financial Officer and Treasurer. "We believe our ability to drive growth, while investing in our enterprise and international initiatives positions Synchronoss well heading into the second half of 2016 and beyond."

**Second Quarter and Recent Business Highlights:**

- Cloud Services revenue accounted for $95.2 million of non-GAAP revenue, representing approximately 59% of total non-GAAP revenue and growing 33% on a year-over-year basis.

- Launched the general availability of our Enterprise Secure Mobility Platform (SMP) in June.

- Free cash flow of $20 million delivered in the quarter generating free cash flow continues to be a major focal point of the Company.

- Share repurchases of $23.4 million completed in the quarter.

- Held our annual analyst day in NYC, outlining the Company's core strategic and growth initiatives.

189.   On an August 3, 2016 earnings call, Defendant Rosenberger stated: "Now let me move to guidance for the third quarter and an update on our 2016 outlook. Non-GAAP revenues are expected to be in the range of $175 million to $180 million, representing year-over-year growth of approximately 17% at the midpoint."

190.   On August 4, 2016, the Individual Defendants caused Synchronoss to file a quarterly report on Form 10-Q for the second quarter of 2016 (the "2Q16 10-Q").  The 2Q16 10-Q was signed by Defendants Waldis and Rosenberger and reaffirmed the financial results announced in the August 3 Press Release.  The 2Q16 10-Q also contained signed SOX certifications and SEC Rule Certifications by Defendants Waldis and Rosenberger.

191.   On November 7, 2016, the Individual Defendants caused Synchronoss to issue a press release (the "November 7 Press Release") reporting "Strong Third Quarter Results" for the third quarter of 2016 ("Q3 2016").  The November 7 Press Release stated, in relevant part:

> **BRIDGEWATER, NJ –November 7, 2016** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation and software-based activation for mobile carriers, enterprises, retailers and OEMs around the world, today announced financial results for the third quarter of 2016.
>
> "We are very proud of the Synchronoss team for delivering a strong third quarter with significant momentum around cloud and enterprise heading into year end and 2017," said Stephen G. Waldis, Founder and Chief Executive Officer of Synchronoss. "Cloud was very strong this quarter with both new and existing customers, as solid subscriber growth and expanded cloud initiatives in our core customer base set the stage for the next chapter of growth at Synchronoss."
>
> **Financial Highlights for the third Quarter of 2016:**
>
> • **Total revenue:** $176.4 million GAAP compared to $150.9 million in the third quarter of 2015.  $181.0 million non-GAAP compared to $151.3 million in the third quarter of 2015.
>
> • **Gross profit:** $99.2 million GAAP compared to $87.4 million in the third quarter of 2015.  $109.1 million non-GAAP compared to $92.1 million in the third quarter of 2015.
>
> • **Operating income:** $13.2 million GAAP compared to $22.3 million in the third quarter of 2015.  $46.5 million non-GAAP compared to $43.2 million in the third quarter of 2015.
>
> • **Net income attributable to Synchronoss:** $7.7 million GAAP compared to $9.6 million in the third quarter of 2015. $32.5 million non-GAAP compared to $27.1 million in the third quarter of 2015.

- **Earnings per diluted share:** $0.16 GAAP compared to $0.21 in the third quarter of 2015.  $0.68 non-GAAP compared to $0.58 in the third quarter of 2015.

- **Operating cash flow:** $(17.7) million GAAP and non-GAAP compared to $14.1 million in the third quarter of 2015.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included in this press release. An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

**Third Quarter and Recent Business Highlights:**

- **Cloud Solution revenue:** $101.9 million of GAAP revenue, representing approximately 58% of total GAAP revenues and growing 34% on a year-over-year basis.  $106.4 million of non-GAAP revenue, representing approximately 59% of total non-GAAP revenue and growing 40% year-over-year.

- **Activation Solution revenue:** $74.5 million of GAAP revenue for the third quarter, representing 42% of our total GAAP revenues and remained flat year-over-year.  $74.6 million of non-GAAP revenue, representing approximately 41% of our total non-GAAP revenues and was down one percent year-over-year.

- Completed key cloud migrations at international customers such as Softbank, America Movil, and British Telecom as they move towards scaling our Personal Cloud Platform.

- Enterprise Secure Mobility Platform (SMP) had numerous customer wins and competitive displacements during the quarter across the healthcare, legal, and financial verticals.

- Our Verizon UID partnership is helping provide us with access to approximately one-third of the US consumer market and a host of large enterprise customers in this new market.

192.  On November 7, 2016, after the close of the financial markets, the

Individual Defendants caused Synchronoss to hold an investor conference call to

discuss the Company's Q3 2016 financial results.  During the conference call, Synchronoss announced its decision to "evaluate strategic alternatives" for its Activation Business in an attempt to enhance shareholder value.  To that effect, Defendant Waldis stated:

> Yes, we're obviously in the process of evaluating opportunities in the activation world. Clearly, there are good pockets of strength, certainly in analytics, certainly in some of the new emerging areas, Internet of Things. But there's been obviously areas or facets that have slowed down as you guys have seen in the market today and so when you look and compare that to both our cloud and enterprise business that have both high growth trajectories and margin profile significantly better than the activation business, we want to make sure that as we evaluate the process that we're doing everything we can to ensure we are making the investments in the high-growth, high margin businesses of the future. That's something that will play out over the next quarter or so and as we'd mentioned, we'll certainly keep everybody up to speed.

193.   On November 8, 2016, the Individual Defendants caused Synchronoss to file a quarterly report on Form 10-Q for the third quarter of 2016 (the "3Q16 10-Q").  The 3Q16 10-Q was signed by Defendants Waldis and Rosenberger and reaffirmed the financial results announced in the November 7 Press Release.  The 3Q16 10-Q also contained signed SOX certifications and SEC Rule Certifications by Defendants Waldis and Rosenberger.

194.   The 3Q16 10-Q also stated: "our consolidated financial statements . . . have been prepared in accordance with GAAP."

195.   On December 6, 2016, the Individual Defendants caused Synchronoss to issue a press release (the "December 6 Press Release"), titled "Synchronoss

Technologies to Acquire Intralinks Holdings Accelerating Strategic Transformation," announcing the Company's decision to purchase Intralinks for $13.00 per share—$821 million in equity value. This was almost twice Intralinks then-share price. Defendant Hovsepian, then serving as CEO, President, and Director of Intralinks, would be named CEO of Synchronoss upon closing of the acquisition. Defendant Waldis was expected to move into the role of active Executive Chairman of the Board.

196. The December 6 Press Release portrayed Intralinks as a highly successful business entity with deep ties in the "financial services world," stating as follows:

> In Intralinks' 20-year history, over 4.1 million business users across the world have used its secure, cloud-based platform, and it counts 99% of Fortune 1000 companies among its customers. To date, Intralinks has supported over $31 trillion in high-stakes transactions, making the company a leader in the enterprise content collaboration market.

> "Intralinks has established itself as a household name in the financial services world over the past 20 years, with a keen focus on growing its presence into the next generation secure content collaboration market over the coming years," said Stephen Waldis, Synchronoss' CEO. "This acquisition marks another major step in the transformation of Synchronoss to significantly expand the scale and scope of the company's enterprise initiatives and strong carrier relationships in attacking this multi-billion dollar market opportunity. Ron brings significant leadership experience and a history of successfully integrating companies into a single portfolio. I intend to stay active in the company, driving growth opportunities and continued developments on new product innovation. I am excited to be working closely with Ron to bring Synchronoss into its next chapter of growth."

"Our board of directors unanimously concluded that Synchronoss is the ideal strategic partner for Intralinks and also gives our employees and customers the opportunity to leverage Synchronoss' deep relationships across the carrier space, cloud expertise, and strong partnerships in the financial services vertical," said Ron Hovsepian, CEO of Intralinks. "Together with Synchronoss, we believe we can deploy enhanced enterprise and mobile solutions to our customers while opening up new enterprise distribution channels across the world."

197.   The December 6 Press Release also disclosed that Synchronoss would divest 70% of its Activation Business to Sequential for a total purchase price of $146 million.  As part of this transaction, Synchronoss retained a 30% ownership interest in the Activation Business, a stake that could be reduced during the course of 2017.

198.   On the Company's December 6, 2016 call to discuss the Intralinks acquisition, Defendant Rosenberger stated: "For the combined company following the proposed Intralinks acquisition, we are giving initial 2017 total revenue guidance of between $810 million to $820 million and pro forma EPS of between $2.45 and $2.60 assuming a late first quarter close on the Intralinks transaction and factoring in the expected impact from our new debt facility."

199.   Taking into account the divestiture of the Activation Business and the Intralinks Acquisition, the Individual Defendants caused Synchronoss to provide 2017 revenue guidance of between $810 million and $820 million, with pro forma EPS of between $2.45 and $2.60 for the combined entity, and further advised that

the Intralinks deal should provide $40 million of combined synergies within the first year.

200.   On December 6, 2016, the Company filed a Form 8-K with the SEC ("December 6 8-K").  The December 6 8-K detailed that Synchronoss would divest 70% of its activation business to Sequential for a total purchase price of $146 million, and that the 30% ownership interest in the activation business that was retained by the Company could be reduced during 2017 as part of the transaction.

201.   The December 6 8-K discussed the Activation Divestiture, stating in part:

> On December 5, 2016, Parent [Synchronoss] entered into a purchase and sale and amended and restated operating agreement (the "Operating Agreement") by and among Sequential Technology International, LLC ("STI"), Parent and Sequential Technology International Holdings, LLC ("Sequential") pursuant to which Parent sold a 70% interest (the "Divestiture") in STI to Sequential in return for a cash payment of $146 million to Parent.  Parent previously formed STI and contributed certain of its activation business assets to STI in return for its initial membership interest in STI.  As part of the transactions contemplated by the Divestiture, Parent issued a promissory note to Sequential, which is secured by Sequential's interest in STI.  In addition, Parent is retaining a 30% interest in STI. Pursuant to the terms of the Operating Agreement, Parent has certain put rights whereby Sequential would be required to purchase Parent's interest in STI in certain circumstances and Sequential has a corresponding call right where Sequential would be required to purchase Parent's interest in STI in certain circumstances.

202.   Synchronoss did not reveal to investors that the new 70% partner in the Activation Business was the company formerly known as Omniglobe.  Synchronoss

further failed to reveal that friends and family of Synchronoss were deeply involved with Omniglobe.

203.   Synchronoss investors were skeptical of the divestiture of the Activation Business.  For example, Roderick, a securities analyst at Stifel Nicolaus & Company, stated on December 19, 2016: "[P]lenty of questions about the Activation divestiture, starting with '**Who the heck is Sequential Technology???**' Since the divestiture of the Activation business was first announced, we have been perplexed by our inability to learn much, if anything, about the buyer Sequential Technology International."  Roderick continued, "we now understand [Sequential] to be a rebranding for the Philippine-based BPO Omniglobe International," but cited no source.

204.   On December 22, 2016, Synchronoss filed a Form 8-K announcing that on December 17, 2016, it had completed a divestiture of a portion of its Activation Business, stating in part:

> On December 16, 2016, Synchronoss Technologies, Inc. ("Synchronoss") completed the previously announced divestiture of a portion of its carrier activation business ("BPO") to newly formed Sequential Technology International, LLC ("STI") for a total purchase price of $146 million (the "Sale"). As part of the Sale, Synchronoss will retain a 30% investment in STI, which can be reduced during the course of 2017. The historical financial results of the BPO business will be classified as discontinued operations in Synchronoss' future filings.

205.   On January 5, 2017, the Individual Defendants caused Synchronoss to file a Form 8-K/A discussing, ***for the first time***, several financial aspects of the

$146 million deal with Sequential.  According to the Form 8-K/A, the divestiture of the Company's Activation Business would initially net Synchronoss only $17.3 million in cash, and included an $83 million note receivable.  And, as shown in the pro forma financial statements, Synchronoss would continue to bear costs associated with the Activation Business, including cost of sales, corporate overhead, and stock-based compensation.  Specifically, the Form 8-K/A revealed specific terms of the divestiture agreement, including, among other things, that: (i) the $17.3 million payment "[r]epresents Synchronoss' cash distribution of approximately $17.3 million as part of the $100.3M consideration received in connection with the sale of 65.6%"; (ii) Sequential contributed assets for the remaining 4.4% ownership; (iii) "[a]pproximately $30 million has been set aside in escrow to cover certain conditions of the closing of the Sale . . . ."; (iv) [i]n connection with the Sale, the billed receivables of the [activation business] were excluded from the transfer to [Sequential]; and (v) "Synchronoss received a Sellers Note of approximately $83.0 million as part of the proceeds in connection with the Sale, which can be reduced or paid back in full to Synchronoss during 2017."

206.   On January 5, 2017, the Individual Defendants caused Synchronoss to file another Form 8-K, disclosing further details of the Company's arrangement with Sequential.  According to the January 5, 2017 8-K, the transaction was structured as a Joint Venture ("JV"), whereby Synchronoss contributed certain components of its

carrier-activation business and retained a 30% ownership stake.  Sequential, which owns the remaining 70% of the JV, agreed to finance "the purchase of these assets through cash, a new term loan, and a sellers note issued by Synchronoss."   In addition, Synchronoss entered into a three-year TSA with Sequential to support various indirect activities stemming from the JV.  Pursuant to the terms of the TSA, Synchronoss agreed to receive an annual payment of approximately $32 million.

207.   On January 12, 2017, Sequential announced that it had closed the transaction to acquire a portion of the activation assets of Synchronoss, and that its global headquarters would be in Warren, New Jersey.

208.   On February 8, 2017, after the market closed, the Individual Defendants caused Synchronoss to issue a press release announcing the Company's financial results for the fourth quarter of 2016 ("Q4 2016") and fiscal year 2016.  The press release stated, in relevant part:

> **BRIDGEWATER, NJ – February 8, 2017** – Synchronoss Technologies, Inc. (NASDAQ: SNCR), the leader in mobile cloud innovation for mobile carriers, enterprises, retailers and OEMs around the world, today announced financial results for the fourth quarter of 2016.
>
> ***"Synchronoss has transformed its strategy with the Intralinks acquisition and divestiture of its traditional activation business as the company now looks to expand the scale and scope of its enterprise and cloud initiatives to drive the new SNCR 3.0 vision, said Ronald Hovsepian, Chief Executive Officer of Synchronoss."*** "The Synchronoss team is laying the foundation for the next chapter of growth," said Ronald Hovsepian, Chief Executive Officer of Synchronoss.

"It has been an exciting time here at Synchronoss over the past few months as we view the acquisition of Intralinks to be a major step forward in our enterprise strategy with Ron leading the team to successfully integrate both companies into a single portfolio", said Founder and Executive Chairman Stephen Waldis.  "I look forward to working with Ron during this pivotal time for Synchronoss' employees, customers, and partners around the globe."

**Financial Highlights for the Fourth Quarter of 2016:**

- **Total revenues from continuing operations:** $121.7 million GAAP compared to $121.2 million in the fourth quarter of 2015. $123.9 million non-GAAP compared to $121.8 million in the fourth quarter of 2015. Total combined revenue from continuing and discontinued operations was $145.6 million.  Non-GAAP combined total revenue from continuing and discontinued operations was $147.8 million.

- **Gross profit from continuing operations:** $71.5 million GAAP compared to $75.7 million in the fourth quarter of 2015.  $78.1 million non-GAAP compared to $83.4 million in the fourth quarter of 2015.

- **Operating (loss) income from continuing operations:** $(30.4) million GAAP compared to $1.5 million in the fourth quarter of 2015.   $13.1 million non-GAAP compared to $29.9 million in the fourth quarter of 2015.

- **Net (loss) income attributable to Synchronoss from continuing operations:** $(22.6) million GAAP compared to $(3.2) million in the fourth quarter of 2015.  $11.0 million non-GAAP compared to $20.0 million in the fourth quarter of 2015.

- **Earnings (loss) per diluted share:** $(0.51) GAAP compared to $(0.07) in the fourth quarter of 2015.   $0.24 non-GAAP compared to $0.43 in the fourth quarter of 2015.

- **Operating cash flow:** $86.0 million GAAP and non-GAAP compared to $63.2 million GAAP and non-GAAP in the fourth quarter of 2015.

**Financial Highlights for the Full Year 2016:**

- **Total revenues from continuing operations:** $476.7 million GAAP compared to $428.1 million in 2015.  $490.2 million non-GAAP compared to $429.4 million in 2015.

- **Gross profit from continuing operations:** $282.5 million GAAP compared to $272.8 million in 2015.  $319.2 million non-GAAP compared to $288.0 million in 2015.

- **Operating (loss) income from continuing operations:** $(71.9) million GAAP compared to $15.1 million in 2015.  $82.0 million non-GAAP compared to $96.2 million in 2015.

- **Net (loss) income from continuing operations attributable to Synchronoss:** $(55.7) million GAAP compared to $1.3 million in 2015.  $59.8 million non-GAAP compared to $63.6 million in 2015.

- **(Loss) earnings per diluted share from continuing operations:** $(1.28) GAAP compared to $0.03 in 2015.  $1.28 non-GAAP compared to $1.38 in 2015.

- **Operating cash flow:** $142.5 million GAAP compared to $139.8 million in 2015.  $142.5 million non-GAAP compared to $143.4 million in 2015.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included in this press release.   An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

**Fourth Quarter and Recent Business Highlights:**

- GAAP Cloud Services revenue from continuing operations accounted for $121.7 million in the fourth quarter.  Non-GAAP Cloud Services revenue from continuing operations accounted for $123.9 million in the fourth quarter.  This was led by cloud deployments at new and existing customers.

- Completed the acquisition of Intralinks together with the closing of the $1.1 billion credit facility.

- Completed the divestiture of our carrier activation business to Sequential Technology International as well as the sale of our SpeechCycle and Mirapoint Software activation businesses.

- Strong progress at international customers in EMEA and APAC as they move towards scaling our Messaging and Personal Cloud Platforms.

209. Also on February 8, 2017, the Individual Defendants caused Synchronoss to hold its Q4 2016 earnings call with analysts and investors. During the call, Defendant Rosenberger provided financial guidance for Q1 2017, which included comments regarding Intralinks, stating, in relevant part:

Now, let me move to guidance for the first quarter and full year 2017 now, with the Intralinks transaction closed. For 2017 non-GAAP revenues are expected to be in the range of $810 million to $820 million, unchanged from our initial guidance given on December 6 for the combined company. On a normalized basis when adjusting for divestitures and the Intralinks acquisition, this would imply year-over-year growth of between 13% and 15%.

The revenue mix in our guidance is expected to be roughly 65% of revenues derived from our cloud carrier-based business and 35% through our cloud enterprise business, which is primarily a subscription-based model. While we would like investors to use these ranges, the revenue mix and its timing could be impacted by the structure of certain large and complex opportunities. For the first quarter we expect total revenues of between $173 million and $178 million.

Turning to profitability. We currently expect non-GAAP gross margins of between 70% and 71% for the full year 2017. In terms of operating profitability, we are slightly widening the range to between 25% and 27% as we have identified some significant enterprise booking

– 94 –

opportunities which may require some upfront investments in the first half of this year.

Including the impact from our $900 million debt raised in January with a better than expected interest rate, we are maintaining our non-GAAP EPS range of between $2.45 and $2.60 per share, assuming a tax rate of 30% on a diluted share count of approximately 50 million shares. Importantly, we also note that we are proceeding on target around realizing the $40 million in annual combined cost synergies first outlined when we discussed the deal.

We expect integration and restructuring charges during the course of the year as we continue to execute on our synergy plan and will update investors on our next conference call. For the first quarter, we anticipate non-GAAP operating margin of between 18% and 20%.

Non-GAAP EPS is expected to be in the range of $0.39 and $0.43 on a diluted share count of approximately 49 million shares, assuming a tax rate of 30%. We expect a restructuring charge of between $5 million and $10 million in the first quarter.

210. Also during the February 8, 2017 conference call, analysts asked Synchronoss's executives multiple questions about payments Synchronoss expected to receive from Sequential as part of the divestiture. Defendant Rosenberger explained as follows:

[Q - Tavis C. McCourt:] Then just some details on the Sequential sale. Can you give us a sense of the size of the revenues that you will be generating from Sequential for providing them services during the transition period, and maybe the margins on those revenues and the timing of when you would expect them to go away?

[A - Defendant Rosenberger:] I can give you some information on that, Tavis. I think as we went through the transaction we had talked about the fact that we were going to provide ongoing services for a three-year term to Sequential Technologies. Obviously contractual, around $30 million in revenue per year over the next three years

associated with those services. As far as margins, et cetera, we don't give those details, but it's clearly consistent with our mix of business.

\*       \*       \*

**[Q - Tom Roderick:]** Got it. I think I got it. Then I think this may be related to your commentary on the ongoing piece, but so I understand what that piece is. I know you guys were highlighting in the calculation around the financing documents that service agreement, which probably is what you are referring to with Sequential.

But can you talk a little bit more about what that agreement is, how you are still supporting them as a partner? And will all of that revenue then flow into continuing ops going forward, or is that $32 million annual agreement, is that all just thrown into discontinuing ops so we won't worry about it?

**[A - Defendant Rosenberger:]** That will be part of continuing operations. And if you want to think about the services that we provide for Sequential, remember the fact that we had software revenues associated with some of that activation business in that analytics area. And that particular IP was obviously kept by Synchronoss and Synchronoss will be providing services around that.

\*       \*       \*

**[Q - Samad Samana:]** I actually wanted to follow up on the $32 million payment. I am curious, when you gave the original $520 million of cloud revenue guidance for calendar 2017, did that assume the $32 million services agreement? Or how much of this analytics revenue that is now being put into cloud was previously in activations?

I guess I'm trying to bridge the map of guidance didn't change but there is this $32 million payment now that you're getting. Help me understand where that was classified before, or where you thought that would be classified into?

**[A - Defendant Rosenberger:]** No, this is new analytics revenue, as we talked about. Clearly the $32 million is part of a TSA arrangement, but it is all around the analytics.

– 96 –

211.   During the February 8, 2017 earnings call, analysist Samad Samana from Stephens, Inc. also asked Defendant Waldis:

> [Q – Samad Samana:] The Verizon, the $25 million payment that was announced last quarter. We have been told that, that is a new product or a new initiative. Is that separate from what you're talking about at Mobile World Congress on the analytics side, or is that the same announcement? Maybe help us understand that?
>
> [A – Defendant Waldis:] Two different things. The Verizon opportunity is a relationship that you will hear more about in Q1 [of 2017] that is not publicly announced.

212.   The Company never provided more detail about the "Verizon opportunity" because it was a phantom contract for which the Company lacked substantiation.

## REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS WERE FALSE AND MISLEADING

213.   The above statements contained in paragraphs 152–201, 204–206, and 208–212 made, or caused to be made, by the Individual Defendants, were materially false and/or misleading because they misrepresented and failed to disclose material, adverse facts concerning the Company's business, operations, and financial prospects, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants made, or caused to be made, false and/or misleading statements and/or failed to disclose that: (i) Sequential, new partner with 70% interest in the Activation Business, was formerly known as Omniglobe and had previously been owned by several members of Synchronoss's

senior management, including Defendant Waldis and other members of the Company's senior management as well as their friends and family; (ii) Omniglobe owns Sequential and 50% of Omniglobe is owned by family and friends of the Company; (iii) Sequential's owner and Chairman is a related party with several ties to Defendant Waldis and the Company; (iv) Synchronoss did not receive a $146 million cash payment for the Activation Sale; (v) Synchronoss and Sequential entered into a $9.2 million licensing agreement for the sole purpose of artificially inflating Synchronoss's financials; (vi) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's Cloud Services Business since 2015; (vii) the newly acquired Intralinks was underperforming; (viii) the Company was facing serious hurdles integrating and capitalizing on its newly acquired companies, and its integration efforts were underperforming; (ix) as such, the Company's guidance was overstated; (x) the Company improperly recognized revenue, regularly recorded false revenues to meet earnings guidance, and manipulated figures and metrics in its financial statements, and as such, the Company's financial statements were not prepared in accordance with GAAP; (xi) the Company failed to maintain internal controls; and (xii) as a result of the foregoing, the Individual Defendants' statements about Synchronoss's business, operations, and prospects were materially false and misleading and/or

lacked a reasonable basis at all relevant times, all of which was known to the Individual Defendants and/or recklessly disregarded by them.

214.   As a result of their fraudulent scheme, the Individual Defendants were able to artificially inflate the Company's financials and stock price.

## THE TRUTH BEGINS TO EMERGE AND FALLOUT ENSUES

215.   On February 24, 2017, SIRF issued a report accusing the Company of hiding from investors key aspects of the Sequential and Intralinks deals.  According to the SIRF Report, Sequential is none other than Omniglobe, a business-process outsourcer first disclosed as a Synchronoss related-party in February 2006.  At the time, many of Synchronoss's current and former executives and directors, including Defendant Waldis, held an ownership stake in Omniglobe.  Matharu, who held a 50% stake in Omniglobe as of the date of the report, informed SIRF that 50% of Omniglobe is currently "owned by friends and family of Synchronoss."  None of these ownership interests were disclosed to investors.

216.   The report stated, in relevant part:

The Sequential Technology International portrayed in the company's conference calls and press releases sounds like a standard corporate buyer, chosen after some consideration among a number of different options.

That is not even remotely the case.

To start, the Southern Investigative Reporting Foundation could not locate Sequential Technology International in any corporate registry or database. It's a corporate shell, formed in early November 2016 whose

website was registered by John Methfessel, a former neighbor of Stephen Waldis and an early-stage Synchronoss investor.

*       *       *

So what is Omniglobe International?

It's a business process outsourcing company (often abbreviated to "BPO") that handles nonessential tasks for Synchronoss' activation unit. Through offices in the Philippines and India, Omniglobe provides phone activation customer service for Synchronoss' AT&T contract.

In its June 2006 initial public offering prospectus, Synchronoss disclosed that Omniglobe was a related party, a legal term of art that in this case means that four of its officers had an investment in Omniglobe, and would benefit financially from doing business with it. (As detailed on page 74 of the prospectus, then-CEO Waldis had a 12.23 percent "indirect equity interest in Omniglobe," former chief financial officer Lawrence Irving and former chief technology officer David Berry both had 2.58 percent and current president and chief operating officer Robert Garcia had 1.29 percent.)

217.   Following the release of the SIRF Report, Synchronoss's share price declined $0.37, or 1.1%, from the previous day's closing price to close at $30.49 per share on February 24, 2017.

218.   On February 27, 2017, the Company filed the 2016 10-K, which was signed by Individual Defendants Waldis, Rosenberger, Hovsepian, Cadogan, Hopkins, McCormick, and Moore.  Therein, Synchronoss disclosed, *for the first time*, that on December 22, 2016, it "entered into a non-exclusive perpetual license agreement with [Sequential], in the amount of $9.2 million, which is included in net revenues in the statement of income, for the use of the Company's Analytics

software."  Remarkably, the $9.2 million software license from Sequential was not mentioned in the Company's February 8, 2017 earnings conference call with investors, even after management received multiple questions regarding payments from Sequential to Synchronoss.   The 2016 10-K also stated that Synchronoss "reclassified revenue historically derived from Cloud Analytics offering to the Cloud category."

219.   The $9.2 million licensing fee, executed nine days before the end of the quarter and six days after the Activation Divestiture's close, provided a significant boon to the Company's cloud-segment revenue and profit margin.   Because Synchronoss posted only $11 million in non-GAAP net income for Q4 2016, the licensing fee accounted for a vast majority of profits and earnings per share.  Indeed, the inclusion of the $9.2 million in revenue allowed Synchronoss to meet its guidance for Cloud Services revenue.

220.   By not revealing to investors that the $9.2 million represented a one-time revenue rather than organic growth, Synchronoss misled investors into believing that Cloud Services growth was greater than it actually was.   The $9.2 million should have been recorded as consideration for Sequential's purchase of part of the Activation Business in accordance with ASC, the source of GAAP.

221.  In reaction to this disclosure, Synchronoss's share price declined $1.80 per share, or 5.9%, from a close of $30.49 per share on Friday, February 24,

2017 to a close of $28.69 per share on Monday, February 27, 2017.  Synchronoss's share price declined an additional $1.61 per share, or 5.61%, to close at $27.08 per share on February 28, 2017.  The February 27 and 28, 2017 stock price drops wiped out **over $158 million** in Company market capitalization.

222.  On March 3, 2017, Daniel Wu ("Wu"), a Research Analyst with Montgomery Global Investment Management, wrote an article titled, "A (Related) Party at Synchronoss," stating that that the purchase price "represents only a 2.5x [enterprise value]/EBITDA multiple.  Whoever acquired the Activation business got an absolute bargain at the expense of Synchronoss shareholders."

223.  On April 6, 2017, the Company filed its annual proxy statement on Schedule 14A with the SEC (previously defined as the "2017 Proxy Statement").  The 2017 Proxy Statement failed to disclose that: (i) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (ii) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (iii) the newly acquired Intralinks was underperforming; (iv) the Company's integration of other acquisitions was underperforming; (v) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (vi) as such, the Company's guidance was overstated; (vii) the Company improperly recognized revenue; (viii) the

Company manipulated the figures and metrics in its financial statements; (ix) the Company's financial statements were not prepared in accordance with GAAP; (x) the Company failed to maintain internal controls; and (xi) as a result of the foregoing, Defendants' statements about Synchronoss's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

224.   On April 27, 2017, Synchronoss issued a press release in which Synchronoss announced that then-CEO, Defendant Hovsepian, and then-CFO, Defendant Frederick, were leaving the Company, after assuming their positions just three months and two months prior, respectively, following the Intralinks Acquisition.  Defendant Waldis would once again take over as CEO of the Company.  Synchronoss also warned investors that Q1 2017 revenue would not meet expectations, disclosing that it expected "total revenue for the first quarter of 2017 to be $13 million to $14 million less than the company's previously announced guidance" and that it expected operating margins of 8% to 10%, which was also less than previously-announced guidance.  The Company stated that it was "disappointed with [its] Q1 performance in this first quarter following our acquisition of Intralinks."

225.   On this news, Synchronoss's stock price plummeted $11.33 per share, or 46.02%, from $24.62 per share on April 26, 2017 to $13.29 per share on April 27, 2017—wiping out *approximately $525 million* in Company market capitalization.

226.   Analysts swiftly chastised the Company.  According to Greenberg, Synchronoss spent months "pulling out all stops to mask a double-digit decline in cloud revenue."  Greenberg also noted that Synchronoss's financials do not add up: "[t]his is a company that we believed, since we first started writing about it in January, that there were plenty of moving parts which just seemed off."  Greenberg further affirmed: "Any time the CEO and CFO, who has been in the post for less than 4 months, walks out the door, that's not a good sign . . . .  If you knew nothing else, that's all you need to know."

227.   Likewise, on April 27, 2017, Deutsche Bank published an analyst report which noted that "the stock price being cut nearly in half today is a reaction to how quickly the SNCR story has soured for investors," emphasizing "[t]he relatively short tenure of Ron Hovsepian as CEO, and even shorter one of John Frederick as CFO" that "clearly caught investors by surprise – this after Karen Rosenberger abruptly stepped down as CFO on the last earnings call," as well as the fact that "[i]f the pre-announced first-quarter shortfall in revenue and margins are any guide, the rest of the year could be much more modest relative to early guidance set for both the Enterprise and Cloud segments . . . ."

228.   In a May 10, 2017 article entitled "Synchronoss Technologies: A Case Study on Destroying Shareholder Value," analyst Wu commented on the "unusually low price" for the Activation Business.  Wu also wrote that he was troubled by the

fact that Sequential (formerly Omniglobe) was the buyer.  When his firm "tried to find out more about STI, we discovered that it was a shell company that may have had links with SNCR management, raising the prospect of a related party transaction that could explain such a favourable price for the buyer."  Wu further stated that upon seeing Synchronoss's 2016 10-K which finally confirmed that Sequential "was previously named Omniglobe International[,]" Wu's "suspicions were reinforced."

229.   On May 12, 2017, after market hours, the Company filed a Form 12b-25 with the SEC notifying the public its inability timely to file its quarterly report for the quarter ended March 31, 2017 on Form 10-Q.  Due to this news about the late filing of the quarterly report, the Company's stock price fell $1.13 per share, or over 7.23%, to close at $14.49 per share on May 15, 2017.

230.   On May 15, 2017, after the market closed, the Company issued a press release stating that it needed extra time to file with the SEC its quarterly report for the quarter ended March 31, 2017 because, *inter alia*, Defendant Waldis and newly appointed CFO Irving needed time to complete reviews of the accounting of certain transactions conducted in prior financial periods.  These preliminary reviews were submitted to the Company's independent auditor who subsequently advised that additional reviews were needed and which the Company was in the process of completing.

231.   On this additional news regarding the untimely filing of the quarterly report, Synchronoss's share price fell another $1.23 per share, or over 8.48%, over the next two trading days to close at $13.26 per share on May 17, 2017.

232.   On May 22, 2017, after the market closed, the Company filed a Form 8-K with the SEC revealing that on May 16, 2017, it received notice from the Listing Qualifications Department of the NASDAQ.  The notice stated that the Company was "not in compliance with Nasdaq Listing Rule 5250(c)(1) because the Company has not yet filed its Quarterly Report on Form 10-Q for the period ended March 31, 2017."

233.   In response, the Company would later submit a plan to the NASDAQ on July 17, 2017 detailing how the Company planned to regain compliance with NASDAQ listing requirements.

234.   Then, on June 13, 2017, after the market closed, the Individual Defendants caused Synchronoss to file a Form 8-K with the SEC, therein announcing that the Company would need to restate its financial statements for fiscal years 2015 and 2016, and that such financial statements should no longer be relied upon by investors.  To that end, the 8-K stated, in relevant part:

> On June 8, 2017, the Audit Committee of the Board of Directors of Synchronoss Technologies, Inc. (the "Company"), after consultation with management and discussion with Ernst & Young LLP, the Company's independent registered public accounting firm, concluded that **the Company's previously issued financial statements for the fiscal years ended December 31, 2016 and 2015 and the respective**

*quarterly periods (collectively, the "Relevant Periods") should be restated and should no longer be relied upon.*

As previously reported by the Company, its new Chief Executive Officer, Stephen Waldis and new Chief Financial Officer, Lawrence Irving, together with its Audit Committee of the Company's Board of Directors and with the assistance of accounting and legal advisors, initiated a thorough review of accounting of certain transactions conducted in the Relevant Periods. As a result of this review, *certain errors have been identified in the Relevant Periods concerning revenue recognition in connection with certain licensing transactions. The Company has determined that revenues from each of the applicable transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting. While the Company has not yet completed its accounting review, the Company estimates that the revenue impact will be no more than 10% for each of the fiscal years ended December 31, 2016 and December 31, 2015.* In connection with the impact of the above errors, the Company also concluded that certain related expenses recognized in the Relevant Periods will be reversed.

The Company has concluded to restate its financial statements for the Relevant Periods to correct the above identified accounting errors and certain other immaterial prior period errors. The Company does not expect the corrections to have an impact on total cash flows for the Relevant Periods, to result in any customer refunds or to impact the Company's services to its customers.

The Company and its advisors are working expeditiously to complete this review and the Company intends to file its Form 10-Q for the quarter ended March 31, 2017 and restated financial statements for the Relevant Periods as soon as practicable.

The Company has identified a material weakness in internal control over financial reporting relating to its revenue recognition process at December 31, 2016. It is possible the Company may identify additional material weaknesses.

235.    The Company's expectation that "revenue impact will be no more than 10% for each of the fiscal years ended December 31, 2016 and December 31, 2015" would amount to revenue overstatements to the tune of more than $105 million.

236.    Following this news, the Company's stock price continued its tumble, closing at $11.26 per share on June 14, 2017, a decrease of 7.2% from its price of $12.13 per share the prior trading day, erasing another $40.34 million in Company market capitalization.

237.    Once again, analysts were quick to chastise this critical development. A June 13, 2017 analyst report published by Stephens's Samad Samana noted that "having to restate financials going all the way back to 2015 will only make it harder for SNCR to re-gain credibility with investors since the leadership is largely the same . . . ."

238.    On June 22, 2017, Synchronoss discussed the restatement, revealing in a presentation to investors "[t]he restatement primarily corrects certain license transactions which were originally recognized as a perpetual license to either netting the license as part of purchase accounting or spreading the license ratably over an extended period of years."  This statement indicated that the restatement would encompass the $9.2 million license payment connected to the Sequential transaction. Further, as the largest publicly disclosed license revenue, the $25 million Verizon license would also be subject to restatement.  The cumulative effect of these

misstatements resulted in the Company portraying its Cloud Services Business as rapidly growing through 2016, when in truth its revenue had been stagnating since 2015.

239.   On July 26, 2017, NASDAQ granted the Company an exception to file any delinquent periodic reports by November 13, 2017.

240.   On August 16, 2017, the Company received notice from NASDAQ's Listing Qualifications Department that the Company yet again was not in compliance with NASDAQ Listing Rule 5250(c)(1) because it had not yet filed its quarterly report on Form 10-Q for the period ended June 30, 2017.  As a result of the delinquency of this filing, NASDAQ requested an update on the Company's previously accepted plan to regain compliance with NASDAQ's listing requirements.

241.   To make matters worse, on October 12, 2017, after the market closed, the Company announced in a Form 8-K filed with the SEC that it would need to restate its financial statements for the fiscal year 2014, stating:

> As previously disclosed, Synchronoss Technologies, Inc. (the "Company"), together with the Audit Committee of its Board of Directors and with the assistance of accounting and legal advisors, initiated a thorough review of the accounting for certain transactions conducted in the fiscal years ended December 31, 2016 and 2015.  The Company reported on June 13, 2017 that its previously issued financial statements for the fiscal years ended December 31, 2016 and 2015 and the respective quarterly periods should be restated and should no longer be relied upon.

As part of the Company's ongoing internal accounting review, the Company has now also identified an error concerning the revenue recognition associated with a transaction conducted during 2014. Similar to certain transactions previously identified in 2015 and 2016, it has been determined that revenue from this 2014 transaction should be netted against the consideration transferred in connection with purchase accounting.  The identified transaction has no impact on cash balances and overall net cash flows for the fiscal year ended December 31, 2014.

On October 5, 2017, the Audit Committee of the Board of Directors of the Company, after consultation with management and discussion with Ernst & Young LLP, the Company's independent registered public accounting firm, concluded to restate the Company's previously issued financial statements for the fiscal year ended December 31, 2014 to correct the accounting error and certain other prior period errors. Accordingly, the Company's previously issued financial statements for the fiscal year ended December 31, 2014 and the respective quarterly periods should no longer be relied upon.

The Company has not yet completed its accounting review of transactions conducted during 2014, and it is possible that additional errors might be identified.

The Company and its advisors are working expeditiously to complete this review and the Company intends to file its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017 and June 30, 2017 and restated financial statements for the fiscal years 2014, 2015 and 2016 as soon as practicable.

242.  On this news, Synchronoss's share price fell $0.63 per share, or over 4.41%, over the next two trading days to close at $13.73 per share on October 16, 2017.

243.  On November 14, 2017, Synchronoss issued a press release entitled "Synchronoss Completes Sale of Intralinks to Siris Capital Group," announcing that

the Company sold Intralinks, a company it had purchased within the last year, to a private equity group.

244.   Shortly thereafter, on November 17, 2017, the Company announced the resignation of Waldis as CEO and the appointment of Lurie as CEO.

245.   On May 11, 2018, Synchronoss filed a Form 8-K with the SEC revealing that due to its inability to become current with its SEC filings by May 10, 2018, trading of the Company's common stock would be suspended effective May 14, 2018, and the Company's stock would be delisted from NASDAQ after applicable appeals periods had lapsed.

246.   On July 2, 2018, the Company filed a Form 10-K for the fiscal year ending December 31, 2017 (the "2017 10-K") with the SEC.  The 2017 10-K was signed by Defendants Lurie, Aquilina, Baker, Berger, Cadogan, Hopkins, McCormick, Moore, and Waldis.  The 2017 10-K included the restatement of the Company's financial statements for the years ended in 2016 and 2015.

247.   On July 2, 2018, after the market closed, Synchronoss filed several disclosures (including several Forms 10-Q, 10-K, and 10-K/A) with the SEC that included restated financial information for fiscal years 2014 through 2016 and a description of the circumstances that led to the restatement, and amended those disclosures on July 9, 2018 (in the form of including several 10-Qs and 10-K and

10-K/A) (collectively these SEC filings on July 2, 2018 and July 9, 2018 are referred to as the "Restatement").

248.   On this news of the Restatement filed on July 2, 2018, the price per share of Synchronoss stock fell $0.35, or over 5.1%, over the next two trading days to close at $6.49 on July 5, 2018.

249.   On this news of the Restatement filed on July 9, 2018, the price per share of Synchronoss stock fell $0.51, or over 7.8%, over the next two trading days to close at $5.95 on July 11, 2018.

250.   The Restatement revealed that only $17.1 million of license revenue had been recognized for all of 2016.  The Restatement also revealed that the amount of revenue recognized for the $25 million Verizon contract in the third quarter of 2016 results was clearly adjusted substantially downward as part of the Restatement.

251.   The Restatement included three primary categories of adjustments of revenue:  (i) revenue recognition adjustments relating to Hosting Services; (ii) revenue recognition adjustments related to establishing persuasive evidence of an arrangement; and (iii) adjustments related to accounting for acquisitions and divestitures.

252.   The Restatement also acknowledged the improper accounting with respect to customers that Synchronoss had "master service agreements" like AT&T, stating in part:

> The Company historically has had, and continues to have, contractual arrangements with certain customers whereby there is an established master services agreement that includes general terms and conditions. Such master services agreements contemplate the delivery by the customer of purchasing documentation for purposes of completing orders, indicating the nature, price and quantity of products and services ordered. In certain cases, the Company historically formed a view that persuasive evidence of an arrangement existed relating to such orders based upon its receipt from a customer of written confirmation of the order and commitment to pay the agreed price, such as a quote approval sent by the customer in response to a quote issued by the Company, but prior to that customer's subsequent delivery to the Company an executed statement of work or, in some instances, a purchase order, pursuant to a master services agreement.

253.   The magnitude of the Restatement was significant.  Synchronoss's cumulative revenue for 2014 through 2016, as restated, was adjusted downward from  $1,212,168,000  to  $1,032,271,000, a cumulative reduction of nearly $180 million (or more than 14.8%).  The Company's 2014 revenues were adjusted downward by $74 million (from $457 million to $383 million, or 16%).  The Company's 2015 revenues were adjusted downward by $56 million (from $579 million to $523 million, or 9.6%).  The Company's 2015 2016 revenues were adjusted downward by $50 million (from $622 million to $572 million, or 8.1%).

254.   The Restatement of Synchronoss's net income (loss) from operations was even more pronounced.  For 2016, Synchronoss's net income from operations

of $8 million was restated to a net loss of $3 million (in other words, a 140% decrease in income). For 2015, Synchronoss's previously reported net income from operations of $47 million decreased to just $2 million, a decrease of nearly 95%. For 2014, net income from operations of $39 million was restated to a loss of $40 million, an over 200% decrease.

255. Thus, while Synchronoss reported net income from operations from 2014 through 2016 of $93.5 million, in reality, it had a cumulative loss during that time of $40 million (a difference of $134 million, a 143% decrease in net income). These dramatically restated income metrics demonstrate that Synchronoss has been in dire financial straits for years, a crucial fact obscured by Defendants' massive accounting fraud.

256. The Restatement was a catastrophic event for Synchronoss, whose shares were halted NASDAQ as a result of it. The three-year span of time covered by the Restatement, and the fact that the Restatement resulted largely from pervasive and repetitive violations of basic revenue recognition principles, in connection with transactions with the Company's largest and most important customers, strongly suggest that the Individual Defendants were aware of the wrongdoing. The Individual Defendants, including Waldis and Rosenberger, had unlimited access to the relevant financial data, including revenue, expense, income, acquisition, licensing, and other data, as well as their accounting treatment.

## THE SECURITIES CLASS ACTION

257.   Given the Individual Defendants' misconduct, including falsifying revenues and concealing material facts related to the Licensing Agreement and the Activation Sale, the Company has been subjected and forced to defend itself and/or pay for the defense of certain of the Individual Defendants in the Securities Class Action.

258.   On May 1, 2017, the Securities Class Action was filed.  Securities Class Action, ECF No. 1.  After the Company filed the Restatement on July 9, 2018 and motions practice, plaintiff in the Securities Class Action filed the SAC on August 14, 2019.

259.   The SAC included confidential witnesses accounts from a total of eight individuals to bolster the inference of scienter with respect to the underlying claims for violations of federal securities laws.  Securities Class Action, ECF No. 81. Thereafter, the defendants in the Securities Class Action filed a motion to dismiss the SAC.  Securities Class Action, ECF No. 84.

260.   The Court denied in part defendants' motion to dismiss the SAC in the Securities Class Action on May 29, 2020 (*see* Securities Class Action, ECF No. 91), finding, in relevant part:

> Considering the above confidential witness information collectively, the Court finds that the SAC sets forth particularized allegations that the Company and, notably, Rosenberger, improperly recognized revenue on contracts before they were signed. These particularized

allegations provide, at the very least, strong circumstantial evidence that Rosenberger "knew or, more importantly, should have known that [she] was misrepresenting material facts related to the Company," *see In re Campbell Soup*, 145 F. Supp. 2d at 599, and thus, acted recklessly. What is clear from the information provided by the confidential witnesses is that Rosenberger knew that revenue had been recognized on certain deals, notably the $25 million and $5 million Verizon contracts, before the contracts were signed. Moreover, the SAC demonstrates that Rosenberger was heavily involved in the revenue recognition process. *See, e.g*., SAC ¶ 395 (setting forth information from CW3 that Rosenberger "'micromanaged' the accountants"). Moreover, the confidential witnesses all gave similar statements with regard to the Company's practice of requiring a signed contract for revenue to be booked, evidencing that such a practice was in place at the Company. That the confidential witnesses did not specifically allege that Rosenberger knew of that policy does not inhibit an inference of scienter—Rosenberger was the CFO of the Company and, previously the Controller, and actively participated in discussions regarding revenue recognition, and was responsible for approving such decisions. Looking to this evidence as a whole, Plaintiff has sufficiently shown that Rosenberger "knew or, more importantly, should have known that" that revenue was being recognized prematurely. *See Novak*, 216 F.3d at 308. Accordingly, I find that scienter can be inferred from the confidential witness testimony pertaining to the improper recognition of revenue as to Rosenberger.

*       *       *

In sum, Plaintiff has adequately demonstrated on this motion (1) the Company had a practice of requiring written signed contracts before revenue was recognized, (2) that the Company recognized certain deals as completed before the contracts were signed, and (3) that Rosenberger was aware that such deals were recognized without a signed contract. This is sufficient to allege violations of the GAAP standard in question and, further, sufficient grounds from which to infer scienter as to Rosenberger.

*       *       *

– 116 –

The Court finds that both these theories now support a stronger inference of scienter, as Plaintiff has sufficiently alleged that Rosenberger knew that the Company had improperly recognized certain revenue without obtaining signed contacts. This allegation of knowledge is enough to meet the "more" required for a restatement of financial results "to support a strong inference of scienter." *See In re Bio-Tech Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 588 (D.N.J. 2005) ("Although a restatement of financial results is probative of scienter, more is needed to support a strong inference of scienter."). It is similarly sufficient for the Court to infer scienter from the size of the contracts involved. "[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653–54 (E.D. Pa. 2015). The confidential witness allegations with respect to revenue recognition demonstrate that Rosenberger knew that the Company had improperly recognized revenue on its two biggest accounts—Verizon and AT&T. That knowledge is sufficient to support an inference of scienter under this theory. . .

Securities Class Action, ECF No. 91.

## THE INSIDER SELLING DEFENDANTS CAPITALIZED ON THE COMPANY'S ARTIFICIALLY INFLATED STOCK PRICE BY TRADING ON MATERIAL, NON-PUBLIC INFORMATION WHILE THE COMPANY WAS FORCED TO REPURCHASE ITS OWN SHARES

### A.    The Share Repurchase Program Constituted Corporate Waste and Breach of Fiduciary Duties

261.    While the Company's shares were trading at artificially inflated prices due to the Individual Defendants' aforementioned material misrepresentations and/or omissions, Defendants Waldis, McCormick, Moore, Hopkins, Cadogan, Rosenberger, and Hoffman further propped up Synchronoss's stock price by causing

the Company to authorize the repurchase of $100 million worth—and execute the repurchase of over $40 million worth—of Synchronoss common stock using Company (*i.e.*, **shareholders'**) funds.

262.   Indeed, on February 4, 2016, Synchronoss announced that certain of the Individual Defendants, including Defendants Waldis, McCormick, Moore, Hopkins, Cadogan, Rosenberger, and Hoffman, had authorized the repurchase of $100 million worth of the Company's shares through a repurchase program fueled by the Company's purportedly "very strong market position and financial profile." According to Defendant Waldis, the Company "expect[s] to deliver an attractive combination of solid top line growth, strong profit margins and expanding free cash flow.  In addition, we are making important investments in our enterprise business, including our ventures with Goldman Sachs and Verizon, that we believe will enhance our long-term growth and profitability profile."

263.   Immediately thereafter, in connection with this authorization, Defendants Waldis, McCormick, Moore, Hopkins, Cadogan, Rosenberger, and Hoffman caused Synchronoss to repurchase aggressively its own shares at prices that were artificially inflated based on the Individual Defendants' misrepresentations and omissions alleged herein.  Indeed, between March 1, 2016 and June 30, 2016, the Company was forced to repurchase **over $40 million** worth of its common stock, at an average price of **nearly $32.00** per share.

264.   The following table represents the Company's stock repurchase activity immediately following the repurchase authorization, from March 2016 through June 2016:

|  | **March 2016** | **April 2016** | **May 2016** | **June 2016** | **Total** |
|---|---|---|---|---|---|
| Shares Repurchased | 552,500 | 372,462 | 297,174 | 39,835 | 1,261,971 |
| Average Price per Share | $30.00 | $32.20 | $33.75 | $35.64 | $31.72 |
| Total Aggregate Cost to Company | $16,580,830 | $11,993,461 | $10,030,973 | $1,419,893 | $40,025,157 |

265.   At the time the truth was revealed, after market hours on June 13, 2017, Synchronoss stock closed at just $11.26 per share on June 14, 2017 and has continued to fall closing at $2.98 on December 3, 2020, resulting the Individual Defendants causing Synchronoss to overpay by $36,264,483 dollars, while the Individual Defendants were aware of the non-public, adverse, material information detailed above.

266.   Despite Defendants Waldis, McCormick, Moore, Hopkins, Cadogan, Rosenberger, and Hoffman's knowledge of the true facts about the Company's business and financial prospects, these Defendants nevertheless authorized and executed the Company's repurchases of its own stock at artificially inflated prices to the Company's detriment.  These Defendants' decisions were not the product of

valid business judgment because the Board knew during the repurchase period that the Company's stock was significantly inflated due to the false and misleading statements and omissions set forth in this Complaint.

267.   The repurchases falsely signaled to the Company's shareholders and the public that the purchase of Synchronoss stock at those prices was the best use of the Company's cash, and that purchases of the stock at the market price at that time represented a good value for the Company.  In truth, the Company's expenditures on its own stock were so profligate as to constitute corporate waste.  The repurchases were not designed to serve a legitimate corporate interest; rather, they were designed to help conceal the true facts concerning the Company's business, operations, and financial prospects through an inflated stock price.

**B.  Insider Sales Based on Material, Non-Public Information: Violating the Insider Selling Defendants' Fiduciary Duty Not to Engage in Insider Trading**

268.   Besides concealing key aspects of the Sequential and Intralinks deals and misrepresenting the financial metrics of the Company's revenues, the Company's share repurchases at the behest of Defendants Waldis, McCormick, Moore, Hopkins, Cadogan, Rosenberger, and Hoffman were also designed to serve another illicit purpose—namely, to allow certain Defendants to profit personally from their fraud and other fiduciary breaches by selling their holdings of Synchronoss stock at bloated prices based on insider information.

269.    During the same time as, and after, Defendants Waldis, McCormick, Moore, Hopkins, Cadogan, Rosenberger, and Hoffman were causing the Company to buy tens of millions of dollars' worth of its own stock at inflated prices, those same Defendants, and others, were liquidating significant portions of their own personally held Synchronoss stock.

270.    Indeed, between March 2016 and June 2016, while the Company was actively repurchasing its own shares at artificially inflated prices (specifically, the Company was forced to repurchase 1,261,971 of its own shares for a staggering cost of approximately $40,025,157), Defendants Waldis, Rosenberger, and Hoffman liquidated 172,266 shares of personally held Synchronoss stock for illicit insider proceeds of more than ***$5.6 million***.

271.    Moreover, during the period of misconduct through June 13, 2017 (when the truth was fully revealed regarding the Individual Defendants' unlawful conduct), each of the Insider Selling Defendants—including ***each*** of the Defendants who authorized the Company's share repurchase program—liquidated significant holdings of Synchronoss stock.  Specifically, these Defendants sold more than ***2,120,557 shares*** for proceeds of ***$78,978,815***.

272.    Specifically, while the Company was materially misstating information to keep its stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant Waldis made the following sales of Company stock: on November 6,

2014, selling 17,318 shares at $51.73; on November 19, 2014, selling 10,000 shares at $43.08 per share; on December 18, 2014, selling 10,000 shares at $42.48 per share; on January 2, 2015, selling 5,579 shares at $41.65 per share; on February 11, 2015, selling 8,309 shares at $41.71 per share; on February 11, 2015, selling 21,000 shares at $42.77 per share; on February 17, 2015, selling 20,825 shares at $42.68 per share; on March 18, 2015, selling 21,000 shares at $46.90 per share; on April 8, 2015, selling 21,000 shares at $47.96 per share; on May 27, 2015, selling 21,000 shares at $45.16 per share; on June 10, 2015, selling 21,000 shares at $48.79 per share; on July 15, 2015, selling 21,000 shares at $46.53 per share; on August 26, 2015, selling 21,000 shares at $40.18 per share; on September 16, 2015, selling 21,000 shares at $40.48 per share; on January 13, 2016, selling 70,000 shares at $30.68 per share; on January 14, 2016, selling 24,430 shares at $31.13 per share; on February 3, 2016, selling 6,927 shares at $27.91 per share; on February 16, 2016, selling 21,869 shares at $23.13 per share; on February 18, 2016, selling 4,143 shares at $25.40 per share; on March 2, 2016, selling 8,509 shares at $30,00 per share; on March 3, 2016, selling 200 shares at $30.01 per share; on March 16, 2016, selling 45,721 shares at $30.02 per share; on March 23, 2016, selling 23,000 shares at $30.28 per share; on April 13, 2016, selling 13,000 shares at $32.49 per share; on May 18, 2016, selling 13,000 shares at $34.83 per share; on June 8, 2016, selling 13,000 shares at $36.12 per share; on July 6, 2016, selling 13,000 shares at $32.32 per share; on August 24,

2016, selling 13,000 shares at $40.61 per share; on September 14, 2016, selling 13,000 shares at $40.43 per share; on October 5, 2016, selling 13,000 shares at $40.85 per share; on February 3, 2017, selling 8,265 shares at $39.00 per share; on February 14, 2017, selling 13,853 shares at $33.71 per share; and on February 21, 2017, selling 11,852 shares at $32.66 per share. All told, while the Company's stock price was artificially inflated due to the Defendants' misconduct, Defendant Waldis sold 569,800 shares of Company stock based on the material, non-public information detailed herein for total illicit proceeds of $21,321,987.89. That he made these sales before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

273. While the Company was materially misstating information to keep its stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant Rosenberger made the following sales of Company stock: on November 6, 2014, selling 1,414 shares at $50,78 per share; on November 24, 2014, selling 2,000 shares at $43 per share; on December 9, 2014, selling 2,749 shares at $41.60 per share; on January 2, 2015, selling 750 shares at $41.65 per share; on January 5, 2015, selling 111 shares at $41.05 per share; on January 6, 2015, selling 3,587 shares at $39.36 per share; on February 11, 2015, selling 463 shares at $41.71 per share; on February 17, 2015, selling 607 shares at $42.68 per share; on February 23, 2015, selling 1,340 shares at $43.55 per share; on February 23, 2015, selling 237 shares at

$44.81 per share; on April 2, 2015, selling 1,910 shares at $47.21 per share; on April 6, 2015, selling 2,245 shares at $47.17 per share; on May 21, 2015, selling 68 shares at $46.15 per share; on July 6, 2015, selling 709 shares at $45.16 per share; on August 21, 2015, selling 69 shares at $44.51 per share; on October 7, 2015, selling 689 shares at $33.76 per share; on November 24, 2015, selling 69 shares at $38.33 per share; on January 5, 2016, selling 831 shares at $33.66 per share; on February 3, 2016, selling 1,466 shares at $27.91 per share; on February 16, 2016, selling 810 shares at $23.13 per share; on February 18, 2016, selling 899 shares at $25.43 per share; on February 24, 2016, selling 70 at $25.01 per share; on April 4, 2016, selling 753 shares at $32.12 per share; on May 24, 2016, selling 83 shares at $35.30 per share; on July 6, 2016, selling 787 shares at $31.45 per share; on August 22, 2016, selling 83 shares at $40.77 per share; on October 3, 2016, selling 755 shares at $40.86 per share; on November 21, 2016, selling 83 shares at $48.92 per share; on December 27, 2016, selling 10,000 shares at $39.51 per share; on December 28, 2016, selling 4,000 shares at $39.63 per share; on January 4, 2017, selling 815 shares at $38.84 per share; on January 11, 2017, selling 3,000 shares at $38.07 per share; on January 23, 2017, selling 777 shares at $39.08 per share; on February 3, 2017, selling 2,162 shares at $39.00 per share; on February 8, 2017, selling 2,000 shares at $36.93 per share; on February 14, 2017, selling 516 shares at $33.73 per share; and on February 21, 2017, selling 3,183 shares at $32.64 per share.

All told, while the Company's stock price was artificially inflated due to the Defendants' misconduct, Defendant Rosenberger sold 52,093 shares of Company stock based on the material, non-public information detailed herein for total illicit proceeds of $2,035,410.11.   That she made these sales before the material misstatements and omissions were exposed demonstrates Defendant Rosenberger's motive in facilitating and participating in the scheme.

274.   Although the Forms 4 disclosing the stock sales by Waldis and Rosenberger were each purportedly made pursuant to a Rule 10(b)(5)-1 plan, given the changes in Defendant Waldis's and Rosenberger's patterns of stock sales, the Rule 10(b)(5)-1 plan applicable to Defendants Waldis's and Rosenberger's transactions in Synchronoss stock must have been amended once or more during the relevant time period.   For example, beginning in April 2016 through October 2016, Defendant Waldis sold 13,000 shares of Synchronoss stock each month.   In March 2016, he sold 77,430 shares (including 31,430 shares that were acquired as a result of the exercise of stock options).   In addition, according to the Form 4s filed by Synchronoss, after his regular monthly sales of shares through October 2016, Defendant Waldis did not sell any Synchronoss shares until February 2017, when he unloaded 33,970 shares.   Further, Rosenberger's trading suspiciously ramped up prior to her resignation, which further supports that the 10(b)(5)-1 plans were amended.

275.   While the Company was materially misstating information to keep its stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant Cadogan made the following sales of Company stock: on November 10, 2014, selling 5,000 shares at $51.70 per share; on November 17, 2014, selling 4,000 shares at $48.09 per share; on November 18, 2014, selling 1,000 shares at $48.00 per share; on January 5, 2016, selling 10,000 shares at $33.94 per share; on February 9, 2016, selling 25,000 shares at $22.96 per share; on December 30, 2016, selling 20,000 shares at $38.56 per share; and on January 4, 2017, selling 7,500 shares at $39.39 per share.  All told, while the Company's stock price was artificially inflated due to the Defendants' misconduct, Defendant Cadogan sold 72,500 shares of Company stock based on the material, non-public information detailed herein for total illicit proceeds of $2,478,885.00.  That he made these sales before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

276.   While the Company was materially misstating information to keep its stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant Hopkins made the following sale of Company stock: on November 17, 2014, selling 10,000 shares at $47.50 per share; on January 12, 2015, selling 10,000 shares at $36.90 per share; on November 12, 2015, selling 25,000 shares at $36.90 per share; and on December 15, 2016, selling 27,500 shares at $41.65 per share.  All told, while

the Company's stock price was artificially inflated due to the Defendants' misconduct, Defendant Hopkins sold 72,500 shares of Company stock based on the material, non-public information detailed herein for total illicit proceeds of $2,911,875.00. That he made these sales before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

277. While the Company was materially misstating information to keep its stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant McCormick made the following sale of Company stock: on November 10, 2014, selling 10,500 shares at $51.83 per share; on November 12, 2014, selling 50,000 shares at $50.35 per share; on November 20, 2014, selling 18,516 shares at $42.37 per share; on November 24, 2014, selling 50,000 shares at $43.13 per share; on December 2, 2014, selling 50,000 shares at $41.08 per share; on December 10, 2014, selling 50,000 shares at $40.78 per share; on December 18, 2014, selling 50,000 shares at $42.61 per share; on December 22, 2014, selling 50,000 shares at $42.57 per share; on December 23, 2014, selling 21,136 at $42.75 per share; on December 30, 2014, selling 23,263 shares at $42.66 per share; on December 31, 2014, selling 26,737 shares at $42.16 per share; on January 8, 2015, selling 50,000 shares at $40.71 per share; on January 15, 2015, selling 800 shares at $40.00 per share; on January 16, 2015, selling 20,398 shares at $40.51 per share; on

January 20, 2015, selling 32,719 shares at $41.18 per share; on January 21, 2015, selling 17,281 shares at $41.34 per share; on January 28, 2015, selling 50,000 shares at $42.24 per share; on February 3, 2015, selling 10,000 shares at $45.00 per share; on February 5, 2015, selling 50,000 shares at $42.24 per share; on February 9, 2015, selling 50,000 shares at $42.21 per share; on February 17, 2015, selling 28,802 shares at $43.28 per share; on December 23, 2015, selling 25,000 shares at $35.86 per share; and on August 4, 2016, selling 27,500 shares at $40.00 per share. All told, while the Company's stock price was artificially inflated due to the Defendants' misconduct, Defendant McCormick sold 741,016 shares of Company stock based on the material, non-public information detailed herein for total illicit proceeds of $31,500,835.40.   That he made these sales before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

278.   While the Company was materially misstating information to keep its stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant Moore made the following sales of Company stock: on November 7, 2014, selling 2,500 shares at $51.97 per share; on November 11, 2014, selling 5,000 shares at $53.12 per share; on December 23, 2015, selling 5,000 shares at $35.89 per share; on September 12, 2016, selling 5,500 shares at $40.63 per share; on October 12, 2016, selling 5,500 shares at $39.38 per share; on November 14, 2016, selling

5,500 shares at $47.93 per share; on December 13, 2016, selling 5,500 shares at $41.15 per share; and on January 12, 2017, selling 5,500 shares of at $38.19 per share.  All told, while the Company's stock price was artificially inflated due to the Defendants' misconduct, Defendant Moore sold 40,000 shares of Company stock based on the material, non-public information detailed herein for total illicit proceeds of $1,715,015.00.  That he made these sales before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

279.   While the Company was materially misstating information to keep its stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant Garcia made the following sales of Company stock: on October 6, 2014, selling 494 shares at $46.49 per share; on October 7, 2014, selling 10,500 shares at $44.24 per share; on October 13, 2014, selling 10,909 shares at $42.40 per share; on October 28, 2014, selling 7,602 shares at $48.40 per share; on November 12, 2014, selling 7,602 shares at $48.34 per share; on November 14, 2014, selling 10,909 shares at $50.51 per share; on November 19, 2014, selling 259 shares at $43.10 per share; on November 19, 2014, selling 5,251 shares at $45.26 per share; on November 25, 2014, selling 7,602 shares at $43.62 per share; on December 9, 2014, selling 7,602 shares at $40.36 per share; on December 16, 2014, selling 7,606 shares at $40.36 per share; on January 2, 2015, selling 3,379 shares at

$41.65 per share; on February 17, 2015, selling 13,096 shares at $42.68 per share; on February 19, 2015, selling 6,729 shares at $44.72 per share; on March 12, 2015, selling 6,729 shares at $43.48 per share; on March 26, 2015 selling 6,729 shares at $45.25 per share; on April 2, 2015, selling 6,729 shares at $47.33 per share; on April 2, 2015, selling 494 shares at $47.17 per share; on April 23, 2015, selling 6,729 shares at $51.56 per share; on May 7, 2015, selling 6,729 shares at $45.12 per share; on May 21, 2015, selling 6,729 shares at $46.24 per share; on June 4, 2015, selling 6,729 shares at $48.81 per share; on June 18, 2015, selling 6,729 shares at $49.73 per share; on July 2, 2015, selling 6,729 shares at $45.52 per share; on July 6, 2015, selling 497 shares at $45.08 per share; on July 16, 2015, selling 6,729 shares at $46.19 per share; on July 30, 2015, selling 6,729 shares at $47.28 per share; on August 7, 2015, selling 6,729 shares at $46.96 per share; on August 21, 2015, selling 6,730 shares at $44.99 per share; on September 4, 2015, selling 6,730 shares at $39.40 per share; on September 28, 2015, selling 1,230 shares at $33.92 per share; on October 7, 2015, selling 480 shares at $33.76 per share; on October 7, 2015, selling 5,500 shares at $35.00 per share; on January 5, 2016, selling 568 shares at $33.66 per share; on February 3, 2016, selling 4,978 shares at $27.91 per share; on February 16, 2016, selling 14,964 shares at $23.13 per share; on February 18, 2016, selling 2,998 shares at $25.51 per share; on December 28, 2016, selling 9,136 shares at $39.11 per share; on January 11, 2017 selling 1,696 shares at $38.99 per share; on

January 11, 2017, selling 7,440 shares at $30.04 per share; on January 25, 2017, selling 1,695 shares at $39.53 per share; on January 25, 2017, he sold 7,440 shares at $39.57 per share; on February 3, 2017, selling 2,908 shares at $39.00 per share; on February 8, 2017, selling 9,135 shares at $35.66 per share; on February 14, 2017, selling 10,280 shares at $33.73 per share; on February 21, 2017, selling 8,240 shares at $32.65 per share; on February 22, 2017, selling 1,695 shares at $31.67 per share; on March 8, 2017, selling 1,695 shares at $26.42 per share; and on March 22, 2017, selling 1,695 shares at $25.66 per share.  All told, while the Company's stock price was artificially inflated due to the Defendants' misconduct, Defendant Garcia sold 292,058 shares of Company stock based on the material, non-public information detailed herein for total illicit proceeds of $12,010,714.00.  That he made these sales before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

280.   While the Company was materially misstating information to keep its stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant Hoffman made the following sales of Company stock: on May 13, 2016, selling 11,132 shares at $35.16 per share; and on May 16, 2016, selling 43,868 shares at $35.06 per share.  All told, while the Company's stock price was artificially inflated due to the Defendants' misconduct, Defendant Hoffman sold 55,000 shares of Company stock based on the material, non-public information detailed herein for

total illicit proceeds of $1,929,413.20.  That he made these sales before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

281.   Indeed, the Insider Selling Defendants' insider sales were specifically timed to coincide with: (a) the Company's stock price trading at artificially inflated prices due to the misrepresentations and omissions alleged herein; **and** (b) the precise time periods that these Defendants caused the Company to repurchase over $40 million worth of its own stock at an average price of $31.72 per share, thereby further inflating the Company's stock price and allowing the Insider Selling Defendants to receive the highest price possible for their shares.

282.   Aside from their direct knowledge of the misrepresentations and omissions that caused Synchronoss's stock price to be inflated in the first place, the wrongful conduct in causing the repurchases is confirmed by the fact that the share repurchase program was halted ***before*** the Company's stock price began its sharpest decline from a high of $49.94 on November 29, 2016, to close at $11.09 on October 23, 2017.

283.   In sum, because the Company's share price was artificially inflated due to the Defendants' knowing concealment of Synchronoss's true financial and operational conditions, the facts surrounding the Activation Sale, and the Licensing Agreement, the Company's stock repurchase program, between March 1, 2016 and

June 30, 2016, was irrational, served no legitimate purpose, constituted corporate waste, and was premised entirely upon fraud, self-dealing, and other unconscionable conduct.  The repurchase program was directly motivated by the Insider Selling Defendants' desire to dispose of their personal holdings of Synchronoss stock at high prices while they still could, and before the artificial inflation therein was removed by revelation of, *inter alia*, previously concealed, conduct mentioned herein.

284.  Moreover, because of their roles as directors and/or officers of Synchronoss, the Insider Selling Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known of material, adverse, non-public information about the business of Synchronoss, including, *inter alia*, that the false and misleading statements and/or omissions alleged herein caused the price of Synchronoss's stock to trade at artificially inflated prices at the same time the Insider Selling Defendants were disposing of millions of dollars' worth of Company stock.

285.  The Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse, non-public information concerning Synchronoss's business, finances, and prospects, but they violated this duty.

## THE INDIVIDUAL DEFENDANTS' DUTIES

### A.     Fiduciary Duties

286.   By reason of their positions as officers, directors, and/or fiduciaries of Synchronoss, and because of their ability to control the business and corporate affairs of Synchronoss, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Synchronoss in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Synchronoss and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

287. Each director and officer of the Company owed, and owes, to Synchronoss and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

288.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Synchronoss, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Synchronoss, each of the Individual Defendants had knowledge of material, non-

public information regarding the Company.  In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, and financial prospects so that the market price of the Company's stock would be based on truthful and accurate information.

289.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty and good faith, requiring that they each favor Synchronoss's interests and that of its shareholders over their own interests while conducting the affairs of the Company, and refrain from using their positions, influence, or knowledge of the affairs of the Company to gain personal advantage.  Further, each of the Individual Defendants are duty-bound to exercise due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

290.   As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present

and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

291.   To discharge their duties, the officers and directors of Synchronoss were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Synchronoss were required to, among other things:

(a)    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of their business;

(b)    exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c)    when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

292.  Individual Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Synchronoss, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were

– 136 –

aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Synchronoss's Board at all relevant times.

293.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Synchronoss and were at all times acting within the course and scope of such agency.

294.  Because of their advisory, executive, managerial, and directorial positions with Synchronoss, each of the Individual Defendants had access to adverse, non-public information about the Company.

295.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Synchronoss.

**B.     Audit Committee Duties**

296.   In addition to these duties, the members of the Audit Committee owed specific duties to Synchronoss under the Audit Committee's Charter.  The purpose of the Audit Committee "shall be to oversee the Company's accounting practices, system of internal controls, audit processes, and financial reporting processes."

297.   Specifically, according to Synchronoss's Audit Committee Charter, and as reiterated in the Company's 2016 and 2017 Proxy Statements, the Audit Committee's responsibilities "shall include" the following:

*Processes, Controls and Risk Management*

1.    Reviewing periodically the Company's financial reporting processes and disclosure controls and processes, based on consultation with the Company's management and independent auditors and counsel;

2.    Reviewing periodically the adequacy and effectiveness of the Company's internal control policies and procedures, including, to the extent applicable, the responsibilities, budget, staffing and effectiveness of the Company's internal audit function, based on consultation with the Company's management and independent auditors;

3.    Reviewing the reports prepared by management, and attested to by the Company's independent auditors, assessing the adequacy and effectiveness of the Company's internal controls and procedures, prior to the inclusion of such reports in the Company's periodic filings as required under the rules of the SEC;

4.    Reviewing and discussing, based on periodic consultations with the Company's management and independent auditors, (i) the guidelines and policies governing the process by which management and other persons responsible for risk management assess and manage the Company's exposure to risks, including risks arising from major legislative and regulatory developments, contingent liabilities, significant business risks and financial disclosure and compliance risks and (ii) the adequacy and effectiveness of the Company's overall risk control environment and the steps taken by the Company's management to monitor and control risk exposure in such environment.

*Independent Auditors*

5.      Appointing, approving the compensation of and overseeing the work of the Company's independent auditors; in this regard, the Committee shall have the sole authority to approve the hiring and firing of the independent auditors and the independent auditors shall report directly to the Committee;

6.      Pre-approving audit and permissible non-audit services provided to the Company by the independent auditors (or subsequently approving non-audit services in those circumstances where a subsequent approval is permissible);

7.      Discussing with the Company's independent auditors their annual audit plan, including the scope of audit activities and all critical accounting policies and practices to be used, and any other matters required to be discussed by Statement on Accounting Standard No. 61, as it may be modified or supplemented;

8.      Reviewing quarterly with management, the Company's independent auditors and, to the extent applicable, the internal auditors (or other persons responsible for the Company's internal audit function):

The results of the annual audit of the Company and the independent auditors' procedures with respect to interim periods, including any significant findings, comments or recommendations of the independent auditors and, to the extent applicable, internal auditors (or other persons responsible for evaluating the Company's compliance with internal controls) together with management's responses thereto; and

Any significant changes in the Company's accounting principles or the methods of applying the Company's accounting principles;

9.      Reviewing and discussing reports from the independent auditors on:

•      All critical accounting policies and practices used by the Company;

•      Alternative accounting treatments within generally accepted accounting principles related to material items that have been

discussed with management, including the ramifications of the use of the alternative treatments; and

• Other material written communications between the independent auditors and management;

10. Reviewing with the Company's independent auditors their judgments as to the quality, not just the acceptability, of the Company's accounting principles and such matters as are required to be discussed with the Committee under generally accepted auditing standards;

11. Obtaining and reviewing at least annually a report by the Company's independent auditors describing:

• The independent auditors' internal quality-control procedures; and

• Any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditors, or by any inquiry or investigation by any governmental or professional authority, within the preceding five years, respecting one or more independent audits carried out by the independent auditors, and any steps taken to deal with any such issues;

12. Obtaining and reviewing at least annually a formal written statement by the Company's independent auditors delineating all relationships between the auditor and the Company, consistent with Independent Standards Board Standard No. 1, as it may be modified or supplemented, and reviewing and discussing with the auditors any disclosed relationships or services that may impact the objectivity and independence of the auditors; in this regard, the Committee shall take appropriate action, if necessary, to ensure the independence of the auditors;

13. Reviewing periodically with the independent auditors any problems or difficulties encountered by the independent auditors in the course of any audit work, including management's response thereto, any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management;

*SEC Reports and Other Disclosure*

14.     Reviewing with:

•       Management and the Company's independent auditors, before release, the audited financial statements and unaudited interim financial statements; and

•       Management and the Company's independent auditors, before release, the Company's earnings announcements or financial releases and Management's Discussion and Analysis (MD&A) in the Company's annual report on Form 10-K and quarterly reports on Form 10-Q;

15.     Directing the Company's independent auditors to review, before filing with the SEC, the Company's interim financial statements included in quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

16.     Overseeing compliance with the disclosure requirements of the SEC, including disclosure of information regarding auditors' services and audit committee members, member qualifications and activities;

*Other Responsibilities and Authority*

17.     Establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

18.     Reviewing and approving all related party transactions in accordance with the applicable rules of Nasdaq;

19.     Reviewing, approving and monitoring the Company's code of ethics for the Chief Executive Officer and senior financial officers in accordance with the applicable rules of Nasdaq and the SEC;

20. Establishing hiring policies regarding employment of employees, or former employees, of the Company's independent auditors in accordance with the applicable rules of Nasdaq and the SEC;

21. Reviewing the Committee's own charter, structure, processes and membership requirements, at least on an annual basis;

22. Preparing and periodically updating an annual calendar and checklist for the Committee's responsibilities and authority; and

23. Performing such other duties as may be requested by the Board.

298. Additionally, per the Audit Committee Charter, to fulfill its responsibilities:

• The Committee shall prepare all reports required to be included in the Company's filings with the SEC, pursuant to and in accordance with applicable rules of the SEC.

• The Committee also shall report regularly to the full Board, including with respect to any issues that arise with respect to the quality or integrity of the Company's financial statements, the effectiveness of the Company's internal controls or disclosure controls, the performance and independence of the Company's independent auditors, or any other issue that the Committee believes should be brought to the attention of the full Board.

299. Upon information and belief, the Company maintained an Audit Committee Charter that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

## C.    Compensation Committee Duties

300.   Additionally, the members of the Compensation Committee—to wit, Defendants Cadogan, Hopkins, and McCormick—owed specific duties to Synchronoss under the Compensation Committee Charter to, among other things, "discharge certain responsibilities of the Board relating to executive compensation policies and programs, including developing the Company's general compensation philosophy, providing oversight of the implementation of the compensation policies and benefit plans, administering the Company's various equity compensation plans and programs including the issuance of equity awards, and to make recommendations to the Board regarding its remaining responsibilities relating to executive compensation."

301.   Specifically, according to Synchronoss's Compensation Committee Charter, and as reiterated in the Company's 2016 and 2017 Proxy Statements, the Compensation Committee's responsibilities "shall include" the following:

1.    Reviewing annually and approving the Company's compensation strategy and philosophy;

2.    Reviewing annually and approving corporate goals and objectives relevant to executive compensation and evaluating performance in light of those goals;

3.    Reviewing and approving the corporate objectives that pertain to the determination of the compensation of the Company's Chief Executive Officer (the "CEO");

4.    Evaluating the CEO's performance;

– 143 –

5.    Determining the CEO's salary and contingent compensation, based on evaluating his or her performance and other relevant criteria as determined by the Committee;

6.    In consultation with the CEO, determining the salaries and contingent compensation of the other individuals who are deemed to be "officers" of the Company under Rule 16a-1(f) of the SEC (the "Executive Officers"), including establishing incentive compensation plans for such individuals, establishing targets and incentive awards under such plans and making any determinations required to be made by the Board or a committee of the Board under such plans;

7.    Making recommendations to the Board regarding compensation for non-employee members of the Board, including, but not limited to the following elements: retainers, meeting and committee fees, committee chair fees, and equity compensation;

8.    Recommending the adoption or amendment of equity and cash incentive plans for Board approval, and recommending amendments to such plans for Board approval (including changes in the number of shares reserved for issuance thereunder);

9.    Administering the Company's equity plans, granting stock option, restricted stock and other equity awards and approving modifications of such awards, provided that the Board may delegate to another committee of the Board, or, if permitted under applicable law, regulations or rules, to Company officers, the concurrent authority to make such awards to individuals other than Executive Officers and Board members on such terms and conditions as the Committee may specify;

10.   Overseeing the administration of other material employee benefit plans of the Company, including the Company's 401(k) plan;

11.   Reviewing and approving policies and procedures relating to the perquisites and expense accounts of the Company's Executive Officers;

12. When and as required by SEC rules, reviewing and discussing with management the Compensation Discussion & Analysis ("CD&A") required to be included in the Company's proxy statement and annual report on Form 10-K under applicable SEC rules; determining on the basis of such process whether to recommend to the Board that the CD&A be included in such filings; and furnishing an annual report on executive compensation for publication in the Company's proxy statement;

13. Conducting a review of Executive Officer succession planning, as necessary, reporting its findings and recommendations to the Board, and working with the Board in evaluating potential successors to Executive Officer positions;

14. Making recommendations to the Board regarding amendments to this Charter;

15. Oversee the Company's submission to, and consider the results of, stockholder votes of matters relating to compensation, including advisory votes on executive compensation and the frequency of such votes, incentive and other compensation plans, and amendments to such plans; [and]

16. Overseeing the Company's compliance with SEC rules and regulations and Nasdaq listing standards regarding stockholder approval of certain compensation matters.

302. Upon information and belief, the Company maintained a Compensation Committee Charter that imposed the same, or substantially and materially the same or similar, duties on the members of the Compensation Committee as those set forth above.

**D.    Duties Pursuant to the Company's Code of Business Conduct**

303. The Individual Defendants, as officers and/or directors of Synchronoss, were also bound by the Company's Code of Business Conduct (the "Code") which,

according to the Code, "sets out basic principles to guide all directors, officers and employees of Synchronoss Technologies, Inc." who "must conduct themselves" in accordance with the Code "and seek to avoid even the appearance of improper behavior."

304. According to the Code, its purpose is to deter wrongdoing and promote the following:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Full, fair, accurate, timely and understandable disclosure in reports and documents that Synchronoss files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by Synchronoss;

- Compliance with applicable governmental laws, rules and regulations;

- The prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and

- Accountability for adherence to the Code.

305. With respect to compliance with applicable laws, rules, and regulations, the Code states:

Obeying the law is the foundation on which Synchronoss' ethical standards are built.  You must comply with applicable laws, rules and regulations.  Although you are not expected to know the details of these laws, it is important to know enough to determine when to seek advice from managers or other appropriate personnel.

306. With respect to conflicts of interest, the Code provides:

– 146 –

A "conflict of interest" exists when a person's private interests interfere or conflict in any way with the interests of Synchronoss.  Examples of when a conflict of interest may arise include, but are not limited to:

- When a director, officer or employee takes actions or has interests that may make it difficult to perform his or her work objectively and effectively.

- When a director, officer or employee, or a member of his or her family, receives improper personal benefits as a result of his or her position with Synchronoss.

- Almost always, when an employee works simultaneously for a competitor or, except on our behalf, a customer or supplier. You are not allowed to work for a competitor in any capacity.

- When a director, officer or employee serves as a director of any company that competes with Synchronoss.

- When a director, officer or employee invests in a customer, supplier, developer or competitor of Synchronoss. In deciding whether to make such an investment, you should consider the size and nature of the investment, your ability to influence decisions of Synchronoss or of the other company, your access to confidential information of Synchronoss or of the other company, and the nature of the relationship between Synchronoss and the other company.

- When a director, officer or employee conducts Synchronoss business with a relative or significant other, or with a business with which a relative or significant other is associated in any significant role. Relatives include spouse, sister, brother, daughter, son, mother, father, grandparents, aunts, uncles, nieces, nephews, cousins, step relationships and in-laws. Significant others include persons living in a spousal or familial fashion (including same sex) with an employee.

307.   With respect to public disclosure of information, the Code states:

The federal securities laws require Synchronoss to disclose certain information in various reports that the Company must file with or

– 147 –

submit to the SEC. In addition, from time to time, Synchronoss makes other public communications, such as issuing press releases.

Synchronoss expects all directors, officers and employees who are involved in the preparation of SEC reports or other public documents to ensure that the information disclosed in those documents is full, fair, accurate, timely and understandable.

To the extent that you reasonably believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should report those concerns to Synchronoss' Chief Financial Officer or in compliance with Company's Whistleblower policy.

308. With respect to insider trading, the Code provides:

You are not permitted to use or share confidential information for stock trading purposes or for any other purpose, except the conduct of our business. All non-public information about Synchronoss should be considered confidential information. To use material non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical, but also illegal, and could result in criminal prosecution in addition to the termination of your employment. In order to assist with compliance with laws against insider trading, the Company has adopted an Insider Trading Policy. A copy of this policy, which has been distributed to every employee, is available on the Company's internal website. If you have any questions, please consult Synchronoss' Chief Financial Officer.

309. With respect to corporate opportunities, the Code states:

You are prohibited from taking for yourself opportunities that are discovered through the use of corporate property, information or position without the informed prior consent of the Board. You may not use corporate property or information obtained through your position with Synchronoss for improper personal gain, and you may not compete with Synchronoss directly or indirectly. Furthermore, you owe a duty to Synchronoss to advance its legitimate interests when such an opportunity arises.

310.   With respect to competition and fair dealing, the Code provides:

Synchronoss seeks to outperform its competition fairly and honestly. Stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited. You should endeavor to respect the rights of and deal fairly with Synchronoss' customers, suppliers, competitors and employees.

311.   With respect to protection and proper use of Synchronoss assets, the

Code states:

You should endeavor to protect Synchronoss' assets and ensure their efficient use. Any suspected incident of fraud or theft should immediately be reported for investigation. Synchronoss equipment should not be used for non-Synchronoss business, though limited incidental personal use is permitted.

Your obligation to protect Synchronoss' assets includes protecting its proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data and reports. Unauthorized use or distribution of such information would violate Synchronoss policy and could also be illegal and result in civil or even criminal penalties.

312.   Upon information and belief, the Company maintained a version of the

Code that imposed the same, or substantially and materially the same or similar,

duties on, among others, the Individual Defendants, as those set forth above.

**E.     Control, Access, and Authority**

313.   The Individual Defendants, because of their positions of control and

authority as directors and/or officers of Synchronoss, were able to, and did, directly

and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Synchronoss.

314.   Because of their advisory, executive, managerial, and directorial positions with Synchronoss, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Synchronoss.

315.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Synchronoss and was at all times acting within the course and scope of such agency.

**F.      Reasonable and Prudent Supervision**

316.   To discharge their duties, the officers and directors of Synchronoss were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Synchronoss were required to, among other things:

(a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business,

to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide shareholders and analysts as to the true business practices, operations, and financial prospects of the Company at any given time, including making accurate statements about the Company's business practices, operations, and financial prospects, as well as its internal controls;

(d)     remain informed as to how Synchronoss conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

(e)     refrain from trading on material, adverse, non-public information; and

(f)     ensure that Synchronoss was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

317.    The conduct of the Individual Defendants complained of herein involves knowing and culpable violations of their obligations as officers and/or directors of Synchronoss, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual

Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

318.   The Individual Defendants breached their duties of loyalty and good faith by allowing the other Individual Defendants to deceive, or by themselves deceiving, the investing public and artificially inflating and maintaining the market price of Synchronoss's securities by making untrue statements and omissions about Synchronoss's business and financial prospects, by engaging in and concealing deceitful business practices, by wasting corporate assets through the authorization and execution of the repurchase program, and by engaging in unlawful insider sales.

319.   The Individual Defendants also violated, or failed to prevent others from violating, federal securities laws and their fiduciary duties, which have resulted in, and exposed the Company to, the Securities Class Action.  As a result of these and other breaches of fiduciary duties, Synchronoss has expended, and will continue to expend, significant sums of money.

320.   Thus, the Individual Defendants, because of their positions of control and authority as officers and/or directors of Synchronoss, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, which resulted in substantial harm to Synchronoss.

321.   Specifically, members of the Audit Committee breached their fiduciary duties of good faith and loyalty by, *inter alia*, failing to implement sufficient internal controls and procedures, and/or recklessly and indifferently failing to follow internal controls and procedures to ensure the accuracy of the Company's public statements. Because of this failure, the Company issued false and misleading statements concerning the Company's business practices, operations, and financial prospects.

322.   Specifically, members of the Compensation Committee breached their fiduciary duties of good faith and loyalty by, *inter alia*, recommending and/or approving unjust compensation and incentive packages for the Individual Defendants which disincentivized them from identifying, addressing, and reporting problems to investors as they were encountered, as well as by authorizing excessive payments for the high-level executive departures of Defendants Rosenberger, Frederick, and Hovsepian, who collectively received over $7.9 million in compensation as they departed.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

323.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

324.   During all times relevant hereto, the Individual Defendants collectively, and individually, initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively, and individually, took the actions set forth herein.

325.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act; (b) disguise and misrepresent the Company's actual business and financial prospects; and (c) artificially inflate the Company's stock price.

326.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently conceal material facts, release improper statements, fail to correct such misstatements, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the

conspiracy, common enterprise, and/or common course of conduct complained of herein.

327.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO SYNCHRONOSS

328.   As a result of the Individual Defendants' wrongful conduct, Synchronoss conducted its affairs in evident violation of federal and state laws and regulations.   In addition, the Company was caused to disseminate false and misleading statements and to omit material information to make such statements not false and misleading when made.   This misconduct has devastated Synchronoss's credibility.   Further, Synchronoss is the subject of the Securities Class Action. Synchronoss has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

329.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Synchronoss's market capitalization has been substantially damaged, having lost over $2.1 billion in value as a result of the conduct described herein.

330.   Further, as a direct and proximate result of the Individual Defendants' conduct, Synchronoss has expended, and will continue to expend, significant sums of money.  Such expenditures include, without limitation:

(a)   costs incurred in investigating and defending Synchronoss and certain officers in the Securities Class Action, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment;

(b)   costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on Synchronoss's artificially inflated stock price;

(c)   costs associated with high-level executive departures, including the costs associated with the departure of Defendant Rosenberger, the Executive Vice President, CFO, and Treasurer, Defendant Frederick, who assumed Rosenberger's position as CFO upon her departure, and former CEO, Defendant Hovsepian (who had only been with Synchronoss for three months).  Collectively, these Defendants alone received over $7.9 million in compensation as they departed;

(d)   costs associated with the repurchase of more than $40 million in Company stock at prices that the Individual Defendants knew, or should have known, were artificially inflated due to their false and misleading statements and/or omissions, and which is currently worth just $3.26 million;

(e)     costs incurred from the misappropriation of Company information by the Insider Selling Defendants for the purpose of selling Synchronoss common stock at artificially inflated prices;

(f)     costs incurred in connection with the Company's restatements of its financials;

(g)     damages associated with the Activation Sale;

(h)     costs incurred from the loss of the Company's customers' confidence in Synchronoss and its products and services; and

(i)     losses incurred in connection with entering related party transactions alleged herein that were unfair to the Company and entered under unfavorable terms.

331.    Moreover, these actions have irreparably damaged Synchronoss's corporate image and goodwill.  For at least the foreseeable future, Synchronoss will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Synchronoss's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company has also suffered over $2.1 billion in market capitalization loss as a direct result of the Individual Defendants' wrongdoing alleged herein.

## DERIVATIVE AND DEMAND ALLEGATIONS

332.   Plaintiffs bring this action derivatively, and in the right and for the benefit of Synchronoss, to redress injuries suffered, and to be suffered, by Synchronoss as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law.  Synchronoss is named as a nominal defendant solely in a derivative capacity.

333.  Plaintiffs will adequately and fairly represent the interests of Synchronoss in enforcing and prosecuting its rights.

334.   Plaintiffs are, and have continuously been, shareholders of Synchronoss at all relevant times hereto.

335.   As detailed below, the Board wrongfully refused Plaintiffs' pre-suit Demands, forcing Plaintiffs to file shareholder derivative actions, and this Complaint, on behalf of the Company.

336.   Given the Board's wrongful, bad faith, and unreasonable refusal of Plaintiffs' lawful Demands to investigate the misconduct sufficiently, and/or to take sufficient action to remedy the harms caused to the Company, this consolidated, shareholder derivative action should be permitted to proceed.

## A.  Plaintiff Laughlin's Demand Allegations

### 1.  The August 6, 2018 Demand

337.  Before filing this derivative action, Plaintiff Laughlin first served a shareholder litigation demand on the Board on August 6, 2018, requesting that the Board investigate and take legal action to remedy breaches of fiduciary duties and violations of law by certain current and former directors and executive Officers of the Company for the misconduct detailed herein, who caused the Company to suffer damages, including having to defend itself in the Securities Class Action (previously defined as the "August 6, 2018 Demand").  A true and correct copy of the August 6, 2018 Demand is attached hereto as **Exhibit A.**

### 2.  Plaintiff Laughlin's Correspondence Following Up on the August 6, 2018 Demand

338.  In response to the August 6, 2018 Demand, corporate counsel to Synchronoss, Mr. Marc Dupre, Esq., of Gunderson Dettmer Stough Villenueve Franklin & Hachigian, LLP, wrote to Plaintiff Laughlin's counsel on September 13, 2018, confirming the Board's receipt of the August 6, 2018 Demand and advising that the Board "[wa]s reviewing the [August 6, 2018] Demand and w[ould] notify [Plaintiff Laughlin's counsel] of its intended course of action when decided" (the "September 13, 2018 Letter").  A true and correct copy of the September 13, 2018 Letter is attached hereto as **Exhibit B.**

339.   Having heard nothing more from the Board for roughly two and a half months after receiving the September 13, 2018 Letter, on November 21, 2018, Plaintiff Laughlin's counsel wrote to Mr. Dupre to follow up on the status of the Board's investigation of the August 6, 2018 Demand, and to raise issue with the complete lack of substantive information regarding the investigation into the August 6, 2018 Demand received by Plaintiff Laughlin as of that date (the "November 21, 2018 Letter").  Specifically, Plaintiff Laughlin requested that Mr. Dupre provide the following basic information: (i) the person(s) charged with reviewing the August 6, 2018 Demand and their position(s) within the Company, or if not affiliated with the Company, their affiliation; (ii) the date on which such person(s) were commissioned to undertake a review of the August 6, 2018 Demand; (iii) how those person(s) were selected and determined to be independent in accordance with Delaware law; and (iv) the scope of any such persons' mandate and authority in connection with their review the August 6, 2018 Demand.  Finally, Plaintiff Laughlin's counsel requested that given the gravity of the allegations in the August 6, 2018 Demand, Mr. Dupre advise as to a timeframe in which the Board expected to complete its investigation.  A true and correct copy of the November 21, 2018 Letter is attached hereto as **Exhibit C.**

340.   Plaintiff Laughlin's counsel did not hear further from Mr. Dupre in response to the November 21, 2018 Letter.

341.   On January 3, 2019, counsel for the Committee, Mr. Kenneth J. Nachbar, Esq., of Morris, Nichols, Arsht & Tunnell LLP, wrote to Plaintiff Laughlin's counsel purporting to "respon[d] to [Plaintiff Laughlin's counsel's] letter dated November 21, 2018 to Marc Dupre, Esq." (the "January 3, 2019 Letter"), but in the January 3, 2019 Letter, Mr. Nachbar wholly failed to address *any* of the concerns raised in Plaintiff Laughlin's November 21, 2018 Letter, except to state that the Committee "anticipate[s] a response during the first half of 2019."  Indeed, Mr. Nachbar's January 3, 2019 Letter consisted of only one four-sentence-long paragraph advising Plaintiff Laughlin's counsel that the Board had "appointed a Demand Review Committee" to consider the August 6, 2018 Demand and "to recommend action to the Board" in response thereto, and that the Committee had hired Mr. Nachbar's law firm to assist it in its consideration of the August 6, 2018 Demand.  A true and correct copy of the January 3, 2019 Letter is attached hereto as **Exhibit D.**

342.   Plaintiff Laughlin's counsel responded on January 15, 2019, reiterating Plaintiff Laughlin's prior requests for basic information regarding the Committee's investigation of the August 6, 2018 Demand contained in Plaintiff Laughlin's counsel's November 21, 2018 Letter (the "January 15, 2019 Letter").  A true and correct copy of the January 15, 2019 Letter is attached hereto as **Exhibit E.**

343.   On January 29, 2019, Mr. Nachbar again wrote to Plaintiff Laughlin's counsel, purporting to respond to Plaintiff Laughlin's counsel's January 15, 2019 Letter (the "January 29, 2019 Letter").  But again, Mr. Nachbar utterly failed to respond to Plaintiff Laughlin's requests for basic information regarding the Committee's investigation, except to state, for the first time, that "the Board ha[d] appointed a Special Committee of two directors, who have been determined to be disinterested and independent under applicable Delaware law," without identifying the two directors or the process by which, and on what basis, they were selected and determined to be independent.  A true and correct copy of the January 29, 2019 Letter is attached hereto as **Exhibit F.**[9]

344.   Given that nearly all of Plaintiff Laughlin's prior inquiries remained unanswered—and indeed, had been wholly ignored by Mr. Nachbar (and Mr. Dupre)—Plaintiff Laughlin's counsel again wrote to Mr. Nachbar on March 18, 2019, reiterating Plaintiff Laughlin's inquiries first raised in his November 21, 2018 Letter for a ***third*** time (the "March 18, 2019 Letter").  Also in the March 18, 2019 Letter, Plaintiff Laughlin's counsel noted that while Plaintiff Laughlin had issued a litigation demand on the Board, thereby conceding that a majority of the Board could

_____

[9] In certain of Mr. Nachbar's correspondence to Plaintiff's counsel, Mr. Nachbar refers to the Committee as a "Special Committee," as is the case with the January 29, 2019 Letter, whereas in other correspondence, such as the letters received by Plaintiff prior to January 29, 2019, Mr. Nachbar refers to what Plaintiff understands to be the same committee as a "Demand Review Committee."

fairly consider a demand, that fact "d[id] not necessarily render the **Committee**," as commissioned, "disinterested and independent," and further noted that the Board's *ex-post* actions taken with respect to the August 6, 2018 Demand—for example, choosing not to empower a committee of fully independent and disinterested directors to review the August 6, 2018 Demand—could justify treating the Board as not independent.  A true and correct copy of the March 18, 2019 Letter is attached hereto as **Exhibit G.**  (citing *Thorpe v. CERBCO, Inc.*, 611 A.2d 5, 10 n.5 (Del. Ch. 199) (emphasis added)).

345.   Mr. Nachbar failed to respond to Plaintiff Laughlin's counsel for another roughly four months.

### 3.    Plaintiff Laughlin's July 9, 2019 Refusal

346.   Then, on July 9, 2019, Mr. Nachbar wrote to Plaintiff Laughlin's counsel, summarily stating that the Committee comprised of supposedly independent and disinterested directors, working in conjunction with purportedly independent outside counsel, had completed its investigation of the August 6, 2018 Demand and presented its findings and recommendations to the Board not to pursue claims related to the misconduct alleged in the August 6, 2018 Demand, as such action would purportedly "not be in the best interests of the Company," which recommendation was unanimously adopted by the Board at a meeting held on June 26, 2019 (the "Plaintiff Laughlin's July 9, 2019 Refusal").

347.   Notably, for the *first* time, Mr. Nachbar addressed Plaintiff Laughlin's prior requests for information regarding the identities of Committee members and their mandate and scope of authority in investigating the August 6, 2018 Demand, stating: (i) the Committee was comprised of purportedly independent and disinterested directors, Cadogan and Rinne; (ii) the "Committee was charged with reviewing, investigating and providing recommendations to the Board about how the Company should proceed with respect to the [August 6, 2018 Demand]"; and (iii) the "Committee was given full authority to retain and pay, at the Company's expense, independent legal counsel and other advisors as the Committee deemed necessary."[10]   Nowhere in Plaintiff Laughlin's July 9, 2019 Refusal (or otherwise), however, did Mr. Nachbar advise as to *how* or on what basis Cadogan and Rinne were selected and determined to be independent in accordance with Delaware law, despite Plaintiff Laughlin's repeated requests for such information in his prior correspondence.   Rather, Mr. Nachbar merely offered the conclusory statement that both Committee members were "disinterested and independent directors."

---

[10] This is true despite Mr. Nachbar's representation to the contrary in Plaintiff Laughlin's July 9, 2019 Refusal.  *See* Exhibit H (falsely indicating Mr. Nachbar had previously provided such information (when in fact he had not), stating, "***[a]s you know from my previous correspondence dated January 3 and January 29, 2019***, the Board appointed a [Committee] consisting of two disinterested and independent directors, William Cadogan and Kristin Rinne, to consider to the Demand and to recommend action to the Board . . . . ").

348.   Plaintiff Laughlin's July 9, 2019 Refusal provided that the Committee's investigation included a review of "over 300 public and non-public documents . . . , including board and audit committee minutes and materials, SEC filings, communications with NASDAQ, press releases and investor call transcripts, employment agreements, 10b5-1 plans of officers and directors and information related to the Company's prior investigation and review of the financial errors," and that the Committee "conducted interviews of in-house and outside counsel."

349.   According to Plaintiff Laughlin's July 9, 2019 Refusal, based on its purportedly "extensive" investigation, the Committee found, *inter alia*: (i) "no member of management was involved in misconduct and that there was no evidence that either management or the directors knew that the Company's financial results were misstated when they had been disclosed"; (ii) "no evidence the officers or directors were aware that the financial results were misstated or were in possession or [*sic*] adverse material non-public information about the Company"; and (iii) the "Board[] lack[ed] knowledge that errors in the Company's financial results had occurred."  Plaintiff Laughlin's July 9, 2019 Refusal also described the August 6, 2018 Demand as "factually inaccurate with respect to the allegations of wrongdoing and lacked merit."

350.   Despite these proclamations, however, Plaintiff Laughlin's July 9, 2019 Refusal also provided that the Company had taken certain actions "to remediate the

prior accounting errors," including "fir[ing] four non-officer employees for actions related to the accounting errors" and retaining a "***new CEO and CFO, as well as other employees with responsibilities related to revenue recognition***."  Moreover, Plaintiff Laughlin's July 9, 2019 Refusal provided that based on its investigation, the Committee had "recommended that the Board direct the Compensation Committee to ***review the Company's insider trading policies*** . . . and make any recommendations to the Board for any revisions that the Compensation Committee deemed appropriate."  A true and correct copy of Plaintiff Laughlin's July 9, 2019 Refusal is attached hereto as **Exhibit H.**

### 4.     Plaintiff Laughlin's September 5, 2019 Demand

351.   Following Plaintiff Laughlin's July 9, 2019 Refusal, on August 14, 2019, the lead plaintiff in the Securities Class Action filed the SAC, alleging numerous additional violations of law by certain current and/or former directors and executive Officers at Synchronoss.  *See* Securities Class Action, ECF No. 81.

352.   In light of these additional allegations of wrongdoing, on September 5, 2019, Plaintiff Laughlin's counsel again wrote to Mr. Nachbar to demand that the Committee undertake a review of the new allegations in the SAC, in supplementation of his August 6, 2018 Demand, and to follow up on Plaintiff Laughlin's July 9, 2019 Refusal (previously defined as the "September 5, 2019 Demand").  Specifically, Plaintiff Laughlin requested copies of the non-public

documents referenced in Plaintiff Laughlin's July 9, 2019 Refusal as having been considered by the Committee in connection with its review of the August 6, 2018 Demand, as well as any documents and materials reviewed in connection with the Committee's supplemental investigation of the allegations in the September 5, 2019 Demand, and asked that the Board confirm whether it stood by Plaintiff Laughlin's July 9, 2019 Refusal following such investigation in light of the new allegations of serious misconduct in the SAC.[11]  A true and correct copy of the September 5, 2019 Demand is attached hereto as **Exhibit I.**

---

[11] Plaintiff Laughlin's September 5, 2019 Demand does not constitute a second, additional litigation demand, as counsel for the Committee suggests in the May 28, 2020 Refusal, but rather, the September 5, 2019 Demand supplemented and expanded on Plaintiff Laughlin's August 6, 2018 Demand.  Indeed, as noted in the September 5, 2019 Demand, in Plaintiff Laughlin's August 6, 2018 Demand, Plaintiff Laughlin had previously explicitly stated:

> Any complete and thorough investigation of the wrongdoing must include a full investigation of the allegations related to these facts in pending litigation, including, without limitation, the Securities Class Action and any other operative complaint in any other shareholder derivative or securities actions. ***In the event that any amended pleading is filed during the pendency of such actions, any additional allegations must also be thoroughly investigated.***

*See* Ex. A (emphasis in original).  Thus, the Committee was obligated, pursuant to the terms of the August 6, 2018 Demand, to investigate all allegations in the SAC.

**5.    Plaintiff Laughlin's Continued Correspondence with the Committee Following Up on the September 5, 2019 Demand**

353.   On September 26, 2019, Mr. Nachbar wrote to Plaintiff Laughlin's counsel, confirming that the Committee received the September 5, 2019 Demand and that the Committee "[wa]s investigating the additional allegations set forth [therein] and in the [SAC] filed in [the Securities Class Action]" (the "September 26, 2019 Letter").  In addition, Mr. Nachbar declined outright Plaintiff Laughlin's request for copies of the documents and materials reviewed in connection with the Committee's consideration of Plaintiff Laughlin's Demands, summarily stating, without citing to any legal authority whatsoever, that "We do not believe that your request for documents in the penultimate paragraph of your letter is proper, and the request is therefore denied."  A true and correct copy of the September 26, 2019 Letter is attached hereto as **Exhibit J.**

354.   Plaintiff Laughlin's counsel responded on December 3, 2019, requesting a timeframe in which the Committee expected to conclude its investigation of the additional allegations in the SAC and reiterating Plaintiff Laughlin's requests for documents reviewed in connection with the Committee's investigation of Plaintiff Laughlin's Demands (the "December 3, 2019 Letter").  A true and correct copy of the December 3, 2019 Letter is attached hereto as **Exhibit K.**

355.   On December 13, 2019, Mr. Nachbar wrote to Plaintiff Laughlin's counsel, advising that the "Special Committee expects to report to the full Board of

Synchronoss, and therefore expects to have a further report to your client, in the first quarter of 2020," and again declining to provide the requested documents and materials because the "Special Committee d[id] not believe that it is legally required to provide" such information to Plaintiff Laughlin (the "December 13, 2019 Letter"). Again, Mr. Nachbar failed to provide any legal authority for this contention. A true and correct copy of the December 13, 2019 Letter is attached hereto as **Exhibit L.**

356.    As the end of the first quarter of 2020 approached, Plaintiff Laughlin's counsel still had not heard from Mr. Nachbar regarding the status of the Committee's investigation, despite Mr. Nachbar's prior representation in his December 13, 2019 Letter that the Committee "expect[ed] to have a further report to [Plaintiff Laughlin] in the first quarter of 2020."

357.    Accordingly, on March 26, 2020, Plaintiff Laughlin's counsel followed up with Mr. Nachbar, requesting that he advise as to whether the Committee still expected to conclude its investigation "in the first quarter of 2020," as previously stated, or if not, requesting that he advise Plaintiff Laughlin of the revised timeframe in which the Committee expected to conclude its investigation of the September 5, 2019 Demand (the "March 26, 2020 Letter"). Moreover, in the event that the Committee no longer expected to conclude its investigation by the close of the first quarter of 2020, Plaintiff Laughlin's counsel asked that the Committee enter into an appropriate tolling agreement to preserve Plaintiff Laughlin's claims on behalf of

Synchronoss.  A true and correct copy of the March 26, 2020 Letter is attached hereto as **Exhibit M.**

358.   On April 2, 2020, Mr. Nachbar responded, stating that the Committee "expects to report to the board of Synchronoss later this month" and "expects to make a decision concerning [Plaintiff Laughlin's] request [that the Committee enter into a tolling agreement] early next week" (the "April 2, 2020 Letter").  A true and correct copy of the April 2, 2020 Letter is attached hereto as **Exhibit N.**

359.  On April 7, 2020, Mr. Nachbar sent another letter to Plaintiff Laughlin's counsel, advising that "[t]he Committee has determined not to request [a tolling agreement] at this time, principally because it expects to complete its work by the end of this month, and it is unaware of any statues of limitations that will expire in the next time between today and the anticipated completion date" (the "April 7, 2020 Letter").  A true and correct copy of the April 7, 2020 Letter is attached hereto as **Exhibit O.**

360.   April came and went without Mr. Nachbar advising as to the outcome of the Committee's investigation into the September 5, 2019 Demand, as he had undertaken to do in his April 2, 2020 Letter.

361.   As such, Plaintiff Laughlin's counsel wrote to Mr. Nachbar on May 15, 2020, inquiring as to the status of the Committee's investigation, and in the event the investigation was still not complete, requesting an explanation of the reason(s)

for the delay and a revised timetable in which the Committee expected to complete its investigation (the "May 15, 2020 Letter").  Finally, in light of the fact that Mr. Nachbar had failed to advise as to the outcome of the Committee's investigation by the end of April 2020, Plaintiff Laughlin reiterated his request for a tolling agreement.  A true and correct copy of the May 15, 2020 Letter is attached hereto as **Exhibit P.**

      **6.**    **The May 28, 2020 Refusal**

362.   On May 28, 2020, Mr. Nachbar responded to Plaintiff Laughlin's counsel, summarily stating that the Committee, consisting of purportedly independent and disinterested directors with the assistance of purportedly independent outside counsel, had "considered the matters raised in the [September 5, 2019 Demand]" and following its investigation, on May 22, 2020, presented its findings and recommendations to the Board that "it would not be in the best interests of the Company and its stockholders to pursue any litigation in response to the [September 5, 2019 Demand]," which the Board adopted at the same meeting (the "May 28, 2020 Refusal").  In addition, the May 28, 2020 Refusal incorporated by reference Plaintiff Laughlin's July 9, 2019 Refusal in its entirety, serving to confirm the Board's prior refusal of the claims alleged in Plaintiff Laughlin's August 6, 2018 Demand.

363.   The May 28, 2020 Refusal provided that as part of the Committee's investigation, it reviewed certain additional documents and materials and conducted interviews of certain counsel and employees at Synchronoss.

364.   Based on its purported investigation of the allegations in the SAC, the Committee found, *inter alia*: (i) "no member of management was involved in misconduct or intended to mislead the public and that there was no evidence that either management or the directors knew that the Company's financial results were misstated when they had been disclosed"; (ii) a "lack of any evidence that actual expenses were manipulated and that the information in the [September 5, 2019 Demand] was either incorrect or contrary to the evidence discovered during the investigation"; and (iii) "no evidence the officers were aware that the financial results were misstated or were in possession of adverse material non-public information about the Company."  Like Plaintiff Laughlin's July 9, 2019 Refusal, the May 28, 2020 Refusal also stated the September 5, 2019 Demand "was factually inaccurate with respect to allegations of wrongdoing and lacked merit."

365.   While the May 28, 2020 Refusal explicitly claims to have investigated the allegations in the SAC, the *eight (8)* confidential witnesses providing first-hand knowledge in support of those allegations—all of whom are former Synchronoss employees—were *not* even identified, much less interviewed, in connection with the Committee's investigation.  Indeed, apparently recognizing the value of speaking

with these confidential witnesses as part of its consideration of the September 5, 2019 Demand, "the Committee requested that plaintiffs' counsel in the Securities Class Action identify the 'confidential witnesses' identified in the SAC so that the Committee could interview those persons, but counsel refused to do so."  Nowhere does the May 28, 2020 Refusal indicate the Committee made any other attempts to identify the confidential witnesses whose allegations form the basis of the SAC, or that they in fact interviewed such persons before refusing the September 5, 2019 Demand and confirming Plaintiff Laughlin's July 9, 2019 Refusal.  A true and correct copy of the May 28, 2020 Refusal is attached hereto as **Exhibit Q.**

## B.     Plaintiff Thieffry's Demand Allegations

366.   On August 3, 2018, Plaintiff Thieffry, through her counsel, sent Plaintiff Thieffry's Demand on Synchronoss's Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by allowing Synchronoss to issue improper statements set forth herein.  A true and correct copy of Plaintiff Thieffry's Demand is attached hereto as **Exhibit R.**

367.   On September 13, 2018, Plaintiff Thieffry received a letter on behalf of the Board from Mr. Dupre, acknowledging receipt of Plaintiff Thieffry's Demand (the "September 13, 2018 Letter").  The September 13, 2018 Letter succinctly stated that the Board was reviewing Plaintiff Thieffry's Demand and "will notify [Plaintiff

Thieffry] of its interested course of action when decided."  A true and correct copy of the September 13, 2018 Letter is attached hereto as **Exhibit S.**

368.  Upon receiving no updates from the Board, Plaintiff Thieffry, through counsel, sent a letter to the Board's counsel on June 24, 2019 to provide the Board with another opportunity to address Plaintiff Thieffry's Demand and commence a civil action against the individuals responsible for the wrongdoing described in the Demand (the "June 24, 2019 Letter").  A true and correct copy of the June 24, 2019 Letter is attached hereto as **Exhibit T.**

369.  On July 9, 2019, the Board, through its counsel, Mr. Nachbar, responded to Plaintiff Thieffry's Demand, stating that after an investigation, the Board had concluded to refuse Plaintiff's Thieffry's Demand (the "Plaintiff Thieffry's July 9, 2019 Refusal" and together with the Plaintiff Laughlin's July 9, 2019 Refusal and the May 28, 2020 Refusal, the "Refusals").  A true and correct copy of Plaintiff Thieffry's July 9, 2019 Refusal is attached hereto as **Exhibit U.**

370.  In response to Plaintiff Thieffry's July 9, 2019 Refusal, Plaintiff Thieffry responded to the Board's counsel, Mr. Nachbar, on October 2, 2019, stating Plaintiff Thieffry's July 9, 2019 Refusal was not detailed enough to evaluate the sufficiency of the Board's investigation of Plaintiff Thieffry's Demand. Accordingly, Plaintiff Thieffry requested information and documents from the Board to evaluate whether the Board's investigation of Plaintiff Thieffry's Demand

and Plaintiff Thieffry's July 9, 2019 Refusal were reasonable and sufficient.  A true and correct copy of the October 2, 2019 letter is attached hereto as **Exhibit V.**

371.   On October 31, 2019, the Board, through Mr. Nachbar, responded that Plaintiff Thieffry's request for documents concerning the Board's investigation was denied (the "October 31, 2019 Letter").  A true and correct copy of the October 31, 2019 Letter is attached hereto as **Exhibit W.**

## C.   The Board Wrongfully Refused Plaintiffs' Demands

372.   At the time of the Board's Refusals of Plaintiffs' Demands, the Board consisted of nine (9) directors—Defendants Waldis, Cadogan, Hopkins, Rinne, Gyani, Baker, Berger, Aquilina, and Lurie.[12]

373.   The Board wrongfully refused Plaintiff's' Demands.   As detailed further below, the Board and the Committee failed to act independently, to act reasonably, to act in good faith, and within the realm of sound business judgment in investigating and denying the Demands.  The Refusals state in conclusory fashion that the Committee and the Board exercised their business judgment when refusing the Demands.  The Committee and Board, however, cannot be protected by the business judgment doctrine as they have failed to discharge their duties.

---

[12] As of the date of the May 28, 2020 Refusal, the Board consisted of the same nine directors and Defendant Harris, who was appointed to the Board on August 2, 2019.

374. *First,* the two Committee members charged with investigating the Demands—Defendants Rinne and Cadogan—were not in fact disinterested and independent, but rather, were conflicted and interested directors incapable of impartially reviewing the Demands.

375. Indeed, Rinne has maintained a *fifteen-year-long* professional relationship with Lurie, who is identified as a culpable wrongdoer in Plaintiff Laughlin's Demands for, among other reasons, continuing to fail to take any remedial action on behalf of the Company to right the wrongs perpetrated by, and being perpetrated by, the Defendants. Specifically, prior to joining Synchronoss's Board, Rinne and Lurie served concurrently as executives at Cingular Wireless for roughly nine years, as the CTO of Cingular Wireless from approximately 2005 to 2007 and as the President of National Distribution, AT&T Mobility/Cingular from approximately 2005 to 2008, respectively. Following the merger of Cingular Wireless and AT&T, the pair then continued to work concurrently with one another for an additional six years prior to joining Synchronoss's Board. From approximately 2007 until 2014, Rinne served as the Senior Vice President at AT&T, while Lurie was then serving as President of Other Enterprises at AT&T from approximately 2008 to 2014, before assuming the role of President and CEO of AT&T's Mobility and Consumer Operations in 2014. Thus, Rinne's professional relationship with Lurie dating back roughly fifteen years casts significant doubt as

to whether Rinne could impartially investigate the Demands which implicate Lurie for significant misconduct.[13]

376.   Cadogan suffers from a similar conflict of interest with Hopkins, as Hopkins is also implicated in serious misconduct in the Demands and Plaintiffs requested the Company take legal action against him.  Specifically, Cadogan and Hopkins have a longstanding personal relationship owing to their shared alma mater, the Wharton School of Business at the University of Pennsylvania, where they each earned their master's in business administration degrees in 1985 and 1987, respectively.

377.   Moreover, Defendant Cadogan is exceptionally interested in the outcome of the Demands as has been a member of the Board since 2005 and was a named director in Plaintiffs' Demands against whom Plaintiffs requested the Company take legal action, and thus he faces a substantial likelihood of liability.  It is highly unlikely that Cadogan would suggest the Company take legal action against himself.  Accordingly, Cadogan, as one of the two members of the Committee formed to investigate the Demands, is tainted and not disinterested to be able to

---

[13] In addition to Rinne and defendant Lurie, other Synchronoss Board members previously served at AT&T as high-level employees, including Aquilina and Gyani, who served as Co-President of AT&T Consumer Services and Member of the Chairman's Operating Group for twenty-two years, and President and CEO of AT&T Wireless Mobility Services for three years, respectively.

evaluate the Demands.  It is unreasonable to state that Cadogan was disinterested and it was improper to include him on the Committee.

378.   Notably, none of the Refusals explain how or on what basis Rinne and Cadogan were selected and determined to be disinterested and independent.  Far from it, the Refusals merely offer the conclusory statement that the Committee "consist[ed] of two disinterested and independent directors" without providing any detail regarding, *inter alia*, who was involved in making the determination that Cadogan and Rinne were disinterested and independent, what criteria were used to make that determination, or when that determination was made.  *See* Ex. Q, U.  This, despite Plaintiff Laughlin having requested such information on at least **three** separate occasions in written correspondence to counsel for the Committee, and Plaintiff Thieffry having likewise requested similar such information.  *See* Exs. C, E, G, V.

379.   It was unreasonable and not in good faith to have two interested directors sit on the Committee and provide recommendations to the Board on the Demands.  Considering Plaintiffs demanded that most of the Board members be investigated and the Company take action against them in the Demands, a committee comprised of outside persons should have been retained to conduct the investigation.  Although the Committee purportedly retained Morris, Nichols, Arsht & Tunnell LLP to facilitate the investigation, any determination whether to pursue the Demands

following an investigation (which was proposed to the Board) ultimately lay with the Committee.  In the alternative, other Board members, who were not listed by Plaintiffs in the Demands, should have been members of the Committee.

380.  *Second*, the Committee's investigation was woefully deficient because it failed to interview relevant persons identified as possessing knowledge of the misconduct in the Demands.  Specifically, despite the fact that both Demands directed the Committee to investigate the newly added allegations in the SAC in the Securities Class Action[14]—including allegations derived from lead plaintiff's counsel's in the Securities Class Action interviews of *eight* confidential witnesses in that action, all of whom are former Synchronoss employees with first-hand knowledge of the misconduct detailed in the Demands.  The Committee never identified or really even attempted to identify, or interviewed, any of those witnesses before refusing the Demands.

---

[14] While the September 5, 2019 Demand first explicitly referred the Committee to the new allegations in the SAC, the August 6, 2018 Demand also directed the Committee to investigate those allegations, stating:

> Any complete and thorough investigation of the wrongdoing must include a full investigation of the allegations related to these facts in pending litigation, including, without limitation, the Securities Class Action and any other operative complaint in any other shareholder derivative or securities actions.  ***In the event that any amended pleading is filed during the pendency of such actions, any additional allegations must also be thoroughly investigated.***

381. This failure to seek out and interview relevant persons with knowledge of the challenged misconduct in the Demands is particularly egregious given that on May 29, 2020, when ruling on defendants' motion to dismiss, this Court credited the information from those witnesses as, in part, the basis for sustaining certain of the claims in the Securities Class Action—the very same claims here. *See* Securities Class Action, ECF No. 91.

382. Despite this failure, the May 28, 2020 Refusal does, however, implicitly acknowledge the propriety of interviewing the confidential witnesses in the Securities Class Action as part of a proper and thorough investigation of the Demands stating: "the Committee requested that plaintiffs' counsel in the Securities Class Action identify the 'confidential witnesses' identified in the SAC so that the Committee could interview those persons, but counsel refused to do so." Beyond this feeble attempt to determine confidential witnesses' identities, however, there is no indication in the May 28, 2020 Refusal (or otherwise) that the Committee undertook any additional steps to identify and interview those persons with crucial, first-hand knowledge of the wrongdoing alleged in the Demands. Instead, the Committee proceeded without this vital information to recommend refusal of the Demands, which the Board adopted.

383. Apart from the Committee's failure to identify and interview the eight confidential witnesses whose interviews support the Securities Class Action claims,

the Committee also appears to have inexplicably failed to interview numerous current and former directors expressly identified in the Demands as responsible for the wrongdoing, including, but not limited to, Waldis, Lurie, Hovsepian, Frederick, Garcia, Hopkins, McCormick, and Moore.

384.   Indeed, aside from counsel, the Committee appears to have interviewed only *five* individuals—whereas the Demands identified ***more than nineteen*** individuals as having information relevant to the misconduct alleged in the Demands (eleven culpable wrongdoers and eight confidential witnesses).   Those persons interviewed include the Company's Corporate Controller, the Company's CTO, a former Synchronoss financial analyst , Irving, and Rosenberger.  And of those five individuals interviewed, only ***three*** are identified in the Demands as persons with relevant knowledge of the alleged misconduct.

385.   On their face then, the Refusals conclusively show the Committee failed to interview witnesses with information material to the allegations in the Demands.  The severely limited scope of the Committee's investigation thus strongly suggests that the Refusals were ill-informed and unreasonable and not undertaken in good faith.

386.   ***Third,*** the Refusals omit key details regarding the Committee's process, investigation, and reasoning leading to its conclusions that the Demands "lacked merit" and were "factually inaccurate."  For example, while the May 28,

2020 Refusal does identify specific persons interviewed by the Committee (unlike Plaintiff Laughlin's July 9, 2019 Refusal), it fails to provide any explanation as to *why* those persons (and not others) were selected to be interviewed, such that Plaintiffs have no visibility whatsoever into the Committee's inexplicable decision to interview, for example, the Company's Corporate Controller and CTO, but chose *not* to interview, *inter alia*, the eight confidential witnesses from the Securities Class Action and Defendants Waldis, Lurie, Hovsepian, Frederick, Garcia, Hopkins, McCormick, and Moore.

387.   Moreover, the Refusals refer to the Committee as having "presented its findings and recommendations to the Board," but no Committee reports, presentations, or other materials, including witness interview summaries, have been provided to Plaintiffs.  In failing to produce a report, the Company neglected to keep a proper record of its investigation to allow Plaintiffs and the Court to assess the reasonableness of the Board's methodology in investigating the Demands, and is an incurable mistake to the Refusals of the Demands because there is no adequate record of the investigation and recommendation of the Board and no evidentiary record upon which to determine whether the Board in good faith refused the Demand.

388.   In inquiring whether the Committee's investigation was sufficient, Plaintiff Thieffry in her October 2, 2019 letter asked: (i) to see copies of the

– 182 –

documents the Committee reviewed in response to Plaintiff Thieffry's Demand as well as an explanation of how these documents were selected; (ii) to see a list of people interviewed in connection with "the investigation that had been conducted previously that led to the restatement of the Company's financial results (the "Prior Investigation"); (iii) a list of materials reviewed in the Prior Investigation reviewed by the Committee, including a list of interviews reviewed; (iv) copies of any reports of investigatory findings produced by the Committee or produced during the Prior Investigation; and (v) explanations about certain conclusions such as the Committee determining that the Board "lacked knowledge that errors in the Company's financial results had occurred."  Rather than consider these requests and err on the side of transparency, the Board's response in the October 31, 2019 Letter, through counsel, outright denied these requests without any explanation.

389.  Moreover, the Refusals do not include information as to who the Committee, during its investigation, sought documents from and who provided the documents and materials the Committee reviewed.  Further, the Committee's investigation was inadequate because the Committee did not review sufficient categories of documents before it reached its conclusion.  For example, the Refusals do not mention a review any correspondence, including emails, which could potentially have valuable information regarding the claims raised in the Demands.

390.   The utter lack of transparency into the Committee's interview process as well as the document and materials reviewed process strongly suggests the Committee's investigation, and the Board's Refusals, were not reasonable and not conducted in good faith.

391.   ***Fourth,*** Defendants Waldis, Cadogan, and Hopkins are interested directors, and thus improperly participated in the Board's vote to adopt the Committee's findings and recommendations.

392.   Specifically, Defendants Waldis, Cadogan, and Hopkins voted to adopt the Committee's findings and recommendations as to the August 3, 2018 and August 6, 2018 Demands, as reflected in Plaintiff Laughlin's and Plaintiff Thieffry's respective July 9, 2019 Refusals (Plaintiff Laughlin's July 9, 2019 Refusal was incorporated into the May 28, 2020 Refusal in full).  Moreover, Defendants Waldis, Cadogan, and Hopkins also separately voted to adopt the Committee's findings and recommendations with respect to the September 5, 2019 Demand, as reflected in the May 28, 2020 Refusal.[15]

393.   But these directors—Waldis, Cadogan, and Hopkins—also made, certified, and/or approved the exact false and misleading statements challenged in

---

[15] Plaintiffs base this allegation on the fact that the Refusals of Plaintiffs' Demands allege that "the Board ***unanimously*** accepted the Committee's recommendations as in the best interests of the Company and its stockholders," and at the time of the Refusals, defendants Waldis, Cadogan, and Hopkins were all sitting Board members. *See* Exs. H, Q, U.

Plaintiffs' Demands, or were otherwise implicated in the wrongdoing detailed therein, including Waldis, Cadogan, and Hopkins.  Indeed, by way of example, Waldis, Cadogan, and Hopkins each signed the materially false and misleading 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K, and Waldis is also alleged to have made numerous false and misleading statements on conference calls with investors.

394.   Additionally, several of the directors participated in unlawful insider trading by selling millions of dollars of Synchronoss stock based on knowledge of material, non-public information, including Waldis, Hopkins, and Cadogan.

395.   *Fifth,* further eroding the Committee's ability to review the Demands is the fact that on May 29, 2020, this Court considered additional allegations substantially similar to Plaintiffs' here on defendants' motion to dismiss the SAC in the Securities Class Action, and found such allegations satisfied even the heightened pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Specifically, the Court found, *inter alia*:

> Considering the above confidential witness information collectively, the Court finds that the SAC sets forth particularized allegations that the Company and, notably, Rosenberger, improperly recognized revenue on contracts before they were signed. These particularized allegations provide, at the very least, strong circumstantial evidence that Rosenberger knew or, more importantly, should have known that [she] was misrepresenting material facts related to the Company, and thus, acted recklessly. What is clear from the information provided by the confidential witnesses is that Rosenberger knew that revenue had been recognized on certain deals, notably the $25 million and $5

– 185 –

million Verizon contracts, before the contracts were signed. Moreover, the SAC demonstrates that Rosenberger was heavily involved in the revenue recognition process. Moreover, the confidential witnesses all gave similar statements with regard to the Company's practice of requiring a signed contract for revenue to be booked, evidencing that such a practice was in place at the Company. That the confidential witnesses did not specifically allege that Rosenberger knew of that policy does not inhibit an inference of scienter—Rosenberger was the CFO of the Company and, previously the Controller, and actively participated in discussions regarding revenue recognition, and was responsible for approving such decisions. Looking to this evidence as a whole, Plaintiff has sufficiently shown that Rosenberger knew or, more importantly, should have known that revenue was being recognized prematurely. Accordingly, I find that scienter can be inferred from the confidential witness testimony pertaining to the improper recognition of revenue as to Rosenberger.

\*     \*     \*

[W]hen considered in conjunction with the confidential witness testimony recited above, the Court is satisfied that Plaintiff has demonstrated the "more" required for a GAAP violation to support an inference of scienter. Despite Defendants' assertions to the contrary, the allegations of the SAC suggest that the Company did have a policy of using written contracts and, further, that it required signed contracts for revenue to be recognized. Thus, the provisions of ASC 985-605-25-16 and -17 applied to the Company. These added allegations support a finding of scienter based on the GAAP violation.

\*     \*     \*

In sum, Plaintiff has adequately demonstrated on this motion (1) the Company had a practice of requiring written signed contracts before revenue was recognized, (2) that the Company recognized certain deals as completed before the contracts were signed, and (3) that Rosenberger was aware that such deals were recognized without a signed contract. This is sufficient to allege violations of the GAAP standard in question and, further, sufficient grounds from which to infer scienter as to Rosenberger.

– 186 –

*       *       *

The Court finds that both these theories now support a stronger inference of scienter, as Plaintiff has sufficiently alleged that Rosenberger knew that the Company had improperly recognized certain revenue without obtaining signed contacts. This allegation of knowledge is enough to meet the "more" required for a restatement of financial results to support a strong inference of scienter. It is similarly sufficient for the Court to infer scienter from the size of the contracts involved. . . . The confidential witness allegations with respect to revenue recognition demonstrate that Rosenberger knew that the Company had improperly recognized revenue on its two biggest accounts—Verizon and AT&T. That knowledge is sufficient to support an inference of scienter under this theory.

*       *       *

Taken together, the Court finds that Plaintiff's allegations with respect to Rosenberger are as compelling as any opposing inference of nonfraudulent intent. Plaintiff has sufficiently pled that, at a minimum, Rosenberger was aware that certain contracts, most notably the $25 million and $5 million Verizon contracts, were recognized prior to receipt of a signed contract on each deal. Plaintiff has further sufficiently alleged that recognition of those deals was in violation of Company policy, which required a signed contract for deal revenue to be recognized and in violation of GAAP standards. This, taken together with the large magnitude of the Restatement and the size of the contracts at issue, is sufficient to support a substantial inference of scienter as to Rosenberger.

Securities Class Action, ECF No. 91 at 23-24, 27, 29, 32, 37 (internal quotation marks and citations omitted).

396.   Thus, the very same allegations the Court reviewed and concluded were sufficiently meritorious to withstand dismissal—even under the heightened pleading standards imposed by Rule 9(b) and the PSLRA—the Committee inexplicably reviewed and prejudged as "factually inaccurate" and "lacked merit," casting

significant doubt on the reasonableness and good faith review conducted by the Committee and the Board in response to Plaintiffs' Demands.

397. **Sixth**, the Refusals fail to weigh the potential recovery from any lawsuit on the Company's behalf in reaching the determination not to pursue claims. This error is significant, particularly in light of the Court's recent order sustaining in part the SAC in the Securities Class Action. The Company has been damaged, and will continue to be damaged, by requiring representation in defending the Securities Class Action as a result of the Individual Defendants' misconduct.

398. **Seventh**, Defendant Waldis is further conflicted from reviewing the Demands because of his long-standing business relationship with Defendant McCormick, who is named in the Demands as a culpable wrongdoer. Indeed, Defendant McCormick founded Vertek, a privately held firm at which Defendant Waldis was employed from 1994 to 2000 as the company's Chief Operating Officer, as well as other roles. Later, the pair spun off a portion of Vertek to form Synchronoss. Thus, Defendant Waldis's relationship with Defendant McCormick dates back to at least 1994—roughly **25 years** prior to the first of the Demands issued. As such, Defendant Waldis was incapable of reviewing the Demands, which implicate his long-standing business partner, Defendant McCormick, among others.

*     *     *

399.    The Board has failed in every respect to properly respond to Plaintiffs' Demands.   The Board failed to commission an independent and disinterested Committee to meaningfully investigate the claims alleged in the Demands, failed to engage in a meaningful and transparent investigative process, reached inexplicable conclusions with respect to the merits of the Demands, particularly in light of this Court's order sustaining substantially similar allegations in the Securities Class Action, failed to undertake an appropriate investigation in proportion to the scope of the Demands, and failed to keep a proper record of its investigation.   As such, the Board's Refusals of the Demands were improper and directly at odds with the Board's fiduciary duties.

400.    The Board's and the Committee's actions in response to the Demands demonstrate that the Board desired to achieve one predetermined result, a refusal of the Demands.   Specifically, the Board abdicated its obligation to investigate the Demands to two conflicted Committee members the Board knew would recommend refusal.   The conflicted Committee members failed to conduct a bona-fide and independent investigation into the allegations raised in the Demands, disregarded the actual merits of the claims set forth in the Demands, and prejudged the merits of the claims set forth in the Demands without undertaking a comprehensive and proportionate investigation given the scope of and allegations in the Demands.   The entire "investigative" process was procedurally deficient and replete with conflicts

of interest.  As such, the Board's Refusals are unreasonable and uninformed, and demonstrate the Board's and the Committee's lack of diligence and good faith, and that the Refusals were not a valid exercise of business judgment.

401.  In light of the Board's unreasonable and wrongful Refusals of the Demands—not once, not twice, but three times—Plaintiffs have filed this action alleging violations of breach of fiduciary duties and unjust enrichment, and this action should be permitted to proceed.

## CAUSES OF ACTION

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties

402.  Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

403.  As alleged in detail herein, each of the Individual Defendants owed, and owe, Synchronoss and its shareholders certain fiduciary obligations, including the duties of care, loyalty, good faith, fair dealing, independence, oversight, and supervision.  These duties include the duty of full and fair disclosure to shareholders, also known as the duty of candor.  To execute this duty, the Individual Defendants were required to disseminate accurate, truthful, and complete information to shareholders at all times.

404.   In direct violation of these duties, the Individual Defendants each knowingly or recklessly issued, or approved the issuance of, false public statements to shareholders that misrepresented and/or failed to disclose material information concerning the Company's business, operations, and financial prospects, including that: (i) the Company was engaged in a regular practice of falsifying contracts with customers and booking these contracts as revenue to meet certain revenue targets; (ii) Synchronoss's Activation Business was sold to an existing vendor, *i.e.*, Sequential, that had previously been owned by several members of Synchronoss's senior management, including Defendant Waldis; (iii) Sequential is owned by Omniglobe, 50% of which is owned by friends and family of Synchronoss; (iv) the Chairman and current owner of Sequential is a related party with multiple ties to Synchronoss and Defendant Waldis; (v) Synchronoss and Sequential had a prior and existing relationship; (vi) Synchronoss and Sequential entered into a $9.2 million Licensing Agreement for the sole purpose of artificially inflating Synchronoss's financials; (vii) Synchronoss had inadequate corporate accounting and corporate financial reporting resources; (viii) Synchronoss failed to maintain effective internal controls over financial reporting; and (ix) as a result of the foregoing, Synchronoss's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.  These actions could not have

been a good faith exercise of prudent business judgment to protect and promote the best interests of the Company and its shareholders.

405.   As alleged in detail herein, each of the Individual Defendants also had a duty to exercise good faith to ensure that the Company maintained adequate internal controls.  When put on notice of problems with Synchronoss's business practices and procedures, each Individual Defendant was required to exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

406.   In direct violation of these duties, the Individual Defendants willfully ignored the obvious and pervasive problems with Synchronoss's internal control practices and procedures and failed to make a good faith effort to correct the problems or their recurrence.  As directors and/or officers of Synchronoss, the Individual Defendants were responsible for authorizing and/or failing to monitor the business practices which resulted in violations of the law as alleged herein.  Each of the Individual Defendants had knowledge of, actively participated in, approved of, or acquiesced in the wrongdoings alleged herein.

407.   As alleged in detail herein, each of the Individual Defendants also had a duty to exercise prudent oversight and supervision of Company officers and other employees to ensure that they conducted Synchronoss's affairs in conformity with all applicable laws and regulations.

408.   In direct violation of these duties, the Individual Defendants turned a blind eye to their duties of oversight and supervision, and willfully or in bad faith allowed Company officers or other employees to conduct the Company's operations in violation of applicable laws and regulations, and in a manner that grievously harmed the best interests of the Company and its shareholders, rather than protecting those interests.

409.   As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Synchronoss has sustained significant damages, not only financially, but also to its reputation, corporate image, goodwill, and ability to continue as a going concern.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

410.   Plaintiffs, on behalf of Synchronoss, have no adequate remedy at law.

## COUNT II

### Against the Demand Defendants for Breach of Fiduciary Duties

411.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

412.   The Demand Defendants acted unreasonably and in bad faith by wrongfully refusing the Demands.

413.   As a direct and proximate result of the breaches of duty alleged herein, Synchronoss has sustained, and will continue to sustain, significant damages.

414.   Plaintiffs, on behalf of Synchronoss, have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

415.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

416.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense, and to the detriment, of Synchronoss.

417.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Synchronoss.

418.   Further, the Insider Selling Defendants sold (or caused to be sold for their benefit) Synchronoss common stock while in possession of material, adverse, non-public information concerning the Company, the concealment of which artificially inflated the price of the Company's stock at the time of their sales.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their misappropriation and exploitation of material, non-public information that belonged to the Company.

419.   Plaintiffs, as shareholders and representatives of Synchronoss, seek restitution from the Individual Defendants, the imposition of a constructive trust over the Individual Defendants' proceeds from their misconduct, and/or an order

requiring the Individual Defendants to disgorge all profits, benefits, and other compensation obtained through or as a result of their wrongful conduct and fiduciary breaches.

420.   As a direct and proximate result of these Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

421.   Plaintiffs, on behalf of Synchronoss, have no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Corporate Waste

422.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

423.   As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in connection with the Securities Class Action, the Company's repurchase program, during which more than $40 million worth of the Company's stock was repurchased at artificially inflated prices, by causing the Company to expend funds in connection with restating the Company's financials, and by approving wrongful compensation to Defendants, as detailed herein.

424.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

425.   Plaintiffs, on behalf of Synchronoss, have no adequate remedy at law.

## COUNT V

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Company Information

426.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

427.   At the time the Insider Selling Defendants sold their Synchronoss stock, they were in possession of material, adverse, non-public information concerning the Company, and they sold their stock on the basis of that information.

428.   The material, adverse, non-public information at issue—which concerned the Company's financial condition, future business prospects, and the sufficiency of its Company's internal controls and accounting procedures—was a proprietary asset belonging to the Company that must be used to benefit the Company and all its shareholders on equal terms.  Instead, the Insider Selling Defendants misappropriated this information entirely for their own benefit.

429.   At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's financial condition and future business prospects, specifically related to, among other things, the Company's lack of internal controls.

430.   The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duty of loyalty and good faith.

431.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

432.   As a direct and proximate result of these Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

433.   Plaintiffs, on behalf of Synchronoss, have no adequate remedy at law.

### COUNT VI

**Against Defendant Rosenberger for Contribution Under Sections 10(B) and 21D of the Securities Exchange Act of 1934**

434.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

435.   Defendant Rosenberger is a named defendant in the Securities Class Action.

436.   This claim is brought derivatively on behalf of the Company against Defendant Rosenberger for contribution and indemnification.

437.   Synchronoss is named as a defendant in the Securities Class Action filed in this Court, asserting claims under the federal securities laws for, *inter alia*, violations of Sections 10(b) and 20(a) of the Exchange Act.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some

– 197 –

or all of the Defendants as alleged herein.  The Company is entitled to receive contribution from those Defendants in connection with the Securities Class Action against the Company currently pending in this Court.

438.   Defendant Rosenberger, as an officer of the Company, had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements about Synchronoss, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements an conduct that violated Sections 10(b) and 20(a) of the Exchange Act, as alleged above.

439.   In addition, Defendant Rosenberger is liable under 15 U.S.C. § 78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

440.   Accordingly, Synchronoss is entitled to all appropriate contribution or indemnification from Defendant Rosenberger.

## COUNT VII

### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

441.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

442.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title [15 U.S.C. § 78l]."

443.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

444.   Under the direction and watch of the Board, the 2016 Proxy Statement failed to disclose that: (i) an existing vendor (Sequential) had purchased the Company's activation business, and this existing vendor had been owned by Defendant Waldis and other members of the Company's senior management; (ii) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (iii) Sequential's current owner and Chairman is a related

party with several ties to Defendant Waldis and the Company; (iv) there was a prior and existing relationship between Sequential and the Company; (v) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (vi) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (vii) the newly acquired Intralinks was underperforming; (viii) the Company's integration of other acquisitions was underperforming; (ix) the Company was facing serious hurdles integrating and capitalizing on its newly acquired companies; (x) as such, the Company's guidance was overstated; (xi) the Company improperly recognized revenue; (xii) the Company manipulated the figures and metrics in its financial statements; (xiii) the Company's financial statements were not prepared in accordance with GAAP; (xiv) the Company failed to maintain internal controls; and (xv) as a result of the foregoing, Defendants' statements about Synchronoss's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

445.   Moreover, under the direction and watch of the Board, the 2017 Proxy Statement failed to disclose that: (i) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (ii) the Company acquired Intralinks and

misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (iii) the newly acquired Intralinks was underperforming; (iv) the Company's integration of other acquisitions was underperforming; (v) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (iv) as such, the Company's guidance was overstated; (vii) the Company improperly recognized revenue; (vii) the Company manipulated the figures and metrics in its financial statements; (ix) the Company's financial statements were not prepared in accordance with GAAP; (x) the Company failed to maintain internal controls; and (xi) as a result of the foregoing, Defendants' statements about Synchronoss's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

446.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2016 and 2017 Proxy Statements were materially false and misleading.   The misrepresentations and omissions were material to Plaintiffs and shareholders in voting on the matters set forth for shareholder determination in the 2016 and 2017 Proxy Statements, including but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

447.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 and 2017 Proxy Statements.

448.   Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## COUNT VIII

### Against the Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Exchange Act

449.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

450.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Synchronoss.   Not only is Synchronoss now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Synchronoss by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over $40 million of its own shares on the open market at artificially inflated prices, damaging Synchronoss by millions of dollars.

451.   During all relevant times hereto, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's

press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

452.   The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Synchronoss not misleading.

453.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Synchronoss.

454.   The Individual Defendants acted with scienter in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.   The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly

responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

455.   In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as senior executives or directors of the Company, as members of the Board, each of the Individual Defendants then serving as a director would have signed the Company's false and misleading Forms 10-K filed with the SEC detailed herein, including Defendants Waldis, Rosenberger, Hovsepian, Cadogan, Hopkins, McCormick, and Moore, who signed the 2016 10-K, and who also, except for Hovsepian, signed the 2014 10-K and 2015 10-K.

456.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT IX

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

457.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

458.   The Individual Defendants, by virtue of their positions at Synchronoss and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Synchronoss within the meaning of § 20(a) of the Exchange Act.  The

Individual Defendants had the power and influence and exercised the same to cause Synchronoss to engage in the illegal conduct and practices complained of herein.

## COUNT X

### Against the Individual Defendants for Abuse of Control

459.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

460.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Synchronoss, for which they were and are legally responsible.

461.   As a direct and proximate result of the Individual Defendants' abuse of control, Synchronoss has sustained significant and continues to sustain significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Synchronoss has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

462.   Plaintiffs, on behalf of Synchronoss, have no adequate remedy at law.

## COUNT XI

### Against the Individual Defendants for Gross Mismanagement

463.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

464.  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Synchronoss in a manner consistent with the operations of a publicly held corporation.

465.  As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duties alleged herein, Synchronoss has sustained and will continue to sustain significant damages.

466.  As a result of the misconduct and breaches of fiduciary duties alleged herein, the Individual Defendants are liable to the Company.

467. Plaintiffs, on behalf of Synchronoss, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' wrongdoing as alleged herein;

B.     Directing Synchronoss to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Synchronoss and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles

of Incorporation and taking such other action as may be necessary to place before

shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a provision eliminating the classification of the Board and requiring that all directors elected at or after any annual meeting, be elected on an annual basis;

- a proposal to strengthen the Company's internal reporting and financial-disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Synchronoss's directors, executives, and other employees;

- a provision to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

- a proposal to regulate the Board's future authorizations of stock repurchases;

- a proposal to regulate the Board's future authorizations of severance awards;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the shareholders of Synchronoss to nominate three candidates for election to the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test, and then strengthen, the Company's internal operational control functions.

C.      Awarding to Synchronoss restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by each of them;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E.      Declaring Plaintiffs may maintain this action on behalf of Synchronoss and that Plaintiffs are adequate representatives of the Company; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


DATED:  December 4, 2020              **THE ROSEN LAW FIRM, P.A.**

                                     */s/ Laurence M. Rosen*
                                     Laurence M. Rosen, Esq.
                                     One Gateway Center, Suite 2600
                                     Newark, NJ 07102
                                     Telephone: (973) 313-1887
                                     Facsimile: (973) 833-0399
                                     Email: lrosen@rosenlegal.com

                                     ***Co-Lead Counsel for Co-Lead Plaintiffs
                                     Laughlin and Thieffry***

**JOHNSON FISTEL, LLP**
Michael I. Fistel, Jr. (*pro hac vice*)
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
Email: MichaelF@johnsonfistel.com

*Co-Lead Counsel for Co-Lead Plaintiffs*
*Laughlin and Thieffry*

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown, Esq.
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Additional Counsel for Co-Lead Plaintiff*
*Thieffry*

**WHIPPLE AZZARELLO, LLC**
John A. Azzarello
161 Madison Avenue, Suite 325
Morristown, NJ 07960
Telephone: (973) 267-7300
Facsimile: (973) 267-0031
Email: azzarello@whippleazzarellolaw.com

*Liaison Counsel for Co-Lead Plaintiff*
*Laughlin*

## **VERIFICATION**

I, Kirk Laughlin, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of December, 2020.

DocuSigned by:

*Kirk Laughlin*

3C3238817C1B473...

Kirk Laughlin

DocuSign Envelope ID: F1AE12C9-998A-4843-9672-6C19A01A0ADA

## **VERIFICATION**

I, Patricia Thieffry, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of December, 2020.

Patricia Thieffry