# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE SYNCHRONOSS TECHNOLOGIES, INC. STOCKHOLDER DERIVATIVE DEMAND REFUSED LITIGATION, | Lead Case No.: 3:20-cv-7150-FLW-LHG |
|  | (Consolidated with Case No.: 3:20-cv-07224) |
| This Document Relates to: | **PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT AND THE POST-DISCLOSURE DEFENDANTS' MOTION TO DISMISS THE VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** |
| All Actions |  |

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................2

STATEMENT OF FACTS .........................................................................................6

   I.  Substantive Allegations ....................................................................................6

     A. Background ..................................................................................................6

     B. The Individual Defendants' Fraudulent Misconduct.................................7

        1.  Premature and Fraudulent Revenue Recognition Practices................7

          i.   The AT&T and Verizon "Contracts" ................................................8

          ii.  The Friends and Family Sale ...........................................................9

          iii. The Licensing Agreement................................................................11

        2.  The Individual Defendants' False and Misleading Statements .........12

        3.  The Company Was Forced to Buy Back Its Own Shares at
            Artificially Inflated Prices While the Insider Sellers Dumped Their
            Synchronoss Stock ...........................................................................13

     C. The Fallout ................................................................................................13

     D. The Underlying Claims Survive Defendants' Challenges Under a
        Heightened Pleading Standard in the Securities Class Action................14

   II. The Board Wrongfully Refused Plaintiffs' Demands on the Board to
      Bring Suit in Response to the Individual Defendants' Fraudulent Activity
      ......................................................................................................................15

     A. The Initial Demands ..................................................................................15

     B. The Investigation ......................................................................................16

     C. The July 9, 2019 Refusals ........................................................................16

     D. Follow-Up to the July 9, 2019 Refusals...................................................17

E.  The May 28, 2020 Refusal ...........................................................................18

ARGUMENT .....................................................................................................19

I.  Standard Governing Demand Refusal .......................................................19

II. The Board's Refusals Are Not Entitled to Protection Under the Business
Judgement Rule ...........................................................................................22

A. Plaintiffs Do Not Concede That the Board Acted Independently in
Considering Plaintiffs' Demands .............................................................23

B. Plaintiffs Have Alleged that the Board Failed to Comply with its Duty of
Care ...........................................................................................................31

C. Plaintiffs Have Adequately Alleged That the Board Failed to Comply
with its Duty of Loyalty............................................................................35

CONCLUSION....................................................................................................40

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Cases</u>

*Andersen v. Mattell, Inc.*,
 2017 WL 218913 (Del. Ch. Jan. 19, 2017)............................................................26

*Aronson v. Lewis*,
 473 A.2d 805 (Del. 1984) .....................................................................................20

*Barovic v. Ballmer*,
 72 F. Supp. 3d 1210 (W.D. Wa. 2014) ........................................................ 31, 34

*Brehm v. Eisner*,
 746 A.2d 244 (Del. 2000) .....................................................................................21

*City of Orlando Police Pension Fund v. Page*,
 970 F. Supp. 2d 1022 (N.D. Cal. 2013)....................................................... passim

*City of Tamarac Firefighters' Pension Trust Fund v. Corvi*,
 2019 WL 549938 (Del Ch. Feb. 12, 2019) ............................................ 24, 25, 26

*Daily Income Fund, Inc. v. Fox*,
 464 U.S. 523 (1984)..............................................................................................19

*FLI Deep Marine LLC v. McKim*,
 2009 WL 1204363 (Del. Ch. April 21, 2009) .....................................................25

*Friedman v. Maffei*,
 2016 WL 1555331 (Del. Ch. April 13, 2016) ............................................. 31, 33

*Gentile v. Rossette*,
 2010 WL 2171613 n.36 (Del. Ch. May 28, 2010)................................................30

*Grimes v. Donald*,
 673 A.2d 1207 (Del. 1996) ......................................................... 20, 23, 31

*Hughes v. Hu*,
  2020 WL 1987029 (Del. Ch. Apr. 27, 2020) ........................................................38

*In re Cardinal Health, Inc. Derivative Litig.*,
  2021 WL 425966 (S.D. Ohio Feb. 8, 2021) ........................................................21

*In re Home Depot, Inc. S'holder Deriv. Litig.*,
  223 F. Supp. 3d 1317 (N.D. Ga. 2016).................................................................21

*In re Par Pharmaceutical, Inc. Derivative Litig.*,
  750 F. Supp. 641 (S.D.N.Y. 1990) ......................................................................38

*Ironworkers Dist. Council of Phil. & Vicinity Ret. & Pension Plan v. Andreotti*,
  2015 WL 2270673 (Del. Ch. May 8, 2015).........................................................20

*Kaplan v. Peat, Marwick, Mitchell & Co.*,
  540 A.2d 726 (Del. 1988) ....................................................................................19

*Levine v. Liveris*,
  216 F. Supp. 3d 794 (E.D. Mich. 2016) ..............................................................25

*London v. Tyrrell*,
  2010 WL 877528 (Del. Ch. Mar. 11, 2010) ........................................................30

*Morefield v. Bailey*,
  959 F. Supp. 2d 887 (E.D. Va. 2013) ..................................................................26

*Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*,
  66 A.3d 963 (Del. Ch. 2013) ...............................................................................19

*Scattered Corp. v. Chicago Stock Exch., Inc.*,
  701 A.2d 70 (Del. 1997) ........................................................................ 21, 23, 24

*Smith v. Van Gorkom*,
  488 A.2d 858 (Del. 1985) ....................................................................................29

*Spiegel v. Buntrock*,
  571 A.2d 767 (Del. 1990) ....................................................................................22

*Stepak v. Addison*,
  20 F.3d 398 (11th Cir. 1994) ...................................................................29

*Thorpe v. CERBCO, Inc.*,
  611 A.2d 5 (Del. Ch. 1991) ......................................................... 25, 38

## **Rules**

Fed. R. Civ. P. 15(a)(2)................................................................................40

Plaintiffs Kirk Laughlin ("Laughlin") and Patricia Thieffry ("Thieffry" and together with Laughlin, "Plaintiffs") respectfully submit this omnibus memorandum in opposition to: (1) the Motion to Dismiss the Verified Consolidated Amended Shareholder Derivative Complaint (the "Motion")[1] filed by defendants Stephen G. Waldis ("Waldis"), William J. Cadogan ("Cadogan"), Thomas J. Hopkins ("Hopkins"), James M. McCormick ("McCormick"), Donnie M. Moore ("Moore"), Robert E. Garcia ("Garcia"), Lawrence Irving ("Irving"), Ronald W. Hovsepian ("Hovsepian"), Karen L. Rosenberger ("Rosenberger"), Charles E. Hoffman ("Hoffman"), and John Frederick ("Frederick") (the "Individual Defendants") and nominal defendant Synchronoss Technologies, Inc. ("Synchronoss" or the "Company"); and (2) the Post-Disclosure Defendants' Motion to Dismiss the Derivative Complaint ("Post-Disclosure Defendants' Motion") filed by defendants Kristin Rinne ("Rinne"), Glenn Lurie ("Lurie"), Laurie Harris, Frank Baker, Robert Aquilina, Mohan Gyani, and Peter Berger ("Post-Disclosure Defendants" and together with the Individual Defendants, "Defendants").[2]

---

[1] Citations to the Motion (Dkt. No. 19-1) appear as "Mot. at [page number]."

[2] Plaintiffs do not challenge the Post-Disclosure Defendants' Motion with respect to Counts I and III-XI.  Citations to the Post-Disclosure Defendants' Motion (Dkt. No. 20-1) appear as "Post-Disclosure Defs.' Mot. at [page number]."

As discussed herein, Plaintiffs' Verified Consolidated Amended Shareholder Derivative Complaint (the "Amended Complaint")[3] (Dkt. No. 15) raises a reasonable doubt as to the good faith and/or reasonableness of Synchronoss's Board of Directors (the "Board") and/or the Board's Demand Review Committee (the "Committee") in connection with its purported investigation conducted in response to both Plaintiff Thieffry's pre-suit shareholder demand issued on August 3, 2018 (the "Thieffry Demand") and Plaintiff Laughlin's pre-suit shareholder demand issued on August 6, 2018 and supplemented on September 2, 2019 ("Laughlin Demands" and together with the Thieffry Demand, the "Demands").  Accordingly, the Motion should be denied in its entirety, and the Post-Disclosure Defendants' Motion should be denied with respect to Count II.

## **INTRODUCTION**[4]

This Action arises from the Board's improper refusals of Plaintiffs' Demands, which called on the Board to remedy breaches of fiduciary duty and other violations of law that resulted in a massive restatement of Synchronoss's financials for fiscal years 2014 to 2016 (collectively, the "Restatement"). The Restatement reduced the Company's cumulative revenues by nearly *$180 million*, and led to the replacement of the Company's Chief Executive Officer ("CEO") and Chief Financial Officer

---

[3] Citations to exhibits to the Amended Complaint appear as "Am. Compl., Ex.___."
[4] All emphasis is added and citations omitted, unless otherwise stated.

("CFO"), among others, and the delisting of the Company's shares from NASDAQ. The Demands detailed the Company's long-standing pattern of fraudulent revenue recognition that was designed to portray the Company's cloud services business ("Cloud Services Business") as rapidly growing just as the Company was attempting to rebrand itself as a leading cloud services provider. Specifically, during the relevant period, Defendants falsely and prematurely recognized revenue from various "contracts" with its largest customers—AT&T Wireless ("AT&T") and Verizon Wireless ("Verizon")—which were either non-existent, unsigned, or undocumented. While Defendants' fraudulent revenue recognition scheme was ongoing, Defendants also nearly gave away its highly profitable Activation Business to their friends and family, not for a "cash payment of $146 million," as investors were initially told, but for a paltry $17.33 million in cash, with the Company financing the remainder (the "Activation Sale"). In connection with the Activation Sale, the Company entered into a $9.2 million licensing agreement with Sequential Technology Holdings, LLC ("Sequential") for the use of the Company's analytics software ("Licensing Agreement"). The Individual Defendants fraudulently caused the Company to recognize the Licensing Agreement as revenue in order to meet its guidance (despite investigative reporters referring to the deal as a "noncash IOU"), and the existence of which Defendants did not even disclose to investors until months later.

3

Defendants were forced to come clean in the Restatement, in which the Company **_admitted_** that it had improperly recognized revenue in violation of generally accepted accounting principles ("GAAP") and had identified a material weakness in the Company's internal control over financial reporting relating to its revenue recognition process.  The Company also fired four non-officer employees and hired a new CEO, CFO, and other employees with responsibilities related to revenue recognition.

Not long thereafter, the Company found itself defending itself and certain of the Defendants for the above misconduct in the related securities class action captioned *In re Synchronoss Technologies, Inc., Securities Litigation*, No. 3:17-cv-02978-FLWLHG (D.N.J.) (the "Securities Class Action").

Notwithstanding the Company's admissions of wrongdoing in the Restatement, the Committee, appointed by the Board to investigate the Demands, remarkably found Synchronoss's directors or officers were in no way culpable for the Company's fraudulent revenue recognition or misstatements and omissions regarding the conflicted nature and terms of the Activation Sale and the Licensing Agreement.  The Board then accepted the Committee's findings, adopted the Committee's recommendation, and refused Plaintiffs' Demands.

Defendants now assert that the Court must honor the Board's decision, claiming it is protected by the business judgment rule.  But the business judgment

4

rule does not offer a free license for directors to refuse any and all demands made on a board of directors on any basis.  Instead, protection of the business judgment rule is contingent on the Board having carried out its obligation to investigate the demand with good faith and due care, which this Board utterly failed to do.

Although a majority of the Board was independent and could have considered the Demands, the Board empowered a biased and conflicted two-person Committee to investigate the Demands.  Specifically, the Board gave full authority to investigate the Demands to defendant Cadogan—one of the alleged wrongdoers in the Demands—and defendant Rinne—who had maintained a *15-year-long* relationship with another named wrongdoer, defendant Lurie.  Notably, despite Plaintiffs' repeated requests, the Board refused to provide an explanation of its determination that defendants Cadogan and Rinne were disinterested and independent under Delaware law.  The biased and conflicted Committee then limited its investigation to sources that supported its desired conclusion—that no wrongdoing occurred—and inexplicably failed to interview relevant persons named in the Demands or the witnesses whose personal accounts bolster the allegations in the Securities Class Action.

Worse still, despite Plaintiffs' repeated calls for transparency into the investigation, the Board has refused outright to provide Plaintiffs with a copy of the Committee's report.  Indeed, Defendants essentially ask that Plaintiffs and the Court

take as a matter of faith that they undertook the investigation of the Demands in good faith and with due care, rather than as a reasoned analysis of the facts of this case—a move which numerous courts applying Delaware law have found highly suspect. As a result, Plaintiffs have no visibility into the documents reviewed by the Committee or the Committee's decision-making process in determining that the claims "lacked merit" and that the Board "lacked knowledge that errors in the Company's financial results had occurred," ultimately recommending refusal of the Demands.  Considering the Company's prior admissions in the Restatement, no reasonable person acting in good faith and with due care could have reached these conclusions.

For these reasons, and the reasons that follow, the Motion should be denied in its entirety, the Post-Disclosure Defendants' Motion should be denied with respect to Count II, and the action should proceed.

## **STATEMENT OF FACTS**

### I.    **Substantive Allegations**

#### A.    **Background**

Synchronoss was founded in 2000, and at that time, consisted solely of a business segment that provided cellphone suppliers, namely AT&T and Verizon, with technology software licenses that enabled consumers to activate cell phones and provided data storage and backup functions (the "Activation Business"). ¶¶ 2,

67-69.[5]  By 2005, Synchronoss derived 80% of its revenues from the Activation Business servicing AT&T consumers.  ¶68.

In or around 2010, the Company entered the Cloud Services Business, which enabled users to store, manage, and process vast amounts of data without having to store it on local servers or personal computers, and shortly thereafter, began to rebrand itself as a cloud services market leader.  ¶¶2, 76-77.  Consistent with that effort, the Company restructured management's compensation to track the success of the Cloud Services Business.  ¶¶3, 77.

**B.    The Individual Defendants' Fraudulent Misconduct**

**1.    Premature and Fraudulent Revenue Recognition Practices**

Predictably, just after Synchronoss restructured management's compensation, the Cloud Services Business surpassed the Activation Business and accounted for a greater portion of Synchronoss's revenue.  ¶76.  Indeed, on paper at least, the Cloud Services Business experienced astronomical growth in revenue, growing 115% in the third quarter of 2014, 43% in 2015, 18% year-over-year for the first quarter of 2016, and 33%, 34%, and 36% for the second, third, and fourth quarters of 2016, respectively.  ¶¶77-78.  In truth, however, the Individual Defendants manufactured the impressive growth with their fraudulent revenue recognition practices, detailed below.

---

[5] Citations to "¶ __" and "¶¶ __" refers to the Amended Complaint.

7

### i.     The AT&T and Verizon "Contracts"

During fiscal years 2014 through 2016, while publicly representing that Synchronoss recognized transaction revenues "based on the total number of transactions processed at the applicable price established in the relevant contract" and subscription revenues "on a straight-line basis over the life of the contract or on a fixed monthly fee based on a set contracted amount" (¶¶86-87), in actuality, immediately before the close of a fiscal quarter, the Individual Defendants caused the Company to recognize revenue fraudulently from its contracts with its largest customers.

Specifically, in late 2015, Synchronoss improperly booked $7 million in revenue associated with two AT&T transactions that never materialized (¶102), and in 2016, inappropriately recorded cloud software licensing revenues derived from $25-million-dollar and $5-million-dollar "contracts" with Verizon at a time when neither contract was signed.  ¶¶106, 114.  This enabled the Individual Defendants to continue misrepresenting the Company's purported cloud growth and meet its guidance in those years.  ¶¶5-7, 102, 106, 114.

The Company's fraudulent revenue recognition from these purported contracts constituted violations of GAAP, Accounting Standards Codification

("ASC") 985-605-25-3, 985-605-25-16, and 985-605-25-17, and the Company's policies. ¶¶90-99,102-116.[6]

### ii.    The Friends and Family Sale

With the Activation Business eclipsed (on paper) by the Company's Cloud Services Business, on November 7, 2016, the Company announced that it was evaluating strategic alternatives for the Activation Business supposedly to enhance shareholder value. ¶9. Unbeknownst to investors, however, the Company was already in negotiations with Intralinks Holdings, Inc. ("Intralinks"), a cloud-computing content manager and service provider, regarding a potential acquisition as part of Synchronoss's strategy to expand its cloud initiatives. ¶¶9, 208.

On December 6, 2016, Defendants announced that Synchronoss would divest 70% of its Activation Business to Sequential, and in return, Sequential would provide a "cash payment of $146 million" to Synchronoss as part of the Activation Sale. ¶¶9, 134. More specifically, Synchronoss was to transfer its Activation Business to a newly formed entity, Sequential Technology, Inc. ("STI"), and

---

[6] It was not long until the U.S. Securities and Exchange Commission ("SEC") took note of the Company's questionable revenue recognition practices. On September 2, 2016, the SEC issued a letter to the Company, questioning its revenues derived from its largest customers and requesting the Company disclose its contracts with Verizon as exhibits to future filings. ¶117. Synchronoss refused to comply with these requests. ¶118. The SEC issued follow-up correspondence dated September 22, 2016, in response to which the Company again declined to publicly file any of the requested contracts—indeed, because there were none. ¶¶119-120.

Sequential would then acquire a 70% interest of STI while Synchronoss retained a 30% interest.  ¶¶134-135, 147-149.  With proceeds from the Activation Sale, and $900 million in possible financing from various banks, the Company would then purchase all outstanding shares of Intralinks at $13.00 per share for around $821 million, and Intralinks would become Synchronoss's wholly owned subsidiary. ¶¶10, 136.

Investors later learned from an investigative report by the Southern Investigative Reporting Foundation ("SIRF") published on February 24, 2017 ("SIRF Report")—*after* the deal closed—that the Activation Sale was practically a giveaway of the Activation Business to the Individual Defendants' friends and family.  ¶11.  Indeed, according to the SIRF Report, Sequential was formerly Omniglobe International, LLC ("Omniglobe"), which was partly owned by friends and family of Defendants Waldis, Irving, and Garcia, and non-party David Berry (the "Synchronoss Insiders").  ¶¶9, 12.  The Synchronoss Insiders attempted to conceal their ownership of Omniglobe, however, by holding shares indirectly through an entity called Rumson Hitters LLC ("Rumson Hitters").  ¶¶70-72, 143-144.  Further, STI was a corporate shell formed the month before the announcement

of the Activation Sale by Defendant Waldis's former next-door neighbor and member of the Waldis Family Foundation Board, John Methfessel.[7]  ¶149.

On February 27, 2017, days after the SIRF Report, Synchronoss finally disclosed that despite having previously stated it would receive a "***cash payment of $146 million***," from Sequential, Sequential in fact paid only $17.33 million in cash up front and $7.7 million in unspecified "contributed assets," with the remaining $83 million financed by Synchronoss via a promissory note.  ¶¶13, 16, 151.  Worse still, the $146 million represented the Activation Business's total value, not just the 70% interest sold to Sequential.  ¶13.  Thus, the Company's entire Activation Business had been sold to Synchronoss Insiders' friends and family for a payment of ***only*** $17.33 million, with the rest financed by the Company.  ¶13.

### iii.   The Licensing Agreement

Also hidden from the investing public was the fact that with just days left in the fourth quarter of 2016, in connection with the Activation Sale, the Company entered into the $9.2 million Licensing Agreement with Sequential for use of the Company's analytics software.  ¶¶14, 128.  Sequential paid for the Licensing Agreement with a promissory note, which the Individual Defendants falsely booked

---

[7] Tom Miller, another member on the Board of the Waldis Family Foundation who went to school with Defendant Waldis at Seton Hall University, was STI's chief strategy officer.  ¶150.

as revenue in violation of GAAP.  ¶14.  The Licensing Agreement enabled the Company to meet its forecasted Cloud Services Business revenue ranging from $122 million to $125 million.  ¶129.

The Individual Defendants concealed this deal for months until February 27, 2017, when the Company filed its annual report for fiscal year 2016, in which the Company stated, for the *first* time, that it had "entered into a non-exclusive perpetual license agreement with [Sequential], in the amount of $9.2 million."  ¶¶128-131.

### 2.    The Individual Defendants' False and Misleading Statements

While the Individual Defendants were committing the foregoing fraudulent practices, in various of the Company's filings with the SEC (including quarterly reports on Form 10-Q, annual reports on Form 10-K, proxy statements, and press releases) and on earnings calls with analysts, they misrepresented and/or failed to disclose, *inter alia*, that: (i) revenues for the Cloud Services Business were in fact caused by improper recognition of revenue via falsified contracts (¶¶152-191); (ii) the conflicted nature and true terms of the Activation Sale and the Intralinks Acquisition, as well as Intralinks' performance after the Intralinks Acquisition (¶¶192-207); and (iii) the Company's financial statements were prepared in accordance with GAAP, internal controls were enhanced to ensure they remained effective, and the Company followed specific guidelines with respect to revenue recognition. *See, e.g.*, ¶¶163-164, 168, 170, 181.

### 3. The Company Was Forced to Buy Back Its Own Shares at Artificially Inflated Prices While the Insider Sellers Dumped Their Synchronoss Stock

While the Company's stock price was artificially inflated as a result of the above misstatements and omissions, Defendants Waldis, McCormick, Moore, Hopkins, Cadogan, Rosenberger, and Hoffman caused the Company to buy back over ***$40 million*** dollars' worth of stock at artificially high prices, thereby further propping up the Company's stock price. ¶261.

At roughly the same time, these same defendants and defendant Garcia (the "Insider Sellers") took advantage of the Company's soaring stock price and liquidated their personal holdings of Synchronoss stock based on inside information regarding the Company's fraudulent practices detailed herein. ¶¶65, 261-285.

### C. The Fallout

Investors learned of the conflicted nature of the Activation Sale on February 24, 2017 when the SIRF Report disclosed the relationship between the Synchronoss Insiders, Omniglobe, Sequential, and STI, including that 50% of Omniglobe was "owned by friends and family of Synchronoss." ¶¶ 11, 215. The true terms of the Activation Sale were revealed days later, on February 27, 2017, when the Company disclosed that it had "entered into a non-exclusive perpetual license agreement with [Sequential], in the amount of $9.2 million." ¶218. From that point, the Company

witnessed its share price decline sharply, wiping out hundreds of millions in shareholder equity.  ¶¶221, 225.

Thereafter, the Company notified the SEC of its inability to timely file certain public filings, and through a series of announcements, disclosed the need to restate its finance statements for fiscal years 2014 through 2016.[8]  ¶¶234-256.

The consequences of the Restatement were catastrophic—while Synchronoss reported net income from operations from 2014 through 2016 of $93.5 million, in reality, it had a cumulative loss during that time of $40 million (a difference of $134 million, or a 143% decrease in net income) and suffered a downward adjustment in revenue of $180 million.  ¶¶253, 255.  The Restatement also admitted that the Company "identified a material weakness in internal control over financial reporting relating to its revenue recognition process" and that "[i]t is possible the Company may identify additional material weaknesses."  ¶234.

### D.   The Underlying Claims Survive Defendants' Challenges Under a Heightened Pleading Standard in the Securities Class Action

As a result of the above misconduct, the Securities Class Action against the Company was instituted, relying on witness accounts of eight individuals.  ¶¶257,

---

[8] The Restatement consists of several disclosures filed on Forms 10-Q, 10-K, and 10-K/A with the SEC that contained restated financial information for fiscal years 2014 through 2016, which include the Company's SEC filings dated July 2, 2018 and July 9, 2018.  ¶247.

259.   On May 29, 2020, the Court denied defendants' motion to dismiss in the Securities Class Action, finding plaintiff had overcome the heightened pleading requirement of the Private Securities Litigation Reform Act of 1995 and that the Company had a practice of recognizing revenue before contracts were signed in violation of GAAP, of which Defendant Rosenberger was aware.  ¶260.

## II.   The Board Wrongfully Refused Plaintiffs' Demands on the Board to Bring Suit in Response to the Individual Defendants' Fraudulent Activity

### A.   The Initial Demands

On August 3, 2018, Plaintiff Thieffry served Plaintiff Thieffry's Demand on Synchronoss's Board to investigate the misconduct and violations of law described herein.  ¶366.  On August 6, 2018, Plaintiff Laughlin served a similar shareholder demand on the Board. ¶337.

The Demands described misconduct relating to improper revenue recognition that occurred throughout 2015 and 2016, and which ultimately forced the Company to restate its previously filed financial statements for those fiscal years.  *See* Am. Compl., Ex. A, R.  The Demands requested that the Board commence a civil action against the following current and former officers and directors: Waldis; Lurie; Hovsepian;   Rosenberger;   Frederick;   Garcia;   Irving;   Cadogan;   Hopkins; McCormick; and Moore.  *Id*.

**B.    The Investigation**

In response to the Demands, the Board created the Committee comprised of defendants Cadogan and Rinne to purportedly investigate the claims and recommend action to the full Board.  ¶¶343, 341, 347.  Both defendants Cadogan and Rinne, however, were conflicted and unable to independently consider the Demands.  ¶374.  Defendant Cadogan was named as a wrongdoer in the Demands based on his participation in the underlying misconduct.  ¶¶218, 246, 261, 455.  Defendant Cadogan also engaged in insider sales during the relevant period, netting total illicit proceeds of approximately $2.5 million.  ¶275.  Defendant Rinne was conflicted based on her long-standing, fifteen-year relationship with another wrongdoer named in the Demands, defendant Lurie.  ¶375.

**C.    The July 9, 2019 Refusals**

After multiple written exchanges following the Demands, on July 9, 2019, the Board informed Plaintiff Laughlin and Plaintiff Thieffry, in separate letters, that it would not pursue legal action (the "July 9, 2019 Refusals").  ¶¶347, 369.

According to the July 9, 2019 Refusals, the Committee concluded that the "conduct described in the Demand . . . was factually inaccurate with respect to the allegations of wrongdoing" and the claims asserted in the Demand "lacked merit."  ¶349.  Additionally, the Committee found that no member of management was involved in misconduct and that there was no evidence that management or the

16

Board was aware of any misconduct relating to the accounting fraud detailed above. *Id*. The Committee also found that Board lacked knowledge that errors in the Company's financial results had occurred. *Id*.

These exculpatory conclusions were somehow reached despite the fact that the Company took certain actions to remediate "prior accounting errors," including "fir[ing] four non-officer employees for actions related to the accounting errors" and retaining a "***new CEO and CFO, as well as other employees with responsibilities related to revenue recognition***." ¶350. Moreover, despite the denials of wrongdoing, the July 9, 2019 Refusals noted that, based on the investigation, the Committee had "recommended that the Board direct the Compensation Committee to ***review the Company's insider trading policies.***" *Id*.

### D.    Follow-Up to the July 9, 2019 Refusals

Given the complete lack of information concerning the July 9, 2019 Refusals, on October 2, 2019, Plaintiff Thieffry requested, *inter alia*, copies of any reports produced by the Committee, copies of documents that the Committee reviewed, a list of people interviewed and materials reviewed, and explanations about certain conclusions reached by the Committee. ¶388. The Board summarily denied Plaintiff Thieffry's request on October 31, 2019. ¶371, Am. Compl., Ex. W.

On September 5, 2019, Plaintiff Laughlin supplemented the August 6, 2018 Demand with new allegations from the operative complaint in the Securities Class

Action (the "September 5, 2019 Demand"). ¶352. Plaintiff Laughlin also requested copies of the documents reviewed in connection with the July 9, 2019 Refusal and documents that would be reviewed in connection with the September 5, 2019 Demand. *Id.*

Corporate counsel twice denied Plaintiff Laughlin's requests for documents on September 26, 2019 and again on December 13, 2019, advising that the Committee "d[id] not believe that it is legally required to provide" documents concerning investigations into Plaintiff Laughlin's Demands. ¶¶353, 355.

### E.    The May 28, 2020 Refusal

On May 28, 2020, corporate counsel informed Plaintiff Laughlin that with respect to the September 5, 2019 Demand, the same Committee recommended to the Board that "it would not be in the best interests of the Company and its stockholders to pursue any litigation in response to the [September 5, 2019 Demand]," which the Board adopted (the "May 28, 2020 Refusal"). ¶362.

According to the May 28, 2020 Refusal, the Committee reviewed additional documents and materials while conducting interviews of certain counsel and employees at the Company. ¶363. The May 28, 2020 Refusal shows, however, that the Committee made little to no attempt to interview the eight confidential witnesses whose accounts are relied upon in the Securities Class Action or individuals with similar duties, nor were numerous directors and officers expressly identified in the

18

Demands as responsible for the misconduct interviewed, including Defendants Waldis, Lurie, Hovsepian, Frederick, Garcia, Hopkins, McCormick, and Moore. ¶365. Indeed, in total, the Demands identified more than nineteen individuals as having information relevant to the misconduct alleged in the Demands, only three of whom were interviewed by the Committee. ¶384.

Following this purported investigation, the Committee again determined the September 5, 2019 Demand "was factually inaccurate with respect to allegations of wrongdoing and lacked merit" and found that no member of management or the Board was involved in or knew of any misconduct leading to the Restatement. ¶364.

## **ARGUMENT**

## I.      **Standard Governing Demand Refusal**

When served with a shareholder demand, directors cannot remain "neutral" and take no position. *See Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 731 (Del. 1988). Instead, "the board has an affirmative duty to evaluate the demand and to determine if the litigation demanded is in the best interest of the stockholders." *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 976 (Del. Ch. 2013). If the board accepts the demand, it assumes control of the derivative claims. *See Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 533 (1984). If, however, the board rejects the demand, the shareholder can still challenge the board's decision and bring a lawsuit on behalf of the corporation. The shareholder "does not, by making demand,

waive the right to claim that demand has been wrongfully refused." *Grimes v. Donald*, 673 A.2d 1207, 1218-19 (Del. 1996), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

If, after a board's rejection of a demand, a shareholder decides to proceed with the action, the shareholder must demonstrate that the board's decision to reject the demand was not protected by the business judgment rule. The "business judgment rule" is a "presumption that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). A plaintiff can rebut this presumption by alleging facts that raise a reasonable doubt that: (1) the board acted on an informed basis, consistent with its duty of care; or (2) the board acted in good faith, consistent with its duty of loyalty. *Ironworkers Dist. Council of Phil. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *25 (Del. Ch. May 8, 2015).

The Delaware Supreme Court explained that "the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule." *Grimes*, 673 A.2d at 1217 n.17. A shareholder can demonstrate "reasonable doubt that demand was properly refused" by alleging that the Board "was biased, lacked independence, or failed to conduct a reasonable investigation."

*Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 75 (Del. 1997), *overruled on other grounds*, *Brehm*, 746 A.2d 244 (emphasis added).

Notably, under Delaware law, "the plaintiff is *not* required to plead evidence." *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) (emphasis added). Further, in ruling on a motion to dismiss, the Court must accept as true all the Complaint's allegations and the reasonable inferences that logically flow from them. *Id.* at 255.[9]

_____

[9] Contrary to the Post-Disclosure Defendants' conclusory assertions that Plaintiffs "impermissibly lump together the Post-Disclosure Defendants . . . without setting forth any specific allegation" as to those defendants (*see* Post-Disclosure Defs.' Mot. at 6-7), the Amended Complaint's allegations of *all* Defendants' breaches of loyalty are well-pled. *See, e.g.*, ¶¶374-75 (specific allegations against defendant Rinne, including her fifteen-year-long professional relationship with defendant Lurie); ¶¶376-77 (specific allegations against defendant Cadogan); ¶¶391-94 (specific allegations against defendants Waldis, Cadogan, and Hopkins and their interest in the underlying claims); ¶398 (specific allegations against defendants Waldis and McCormick with respect to their long-standing business relationship). And where Plaintiffs alleged failures on the Committee's part as a whole (*see, e.g.*, ¶380 (alleging Committee's failure as a whole to interview relevant persons)), these allegations are sufficient because the Committee's members are all similarly situated, such that there is no practical need to recite the same allegations as to each Committee member. *See In re Home Depot, Inc. S'holder Deriv. Litig.*, 223 F. Supp. 3d 1317, 1325 (N.D. Ga. 2016) (applying Delaware law, noting "a number of District Courts have [addressed group pleading], and all of them have at least said that group pleading is not *per se* insufficient," and clarifying that "[a]s long as the defendants are 'similarly situated,' group pleading may be enough."); *see also In re Cardinal Health, Inc. Derivative Litig.*, 2021 WL 425966, at *14 (S.D. Ohio Feb. 8, 2021) (analyzing board members as a group and noting that a director-by-director analysis is not required).

## II.     The Board's Refusals Are Not Entitled to Protection Under the Business Judgement Rule

In considering the Demands, the Board did not act independently, on an informed basis, or in good faith.  As explained below, the Board empowered a biased and conflicted Committee to conduct the investigation and recommend action to the full Board.  The Committee then limited its investigation to witnesses and documents that would support its desired conclusion—that no wrongdoing occurred—which was contradicted by the Company's own prior admissions. The Board has since shielded its investigation from scrutiny by refusing to provide any reports or documentation to support its conclusion.  For all these reasons, and others, the Amended Complaint raises reasonable doubt that the Demands were properly refused, and the Board's decision is not protected by the business judgment rule.[10]

_____

[10] The Post-Disclosure Defendants argue that the Amended Complaint "fails to adequately plead that any of them had any reason to have breached their fiduciary duties with respect to their assessment of Plaintiffs' Demands" because, according to the Post-Disclosure Defendants, "Plaintiffs' Demands all relate to alleged misconduct that pre-dated the Post-Disclosure Defendants' affiliation with the Company."  Post-Disclosure Defs.' Mot. at 6-7.  As an initial matter, the Post-Disclosure Defendants cite to no authority whatsoever supporting their position, nor are Plaintiffs aware of any.  Rather, a claim for wrongful refusal is separate and independent from any claims tied to the underlying misconduct. *See Spiegel v. Buntrock*, 571 A.2d 767, 775-76 (Del. 1990) (wrongful refusal decision subject to judicial review).  Moreover, the Post-Disclosure Defendants' argument wholly ignores the plethora of allegations in the Amended Complaint supporting Plaintiffs' claim that the Refusals were wrongful, which, as discussed herein, apply equally to all members of the Board, regardless of the date on which they became a Board

### A.     Plaintiffs Do Not Concede That the Board Acted Independently in Considering Plaintiffs' Demands

Defendants claim that by serving the Demands, Plaintiffs have waived their right to allege that a majority of the Board was not independent or disinterested for purposes of considering the Demands. *See* Mot. at 29-30.  This argument is without merit.

While a shareholder may concede that the board is facially independent at the time of making the demand, "[i]t is not correct that a demand concedes independence 'conclusively' and *in futuro* for all purposes relevant to the demand." *Scattered Corp.*, 701 A.2d at 74-75.  Rather, if a demand is made, the shareholder has only conceded the right to claim that demand is excused, not the right to claim that the seemingly independent board failed to act independently or with due care in response to the demand. *Id.*

As the Delaware Supreme Court explained in *Grimes*, "[s]imply because the composition of the board provides no basis *ex ante* for the stockholder to claim . . . that it is reasonable to doubt that a majority of the board is either interested or not independent, it does not necessarily follow *ex post* that the board in fact acted independently, disinterestedly or with due care in response to the demand." *Grimes*,

---

member.  Thus, the Post-Disclosure Defendants are equally complicit in and liable for the Board's wrongful Refusals for the reasons discussed in this Section.

673 A.2d at 1219. The "[f]ailure of an otherwise independent-appearing board or committee to act independently is a failure to carry out its fiduciary duties in good faith or to conduct a reasonable investigation," and such a "failure could constitute wrongful refusal." *Scattered Corp.*, 701 A.2d at 75. Thus, in demand-refused cases, the Court "must consider allegations of director bias or self-interest when evaluating whether a board or committee acted independently and in good faith when responding to a demand." *City of Tamarac Firefighters' Pension Trust Fund v. Corvi*, 2019 WL 549938, at *7 (Del. Ch. Feb. 12, 2019) (citing *Scattered Corp.*, 701 A.2d at 75).

Here, Plaintiffs have conceded, at most, that when they made the Demands, a majority of the board was independent and capable of considering the Demands. Plaintiffs have ***not*** conceded, however, that the Board acted independently or conducted a reasonable investigation in response to the Demands. To the contrary— the Amended Complaint sufficiently alleges that the Board did not act independently or reasonably in response to the Demands. Instead of considering the Demands itself, or employing an independent, disinterested committee, the Board handed the investigation over to defendant Cadogan, one of the alleged wrongdoers, and defendant Rinne, a close personal friend of another wrongdoer. The Board's inexplicable decision to entrust the Committee comprised of defendants Cadogan and Rinne to make a recommendation to the Board demonstrates the sham nature of

the Board's consideration of the Demands.  *See Thorpe v. CERBCO, Inc.*, 611 A.2d 5, 10 n.5 (Del. Ch. 1991) ("[W]hile the board may have been able to act independently through a fully empowered special committee of independent directors (thus justifying a stockholder in making demand), the board in fact chose not to do so, thus justifying treating the board as not independent."); *City of Tamarac*, 2019 WL 549938, at *8 (noting as an "extreme example" of gross negligence and evidence of bad faith a situation in which a nine-member board delegated review of shareholder demand to claw back CEO's compensation to the CEO).

Indeed, Defendants essentially concede that the Committee was not independent.  But they attempt to shield the conflicted Committee's investigation by arguing that the Board was under no obligation to even form a committee, let alone one comprised of independent directors, and the Court should grant the motion to dismiss for that reason.  Mot. at 31.[11]  It is true that Defendants were not required to

---

[11] The cases cited by Defendants are distinguishable.  For example, in *FLI Deep Marine LLC v. McKim*, 2009 WL 1204363 (Del. Ch. April 21, 2009), the plaintiffs argued that demand should be excused after the Board refused their demand.  This is not the case here, as Plaintiffs argue that the demand was wrongfully refused, not that demand should now be excused.  Similarly, *Levine v. Liveris*, 216 F. Supp. 3d 794 (E.D. Mich. 2016) is distinguishable because the court there held that the "fact that the composition of the investigation committee resembled that of [the company's] Board as a whole is not evidence of wrongful refusal."  Here, the composition of the Committee did not resemble that of Synchronoss's full Board. To the contrary—the full Board was comprised of a majority of disinterested directors, whereas the Committee was interested and conflicted.  *See Thorpe*, 611

form a special committee—but this argument is a red herring. While the Board as a whole could have considered the Demands, it chose not to. Instead, the Board members appointed two conflicted and interested directors to review the Demands and recommend action to the full Board. Thus, contrary to Defendants' arguments, the Court should evaluate the Committee members' independence. *See City of Tamarac*, 2019 WL 549938, at *9 (the tacit confession by plaintiff in making a demand does not prevent the court from examining bias or obvious conflicts in the board's decision to delegate demand review to a committee—therefore, "the Court may evaluate Plaintiff's allegations that the Special Committee and the Subcommittee members were incapable of acting disinterestedly in responding to the demands").[12]

---

A.2d at 10 n.5 (noting a board that "may have been able to act independently" but "chose not to do so" would "justify[] treating the board as not independent"). Finally, both *Andersen v. Mattell, Inc.*, 2017 WL 218913 (Del. Ch. Jan. 19, 2017) and *Morefield v. Bailey*, 959 F. Supp. 2d 887 (E.D. Va. 2013) are cited for the proposition that the Board was not required to establish a special committee, which Plaintiffs do not contest. Plaintiffs simply argue that the Board was grossly negligent in relying on a conflicted Committee that conducted a bad faith, deficient investigation.

[12] The *City of Tamarac* court ultimately found that the plaintiff had failed to allege facts to support conflicts at the committee level because plaintiff did "not allege facts suggesting a financial or personal benefit to any of the Director Defendants in approving the Separation Agreements" and, instead, focused its conflict argument on the committee members' prior involvement in the initial decision to approve the Separation Agreements." *City of Tamarac*, 2019 WL 549938 at *9. But here, the

26

Here, the Board's actions in appointing the Committee are highly questionable and suspicious. The Board was fully aware of the charges that the Committee would be investigating as they were detailed in the Demands. The Board was also fully aware of the identities of the officers and directors against whom Plaintiffs requested the Company take legal action, as these individuals were named in the Demands. Significantly, when Plaintiffs sent their Demands, the Board consisted of several directors that were *not* named as wrongdoers in the Demands. Indeed, in the Motion, Defendants admit that seven of the ten-member Board were "not even affiliated with the Company, in any capacity, at the time that the alleged wrongdoing occurred." Mot. at 39.[13]

Yet, despite seven independent directors from which to choose, the Board inexplicably appointed one of the alleged wrongdoers, defendant Cadogan, to the Committee. Not only was defendant Cadogan affiliated with the Company during

_____

Amended Complaint contains allegations that the Committee members were conflicted by both financial and personal benefits.

[13] Consistent with Defendants' admission, in the Post-Disclosure Defendants' Motion, the Post-Disclosure Defendants—who comprised six of the nine-member Board as of the dates of the Demands—claim to have had no involvement whatsoever in the underlying misconduct by virtue of their having joined the Board after the last alleged misstatement on February 8, 2017. Post-Disclosure Defs.' Mot. at 2-3.

the relevant period of wrongdoing, but he was also one of the directors against whom Plaintiffs specifically requested the Company take legal action.

Defendant Cadogan's involvement in the wrongdoing was substantial. He made, certified, and/or approved the exact false and misleading statements challenged in Plaintiffs' Demands. Specifically, he signed the materially false and misleading 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K (which contained the restatement of the Company's financial statements for the years ended in 2015 and 2016). ¶¶218, 246, 455. In addition, during the relevant period, and while the Company's stock price was artificially inflated, defendant Cadogan caused the Company to repurchase over $40 million worth of its common stock using shareholders' funds. ¶261. He also personally and uniquely benefitted from this misconduct—while the Company was misstating information to keep its stock price inflated, he engaged in insider sales for total illicit proceeds of approximately *$2.5 million*. ¶275. Given defendant Cadogan's involvement in the underlying misconduct, and his personal financial benefit from it, he faces a substantial likelihood of personal liability for breaching his fiduciary duty.[14]

_____

[14] In the Motion, Defendants argue that Cadogan does not face a substantial likelihood of liability because the Court in the related demand futility action, captioned *In re Synchronoss Technologies, Inc. Deriv. Litig.*, No. 17-cv-7173 (FLW) ("Demand Futility Action"), already ruled that he does not face a substantial likelihood of liability. Mot. at 36, n.24. Citing to the Motion, the Post-Disclosure Defendants proffer the same argument. Post-Disclosure Defs.' Mot. at 6, n.5. This argument is without merit. First, the Court was only addressing the adequacy of the

Thus, the Board's decision to include defendant Cadogan on the Committee and his recommendation to reject Plaintiffs' Demands raises serious doubt as to the integrity and impartiality of the Board's Refusals. *See Stepak v. Addison*, 20 F.3d 398, 405 (11th Cir. 1994) ("We take it as axiomatic that a board would not be acting consistently with its fiduciary duties were it to reject a shareholder demand based on an investigation and presentation by the alleged wrongdoers.") (citing *Smith v. Van Gorkom*, 488 A.2d 858, 874 (Del. 1985)).

The integrity of the investigation is further weakened by defendant Rinne's appointment as the other member of the Committee.   Defendant Rinne has substantial personal ties to one of the other alleged wrongdoers, defendant Lurie. ¶375.  Lurie was the Company's CEO, President, and a Director from November 2017 to September 2020, when he resigned following the Board's review of allegations of personal misconduct in violation of the Company's policies.  ¶51. Despite knowing of Lurie's misconduct, and despite his personal ties to defendant Rinne—specifically, a ***fifteen-year-long*** relationship serving concurrently as executives of Cingular Wireless and later AT&T—the Board nonetheless selected

---

pleadings as to demand futility in that case.  Since that time, plaintiff has filed an amended complaint.  *See* Demand Futility Action, Dkt. Nos. 79, 99.  The Court has not yet decided the motion to dismiss as to the amended complaint.  Second, the instant matter contains additional, more detailed claims against defendant Cadogan. For example, here Plaintiffs have alleged that defendant Cadogan breached his fiduciary duties by engaging in lucrative insider sales.

defendant Rinne as the only other member of the Committee.  ¶375.  These personal ties raise serious doubt as to whether defendant Rinne could impartially investigate the Demands.

Indeed, "[i]ndependence can be impaired by lesser affiliations, so long as those affiliations are substantial enough to present a material question of fact as to whether the [special committee] member can make a totally unbiased decision." *London v. Tyrrell*, 2010 WL 877528, at *12 (Del. Ch. Mar. 11, 2010) (citation omitted).  For example, the special committee member could hold a sense of obligation to the interested director based on prior events.  *Id.*  Notably, this "sense of obligation does not need to be financial in nature."  *Id.*  Given defendant Rinne's substantial ties with defendant Lurie, it was unreasonable to appoint her to the Committee.[15] Again, it is unclear why the Board did not select another, unconflicted Board member to the Committee.

Because the Committee was clearly biased, Defendants did not act independently in responding to the Demands.  For this reason alone, the Court should deny the Motion in its entirety and the Post-Disclosure Defendants' Motion with

---

[15] Even if the Court finds that defendant Rinne was independent, the Committee was still conflicted based on defendant Cadogan's personal involvement in the underlying wrongdoing. *See Gentile v. Rossette*, 2010 WL 2171613, at *7 n.36 (Del. Ch. May 28, 2010) ("A board that is evenly divided between conflicted and non-conflicted members is not considered independent and disinterested.").

respect to Count II.  *City of Orlando Police Pension Fund v. Page*, 970 F. Supp. 2d 1022, 1029 (N.D. Cal. 2013) ("*Google*") ("[I]f plaintiff can show that the board did not act independently in responding to the demand, those facts will undermine any finding that the investigation was undertaken reasonably and in good faith.").

## B.      Plaintiffs Have Alleged that the Board Failed to Comply with its Duty of Care

A board's compliance with its duty of care is measured by the standard of gross negligence, which "focuses on whether the directors considered all material information reasonably available to them." *Friedman v. Maffei*, 2016 WL 1555331, at *10 (Del. Ch. April 13, 2016).  As the Delaware Supreme Court has recognized, "it is important that the demand process be meaningful." *Grimes*, 673 A.2d at 1218. Thus, while there is no prescribed procedure that a board of directors must follow, "the process must be such that a reviewing court can look to it and conclude confidently that it reflects a corporation's earnest attempt to investigate a shareholder's complaint." *Barovic v. Ballmer*, 72 F. Supp. 3d 1210, 1215 (W.D. Wa. 2014).  Where, as here, a shareholder identifies in a pre-suit demand a witness or set of witnesses "who should have been interviewed but were not" in connection with a board's investigation, then that investigation may be unreasonable. *Google*, 970 F. Supp. 2d at 1032.

The Amended Complaint raises a reasonable doubt that the Board complied with its duty of care in refusing the Demands.  The process the Board employed was

impaired from the start because the Board appointed a biased and interested Committee. *See* Section II.A. Furthermore, the Committee's investigation itself was fundamentally flawed because it was limited to sources supporting a predetermined conclusion that no wrongdoing occurred.

In particular, the Committee failed to interview relevant persons identified as possessing knowledge of the misconduct in the Demands. The Demands identified ***more than nineteen*** individuals as having information relevant to the misconduct alleged in the Demands. ¶384. However, other than in-house and outside counsel, the Committee only interviewed *five* people: the Company's Corporate Controller; the Company's Chief Technology Officer; a former Synchronoss financial analyst; and defendants Irving and Rosenberger.[16] *Id.* Only three of these individuals were identified in the Demands as persons with relevant knowledge of the alleged misconduct. *Id.* The Committee failed to interview any of the other sixteen current

---

[16] That the Committee determined the Board and its officers were unaware of the fraudulent conduct detailed in the Demands is all the more suspect given that the Committee claims to have interviewed defendant Rosenberger as part of its investigation, who, according to the Court's opinion sustaining in part the Securities Class Action, was sufficiently alleged to have been aware of the fraudulent revenue recognition practices at the Company. Securities Class Action, Dkt. 91 at 32 ("Rosenberger knew that the Company had improperly recognized revenue on its two biggest contracts—Verizon and AT&T") and at 23 (it "is clear . . . that Rosenberger knew that revenue had been recognized on certain deals, notably the $25 million and $5 million Verizon contracts, before the contracts were signed. Moreover, the [Second Amended Complaint] demonstrates that Rosenberger was heavily involved in the revenue recognition process.").

and former directors identified in the Demands as responsible for the wrongdoing, including, but not limited to, Waldis, Lurie, Hovsepian, Frederick, Garcia, Hopkins, McCormick, and Moore. ¶383. Moreover, the Committee made little to no effort to interview the eight confidential witnesses with crucial, first-hand knowledge of the wrongdoing alleged in the Demands. ¶382.

In the face of these allegations, Defendants now assert that the Board did not have to interview anyone, let alone the alleged wrongdoers, and that its investigation was sufficient on that basis. Mot. at 22. While it is true that the Committee did not have to interview *every* possible wrongdoer, the Committee's decision to only interview three of the nineteen individuals with knowledge of the misconduct, as well as their lack of effort in identifying and interviewing the confidential witnesses, raises serious doubt as to the Committee's good faith and due care, which is all Plaintiffs are required to plead. *See Friedman*, 2016 WL 1555331, at *10.

The Northern District of California's ruling in *Google* is instructive on this issue. There, in response to a shareholder demand, Google's board created a purportedly independent two-person committee to investigate the allegations contained therein. *Google*, 970 F. Supp. 2d at 1026. The committee refused the demand "in a six page letter to plaintiff." *Id.* The plaintiff then filed a demand refused action and argued that the committee's denial was improper because, *inter alia*, the committee failed to interview key witnesses. *Id.* at 1032. The court

ultimately agreed, holding that "plaintiff has identified witnesses who should have been interviewed but were not, and the court does find that any reasonable investigation of plaintiff's demand should have included an interview of Mr. Neronha, or someone with comparable knowledge of the DOJ's investigation." *Id.*

Similarly, in *Barovic v. Ballmer*, the court, applying Delaware law, held that plaintiffs satisfied their burden of rebutting the business judgment rule. 72 F. Supp. 3d 1210, 1216 (W.D. Wash. 2014). The court found that plaintiffs alleged facts that created a reasonable doubt about the board's good faith and reasonableness in refusing the demand, emphasizing that the Company had only interviewed its own employees and that plaintiffs had identified external interviewees with relevant knowledge that the Company should have interviewed. *Id.*

The allegations Plaintiffs raised in this action are as strong as those advanced in *Google* and *Barovic*. Plaintiffs identified more than nineteen individuals with knowledge of relevant information, yet the Committee only interviewed five persons, other than in-house and outside counsel, and only three of whom were identified in the Demands. The Committee also made a sham effort to interview the eight confidential witnesses, all of whom are former Synchronoss employees, while implicitly conceding the propriety of interviewing such persons. *See* Am. Compl., Ex. Q (noting the "Committee requested" identification of the "confidential witnesses" supporting the Securities Class Action, but failed to take any further

action). This is particularly egregious since the Court had already credited information from these witnesses as, in part, the basis for sustaining certain claims in the Securities Class Action—conduct that supports the claims here. Without these interviews, the Committee's investigation was unreasonable and only reflected one side of the story—the side that no wrongdoing occurred. The Committee's failure to interview witnesses that could potentially contradict Defendants' claims of innocence is not only telling and a breach of their duty of care, but is also unreasonable and seriously calls into question the good faith of the Refusals.

## C. Plaintiffs Have Adequately Alleged That the Board Failed to Comply with its Duty of Loyalty[17]

Plaintiffs have also raised a reasonable doubt as to the Board's good faith in the way it responded to the Demands. Contrary to Defendants' assertions, the Plaintiffs do not "tout" the strength of their underlying allegations to argue that any refusal would be improper and in bad faith. Mot. at 37-40. Instead, the strength of the underlying allegations are relevant because they raise serious doubts as to the

---

[17] The Post-Disclosure Defendants argue that they cannot be held liable for Plaintiffs' claims because they "are exculpated from liability for any breaches of the duty of care by section 102(b)(7) clause in the Company's certificate of incorporation." Post-Disclosure Defs.' Mot. at 7. Plaintiffs, however, do not plead a breach of the duty of care; rather, they allege a breach of the fiduciary duty of loyalty. And as the Post-Disclosure Defendants concede, not included in the Company's exculpation provision are sufficiently alleged claims for breach of the duty of loyalty. *Id.* (acknowledging the "duty of loyalty" remains "at issue").

35

Refusals' conclusion that the "claims related to the conduct described in the Demand . . . lacked merit" and that the "conduct described in the Demand . . . was factually inaccurate with respect to the allegations of wrongdoing." ¶386; s*ee also* Am. Compl., Ex. Q, U.

These conclusions are particularly troublesome because they are factually impossible.  The Demands describe conduct relating to improper revenue recognition that occurred throughout 2015 and 2016, and continued unabated thereafter, and ultimately forced the Company to restate its previously filed financial statements for those fiscal years.  *See* Am. Compl., Ex. A, I, R.  In the Restatement, the Company admitted that the errors had been identified in the previous statements "concerning revenue recognition in connection with certain licensing transactions," and that the Company had "determined that revenues from each of the applicable transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting." *See* Am. Compl., Ex. R.  The Company predicted that the Restatement amounted to revenue overstatements of over $105 million.  *Id.*  The Restatement also admitted that the Company had "identified a material weakness in internal control over financial reporting relating to its revenue recognition process." *Id.*

Despite these admissions, the Committee determined that the Board "lacked knowledge that errors in the Company's financial results had occurred." ¶388.  It

36

also concluded that no member of management or the Board was aware that the Company's financial results were misstated, even though the Company had already taken certain actions to "remediate the prior accounting errors," including "fir[ing] four non-officer employees for actions related to the accounting errors" and hiring a new CEO, CFO, and other employees with responsibilities related to revenue recognition.  ¶350.  Thus, the Refusals' sweeping conclusion that no wrongdoing occurred is directly contradicted by the Company's prior statements and actions.[18]

Moreover, the Refusals concluded that no wrongdoing occurred, yet still recommended that the Board direct the Compensation Committee to review the Company's insider trading policies.  ¶350.  This is particularly troubling since the Demands allege that defendant Cadogan engaged in insider trading that netted him total illicit proceeds of approximately $2.5 million.  ¶275.  Thus, the Committee was clearly biased and not independent.

The Refusals' conclusions are even more troubling since Defendants have shielded their investigation from scrutiny.  The Refusals refer to the Committee as having "presented its findings and recommendations to the Board," but no Committee reports, presentations, or other materials have been provided to

---

[18] The Refusals' conclusion is further contradicted by Defendants' implicit concession that Plaintiffs have stated a claim against certain directors.  Defendants only challenge whether a claim is stated against the Post-Disclosure Defendants, *see* Post-Disclosure Defs.' Mot. at 2-6, and thus, have conceded that Plaintiffs have stated a claim against the other defendants.

Plaintiffs, despite repeated requests for such information.[19]   ¶387.   In failing to produce a report, the Committee has neglected to keep a proper record of its investigation to allow Plaintiffs and the Court to assess the reasonableness of the investigation.   *Id.*   By refusing to make a report public, Defendants have "effectively insulate[d] its investigation from scrutiny by a Court or otherwise," thus raising doubt as to the integrity of the Board's decision.   *In re Par Pharmaceutical, Inc. Derivative Litig.*, 750 F. Supp. 641, 647-648 (S.D.N.Y. 1990); *Thorpe*, 611 A.2d at 10 (noting the board's "failure to disclose [committee's report] to stockholders after request" as a factor in concluding that plaintiff alleged a reasonable doubt concerning the board's good faith); *see also Hughes v. Hu*, 2020 WL 1987029, at *16 (Del. Ch. Apr. 27, 2020) (concluding that the absence of exculpatory documents produced in response to a books and records request "telling" because it is "more

---

[19] Contrary to Defendants' argument, Mot. at 26-28, Plaintiffs did request additional documents to evaluate the sufficiency of the investigation before filing this Action. Specifically, on October 2, 2019, Plaintiff Theiffry wrote a letter to the Board's counsel, stating that its refusal of her demand was not detailed enough to evaluate the sufficiency of the investigation and requesting, *inter alia*, copies of the documents the Committee reviewed, lists of materials reviewed by the Committee, and copies of any reports or other materials produced by the Committee.  ¶388; *see also* Am. Compl., Ex. V.  Defendants did not provide any documents in response, nor did they indicate that the written request was somehow insufficient other than a vague conclusion that the request was "improper."  ¶371; *see also* Am. Compl., Ex. W.  Therefore, Defendants' argument that Plaintiffs should be precluded from complaining about a lack of evidence is without merit.

reasonable to infer that exculpatory documents would be provided than to believe the opposite: that such documents existed and yet were inexplicably withheld").

*Google* is also instructive on this issue. There, the investigating committee "found no wrongdoing or culpability by Google directors or officers, even though the [non-prosecution agreement] includes an acceptance of responsibility." *Google*, 970 F. Supp. 2d at 1031 (internal quotations omitted). The court found that the committee's "sweeping conclusion that no wrongdoing or culpability occurred, when coupled with the NPA's express acceptance of responsibility, does create reasonable doubt that the investigation was conducted reasonably and in good faith." *Id.* (internal quotations omitted). The court also stated that while "[i]t may be true pursuing litigation was not in Google's best interests, and that demand was properly refused . . . the [refusal] merely recites the conclusion that refusal was proper without explaining how the committee reached that conclusion." *Id.* But since Google did not provide the report, "the court [could not] find that the investigation was conducted reasonably and in good faith." *Id.* Simply stated, the court could not find that the investigation was done reasonably and in good faith simply because Google "ask[ed] plaintiff and the court . . . to take their word for it." *Id.* at 1032.

Here, just as in *Google*, Defendants accepted responsibility for accounting manipulations and errors in the Company's internal controls over financial reporting in the Restatement, and yet have also completely denied similar claims in the

Demands.   When Plaintiffs requested documents and reports to support this conclusion, the Board outright denied these requests without any explanation.  Just as in *Google*, Defendants here are asking Plaintiffs and the Court to "take their word for it," which is improper and further demonstrates that the Refusals were wrongful and in bad faith.  *Id.* at 1032.  Accordingly, the Board's reticence to provide any documentation supporting the Refusal speaks volumes as to their improper nature.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Motion should be denied in its entirety and the Post-Disclosure Defendants' Motion should be denied with respect to Count II.  If the Court finds any deficiencies in the Amended Complaint, Plaintiffs respectfully request that the Court grant them leave to amend.  Fed. R. Civ. P. 15(a)(2) ("The Court should freely give leave [to amend] when justice so requires.").

DATED: March 22, 2021

THE ROSEN LAW FIRM, P.A.

/s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Co-Lead Plaintiffs Laughlin and Thieffry*

**JOHNSON FISTEL, LLP**
Michael I. Fistel, Jr. (*pro hac vice*)
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
Email: MichaelF@johnsonfistel.com

*Co-Lead Counsel for Co-Lead*
*Plaintiffs Laughlin and Thieffry*

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown, Esq.
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Additional Counsel for Co-Lead*
*Plaintiff Thieffry*

**WHIPPLE AZZARELLO, LLC**
John A. Azzarello
161 Madison Avenue, Suite 325
Morristown, NJ 07960
Telephone: (973) 267-7300
Facsimile: (973) 267-0031
Email:
azzarello@whippleazzarellolaw.com

*Liaison Counsel for Co-Lead*
*Plaintiff Laughlin*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2021 a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system

/s/Laurence M. Rosen
Laurence M. Rosen

42