**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE SYNCHRONOSS TECHNOLOGIES, INC. STOCKHOLDER DERIVATIVE DEMAND REFUSED LITIGATION | Lead Case No. 20-07150 (FLW) |
| | (Consolidated with Case No. 3:20-cv-07224) |
| THIS DOCUMENT RELATES TO: | **OPINION** |
| ALL ACTIONS | |

**WOLFSON, Chief Judge**:

Presently before the Court is an unopposed motion to approve the final settlement agreement ("Settlement Agreement") between Plaintiff-shareholders and nominal defendant Synchronoss Technologies, Inc. ("Synchronoss").  Through the settlement, Synchronoss agrees to, among other things, institute corporate governance reforms and pay $800,000 in attorney's fees and expenses.  For the following reasons, the Court approves the Settlement Agreement in all respects, including an award to Plaintiffs' counsel in the amount of $800,000 in attorney's fees and expenses.

## I.   FACTUAL BACKGROUND

Synchronoss, a Delaware corporation, is a mobile technology service company that provides mobility solutions to service providers and enterprises on the cloud platform and software-based applications for connected devices.  Decl. of Laurence M. Rosen. ¶9 ("Rosen Decl.").  During the time of the alleged misconduct, Synchronoss was divided into two business segments.  *Id*.  First, the Activation Business, gave cellphone providers software licenses to allow consumers to activate newly purchased cellphones and provided these phones with data storage

and backup functions.  *Id*.  Second, the Cloud Services Business, allowed users to store, manage, and process data without having to store the data on local servers or personal computers.  *Id*.

Plaintiffs brought shareholder derivative actions on behalf of nominal defendant Synchronoss and against certain current and former directors and officers, alleging that these directors and officers: "(i) caused the Company to divest itself of the profitable Activation Business on unfavorable terms to the Company's "friends and family"; (ii) engaged in improper accounting practices with respect to revenue recognition, which ultimately required the Company to restate its public financial disclosures; (iii) made false and misleading statements to the investing public regarding the aforementioned divestiture and accounting practices; (iv) engaged in insider sales of the Company's stock while the Company's stock price was allegedly artificially inflated; and (v) caused the Company to sell a valuable subsidiary and agree to a private investment in a public equity deal on unfavorable terms to preempt a proxy contest, thereby breaching their fiduciary duties owed to Synchronoss."  *Id*. ¶10.

## II.    PROCEDURAL HISTORY

### A.  The Related Securities Action

Synchronoss, as well as certain former officers, were named as defendants in a securities fraud class action ("Securities Action").  *In re Synchronoss., Inc. Sec. Litig.*, No. 3:17-cv-02978 (D.N.J.).  On November 6, 2018, the Securities Action defendants moved to dismiss the action. Rosen Decl.  ¶13.  On June 28, 2019, this Court granted the motion to dismiss and gave leave to lead plaintiff to replead.  *Id.*  On August 14, 2019, the lead plaintiff filed a Second Amended Class Action Complaint, which defendants moved to dismiss.  *Id.* ¶14. On May 29, 2020, this Court granted in part and denied in part defendants' motion to dismiss.  *Id.* On October 30, 2020, the lead plaintiff filed a motion for class certification.  *Id.* ¶15.  Thereafter, that matter was reassigned

to the Hon. Zahid N. Quraishi, U.S.D.J., and on June 30, 2021, Judge Quraishi stayed the Securities

Action to allow the parties to effectuate a settlement. *Id.* ¶16; *In re Synchronoss., Inc. Sec. Litig.*,

No. 3:17-cv-02978, ECF No. 156 (D.N.J. June 24, 2021).  Judge Quraishi preliminarily approved

a settlement, and then gave final approval on December 8, 2021.  *Id.*; *In re Synchronoss., Inc. Sec.

Litig.*, No. 3:17-cv-02978, ECF No. 173 (D.N.J. Dec. 8, 2021).

### B.  The Related Federal Derivative Actions

There are four related shareholder derivative actions that were filed between September

15, 2017, and October 30, 2017, captioned: *Thieffry v. Waldis, et al.*, Civil Action No. 17-cv-07173

(D.N.J. filed Sept. 15, 2017); *Laughlin v. Waldis, et al.*, Civil Action No. 17-cv-09039 (D.N.J.

filed Oct. 24, 2017); *LeBoeuf v. Waldis, et al.*, Civil Action No. 17-cv-09766 (D.N.J. filed Oct. 27,

2017); and *Coltrane v. Waldis, et al.*, Civil Action No. 17-cv-10062 (D.N.J. filed Oct. 30, 2017).

*Id.* ¶17.  On May 23, 2018, the Court consolidated these actions, and appointed plaintiff LeBoeuf

as lead Plaintiff.  *Id.*  Plaintiff LeBeouf designated the complaint in *LeBoeuf v. Waldis* as the

operative complaint.  *Id.* ¶18.  Three years later, on April 30, 2021, the Court granted defendants'

motion to dismiss the actions.  *Id.* ¶20.  On May 28, 2021, plaintiff LeBoeuf filed a notice of

appeal.  *Id.* ¶21.[1]

### C.  This Demand Refused Action

Meanwhile, on August 3, 2018, plaintiff Thieffry issued a pre-suit litigation demand on the

Board, separate from her pending derivative action, to investigate alleged misconduct that was

later alleged in this action.  *Id.* ¶22.  On August 6, 2018, plaintiff Laughlin, separate from his

---

[1] That appeal has been stayed by the Third Circuit pending this settlement approval. *In re
Synchronoss Technologies*, No. 21-2055, ECF No. 12 (3d Cir. Aug. 18, 2021).

pending derivative action, did the same. *Id.* ¶23.  On July 9, 2019, the Synchronoss Board informed both plaintiffs separately that it would not pursue legal action. *Id.*

On June 11, 2020, plaintiff Laughlin commenced this action derivatively on behalf of Synchronoss by filing another complaint, which alleged that his demand was wrongfully refused by the Board. *Id.* ¶26.  Plaintiff Thieffry filed a similar action on June 12, 2020. *Id.* ¶27.  On August 27, 2020, the Court granted the stipulation by the parties to consolidate these two actions. *Id.* ¶28.  On October 20, 2020, the Court entered an order appointing Laughlin and Thieffry co-lead plaintiffs and The Rosen Law Firm, P.A., and Johnson Fistel, LLP, as co-lead counsel in the Demand Refused Action. *Id.* ¶29.  On December 4, 2020, co-lead Plaintiffs Laughlin and Thieffry filed a consolidated amended complaint. *Id.* ¶30.  On February 3, 2021, the defendants filed a motion to dismiss the amended complaint. *Id.*  On July 14, 2021, this Court stayed this action for 45 days to afford the parties time to finalize a settlement. *Id.* ¶31.

### D.  The Delaware Derivative Action

On March 7, 2019, plaintiffs Daniel and Solis filed a shareholder derivative action in Delaware, *Daniel, v. Waldis*, No. 2019-0189 (Del. Ch.).  Rosen Decl. ¶32.  On April 17, 2019, plaintiff LeBoeuf filed a motion to intervene and stay the Delaware action. *Id.* ¶33.  Counsel for plaintiff LeBoeuf and the Delaware parties met and agreed to temporarily stay the action pending a ruling on the motion to dismiss in the federal derivative action. *Id.*

### E.  Settlement Negotiations

In early 2021, the parties agreed to participate in a mediation to resolve the derivative actions. *Id.* ¶35.  The parties, including the parallel securities action plaintiffs, attended their first mediation session before a mediator on May 7, 2021. *Id.* ¶36.  This session ended without a resolution. *Id.*  The parties continued exchanging proposals and counterproposals into June, and

ultimately attended a second mediation session on June 11, 2021. *Id*. ¶38. The negotiating parties did not reach an agreement at that session, but continued discussing settlement possibilities in the following days. *Id*. On June 17, 2021, the mediator offered a double-blind proposal of $800,000 for the fee and expense amount. Melnick Decl. ¶10. On June 18, 2021, the parties accepted the mediator's proposal. *Id*. ¶11. The parties eventually agreed to material terms of the settlement, which were memorialized in a settlement Term Sheet executed on June 24, 2021. Rosen Decl. ¶39. On September 9, 2021, the parties thereafter finalized documentation of the terms of the settlement in a stipulation. *Id*.; Stipulation of Settlement ("Stipulation" or "Stip."), ECF No. 29. On September 14, 2021, this Court granted preliminary approval of the Settlement Agreement, approved the form and manner of providing notice ("Notice") of the Settlement to Synchronoss shareholders, and initially set November 30, 2021, as the hearing date for final approval of the Settlement Agreement. ECF No. 31.

On November 4, 2021, this Court amended certain dates within the Preliminary Approval Order, including the hearing date for final approval of the Settlement Agreement, from November 30, 2021, to December 13, 2021. ECF No. 35 ("Amended Order"). Pursuant to the Order, Synchronoss posted a Summary Notice in the online version of *Investor's Business Daily*, filed a Current Report on Form 8-K with the SEC, which included an accompanying press release and had the Notice and Stipulation attached, and posted the Notice and Stipulation to the Company's investor relations page of its website. Rosen Decl. ¶42; Declaration of Harvey Bartle IV, Esq. in Support of Final Approval of Proposed Settlement ("Bartle Decl."), ECF No. 38 ¶3. The Notice and Summary Notice directed objections to be filed by December 3, 2021. Rosen Decl. ¶43. No objections were filed by that date. ECF No. 42.

## III.     TERMS OF SETTLEMENT

Broadly, the settlement agreement requires changes to the following: (1) the Board of Directors, (2) the Disclosure Committee, (3) the duties of the Chief Compliance Officer, (4) the Audit Committee, (5) Board oversight of stock repurchases, (6) conduct of internal audits, (7) related party transactions, (8) the insider trading policy, and (8) reports of executives at Board meetings.  Rosen Decl. *Id*. ¶¶ 44-63.  *See* Stip.  These terms will be discussed more fully, *infra*.

Most importantly, the Settlement Agreement will ensure: "(i) the Company's disclosures are accurate, material information is accurately and timely disclosed, and the Company's disclosure controls are effective; (ii) potential related party transactions are conducted at arm's-length and appropriate disclosures are made; (iii) potential stock repurchases are vetted and evaluated to ensure they remain in the Company's best interests; (iv) the Company maintains and monitors a system for reporting and investigating potential compliance and ethics concerns, employees are trained in risk assessment and compliance, and the Company maintains an Internal Audit Function to review the Company's compliance with applicable policies and review key risk areas; and (v) the independent directors of the Board are provided with meaningful leadership from the Lead Independent Director and have an effective line of communication with the Chief Executive Officer ("CEO")."  *Id*. ¶46.

## IV.     MOTION TO APPROVE SETTLEMENT

Under Federal Rule of Civil Procedure 23.1, parties to a shareholder derivative action must obtain the Court's approval to settle.  FED. R. OF CIV. P. 23.1(c) ("A derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval.  Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders.").  The Court must find that the settlement is "fair,

adequate, reasonable and proper, and in the best interests of the class and the shareholders." *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1310 (3d Cir. 1993).  While the shareholders' interest is relevant, the Third Circuit has made clear, that the "principal factor" to be considered "is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Shlensky v. Dorsey,* 574 F.2d 131, 147 (3d Cir. 1978) (citations omitted).

As such, the Third Circuit has articulated a set of nine "*Girsh* factors" that courts should consider when determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the shareholder action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations omitted); *see, e.g., In re Johnson & Johnson Deriv. Litig.*, 900 F. Supp. 2d 467, 479-85 (D.N.J. 2012) (reciting and applying the *Girsh* factors).  "The settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement." *Myers v. Jani-King of Philadelphia*, No. 09-1738, 2019 WL 4034736, at *7 (E.D. Pa. 2019) (quoting *In re Pet Food Prods. Liability Litigation,* 629 F.3d 333, 350 (3d Cir. 2010)).  "A district court's findings under the *Girsh* test are those of fact." *In re Nat'l Football League Players Concussion Injury Litigation*, 821 F.3d 410, 437 (3d Cir. 2016).

Before turning to my application of the *Girsh* factors, I first explain what distinguishes shareholder derivative actions from the typical class action.

> Derivative suits are the procedural mechanism to enforce state fiduciary duty law. In a derivative suit, the corporation is the functional plaintiff-that is, the real party in interest-and the allegations are that the corporation's current or former officers and directors breached their fiduciary duties to the corporation. Any recovery in a derivative suit is returned to the corporation. In a derivative suit, despite the fact

> that the suit is brought in its name, the corporation's role is limited because shareholders, whom I will call derivative plaintiffs, file these suits on behalf of corporations. The law gives shareholders this power because corporate officers and directors, who normally decide whether corporations should file lawsuits, are often implicated in the alleged wrongdoing and cannot be trusted to make unbiased decisions regarding the merits of these suits.

*In re Johnson & Johnson*, 900 F. Supp. 2d at 479 (quoting Jessica Erickson, Corporate Governance in the Courtroom: An Empirical Analysis, 51 Wm. & Mary L. Rev. 1749, 1756 (2010)).

To the extent that there are monetary damages awarded in a shareholder derivative suit, that money comes from the individual officers and directors (i.e., the corporation's officer and director insurance) and is deposited into the corporation's coffers. *In re Pittsburgh & L. E. R. Co. Securities and Antitrust Litig.*, 543 F.2d 1058, 1068 (3d Cir. 1976) ("The proceeds of the action belong to the corporation and it is bound by the result of the suit.") (quoting *Ross v. Bernhard*, 396 U.S. 531, 538 (1970)). This creates an indirect benefit to the shareholders but, unlike typical class actions, shareholder derivative actions do not involve a "common fund," or pool of money, that must be distributed to members of the class. *See generally* William Meade Fletcher, Derivative v. "Pure" Class Action, 12B Fletcher Cyc. Corp. § 5908 (2012).

That said, shareholder derivative suits are far less likely to involve a monetary component than typical class action suits. *In re Johnson & Johnson*, 900 F. Supp. 2d at 480 (citing Erickson, at 1804). Indeed, an empirical study of shareholder derivative actions concluded that the overwhelming majority of settlements result solely in corporate governance changes like those presented here. *Id*.

In addition, the total amount of attorney's fees payable by the plaintiff corporation, in most instances, greatly outweighs those paid by a defendant corporation in typical class action. In the typical class action suit, an unsuccessful corporate defendant pays its own attorney's fees plus any fees due plaintiffs' counsel under fee-shifting statutes. Where there is no fee-shifting statute, and

the case settles, the defendant will often agree to pay plaintiffs' counsel fees as part of the settlement.  Conversely, for shareholder derivative suits:

> First, the corporation has to hire lawyers to represent the corporation's interests in the litigation. Second, the corporation often has to pay the legal bills of its officers and directors pursuant to indemnification agreements. Third, . . . corporations often form a special litigation committee [("SLC")] to investigate the allegations in the suit. The cost of forming such a committee can dwarf the other expenses in the litigation because SLCs typically hire a law firm with no connection to the case to ensure the firm's independence, and the law firm then commences a full-blown investigation, complete with extensive document review and interviews of dozens of people close to the alleged events. Fourth, the corporation incurs additional indirect costs when its key personnel have to divert attention from other corporate duties to assist with the litigation. These costs can be considerable, . . . on average, more than six law firms [are] involved in [the] lawsuit.

*In re Johnson & Johnson*, 900 F. Supp. 2d at 480 (quoting Erickson, at 1085).

In light of the unique characteristics of shareholder derivative actions, and the potential for abuse and collusion inherent in cases that involve large attorney's fee awards, I carefully review the settlement terms to examine whether the specific corporate reforms agreed to by the parties as settlement terms, here, result in a fair settlement to the corporation.  To that end, I find that the proposed settlement satisfies the *Girsh* factors.

### A.  Complexity, Expense, and Likely Duration of Litigation

The first *Girsh* factor captures "the probable costs, in both time and money, of continued litigation."  *Griffen v. Zager*, No. 16-1234, 2017 WL 3872401, at *6 (D.N.J. Sept. 1, 2017) (quoting *In re Cendant Corp. Deriv. Action Litig.*, 232 F. Supp. 2d 327, 333 (D.N.J. 2002)).  "By measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably."  *Beneli v. BCA Financial Services, Inc.*, 324 F.R.D. 89, 102 (D.N.J. 2018).  "Settlement is favored under this factor if litigation is expected to be complex, expensive and time consuming."  *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-374, 2008 WL 9447623, at *17 (D.N.J. Dec. 9, 2008) (internal citations omitted).

As an initial matter, the Court notes that shareholder derivative actions are, by their nature, "undeniably complex." *Unite Nat. Retirement Fund v. Watts, Civil Action*, No. 04-3603, 2005 WL 2877899, at *3 (D.N.J. Oct. 28, 2005).   Indeed, the allegations, here, involve complex legal issues, such as establishing standing to maintain the derivative actions on the Company's behalf, as well as highly technical subject matters, such as accounting and revenue recognition irregularities, related party transaction, and other complex business transactions.  Rosen Decl. ¶82.  These issues would undoubtedly require significant expert analysis.  *Id*. ¶82.

Further, Defendants deny liability and dispute the underlying factual and legal predicates of the derivative claims.  *Id*. ¶83.  If litigation were to continue, there is potential for significant document discovery, depositions, expert discovery, motions practice, and possibly a trial.  *Id*. Additionally, an unfavorable judgment for Defendants could result in post-trial motions and an appeal, prolonging the case for years.  *Id*.  In contrast, settlement eliminates any further risks and expenses for the parties.  Considering the potential risks and expenses associated with continued prosecution of the case, this factor supports approval.

### B.  Class's Reaction to Settlement

As explained *supra*, Synchronoss posted proper notice of the Settlement Agreement in accordance with the process approved by this Court, and consistent with both Rule 23.1 and due process.  *See* Bartle Decl.  The Notice and Summary Notice informed investors of their rights under the Settlement Agreement, and described the procedure for raising objections.  Rosen Decl. ¶85.  The deadline for submitting objections was December 3, 2021, and no objections were filed. *Id*.; ECF 42.  The lack of objections is strong evidence of the fairness, reasonableness and adequacy of the settlement.  *See In re Cendant Corp.*, 232 F. Supp. 2d at 333-34 ("Given that no formal objection was filed to the settlement itself, there is little doubt that this factor weighs in favor of

approval of the Settlement Agreement."); *In re Par Pharm. Sec. Litig.*, No. 06-cv-3226, 2013 WL 3930091, at *4 (D.N.J. July 29, 2013) ("[T]otal absence of objections argues in favor of the proposed settlement") (citations omitted).

### C.  Stage of Proceedings and Amount of Discovery Completed

The goal of the third *Girsh* factor is to "capture[] the degree of case development that class counsel accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  *In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001) (*citing In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 813 (3d Cir. 1995)).

"Even settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties. . . .  Indeed, courts in this district have approved settlements while the case was in the pre-trial stage and formal discovery had not yet commenced."  *In re Johnson & Johnson*, 900 F. Supp. 2d at 482; *accord, e.g., In re Nat'l Football League*, 821 F.3d at 436-37 ("To the extent objectors ask us to require formal discovery before presuming that a settlement is fair, we decline the invitation. In some cases, informal discovery will be enough for class counsel to assess the value of the class claims and negotiate a settlement that provides fair compensation."). Courts in this Circuit frequently approve class action settlements despite the absence of formal discovery. *See, e.g., Schuler v. Medicines Co.*, No. CV 14-1149, 2016 WL 3457218, at *7 (D.N.J. June 24, 2016) (approving settlement prior to discovery because of counsel's investigation); *In re Johnson & Johnson*, 900 F. Supp.2d at 482 ("Even settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties.")

Prior to litigation, Plaintiffs' counsel conducted an extensive investigation as to the individual Defendants' alleged misconduct and damages caused to the Company.  Rosen Decl. ¶87.  This investigation included, among other things, reviewing Synchronoss's public filings, analyst reports, conference calls, media reports, internal company documents produced pursuant to Title 8, Section 220 of the Delaware Corporation Law Code, and relevant Securities Action documents and public filings.  *Id*.  In addition, Plaintiffs' counsel was responsible for the filing of initial and amended complaints, issuing the litigation demands, preparing damages analyses, opposing several motions to dismiss, and participating in the relevant mediation sessions and follow up settlement negotiations.  *Id*.  In light of this experience, this Court finds that counsel had an adequate appreciation of the merits of the case before negotiating.  *See In re Cendant*, 264 F.3d at 235.

### D.  Risks of Establish Liability and Damages

"The fourth and fifth [*Girsh*] factors survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  *In re Johnson & Johnson*, 900 F. Supp. 2d at 483 (internal quotations omitted).  "By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them."  *In re General Motors*, 55 F.3d at 814.  In making this assessment, however, "a court should not conduct a mini-trial and must, to a certain extent, give credence to the estimation of the probability of success proffered by [lead] counsel."  *Murphy v. Charles Tyrwhitt, Inc.*, No. 20-00056, 2020 WL 8513583, at *10 (W.D. Pa. Nov. 25, 2020) (internal citations omitted).  In complex cases, "[t]he risks surrounding a trial on the merits are always

considerable." *Murphy v. Eyebobs, LLC*, No. 21-00017, 2021 WL 4594679, at *11 (W.D. Pa. Oct.

6, 2021) (quoting *Weiss v. MercedesBenz of N. Am.*, 899 F. Supp. 1297, 1301 (D.N.J. 1995)).

Plaintiffs would face substantial risks if they were to continue litigating this matter.

According to Plaintiffs, and I agree, that the instant derivative actions presented difficult questions

of law and fact that made liability highly uncertain.  Rosen Decl. ¶90.  Plaintiffs face significant

obstacles from reaching the merits of this case, let alone succeeding at trial.  *Id.*  As an example,

the related derivative action was dismissed for failure to adequately allege that the demand was

excused as futile, an issue currently being appealed.  Pl. Br. in Supp. of Approval at 31.  Here,

pending motions to dismiss in this matter include contentious arguments regarding whether

Plaintiffs satisfied requirements set forth in Rules 23.1 and 12(b)(6).  *Id.*  Further, had the

derivative claims survived any procedural hurdles, subsequent discovery, motions practice, and

trial would assuredly be highly contentious.  Rosen Decl. ¶91.  As already noted, shareholder

derivative actions are, by their nature, "undeniably complex," *Watts*, 2005 WL 2877899 at *3, and

therefore, the risks surrounding a trial on the merits would be considerable.  *Weiss*, 899 F. Supp.

at 1300-01.  This factor weighs in favor of supporting approval.

### E.  Defendants' Ability to Pay[2]

This *Girsh* factor "addresses whether Defendants could withstand a [monetary] judgment

for an amount significantly greater than the [proposed] Settlement."  *In re Johnson & Johnson*,

900 F. Supp. 2d at 484 (internal quotations omitted); *Cendant*, 264 F.3d at 240 (same).

---

[2] This matter is not a class action, and therefore, the sixth factor does not apply.  *Watts,* 2005 WL 2877899, at *3 ("The sixth *Girsh* factor is typically used to evaluate the risk of maintaining class certification in a class action.  A derivative action does not present the same concern.  As such, this factor neither weighs in favor of nor against approval.").

Here, there is the possibility that the derivative suits would have succeeded at trial and a monetary judgment would have been imposed against the individual director and officer defendants.  If that were to occur, the individual defendants would likely tender the claims to their insurance carriers, as they did here with the agreed to fee and expense amounts.  Rosen Decl. ¶98. But even assuming there are sufficient funds to pay a greater judgment, the Third Circuit "has found that a defendant's ability to pay a larger settlement sum is not particularly damaging to the settlement agreement's fairness as long as the other factors favor settlement."  *O'Brien v. Brain Research Labs, LLC*, No. 12-204, 2012 WL 3242365, at *19 (D.N.J. Aug. 9, 2012) (citing *In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions,* 148 F.3d 283, 322 (3d Cir. 1998)). This factor does not weigh against approving the settlement.

### F.   Range of Reasonableness of Settlement Fund

"The last two [*Girsh*] factors evaluate whether the settlement represents a fair and good value for a weak case or a poor value for a strong case."  *In re Johnson & Johnson*, 900 F. Supp. 2d at 484 (internal quotations omitted).  "In conducting this evaluation, it is recognized that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding [too] large a settlement based on the court's view of the merits of the litigation."  *Id.* at 484-85 (internal quotations omitted).  These factors inquire "'whether the settlement is reasonable in light of the best possible recovery and the risks the parties would race if the case went to trial.'"  *Pro v. Hertz Equip. Rental Corp.*, No. 06-3830, 2013 WL 3167736, at *5 (D.N.J. June 20, 2013) (quoting *Prudential,* 148 F.3d at 322).

Because Plaintiffs have a real risk of failing to prove their claims, as they admit, these two factors weigh in favor of approving settlement for the reasons described above.  Moreover, even

if Plaintiffs ultimately obtained similar corporate governance reforms through a successful trial and appeal, settling at this juncture benefits Synchronoss by ensuring that the reforms are implemented more expeditiously, and by eliminating future litigation costs.  *See Watts,* 2005 WL 2877899, at *4 ("The settlement provides immediate and substantial benefits for all parties and represents a better option than little or no recovery at all."); *id.* ("The best possible recovery, while arguably more than the settlement, is tempered by the risks of further litigation.").  Therefore, these factors weigh in favor of approving the Settlement.

Having weighed all the *Girsh* factors, the Court finds that these factors strongly suggest that the proposed settlement is fair, reasonable, and adequate.  As discussed *supra*, this matter is complex and would likely require an extensive discovery and motions practice, and if necessary, a contentious trial. And should the matter reach trial, there is "no guarantee whom the jury would believe," *In re Cendant*, 264 F.3d at 239, which means that Plaintiffs run the risk of not prevailing on their claims.  Further, no shareholders have objected to the settlement, which strongly supports the notion that the settlement is fair and reasonable.  ECF No. 42.  While the derivative suits are in the early stages of litigation, Plaintiffs' counsel has conducted intensive research, reviewed numerous publicly available documents, among other things, which has facilitated counsel's appreciation of the merits of these cases.  Finally, not approving the settlement would lead Synchronoss to incur substantial attorney's fees and expenses for the remainder of litigation before this Court, and possibly, on appeal.  For these reasons, the Court finds the settlement to be fair, adequate, and reasonable.

**V.   ATTORNEY FEES**

Having concluded that the *Girsh* factors favor approval of the settlement, and that notice was adequate, I now turn to whether the settlement confers a substantial benefit on the corporation.

If I conclude that the settlement does not confer a substantial benefit, Plaintiffs' counsel may not be awarded attorney's fees. *See Shlensky,* 574 F.2d at 149.

While, under the "'American' rule ordinarily applied in our courts, a prevailing litigant is not entitled to recover attorneys' fees from a losing party absent statutory authority . . . [t]he plaintiffs in a shareholders' derivative action may . . . recover their expenses, including attorneys' fees, from the corporation on whose behalf their action is taken if the corporation derives a benefit, which may be monetary or nonmonetary, from their successful prosecution or settlement of the case." *Id*. In making this assessment, courts should consider case law addressing fee awards in class action suits alongside derivative suit case law. *See id*. at 150.

To determine whether a settlement confers a substantial benefit, courts in this circuit consider the following factors in class action suits:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*In re AT & T Corp*., 455 F.3d 160, 165 (3d Cir. 2006). In addition, courts may consider "(1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any 'innovative' terms of settlement." *Id*. The first factor—the size of the fund created and the number of persons benefitted—is not relevant where, as here, the settlement is comprised of only injunctive relief. Also, the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained is not relevant here where the injunctive relief has not been monetized.

Many of these inquiries were addressed in my analysis of the *Girsh* factors and, as that analysis suggests, I conclude, below, that the factors favoring settlement also demonstrate that this proposed settlement confers a substantial benefit on the corporation. Once I address the substantial benefit to the corporation, I will address the remaining substantial benefit factors I not yet discussed.

### A.  The Settlement Confers a Substantial Benefit on the Corporation

Case law makes clear that corporate governance reforms, unaccompanied by monetary damages, may form the basis for an attorney's fee award where the reforms confer a "substantial benefit" on the plaintiff corporation. *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 395 (1970) (holding that "a corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature"); *In re Nvidia Corp. Derivative Litig.*, No. C-06-06110, 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008) (approving an award for attorney's fees in connection with a settlement comprised largely of corporate governance reforms because "strong corporate governance is fundamental to the economic well-being and success of a corporation"); *Watts*, 2005 WL 2877899, at *5 (concluding the corporate governance reforms conferred a "great benefit" on the plaintiff corporation because the reforms will "serve to prevent and protect [the corporation] from the reoccurrence of certain alleged wrongdoings."). To be considered a substantial benefit, however, the reforms must be more than merely "illusory" or "superficial." *Kaplan v. Rand*, 192 F.3d 60, 70-72 (2d Cir. 1999).

As corporate governance reforms are not atypical components of a shareholder derivative settlement, I look to other cases involving such reforms for guidance on evaluating the reforms here. Many corporate governance settlements include the following list of reforms:

> (1) A rule requiring a majority or more of the directors to meet existing or enhanced independence requirements; (2) A requirement that the board or certain committees

of the board meet regularly in executive sessions; (3) An agreement to appoint, or enhance the duties of, a lead independent director; (4) The addition of one or more independent directors to the board; (5) A policy allowing the board and/or its committees to hire advisors; (6) A limitation on the number of boards on which the directors can serve; (7) A requirement that directors attend a certain percentage of board, committee, or shareholder meetings; (8) A requirement or recommendation that the board adopt a "clawback" provision, or a provision requiring executive officers to repay bonuses or other monies in the event of a restatement of the company's financial statements; and (9) A provision allowing major shareholders to nominate candidates for the corporation's board of directors.

*In re Johnson & Johnson*, 900 F.Supp. 2d at 488-89 (quoting Erickson, at 1804-05). For these sorts of reforms, corporations have usually agreed to maintain them for two to five years. *Id.* at 489.

The Settlement Agreement here includes more substantial and tailored terms than these listed above. I will address these specific reforms in detail:

**Board of Directors**

The Board will be required to annually review the performance of the Board Chairperson to ensure that person is acting in the Company's best interest. Rosen Decl. ¶49. In addition, if within four years following approval of the Settlement Agreement, the positions of CEO and Chairperson are no longer separated, a Lead Independent Director shall serve a one-year term, with a maximum tenure of four years. *Id.* ¶50. In addition, if a Director wishes to join the Board of another company, the Director must seek approval of the Audit Committee. If approved, the Chief Legal Officer of the Company shall advise the full Board and confirm that no other Director has an objection. *Id.* ¶51.

**Board Oversight of Stock Repurchases**

Before authorizing repurchase of Synchronoss common stock, the independent Directors must evaluate management's recommendation and independently determine whether a repurchase is within the Company's best interests, including with regard to the Company's financial position.

*Id*. ¶52.  The Board shall also consider whether significant developments require a reevaluation or termination of the stock repurchase program.  *Id*.

**Disclosure Committee**

The Company's Disclosure Committee will be comprised of senior members of the Company's finance, legal, product, business operations, compliance, and sales departments, and will be tasked with adopting a Disclosure Committee Charter.  *Id*. ¶53.  Among other things, the Disclosure Committee will assist (1) the Company in designing, overseeing, and evaluating disclosure controls; (2) the Company's senior management in discharging their duties under the Securities Exchange Act of 1934; and (3) the Company in evaluating the accuracy and quality of its public disclosures to investors.  *Id*.

**Chief Compliance Officer**

The Company's Chief Compliance Officer (CCO) will be responsible for oversight and administration of the Company's corporate governance policies, fostering a culture of compliance and ethics business processes and practices, and maintaining and monitoring a system for reporting and investigating potential compliance and ethics concerns.  *Id*. ¶56.  In addition, the CCO shall serve on the Company's Disclosure Committee, evaluate the adequacy of the Company's internal compliance controls, oversee marketing materials and the website, oversee employee risk assessment training, and work with outside consultants to assess risk and the Company's controls. *Id*.  The CCO will also be responsible for assisting the Nominating and Corporate Governance Committee and the Board in fulfilling oversight duties with regard to the Company's compliance with applicable laws and regulations.  *Id*.

**Audit Committee**

The Audit Committee will meet at least six times a year. *Id*. ¶57. The Audit Committee will review with the Disclosure Committee any financial statements issued by the Company to ensure sufficient material risk disclosures. *Id*. Prior to the issuance of earnings guidance, the Audit Committee shall review and approve any such guidance with the Disclosure Committee to ensure that the proposed guidance has a reasonable basis, and that all material risks and contingencies are properly disclosed. *Id*. The Audit Committee shall also review the Company's Form 10-Q's and 10-K's, the "Management's Discussion and Analysis of Financial Condition and Results of Operation" section of the Company's annual audited and quarterly financial statements and proxy statements, and any Form 8-K regarding a material transaction. *Id*.

**Internal Audit Function**

The Company shall maintain an internal audit function. *Id*. ¶58. The Internal Auditor is required to review Company compliance with applicable policy, at least annually report to senior management and the Audit Committee on findings and recommendations, and at least annually submit to senior management and the Audit Committee a risk-based internal audit plan for such fiscal year for review and approval. *Id*.

**Related Party Transactions**

Related Party Transactions is a defined term in the Settlement Agreement. *Id*. ¶59. The Audit Committee will be required to review Related Party Transactions and ensure that all such transactions are conducted at arm's-length. *Id*. Further, the Audit Committee will be granted broad authority to (1) evaluate and monitor existing relations with the Company to ensure all related parties are continuously identified; (2) review and evaluate several aspects of proposed Related Party Transactions and how they compare to the terms generally available to an unrelated

party; (3) ensure that appropriate disclosures are made and/or information is provided to regulating and supervising authorities; and (4) regularly report to the Board regarding the foregoing, including making recommendations that the Board take corrective measures for Related Party Transactions that violate laws or Company regulations.  *Id*.

**Insider Trading Policy**

The derivative actions were a factor in the Company reviewing its Insider Trading Policy, which resulted in updates to the Policy.  *Id*. ¶60.  The parties agree that the updated Policy is comprehensive and sets out the persons, companies, and transactions covered by the Policy.  *Id*. The Policy also details the blackout and pre-clearance procedures.  *Id*.

**Executive Reports**

At every regularly scheduled Board meeting, the Company CFO shall provide a report on the Company's financial condition and prospects, including a discussion of any material increases in expenses and liabilities, and any material decreases in revenues and earnings.  *Id*. ¶61.

I find that these additional and substantial corporate reforms strike the balance in curbing future issues that are the subject of these actions, and as such, I further find that the settlement confers a substantial benefit to the corporation.

### B.  The Skill and Efficiency of Counsel

Counsel's skill and efficiency is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel."  *In re Valeant Pharmaceuticals Int'l, Inc. Sec. Litig.*, No. 15-07658, 2020 WL 3166456, at *12 (D.N.J. June 15, 2020) (internal citations omitted).

The Settlement Agreement would not have been achieved without the skill and experience of counsel. As set forth in Exhibits 2 through 7 of Plaintiffs' counsel's declarations, ECF No. 40, counsel are experienced and well versed in stockholder derivative actions. In addition, counsel's motion practice reflects their knowledge in this area of law, and their past successes further evidence their competency.

Moreover, I have already detailed the considerable activities of counsel prior to settlement, and indeed, the success of the settlement itself speaks to the skill and efficiency of counsel. *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 132 (D.N.J. 2002) ("'[T]he single clearest factor reflecting the quality of class counsels' services to the class are the results obtained.'") (quoting *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 149 (E.D. Pa. 2000)).

### C. The Risk of Nonpayment

Plaintiffs' counsel in the derivative actions was operating on a fully contingent basis. *Id.* ¶111. In that regard, in light of considerable litigation hurdles, counsel faced a possibility of no compensation for over 3,000 hours of work and various up-front costs. *Id.* This factor also weights in support of the requested fee award.

### D. Class Counsel Spent Significant Time Investigating and Litigating the Case

This factor evaluates counsel's time devoted to the litigation. *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 199 (3d Cir. 2000). This factor is usually considered with the lodestar to look at reasonableness of counsel's requested fee. According to counsel's declarations in Exhibits 2 through 7, ECF 40, counsel and their professional staff spent 3,126.25 hours on this matter, which Plaintiffs maintain yields a collective lodestar of $1,789,809.50. Rosen Decl. ¶107. Although I have yet to conclude for purposes of the lodestar analysis that the hours were reasonable, I nevertheless conclude that the attorneys attentively worked towards a settlement that

22

substantially benefits the Company.  Accordingly, the number of hours devoted by counsel to this lawsuit supports the requested fee award.  *See*, *infra*.

### E.  Lodestar

Under the lodestar analysis, counsel fees are determined by multiplying the number of hours reasonably spent litigating the matter by counsel's hourly rate.  This yields the "presumptively reasonable fee."  *Hahnemann Univ. Hosp. v. All Shore, Inc.,* 514 F.3d 300, 310 (3d Cir. 2008) (internal citations omitted); *Washington v. Philadelphia Court of Common Pleas,* 89 F.3d 1031, 1035 (3d Cir. 1996) ("The lodestar is strongly presumed to yield a reasonable fee."). As the Third Circuit held, in reviewing counsel's lodestar,

> The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records. Furthermore, the resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award.

*In re Rite Aid Sec. Litig.*, 396 F.3d 294, 306-07 (3d. Cir. 2005) (citation and footnotes omitted).

> Because the lodestar award is de-coupled from the class recovery, the lodestar assures counsel undertaking socially beneficial litigation (as legislatively identified by the statutory fee shifting provision) an adequate fee irrespective of the monetary value of the final relief achieved for the class.

*In re General Motors Corp.*, 55 F.3d at 821 (3d Cir. 1995).

The following chart summarizes Plaintiffs' counsel's lodestar and expenses by firm:

| FIRM | HOURS | LODESTAR | EXPENSES |
|---|---|---|---|
| Johnson Fistel, LLP[3] | 865.9 | $496,384.50 | $21,689.71 |
| The Rosen Law Firm, P.A.[4] | 353.35 | $244,367.75 | $5,380.93 |

---

[3] Billing Rates – Partner: $875-$1050; Of Counsel: $650; Associate: $420-$605; Paralegal: $250-$365.  ECF 40 Ex. 3.
[4] Billing Rates – Partner: $925; Associate: $425-$750.  ECF 40 Ex. 2.

| | | | |
|---|---|---|---|
| The Brown Law Firm, P.C.[5] | 204.6 | $152,890 | $17,465.72 |
| Robbins LLP[6] | 781 | $347,158.75 | $21,537.25 |
| Block & Leviton LLP[7] | 891.3 | $534,403.50 | $10,560.28 |
| Whipple Azzarello, LLC [8] | 30.1 | $14,605.00 | n/a |

Rosen Decl. ¶108.

"A thorough judicial review of fee applications is required for all class action settlements." *Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 496 (3d Cir. 2017) (internal citations omitted). The same holds true for shareholder derivative suits. It is of no moment that the parties have consented to the proposed attorney's fees. *See Yong Soon Oh v. AT & T Corp.*, 225 F.R.D. 142, 146 (D.N.J. 2004). Because there is a risk that "lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees," *In re Gen. Motors.*, 55 F.3d at 820 (citation and quotation marks omitted), courts must be vigilant in ensuring that the fees are reasonable.

Courts generally apply the lodestar method in cases where, like here, the settlement "evades the precise evaluation needed for the percentage-of-recovery method." *In re Gen. Motors,* 55 F.3d at 821. A lodestar analysis is fitting where there is no monetary component to the settlement and no valuation of the non-monetary award upon which the Court could base a percentage of recovery calculation. *See In re Schering–Plough/Merck Merger Litigation,* No. 09-1099, 2010 WL 1257722, at *17 (D.N.J. Mar. 26, 2010); *Charles v. Goodyear Tire and Rubber Co.,* 976 F. Supp. 321, 325 (D.N.J. 1997) ("As a result of the difficulty in making some reasonable assessment of the

---

[5] Billing Rates – Partner: $900; Counsel: $800; Associate: $550-$600; Law Clerk: $300. ECF 40 Ex. 4.
[6] Billing Rates – Partner: $875-$975; Of Counsel: $850; Associate: $375-$485; Paralegal: $215-$305; Staff Attorney: $300. ECF 40 Ex. 7
[7] Billing Rates – Partner: $750-$1025; Associate: $425-$615; Paralegal: $235-$250. ECF 40 Ex. 6.
[8] Billing Rates – Partner: $550; Associate: $300. ECF 40 Ex. 5.

settlement's value, this Court will utilize the lodestar method in awarding class counsel's attorneys' fees."); *Osher v. SCA Realty I, Inc.,* 945 F. Supp. 298, 306-07 (D.D.C. 1996) (applying lodestar in shareholder derivative settlement involving only injunctive relief) (relying on *In re General Motors,* 55 F.3d at 821); *but see Peter Fabrics, Inc. v. S.S. Hermes,* 765 F.2d 306, 319 (2d Cir. 1985) (suggesting that something less than full blown lodestar is appropriate for fee awards not made pursuant to statute); *id.* (distinguishing between "court awarded" fees and calculating appropriate fees under a contract).  Here, there is no record evidence from which the Court could quantify in monetary terms the corporate reforms.

In conducting a traditional lodestar analysis, courts bear the "responsibility [of] closely scrutiniz[ing] all fee arrangements to ensure fees do not exceed a reasonable amount." *In re AT & T Corp.,* 455 F.3d at 169.

> The first step in applying the lodestar formula is to determine the appropriate hourly rate. In determining the appropriate hourly rate, the court should first consider the attorney's usual billing rate. The Supreme Court has indicated that the district court can also consider the prevailing market rates in the relevant community to assist in the determination of an appropriate hourly rate. In calculating the second part of the lodestar formula, the time reasonably expended, the district court should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary. Time expended is considered reasonable if the work performed was useful and of a type ordinarily necessary to secure the final result obtained from the litigation.

*Schering-Plough,* 2010 WL 1257722, at *17 (internal quotation marks and citations omitted).

In sum, the lodestar formula is a two-part process: first, the court must determine the appropriate hourly rate for each counsel and, second, the court must then determine the reasonableness of the time expended, reducing the number of hours claimed where appropriate. Once the lodestar amount is determined, the court may decrease or increase that amount by applying a multiplier, *i.e.,* "a device that attempts to account for the contingent nature or risk

involved in a particular case and the quality of the attorneys' work." *In re Diet Drugs,* 582 F.3d 524, 540 n.33 (3d Cir. 2009).

According to Plaintiffs' declarations, and as described *supra*, counsel and their professional staff spent 3,126.25 hours on this matter, which Plaintiffs' claim yields a collective lodestar of $1,789,809.50. *Id*. ¶107. In addition, the total expenses incurred are $76,633.89. *Id*. However, Plaintiffs' counsel requests attorney's fees and costs in the amount of $800,000, which counsel submits represents a negative lodestar multiplier of approximately 0.447. *Id*. ¶109.

Considering the procedural history and complex nature of this case, the Court is satisfied that the hours expended collectively by the attorneys are reasonable. However, looking to the rates typically charged in the relevant geographic locations, the rates charged by Plaintiffs' counsel appear to be inflated. However, because counsel has voluntarily applied a negative multiplier, which is substantially less than the lodestar amount, I approve the rates in light of this negative multiplier. *See In re Ocean Power Technologies, Inc.*, No. 3:14-cv-3799, 2016 WL 6778218, at *25 (D.N.J. Nov. 15, 2016). Further, the Court finds the requested lodestar multiplier to be reasonable. First, as the Third Circuit has noted, "[t]he lodestar is strongly presumed to yield a reasonable fee[,]" and here, the amount requested is well below the lodestar. *Philadelphia Cty. Ct. of Comm. Pleas*, 89 F.3d at 1035. Second, the fee awards of comparable derivative settlements display the reasonableness of the requested fees here. *See, e.g.*, *In re MannKind Corp. Deriv. Litig.*, No. 11-05003, slip. op. (C.D. Cal. Nov. 19, 2012) (awarding approximately $1,236,500 in fees in a derivative action that settled for the following governance: establishing a management-level Disclosure Committee tasked with maintaining and overseeing disclosure controls and procedures and ensuring disclosures are accurate; Audit Committee oversight over the Disclosure Committee, including quarterly meetings with the Chair of Disclosure Committee; and enhanced

independence requirements), Rosen Decl., Ex. 13; *In re Invacare Deriv. Litig.*, 11-01893, slip op. (N.D. Ohio Nov. 15, 2012) (awarding $1,300,000 in fees in a derivative action that settled for the following governance: enhancements to Audit Committee oversight over the company's compliance with regulatory requirements, including enhanced reporting by management to the Audit Committee; annual reporting to the Board; enhanced training; enhanced whistleblower policies), Rosen Decl., Ex. 16.  Finally, the complexity of the matter, the unopposed nature of the fee request negotiated through arms-length bargaining, the scope of counsel's work, and the fact that Plaintiffs' counsel was working on a contingency basis, all weigh in favor of the reasonableness of the requested fees.  For these reasons, the Court concludes that $800,000 is reasonable and fair compensation for Plaintiffs' counsel's work on this matter.

Finally, Plaintiffs request the Court approve a service award to each Plaintiff in the amount of $2,500, which would be paid out of the attorney fee and expense request.  Stip. ¶4.4; Rosen Decl. ¶113.  Courts "may grant incentive awards in class action cases to particular members of the class . . . to reward the public service performed by lead plaintiffs in contributing to the vitality and enforcement of securities laws."  *In re Cendant*, 232 F. Supp. 2d at 344.  Further, incentive payments that "come from the attorneys' fees awarded to Plaintiffs' counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected."  *Id*.  Considering these Plaintiffs' willingness to dedicate their time and effort on behalf of the shareholders to benefit Synchronoss, and the fact that such an award would be paid out of the attorney's fee and expense award, I approve the requested service award payments to Plaintiffs Laughlin, Thieffry, LeBoeuf, Daniel, and Solis.[9]  Stip. ¶4.4.

---

[9] The Court has not found any case law that would bar a service award to state Plaintiffs, Daniel and Solis, pursuant to a settlement agreement, although they were not named plaintiffs in the actions pending in this Court.

## VI.    CONCLUSION

For the foregoing reasons, the Court finds that the Settlement Agreement, including the attorney's fee and expense request of $800,000 and service award payments of $2,500 to each Plaintiff, is approved in all respects.


Date: December 13, 2021                                    /s/ Freda L. Wolfson
                                                           Freda L. Wolfson
                                                           U.S. Chief District Judge